**L. Miles LeBaron (#8982)**
**Melinda Checketts Hibbert (#6098)**
**LEBARON & JENSEN, P.C.**
**476 West Heritage Park Blvd., Suite 230**
**Layton, Utah 84041**
**Telephone:(801) 773-9488**
**Facsimile:(801) 773-9489**
miles@lebaronjensen.com
melinda@lebaronjensen.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARIA CALZADA and MANUELA ROSALES, on behalf of the ESTATE OF JOSE CALZADA,<br><br>Plaintiffs,<br><br>v.<br><br>ROY CITY, et al.,<br><br>Defendants. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:16-cv-165<br><br>District Judge David Nuffer |

Plaintiffs Maria Calzada and Manuela Rosales, on behalf of the Estate of Jose Calzada, by and through counsel, respectfully submit this Memorandum in Opposition to Defendants' Motion for Summary Judgment as follows:

## TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS .......... 2

PLAINTIFFS' ADDITIONAL MATERIAL FACTS ................................................. 50

Argument .......................................................................................................... 58

## INTRODUCTION

Plaintiffs bring this action following the illegal search and seizure of Jose Calzada's home and subsequent shooting death of Jose Calzada.  Mr. Calzada had called a suicide hot line seeking help around 3:00 am.  Approximately an hour later, law enforcement began arriving at the scene. Mr. Calzada spoke via telephone with law enforcement officers and others who were on the scene, surrounding his home for nearly five hours.  During this time Defendants and other law enforcement officers repeatedly reassured Mr. Calzada that he had done nothing wrong and had committed no crimes and that they would not enter his home without his knowledge. Mr. Calzada, who had drunk nearly a gallon of Seagram's 7 and had taken some prescription medication and had been up all night, informed law enforcement that he was tired and was going to sleep.  Defendant Pledger informed the other officers, including Defendants, that Mr. Calzada was asleep or passed out, that that he had done nothing wrong and  had threatened no third parties. Notwithstanding these facts, Defendants, in full SWAT gear and with assault weapons drawn, illegally entered and searched Mr. Calzada's home <u>an hour and a half after he told them he was going to sleep</u>.  Defendants now claim they did so to render "immediate aid" to Mr. Calzada; this justification does not bear scrutiny.  If Defendants reasonably believed Mr. Calzada was in need of "immediate aid", it should have been rendered "immediately."  Obviously Defendants held no such belief.  Mr. Calzada was gunned down after Defendants found him lying in the closed trunk of his car in his garage and opened fire and shot him several times immediately killing him.  When viewed in the light most favorable to the Plaintiffs, there are disputed facts that preclude summary judgment.

## PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Terry Thompson was the duly elected Sheriff of Weber County, Utah. He took office in January 2011 and left the office in January 2019. As the Sheriff, he was the sole and final policymaker for Weber County regarding all law enforcement decisions in Weber County. (Thompson Decl. ¶¶ 1-2).

**Response to Defendants' Fact No. 1:** DISPUTED.  Other agencies within Weber County created their own policies by policymakers other than Mr. Thompson.  For example, Roy City Police Department had its own polices separate from Weber County's policies. ( See e.g., Roy City Use of Force Policy, Plaintiffs' App. Ex. 1).  Another example is that Defendant , Pledger had final tactical decision-making authority for the hands-on incident. (Pledger Decl. ¶ 10, Defendants' App.)

5.     The SWAT team was composed of individuals employed by the participating law enforcement agencies. They remained employed by their original agency but agreed that SWAT activities took precedence over their normal responsibilities. SWAT team members were generally the best law enforcement officers from their respective agencies. They had to demonstrate exemplary character and not have any disciplinary actions taken against them for the previous three years before being appointed to the team. (Agreement § 3.1.2(C)). (Thompson Decl. ¶¶ 7-8, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 5:** DISPUTED.  The Defendants on the SWAT team did not have exemplary character nor were they devoid of disciplinary actions taken against them for the three years before being appointed to the team.  (Miles Tr. 44:16-20, Plaintiffs' App. Ex. 2); Exhibit  20 to the Miles Tr., Plaintiffs' App. Ex. 3;  Ex. 18 to Miles Tr., Plaintiffs' App. Ex. 4).

8.      The SWAT team had a comprehensive use of force policy that governed that situation. Therefore, no local agency's policy would supersede the SWAT team's policy. The policy spelled out that officers were to use the reasonably necessary force to accomplish the objectives and effectively bring a situation under control with protecting the life of the team member or another. Force was only to be in a deliberate and measured manner and only to the extent that is reasonable. (Thompson Decl. ¶¶ 14-15; Elliott Decl. ¶ 8, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 8:**  DISPUTED.  The SWAT team's use of force policy was not comprehensive.  Rather, it was deficient.  For example, it had no applicable policies or procedures regarding use of force on individuals under the influence of alcohol or drugs; nor did it speak to situations regarding use of force on suicidal individuals.  (SWAT Team Use of Force Policy, Plaintiffs' App. Ex. 6; Weber County Use of Force Policy, Plaintiffs' App. Ex. 5; Roy City Use of Force Policy, Plaintiffs' App. Ex. 1).   Therefore, the SWAT team members were to refer to their respective employing agencies' use of force policies in these situations.  (Thompson Decl., ¶12, Defendants' App. Ex. 1; and Interlocal Agreement § 10.1, attached as Exhibit 1 to the Thompson Decl., Defendant's App. Ex. 1).

Also, Plaintiffs object to Fact No. 8 as it is is not supported by admissible evidence. Defendants cite only to Thompson's and Elliott's declarations providing their descriptions and interpretations of the content of the SWAT team use of force policy rather than to the SWAT team use of force policy itself to prove its contents.  See Fed. R. Evid. 1002 ("[a]n original writing . . . is required to prove its contents...").

8.      The policy also stated that it was to comply with all law concerning the application of force. The use of deadly force was only acceptable when officers met the

conditions of Utah Code Ann. § 76-2-404. The code, in part, states that deadly force is authorized when "the officer reasonably believes that the use of deadly force is necessary to prevent death or serious bodily injury to the officer or another person." Utah Code Ann. § 76-2-404(1)(c). (Thompson Decl. ¶ 16-17, Defendants' App. Ex. 1).

      **<u>Response to Defendants' Fact No. 9</u>**:  DISPUTED to the extent that this fact suggests that this fact has included all conditions necessary to use deadly force as set forth in the SWAT team use of force policy, Utah Code Ann. § 76-2-404(2), and as articulated by the U.S. Supreme Court in *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) (SWAT Team Use of Force Policy, Plaintiffs' App. Ex. 5)("[i]f feasible, a verbal warning should be given by the officer prior to any use of deadly force…")

      Also, Plaintiffs object to Fact No. 9 as it is not supported by admissible evidence. Defendants cite only to Thompson's declaration providing his description and interpretation of the content of the SWAT team use of force policy rather than to the SWAT team use of force policy itself to prove its contents. *See* Fed. R. Evid. 1002 ("[a]n original writing . . . is required to prove its contents…").

      9.     Sheriff Thompson and Chief Elliott are unaware of any defect in this policy. Further, the policy guided SWAT training. Thompson was never notified of any defect in the training or the policy of how the SWAT team deployed any use of force. (Thompson Decl. ¶ 18; Elliott Decl. ¶ 12, Defendants' App. Ex. 1).

      **<u>Response to Defendants' Fact No. 10:</u>** DISPUTED.  It is not necessary that Thompson receive a formal notification of defect.  As "a showing of specific incidents which establish a pattern of constitutional violations is <u>not</u> necessary to put the [County] on notice that its training

4

program is inadequate.  Rather, evidence of a single violation of federal rights, accompanied by a

showing that a municipality has failed to train its employees to handle recurring situations

presenting an obvious potential for such a violation is sufficient to trigger municipal liability."

*Allen*, 119 F.3d at 842 (emphasis added); *citing Board of County Comm'rs v. Brown*, (1997) 117

S. Ct. 1382; *see also, Allen* 119 F.3d at 845 ("A plaintiff can rely on the single incident if there is

other evidence of inadequate training.")(Citations omitted).

13.     SWAT team members were drawn from the various law enforcement agencies in

the interlocal agreement. They were all POST certified and in good standing. All team members

had received training in proper search and seizures protocols and when it is appropriate to use

force including deadly force. Serving on the SWAT team is an important responsibility and only

offered to the best law enforcement officers from each agency. (Pledger Decl. ¶ 9, Defendants'

App. Ex. 1).

**Response to Defendants' Fact No. 13:**  DISPUTED. Defendants' employing agencies'

use of force policies stated that whether an individual was under the influence of alcohol or drugs

would be a factor in determining what amount and type of force was necessary.  (Weber County

Use of Force Policy, Plaintiffs' App. Ex. 6; Roy City Use of Force Policy, Plaintiffs' App. Ex.

1.)  However, Defendants did NOT receive proper training as to the reasonable use of force when

dealing with individuals who were under the influence of alcohol, even though it was a usual and

recurring situation for Defendants to deal with suicidal, mentally ill, or emotionally disturbed

people and people under the influence of alcohol or drugs.  (See e.g., Fulton Tr. 24:7-9,

Plaintiffs' App. Ex. 7) (spoken with suicidal subjects "hundreds" of times))

5

16.     Early on the morning of October 21, 2014, Val Truscott of the Roy City Police Department was contacted by Dispatch, and they informed him that a suicide crisis line had a suicidal male named Jose Calzada on the line with them. Truscott was told Mr. Calzada was at his home in Roy City with his girlfriend and later found out there were children in the home. Truscott was also told that Calzada was threatening suicide by cop and that he had an assault rifle with him. (Truscott Decl. ¶¶ 2-3, Defendants' App. Ex. 3).

**Response to Defendants' Fact No. 16:** DISPUTED to the extent that this fact suggests that Mr. Calzada was threatening suicide by cop before law enforcement came to his property.  It was law enforcement's coming to his property that caused Mr. Calzada to first voice any suggestion of suicide by cop. (Law Enforcement arrived at approx. 1:03 on audio and Mr. Calzada did not mention being killed by officers until 8:53 on audio (Bates No. 000260, Plaintiffs' App. Ex. 8.). Mr. Calzada did not want the police at his property; he called the suicide hotline for help and did not seek or want police involvement. (Brook Decl., Exhibit A at page 1; Plaintiff's App. Ex. 9; Truscott Decl. ¶ 3; Pledger Decl. ¶ 25). In fact, when the police were on the phone with him, Mr. Calzada became "much more agitated."  (Brooks Decl., Exhibit A at page 2, Plaintiffs' App. Ex. 9; Pledger Decl. ¶¶ 16, Defendants' App. Ex. 1; Truscott Decl. ¶¶ 8-9; Defendants' App. Ex. 3.). He repeatedly told police that he did not want to talk to them and that he only wanted to speak with the suicide hotline workers. (Truscott Depo. Tr. 19:3-11, Plaintiffs' App. Ex. 24.).

19.     Officer Truscott informed Pledger that no threats had been made to harm the inhabitants of the home and that the officers had not spoken to Mr. Calzada. However, Calzada had made a threat that he wanted to go out "by suicide by cop." Suicide by cop generally meant

6

to Pledger at that time that a person wanted to provoke the police by threatening or using deadly force at people or law enforcement so as to cause the police to shoot them before or during when they use force against another person. (Pledger Decl. ¶ 15, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 19:**  It is undisputed that Mr. Calzada made no threats to the inhabitants of the home.  However, the audio recordings of the phone calls with Mr. Calzada are devoid of any "threats" that he wanted to commit "suicide by cop."  Only once did Mr. Calzada mention being "killed by officers" and that was only after his home was surrounded by police officers at approximately 4:34:13 am. (Audio of Dispatch Call, Bates 000260 at 0:8:54; CAD Call at 4:34:13 am, Plaintiffs' App. Ex. 8.). Mr. Calzada did not want police on his property, nor did he want to interact or negotiate with law enforcement.  Rather, he repeatedly requested to just speak to the suicide help line workers.  Despite Mr. Calzada's requests, Defendant Pledger disconnected the suicide hotline worker from the call. Mr. Calzada did nothing to provoke the police.  Mr. Calzada did not summon the police; he did not want them at his home; he did not even want to talk to them. (Pledger Decl. ¶¶ 16, Defendants' App. Ex. 1; Truscott Decl. ¶¶ 8-9; Defendants' App. 3; Brooks Decl. Ex. A at page 2; Plaintiffs' App. Ex. 9). Mr. Calzada never provoked the police.  Rather, it was the police who would not let Mr. Calzada alone.

20.    After learning all this Pledger decided not to mobilize the SWAT team but told Officer Truscott to try to make contact with the subject to see if he would respond to our offers of help. Pledger did not mobilize the SWAT team at this time because the subject had not made any threats towards the other occupants of the home, and he had contacted the suicide hotline on

his own. Pledger did not want to unnecessarily escalate the situation. (Pledger Decl. ¶ 16, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 20:** Plaintiffs do not dispute that Mr. Calzada had not made any threats to the occupants of the home and that he had contacted the suicide hotline on his own. However, Plaintiffs DISPUTE the remainder of this fact to the extent that it suggests that Defendant Pledger and/or Defendants did not, in fact, escalate the situation any more than necessary.  One suicide crisis worker complained to Pledger that "Sir, you have to understand that she [the other suicide crisis worker] has already built a rapport with him [Mr. Calzada] and the guy you have talking to him right now is making it worse."  A few minutes later the other suicide crisis worker told Pledger that "[s]he too .. felt that Vanderwarf was making things worse by discussing what a nice house Jose had, nice vehicles, a job and a family who obviously loved and needed him.  athat law enforcement was making the situation worse."  (Pledger's Report at page 34 of 43, Exhibit 2 to Pledger Decl., Defendants' App. Ex. 1) Nevertheless, Pledger told the suicide crisis workers to stay off the line and to not enter the conversation with Mr. Calzada again.  *Id.*

Also, Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL. (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

23.     Officer Truscott requested the assistance of the SWAT team at this time. However, because Mr. Calzada was now alone in the home and only an immediate danger to himself, Pledger declined to call out the SWAT team. Pledger did not want to escalate the situation any more than necessary. However, instead of mobilizing the SWAT team Pledger instead offered to assist at the

scene personally, which Truscott accepted. Pledger also asked Officer Truscott to contact Roy Police Officer Jason Vanderwarf. Vanderwarf was the head negotiator for the Ogden Metro SWAT Team and was experienced and trained for this type of situation. (Pledger Decl. ¶ 18-19, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 23**:   DISPUTED to the extent that it suggests that Defendant Pledger and/or Defendants did not, in fact, escalate the situation any more than necessary.  One suicide crisis worker complained to Pledger that "Sir, you have to understand that she [the other suicide crisis worker] has already built a rapport with him [Mr. Calzada] and the guy you have talking to him right now is making it worse."  A few minutes later the other suicide crisis worker told Pledger that "[s]he too .. felt that Vanderwarf was making things worse by discussing what a nice house Jose had, nice vehicles, a job and a family who obviously loved and needed him.  athat law enforcement was making the situation worse."  (Pledger's Report at page 34 of 43, Exhibit 2 to Pledger Decl., Defendants' App. Ex. 1) Nevertheless, Pledger told the suicide crisis workers to stay off the line and to not enter the conversation with Mr. Calzada again.  *Id.*

Also, Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

24.    Vanderwarf has been trained in negotiations through the Federal Bureau of Investigation's negotiation class and trained through Crisis Intervention Training, in order to become a negotiator. He has been certified in forensics interview technique and has taken additional negotiator training periodically through his time at Roy City Police Department and

the Ogden Metro SWAT team. Prior to October 21, 2014, Vanderwarf had responded to several threatened suicides and participated in successfully resolving the incident without loss of life. (Vanderwarf Decl. ¶¶ 5-6, Defendants App. Ex. 3).

**Response to Defendants' Fact No. 24**:  DISPUTED to the extent that both this fact, and Vanderwarf's Decl. are unclear if all threatened suicides to which Vanderwarf responded ended without loss of life or if only one of the several threatened suicides ended without loss of life, as the word "incident" in the singular is used in both this fact and the declaration.

27.    Pledger was briefed by Officer Truscott and others on scene. It was decided during this briefing that police were present out of concern for Mr. Calzada's well-being. However, if Mr. Calzada attempted to discharge any of his guns, it would put at risk the various neighbors who lived around him. (Pledger Decl. ¶ 21, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 27:**  DISPUTED that Mr. Calzada posed a risk to his neighbors.  It is undisputed that Mr. Calzada never threatened anyone, and, in fact, Mr. Calzada's stated intention over the phone line with law enforcement and his psychiatrist at 8:35:17 a.m., just  minutes before losing contact with law enforcement was that he was not going to hurt the officers.  Mr. Calzada was assured over this phone line by Det. Vanderwarf that he knew that Mr. Calzada would not hurt the officers.  (CAD Call Hardcopy at page 22 of 49 at 08:35:17, Ex. 3 to Pledger's Tr, Plaintiffs' App. Ex. 10; Vanderwarf Report pages 22-23 of 43, Exhibit 12 to Vanderwarf  Tr., Plaintiff's App. Ex. 11).

30.    Vanderwarf is a trained hostage negotiator and has received specialized training in dealing with people in crisis. He has successfully worked as a negotiator in several prior

dangerous situations. His purpose was to negotiate a peaceful conclusion of the situation.
(Pledger Decl. ¶ 23, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 30:**  Plaintiffs object to Defendants' evidence
allegedly supporting this fact on the grounds that Pledger lacks foundation and personal
knowledge as to Vanderwarf's purpose. Moreover,

34.     The next several hours were spent with Vanderwarf urging Mr. Calzada to come
out of the house unarmed. Unfortunately, Mr. Calzada refused to come out of the house without
his guns. He specifically told Vanderwarf that if he comes out, it will be with his guns. (Pledger
Decl. ¶ 27, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 34**: DISPUTED to the extent that it suggests that Mr.
Calzada's intent was to have a show down with police.  Mr. Calzada did not request or want the
police come to his residence, was agitated when they spoke to him, did not wish to speak to law
enforcement, but rather wanted to continue to receive help by conversing with the suicide hotline
crisis workers.  (Pledger Decl. ¶¶ 16, Defendants' App. Ex. 1; Truscott Decl. ¶¶ 8-9; Defendants'
App. Ex. 3; Brooks Decl. Ex. A at page 2; Plaintiffs' App. Ex. 9). (Truscott Depo. Tr. 19-3-11,
Plaintiffs' App. Ex. 24.).

35.     Jose made many statements that concerned Vanderwarf throughout their
conversation. Jose stated that he was "locked and loaded" multiple times. He indicated he had
hundreds of rounds of ammunition. He made several statements about "going tactical." He
indicated he was doing "perimeter checks" and would be absent from the phone. It was
confirmed from officers outside the residence that movements were occurring in different rooms

in the house and lights would go on and off during these "perimeter checks." (Vanderwarf Decl. ¶ 14, Defendants App. Ex 3).

**Response to Defendants' Fact No. 35**: DISPUTED to the extent that this fact suggests that Mr. Calzada was offensively making these statements.  Mr. Calzada only started mentioning "going tactical" and doing "perimeter checks" after he found himself and his home surrounded by law enforcement whom he had not summoned.  Mr. Calzada was taking a defensive position by informing himself of where the officers were as they were surrounding him. Mr. Calzada's statement that he was "going tactical" meant that "he was fortifying his house against an assault."  (Fulton Tr. 50:6-14; Plaintiffs' App. Ex. 7).

 Mr. Calzada never threatened anyone, and, in fact, Mr. Calzada's stated intention over the phone line with law enforcement and his psychiatrist at 8:35:17 a.m., just  minutes before phone contact was lost with Mr. Calzada as he had stated that he was going to sleep, was that he was not going to hurt the officers.  Mr. Calzada was assured over this phone line by Det. Vanderwarf that he knew that Mr. Calzada would not hurt the officers.  (CAD Call Hardcopy at page 22 of 49 at 08:35:17, Ex. 3 to Pledger's Tr, Plaintiffs' App. Ex. 10; Vanderwarf Report pages 22-23 of 43, Exhibit 12 to Vanderwarf  Tr., Plaintiff's App. Ex. 11).

36.     Vanderwarf continued speaking to Jose in attempt to get him to come out of the home unarmed. Jose said that he would not come out unarmed. Jose said that law enforcement, however, could come in. Vanderwarf informed Jose that no one wanted to harm him, and law enforcement were there to help him. (Vanderwarf Decl. ¶ 15, Defendants' App. Ex. 3).

**Response to Defendants' Fact No. 36:** DISPUTED to the extent that it suggests that Mr. Calzada gave voluntary consent for law enforcement to enter and search his home.  Rather, Mr.

Calzada stated that they could come in but he would not put his weapons down. (Pledger Decl. 62:6-19, Defendants' App. Ex. 1). Law enforcement declined.  Mr. Calzada also stated to law enforcement that he did not want them to come into his home.  Law enforcement acknowledged that they knew that he did not want them to come into his home and law enforcement further promised Mr. Calzada that they would not come into his home.  (Audio of Dispatch Call, Bates No. 000260 at 1:10:50: "You told me you don't want them to come into the house and you don't want to be surprised so they're not just going to come into the house", Plaintiffs' App. Ex. 8). Hours later, Mr. Calzada expressed strong concern that someone was in his basement and law enforcement again immediately reassured Mr. Calzada that they "were not going to surprise him like that."  (Vanderwarf Report page 23 of 43, Exhibit 12 to Vanderwarf Depo. Tr., Plaintiff's App. Ex. 11).

37.     Vanderwarf worked to build a rapport with Jose. They discussed Jose's employment, military career, and the importance of honor and integrity and his family. It was Vanderwarf's impression that the issues of honor and integrity were important to Jose, and Vanderwarf continued to bring this up in the conversation. (Vanderwarf Decl. ¶ 16, Defendants' App. Ex. 3).

**Response to Defendants' Fact No. 37**:  DISPUTED that Vanderwarf worked to build a rapport with Mr. Calzada, escalate the situation any more than necessary.  One suicide crisis worker complained to Pledger that "Sir, you have to understand that she [the other suicide crisis worker] has already built a rapport with him [Mr. Calzada] and the guy you have talking to him right now is making it worse."  A few minutes later the other suicide crisis worker told Pledger that "[s]he too .. felt that Vanderwarf was making things worse by discussing what a nice house

Jose had, nice vehicles, a job and a family who obviously loved and needed him and that law enforcement was making the situation worse." (Pledger's Report at page 34 of 43, Exhibit 2 to Pledger Decl., Defendants' App. Ex. 2) Nevertheless, Pledger told the suicide crisis workers to stay off the line and to not enter the conversation with Mr. Calzada again. *Id.*

38.     Pledger would periodically leave the truck where Vanderwarf was speaking to Calzada in order to discuss progress or lack of progress with Deputy Chief Calcut and Lieutenant Hammond but would return to the truck and then be able to hear the conversation continue. However, Pledger did personally hear Calzada say he would not come out of the home without his guns. (Pledger Decl. ¶ 28, Defendants' App. Ex. 1)

**Response to Defendants' Fact No. 38**:  It is undisputed that Pledger periodically updated Calcut and Hammond about the situation. However, Plaintiff DISPUTES the remainder of this fact to the extent that this fact suggests that Mr. Calzada's comments were a show of aggression, rather than defensive statements. This does not mean he was planning an assault but fortifying his home against perceived aggressors. *Hastings v. Barnes*, 252 Fed. Appx. 197, 202 (2007)(unpublished); (Fulton Depo. Tr. 50:6-14, Plaintiff's App. 7).

39.     Pledger was further told that Mr. Calzada wanted to die by "suicide by cop." This meant to Pledger that Calzada was planning on somehow engaging the police in some sort of gun battle where he would be shooting at the police so that they would have to shoot back and kill him. (Pledger Decl. ¶ 29, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 39**:  DISPUTED AND IRRELEVANT.  Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher,* 130 S. Ct. at 548.)

Moreover, Pledger's belief is inconsistent with Mr. Calzada's stated intention at 8:35:17 am on the phone call that he would not hurt any of the to which Det. Vanderwarf responded to Mr. Calzada that he knew Mr. Calzada would not hurt the officers. officers (CAD Call Hardcopy at page 22 of 49 at 08:35:17, Plaintiffs' App. Ex. 10).

Furthermore, Plaintiffs object to this fact as it is mere speculation on Pledger's part that "suicide by cop" meant that Mr. Calzada was going to engage the cops in a gun battle and it is, therefore, inadmissible. *See* Fed. R. Evid. 602. Moreover, this is a "conclusory statement" and as such has no probative value. *Nichols v. Hurley*, (10th Cir. 1990) 921 F.2d 1101, 1112-1113.

40.    Mr. Calzada's speech was lethargic, slow, and sometimes incoherent. It was obvious to Pledger that Mr. Calzada was under the influence of alcohol, drugs or both. Vanderwarf privately told Pledger that Dona Hotz told him that Calzada had consumed up to a gallon of Seagram's 7 whiskey. This was believable based upon how Calzada was speaking. This factor only increased the potential unpredictability and potential risk of danger from Mr. Calzada. (Pledger Decl. ¶ 30, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 40:** Plaintiffs object to Pledger's statement that "This factor only increased the potential unpredictability and potential risk of danger from Mr. Calzada" as mere speculation, being without foundation. *See Fed. R. Evid.* 602. Moreover, this is a "conclusory statement" and as such has no probative value. *Nichols v. Hurley*, (10th Cir. 1990) 921 F.2d 1101, 1112-1113.

44.    Lt. Pledger spoke with Dr. Gushman while Vanderwarf remained on the phone with Jose. Lt. Pledger relayed to Vanderwarf from his conversations with Dr. Gushman that when Mr. Calzada had discussed suicide with him in the past, that discussions about provision

15

for his family, being with his children, and the impact that suicide would have on them helped

dissuade him from his suicidal thoughts. Vanderwarf addressed these concerns with Mr. Calzada.

Jose's demeanor would change throughout the conversation. He expressed strong concern that

someone was in his home, either in the basement or on the stairs. Vanderwarf assured him no

one had entered the home. (Vanderwarf Decl. ¶ 18, Defendants' App. Ex. 3).

   **Response to Defendants' Fact No. 44**: Plaintiffs object to this fact on the grounds of

lack of foundation and hearsay.  This fact is also DISPUTED in that talking about Mr. Calzada's

family helped dissuade Mr. Calzada from suicidal thoughts. In fact, one suicide crisis worker

complained to Pledger that "Sir, you have to understand that she [the other suicide crisis worker]

has already built a rapport with him [Mr. Calzada] and the guy you have talking to him right now

is making it worse."  A few minutes later the other suicide crisis worker told Pledger that "[s]he

too .. felt that Vanderwarf was making things worse by discussing what a nice house Jose had,

nice vehicles, a job and a family who obviously loved and needed him.  She said that [Mr.

Calzada was fearful that he was losing all of that and that this was part of what was driving him

to the suicidal thoughts."  (Pledger's Report at page 34 of 43, Exhibit 2 to Pledger Decl.,

Defendants' App. Ex. 1) Nevertheless, Pledger told the suicide crisis workers to stay off the line

and to not enter the conversation with Mr. Calzada again.  *Id.*

   Plaintiffs do not dispute that Mr. Calzada expressed strong concern that someone was in

his basement and Plaintiffs affirmatively assert that upon Mr. Calzada's expressing these

concerns, law enforcement immediately reassured Mr. Calzada that they "were not going to

surprise him like that."  (Vanderwarf Report page 23 of 43, Exhibit 12 to Vanderwarf Depo. Tr.,

Plaintiff's App. Ex. 11).  Vanderwarf's reassurance was almost verbatim to the reassurance given

16

to Mr. Calzada hours earlier that "You told me you don't want them to come into the house and

you don't want to be surprised so they're not just going to come into the house" (Audio of

Dispatch Call, Bates No. 000260 at 1:10:50:, Plaintiffs' App. Ex. 8).

45.     Mr. Calzada's increased agitation and prior comments about weapons and tactics

raised Vanderwarf's concern for his well-being, the safety of the officers and surrounding

neighbors. (Vanderwarf Decl. ¶ 19, Defendants' App. Ex. 3).

**Response to Defendants' Fact No. 45:** DISPUTED that Vanderwarf's concern was

raised or that objectively that his concern should have been raised. Mr. Calzada stated at 8:35:17

a.m. that he would not hurt the officers.   Mr. Calzada never threatened anyone, and, in fact, Mr.

Calzada's stated intention over the phone line with law enforcement and his psychiatrist at

8:35:17 a.m., just minutes before losing contact with law enforcement was that he was not going

to hurt the officers.  Mr. Calzada was assured over this phone line by Det. Vanderwarf that he

knew that Mr. Calzada would not hurt the officers.  (CAD Call Hardcopy at page 22 of 49 at

08:35:17, Ex. 3 to Pledger's Tr, Plaintiffs' App. Ex. 10; Vanderwarf Report pages 22-23 of 43,

Exhibit 12 to Vanderwarf  Tr., Plaintiff's App. Ex. 11).

49.     Pledger also requested an ambulance be stationed at the scene, as it was becoming

more apparent that Mr. Calzada may have consumed a potentially dangerous amount of alcohol

and prescription drugs and he could need emergency medical help at any time. (Pledger Decl. ¶

33, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 49**: Plaintiffs object to this fact on the grounds that:

(1) Pledger is not a medical expert and cannot medical render opinion testimony that Mr.

Calzada could need emergency medical help at any time (see Fed. R. Evid. 701 and 702); and (2) this assertion is mere "speculation and it is inadmissible." *See* Fed. R. Evid. 602.

50.     Calzada made comments to Vanderwarf that "he was going tactical," and that his rifle had a "tac light" on it, which is a flashlight attached to the barrel of the weapon. Calzada turned the light on his gun on and off and we could see this from the street. He also made comments that he was going to leave his phone to go "check the perimeter," and he would leave the conversation for a few moments before returning. These comments, combined with the fact that Pledger was told he had military training, served to heighten Pledger's concern for Calzada's safety and any people living around him. These comments seem to refer generally to military maneuvers where he might deploy his firearms against some target outside his home. In fact, he seemed to indicate there would be some sort of show down where he would "test the officers" and see what they are made of. (Pledger Decl. ¶ 34, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 50:** DISPUTED to the extent that this fact suggests that Mr. Calzada's comments were a show of aggressive, rather than defensive statements.   Mr. Calzada's statement that he was "going tactical" meant that "he was fortifying his house against an assault." (Fulton Tr. 50:6-14; Plaintiffs' App. Ex. 7).  This does not mean he was planning an assault.  Moreover, these comments were only made after Mr. Calzada's home was surrounded by law enforcement whom Mr. Calzada had not summoned.

Moreover,  Pledger's subjective beliefs as to the meaning of the comments are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

Finally, Plaintiffs object to this fact on the grounds that it is not based on personal knowledge, but rather is based on Pledger's mere speculation as to what the comments "seemed to refer to" or "seemed to indicate", and as such this fact is inadmissible.  See Fed. R. Evid. 602.

51.     Calzada let Vanderwarf and Pledger know that he could see a patrol car and could hear officers talking outside the home. Calzada would not agree to come outside the home without his guns. Calzada even invited Vanderwarf and Pledger into the home, but Vanderwarf would not agree to because Calzada would not put down his weapons. Vanderwarf tried to build a bond with Calzada and they discussed their shared military service and weapons. (Pledger Decl. ¶¶ 35-37, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 51**: DISPUTED that Vanderwarf was trying to build a bond.  One suicide crisis worker complained to Pledger that "Sir, you have to understand that she [the other suicide crisis worker] has already built a rapport with him [Mr. Calzada] and the guy you have talking to him right now is making it worse."  A few minutes later the other suicide crisis worker told Pledger that "[s]he too .. felt that Vanderwarf was making things worse by discussing what a nice house Jose had, nice vehicles, a job and a family who obviously loved and needed him.  athat law enforcement was making the situation worse."  (Pledger's Report at page 34 of 43, Exhibit 2 to Pledger Decl., Defendants' App. Ex. 2) Nevertheless, Pledger told the suicide crisis workers to stay off the line and to not enter the conversation with Mr. Calzada again.  *Id.*

Also DISPUTED to the extent that this fact suggests that Mr. Calzada's "invitation" was consent for Defendants to conduct a search.  Defendant Pledger testified that he did not consider this comment as consent to search Mr. Calzada's home. (Pledger Tr. 62:6-63:4, Plaintiffs' App.

19

Ex. 25). Pledger also felt he needed to obtain consent from Ms. Hotz "to clearly establish [Defendants'] legal authority to enter that home." (Pledger Report at page 38 of 43, Exhibit 2 to Defendants' App. Ex. 2)

54.     Dr. Gushman discussed with Mr. Calzada the hardships he was going through with his family and with work. Dr. Gushman also made several attempts to have Mr. Calzada exit the home unarmed. Mr. Calzada told Dr. Gushman that he would come out but that he was not going to put down his guns and Dr. Gushman tried to explain to Mr. Calzada that this would send the wrong message. At one point near the end of their conversation, Mr. Calzada made mention that he was tired, that he had a long night, and that he wanted to sleep. Dr. Gushman agreed but stated that he should go outside so that he could get some help and get some sleep. (Vanderwarf Decl. ¶ 24, Defendants' App. Ex. 3).

**Response to Defendants' Fact No. 54**: It is undisputed that Dr. Gushman made several attempts to have Mr. Calzada exit the home to talk with the police officers. It is undisputed that Mr. Calzada mentioned he was tired, had a long night, and that he wanted to go to sleep. However, Plaintiff DISPUTES the remainder of this fact to the extent that it suggests that Mr. Calzada's intention was to aggressively engage and harm the officers by coming out with his guns. Mr. Calzada made multiple statements that he did not intend to harm the police officers or others both to Vanderward and Dr. Gushman. (CAD Call Hardcopy at page 22 of 49 at 08:35:17, Ex. 3 to Pledger's Tr., Plaintiff's App. Ex. 10; Vanderwarf Report pages 22-23 if 43, Exhibit 12 to Vanderwarf Tr., Plaintiff's App. Ex. 11).

56.     At one point, Mr. Calzada stated that he wanted to sleep. Based on this comment and his tone, Pledger interpreted this as Calzada wanted to sleep forever or end his life. This is

also because he had called the suicide hotline and told them that he wanted to commit suicide. This was an interpretation that was obviously shared by Dr. Gushman based upon the line of discussion that immediately followed that comment. In other words, based upon what Dr. Gushman and Calzada said on the phone, it seemed that both of them understood that "going to sleep" somehow meant that Calzada was going to end his life. Pledger's concern was that when Calzada said he "wanted to go to sleep;" Pledger believed Calzada meant permanently because he had stated several times on the phone that he wanted to end his life. The following are some of the quotes of statements made by Mr. Calzada on the phone (the time is the duration of the phone call and not the actual time on the clock):

      a.     At 50:17 on the recording Calzada says, "I am done. This is what I am going through and that it. I am done. It's going to happen." ….. "I am gonna end my life."

      b.     At 1:03:55 Jose states, "I have to end my own life, regardless if its by my own hand or not."

      c.     At 1:07:00 Jose says, "I have tried pills and failed and now it's just a bullet."

      d.     At 1:37:00 Jose tells Dr. Gushman that he just finished writing his will and detailing what he wants his nephew to have.

      e.     At 1:41:33 Jose tells Dr. Gushman, "I just feel like I can't walk out of here without (putting) a bullet in my head." Dr. Gushman asks, "What makes you say that?" Jose replies, "It is what I have been wanting to do."

      f.     At 1:43:30 Dr. Gushman encourages Jose to "go out and talk with the police unarmed if for no other reason than for your nephew." Jose replies, I will do it armed, but not unarmed." Dr. Gushman asks, "why do you need to be armed? Tell me about that."

Jose responds, "if the conversation doesn't go good I ain't saying that I am not going to do harm to anyone else but myself."

       g.      At 1:58:48, Dr. Gushman tells Jose, "You're just going to go to sleep. I think you have had a long night and I think you need a rest, but not like what you're planning."

       h.      At 1:59:22, Jose talks about a sleep aid he has and Dr. Gushman encourages him to not take it since he has consumed alcohol and medications already, but he encourages Jose to come out unarmed. Jose replies that he will only talk to the officers if he is still armed. Jose then describes his rifle by saying "she is locked and loaded" and "so is my side arm."

       i.      At 2:02:19 Jose tells Dr. Gushman that he has "done a lot for me" and that "its just me. It's something I have to do and I'd rather end our conversation with telling you that."

       j.      At 2:16:50 Jose begins to talk about his military flag and his red beret and medals and that he wants the flag draped over his casket and he describes how it should be done. He wants his medals placed next to the flag.

       k.      Dr. Gushman takes the next 20 minutes trying to persuade Jose to come out without his guns and that things will be better if he does.

       l.      At 2:21:30 Jose tells Dr. Gushman that he is going to hang up now. Dr. Gushman stays on the line, but we never hear from Jose on the phone again.

       m.      All of the above and the entire conversation gave Pledger a heightened concern that something dangerous was about to happen either involving Jose and his guns

or that he would overdose on something and need immediate medical treatment. (Pledger Decl. ¶ 40).

**Response to Defendants' Fact No. 56:** DISPUTED – that Pledger believed that Mr. Calzada's comments about "going to sleep" meant that he was "going to sleep forever." Mr. Calzada told Dr. Gushman he had been up all night and was tired and needed to go to sleep. Moreover, Dr. Gushman had discussed a song which he suggested would give Mr. Calzada hope. Mr. Calzada responded that he would add the song to his playlist suggesting that "going to sleep" really meant that he was tired and ready to sleep as it is conventionally understood – not that he was "going to sleep forever." (Audio of Dispatch Call, Bates 000334B at 2:10:05-2:10:45, Defendants' App. Ex. 3; CAD CAD Call Hardcopy at page 24 of 49 at 08:44:51-08:45:39, Ex. 3 to Pledger's Tr., Plaintiff's App. Ex. 10).

57.     Prior to the final statements by Jose every so often, the phone call would be dropped, or he would hang up, but Vanderwarf and Pledger were always able to reestablish phone contact. At 8:59 a.m. contact with Mr. Calzada was lost and all subsequent attempts to reestablish telephone contact were unsuccessful. Based upon the prior statements by Jose, Pledger felt an increasing sense of urgency the longer it went without hearing from Jose. (Pledger Decl. ¶¶ 41-42, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 57**: IRRELEVANT and IMMATERIAL.  Pledger's subjective feelings, beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL. (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

58.     Pledger believed that Mr. Calzada had most likely fallen asleep because of Dona Hotz's statements regarding the large consumption of alcohol, and Dr. Gushman's statements that

the prescription medications Mr. Calzada was taking combined with the alcohol would likely make him unconscious. Further, the heavily slurred and incoherent speech that Pledger heard from Calzada, led Pledger to believe Calzada was most likely sleeping or that he had overdosed and needed emergency medical treatment to save his life. (Pledger Decl. ¶ 43, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 58**: DISPUTED. Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

59.    Pledger discussed the situation with Vanderwarf, and the command staff present from Roy Police Department, including Lieutenant Hammond, Deputy Chief Calcut and Chief Elliott. They agreed that leaving the scene and doing nothing was not a viable option since Mr. Calzada would likely try to harm himself again once he woke up or he might leave the house with his firearms and place more people in danger. Additionally, Hotz and the three children did not have anywhere to go, and they could not in good faith allow them to re-enter the home without the situation being resolved. (Pledger Decl. ¶ 44, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 59**: DISPUTED. Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

Also, Plaintiffs object to this fact on the grounds of lack of personal knowledge and lack of foundation that Ms. Hotz and her children did not have anywhere to go.  Fed. R. Evid. 602.

60.     Pledger also believed there was a very real risk of overdose for Mr. Calzada due to the possibility of consumption of a large amount of alcohol and prescription medication. (Pledger Decl. ¶ 45, Defendants App. Ex. 1).

**Response to Defendants' Fact No. 60:** IRRELEVANT and IMMATERIAL. Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL. (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

62.     Pledger decided the best course of action was to covertly insert SWAT team members into the house who would hopefully find Mr. Calzada asleep. Pledger believed this plan had the highest likelihood of taking Mr. Calzada safely into custody for transport to the hospital and presented the least risk to law enforcement and the surrounding neighbors. If Mr. Calzada was not asleep, SWAT team members could locate him and hopefully convince him to peacefully surrender or at least re-establish productive peaceful negotiations. (Pledger Decl. ¶ 48, Defendants' App. Ex. 1).

**Response to Defendants' Fact No. 62**: DISPUTED to the extent that this fact suggests the SWAT team was to remain inside Mr. Calzada's home once he was located and attempt to convince him to surrender or reestablish communication with him. Pledger told the SWAT team that the purpose of their plan was to locate Mr. Calzada and once he was located, they were to back out. (Pledger Depo. TR. 99:2-6; 125:16-19, Plaintiffs App. Ex. 25); Perez Depo TR. 75:5-11, Plaintiffs' App. Ex. 20).

63.     For purposes of officer safety, it was necessary for the SWAT team members to enter the premises with their weapons drawn and ready for a potential unwanted confrontation. This was because it was unknown whether Calzada was asleep or awake, and because it was known

he was armed within the home. In fact, there was some evidence that he had in his possession an assault rifle and more than 1000 rounds of ammunition. (Pledger Decl. ¶ 49)

**Response to Defendants' Fact No. 63:** DISPUTED that it was "necessary" for the SWAT team to enter the home of Mr. Calzada, a suicidal person under the influence of alcohol and/or drugs, in the manner in which they entered.  See _Allen v. Muskogee_, 119 F.3d 837, 840(10th Cir. 1997).  Plaintiffs object to this fact on the grounds that: (i) it is mere speculation and, therefore, inadmissible (Fed. R. Evid. 602); (ii) it is a conclusory statement; and (iii) necessity and reasonableness are issues for the trier of fact.

66.     Fusselman explained the Consent to Search Form to Dona Hotz and that it would include all the house and curtilage as defined on the form. He did not have personal knowledge of the exact items or locations on the property that the search would entail. Fusselman told her she could stop the consent at any time. He had Dona Hotz read the paragraphs on the Consent to Search From above where Dona Hotz signed the form. Dona Hotz signed the form and Fusselman signed the witness line. (Fusselman Decl. ¶ 6).

**Response to Defendants' Fact No. 66:** DISPUTED.  Plaintiffs dispute this fact to the extent that it suggests that Fusselman properly and thoroughly explained the form to Ms. Hotz as he was filling it out. In the "Property description" section of the form, he filled in "Entire Home & Curtilage," but he never explained to Ms. Hotz what curtilage meant."  He then requested that Ms. Hotz sign it.  (Fusselman Depo. Tr. 25:7-26:8; 27:13-18, Plaintiffs' App. Ex. 12.) Moreover, all areas in the "Vehicle" section of the Consent to Search Form are completely blank,. i.e., "- Vehicle – Make _____ Model_____ Color_____ Vin Number_____ License Plate _____." The

Consent to Search Form states in pertinent part "I understand that I am giving my consent for the officers to search my property <u>as listed above</u>."  (Emphasis added).  (Consent to Search Form, Defendants' App., Exhibit 4.)

Significantly, Officer Fusselman never asked Ms. Hotz if she consented to the search of Mr. Calzada's vehicles in his garage nor was she ever asked about the ownership of any vehicles on the property.  Ms. Hotz never gave law enforcement the keys to Mr. Calzada's vehicles nor did she ever tell them how to access the vehicles.  (Fusselman Depo. Tr. 27:22-29:2, Plaintiffs' App. Ex. 12).

67.     Fusselman relayed the information to Lt. Hammon that Hotz had signed the Consent to Search Form and sent him a copy of the Form via text message. Dona Hotz informed Fusselman that the easiest way to enter the house would be to go through the garage. Hotz also informed Fusselman that she thought Calzada had a rifle. Fusselman relayed this information to Lt. Hammon. (Fusselman Decl. ¶ 7; Pledger Decl. ¶ 50).

**Response to Defendants' Fact No. 67:** DISPUTED.  Plaintiffs dispute this fact to the extent that it suggests that the Consent to Search Form signed by Ms. Hotz actually gave Defendants constitutionally-valid consent to search Mr. Calzada's home and vehicles.  It did not. Law enforcement knew that Mr. Calzada did not want law enforcement to enter his home and they had reassured him multiple time that they would not.  Mr. Calzada informed law enforcement that he was going to sleep and he remained present in the house.  Law enforcement then attempted to get consent to search Mr. Calzada's residence, from Ms. Hotz who was miles away at the police station.  Her consent was invalid under <u>*Georgia v. Randolph*</u>, 547 U.S. 103.

72.     Pledger also told the team that Mr. Calzada mentioned to the negotiator that his intentions were to commit suicide by cop. Mr. Calzada had purportedly used a tactical light and would periodically perform perimeter checks. Perez further heard that Jose had used military tactical terms such as "going tactical, flash and suppression, suicide by cop, etc." The team was also told that he had military training and these comments gave me more concern about the potentially dangerous situation and the threat to the neighborhood if and when he started shooting. Finally, the team was told that they had lost communications with Jose. (Perez Decl. ¶ 16; Mackley Decl. ¶¶ 9-10).

**Response to Defendants' Fact No. 72**: IRRELEVANT and IMMATERIAL. Defendants' concerns, subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

73.     Pledger briefed the team on what had transpired during the previous six or seven hours, and about the plan Pledger had formulated to get Mr. Calzada out of the home peacefully and prevent him from harming himself. This plan was as follows:

a.      Armando Perez would lead the team that would access the house.

b.      The team was to attempt to access the house through the garage door. Ms. Hotz had provided the code for the garage door earlier.

c.      Once the garage door was open, the team would then wait and listen to see if there was any noticeable response from Mr. Calzada. The goal was to reestablish dialogue with him. Should they not get any response from Mr. Calzada, they were to

search the home slowly and deliberately to find Mr. Calzada. (Pledger Decl. ¶ 54; Lavely

Decl. ¶ 6; Stirling Decl. ¶ 14; Fulton Decl. ¶ 6).

**Response to Defendants' Fact No. 73:**   DISPUTED to the extent that this fact suggests

the SWAT team was to remain inside Mr. Calzada's home once he was located and attempted to

convince him surrender or reestablish communication with him. Pledger told the SWAT team

that the purpose of their plan was to locate Mr. Calzada and once he was located, they were to

back out. Pledger Depo. TR. 99:2-6; 125:16-19 Plaintiffs' App. Ex. 25; Perez Depo TR. 75:5-11,

Plaintiff's App. Ex. 20.).

77.     After discussing with Perez over the radio, Pledger decided that entering the

house through the access door on the side that entered to the garage was the appropriate move for

the team, and ordered them to take this action. (Pledger Decl. ¶ 58; Perez Decl. ¶ 20).

**Response to Defendants' Fact No. 77:** DISPUTED, IRRELEVANT and

IMMATERIAL.  Pledgers' concerns, subjective beliefs and motivations are IRRELEVANT and,

therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v.*

*Fisher*, 130 S. Ct. at 548.)

Plaintiffs also DISPUTE that entering the garage was "the appropriate move."  Rather, it

was a violation of Mr. Calzada's constitutional rights.

78.     The team breached the door using manual tools rather than ballistics because

Pledger wanted to do everything he could to not escalate the situation more than necessary.

(Pledger Decl. ¶ 59).

**Response to Defendants' Fact No. 78:**  DISPUTED, IRRELEVANT and

IMMATERIAL.   Defendant Pledger's subjective beliefs and motivations are IRRELEVANT

and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

Plaintiffs also DISPUTE this fact to the extent that it suggests that Pledger did not recklessly or intentionally escalate the situation.  For example, One suicide crisis worker complained to Pledger that "Sir, you have to understand that she [the other suicide crisis worker] has already built a rapport with him [Mr. Calzada] and the guy you have talking to him right now is making it worse."  A few minutes later the other suicide crisis worker told Pledger that "[s]he too .. felt that Vanderwarf was making things worse by discussing what a nice house Jose had, nice vehicles, a job and a family who obviously loved and needed him, and that law enforcement was making the situation worse."  (Pledger's Report at page 34 of 43, Exhibit 2 to Pledger Decl., Defendants' App.) Nevertheless, Pledger told the suicide crisis workers to stay off the line and to not enter the conversation with Mr. Calzada again.  *Id.*

Other examples of reckless or intentional escalation of the situation include entering Mr. Calzada's home after he had told law enforcement that he did not want them to come in and he was assured multiple times that they would not come in, shouting commands with rifles pointed at Mr. Calzada , an intoxicated and suicidal person, not having the SWAT Team back out after they found Mr. Calzada.  (Audio of Dispatch Call, Bates 000260 at 1:10:50 Plaintiffs' App. Ex. 8; Bates 000344B at 0:18:45-0:19:30, 0:32:21-0:32:37, Defendants' App. Ex. 3; Vanderwarf Decl. ¶ 18; Miles Tr. 46:5-47:24, 94:8-13 and 98:12-21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13).

79.    Upon breaching into the garage, the team made several call outs to Mr. Calzada in the hopes to reestablish communication with him without further entry. Perez could see that the

door from the garage to the residence itself was open. After about three minutes Perez relayed

this information to Lt. Pledger, and he approved entrance into the garage and a slow and

deliberate search of the residence for Jose. (Perez Decl. ¶ 21; Pledger Decl. ¶¶ 61-62).

**Response to Defendants' Fact No. 79:**  IRRELEVANT and IMMATERIAL.

Defendants' subjective hopes, beliefs and motivations are IRRELEVANT and, therefore,

IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S.

Ct. at 548.)

80.      The team began the slow and deliberate search in the garage. When Mr. Calzada

was not found, the team then entered and moved through the house slowly so as not to startle Mr.

Calzada. For the next thirty minutes, Perez and his team very slowly and methodically cleared

the home but were unable to find Mr. Calzada. (Perez Decl. ¶ 23; Pledger Decl. ¶ 63).

**Response to Defendants' Fact No. 80:**  IRRELEVANT and IMMATERIAL.

Defendants' subjective beliefs and motivations are IRRELEVANT and, therefore,

IMMATERIAL. (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct.

at 548.)

81.      It was Perez's understanding that because of the amount of alcohol likely

consumed and that there were also likely prescription medications consumed, Mr. Calzada could

be asleep or have a medical emergency. (Perez Decl. ¶ 24).

**Response to Defendants' Fact No. 81:** IRRELEVANT and IMMATERIAL.

Defendants' subjective beliefs and motivations are IRRELEVANT and, therefore,

IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S.

Ct. at 548.)

83.     While going through the house they were not trying to search or disturb anything in the home. The SWAT team was only trying to locate Mr. Calzada and take him to a hospital or render urgent medical care. (Lavely Decl. ¶ 11; Fulton Decl. ¶ 10; Harper Decl. ¶ 11; Butler Decl. ¶ 12).

**Response to Defendants' Fact No. 83:**  DISPUTED, IRRELEVANT and IMMATERIAL.  Defendants' subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

This fact is also DISPUTED by Defendants' conflicting testimony that the plan was to merely locate Mr. Calzada, re-establish communication with him and back out. Pledger Depo. TR. 99:2-6; 125:16-19; Perez Depo TR. 75:5-11, Plaintiff's App. Ex. 20.).

84.     Perez utilized the shield team for protective cover as the remaining members of the squad searched the upstairs. They did not find Mr. Calzada but found the family dog and a rifle case without a rifle in it. This led Perez to conclude that Mr. Calzada was in fact armed. (Perez Decl. ¶ 28).

**Response to Defendants' Fact No. 84:** IRRELEVANT and IMMATERIAL. Defendant Perez's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

Also, Plaintiffs DISPUTE this fact as mere speculation is insufficient evidentiary support and this fact is supported only by Perez's speculation that Mr. Calzada was armed. Therefore, his testimony is mere "speculation and it is inadmissible."  *See* Fed. R. Evid. 602.

32

86.     The search took about an hour. When the SWAT Team were unable to find Mr. Calzada, it greatly elevated Beck's concern. Beck had anticipated to find Mr. Calzada asleep, unconscious, or that he would verbally respond to the team's verbal callouts. (Beck Decl. ¶ 20-21).

**Response to Defendants' Fact No. 86:** IRRELEVANT and IMMATERIAL.  Defendant Beck's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL. (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

87.     Mackley also felt elevated concern that they had not found Calzada at this time because either he was intentionally hiding and could surprise us or he had eluded us and could be in the neighborhood. (Mackley Decl. ¶ 18).

**Response to Defendants' Fact No. 87:** DISPUTED, IMMATERIAL and IRRELEVANT.  Defendant Mackely's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

Also, Plaintiffs DISPUTE this fact as mere speculation is insufficient evidentiary support and this fact is supported only by Mackley's speculation that Mr. Calzada was either intentionally hiding or was in the neighborhood. Mackley had no personal knowledge of such. Therefore, his testimony is mere "speculation and it is inadmissible."  *See* Fed. R. Evid. 602.

88.     Eventually, the SWAT Team had cleared the entire house except for a large area that went underneath the kitchen and living room. This crawlspace had been viewed with mirrors, but because of items such as boxes in the crawlspace, Perez felt it was unsafe to send any men into the crawlspace. Perez asked Lt. Pledger for a K9 unit to search the crawlspace. He

was told it would be about 20 minutes before a K9 could arrive. While awaiting the arrival of the K9 unit, Perez instructed Deputy Miles and Officer Beck to retrieve the keys to the two vehicles parked in the garage and to open the trunks to the vehicles to be certain Mr. Calzada was not in one of the vehicles. (Beck Decl. ¶ 20; Perez Decl. ¶¶ 30-31; Pledger Decl. ¶ 64).

**Response to Defendants' Fact No. 88:** DISPUTED, IMMATERIAL and IRRELEVANT.  Defendant Perez's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

93.     Beck immediately announced himself as a police officer and told Jose not to move. Beck then backed up behind the Chrysler and again stated that he was a police officer and that he was there to help. (Beck Decl. ¶ 31).

**Response to Defendants' Fact No. 93:** DISPUTED to the extent that this fact suggests that Defendant Beck was talking, rather than <u>shouting</u>, at Mr. Calzada when the trunk was opened, and DISPUTED to the extent that Defendant Beck did not immediately announce himself as a police office, nor did he immediately tell Mr. Calzada not to move.  Rather, as soon as the trunk to the vehicle where Mr. Calzada was lying was opened, Defendant Beck immediately began shouting at Mr. Calzada, "Show me your hands, show me your hands." Defendant Beck's rifle was drawn and aimed at Mr. Calzada and Defendant Miles' pistol was drawn and pointed at Mr. Calzada, even though Mr. Calzada was posing no threat to anyone but himself as he had his handgun on his chest pointed toward his head which was on the opposite side of the trunk from where Defendant Beck and the other officers were standing.  (Miles Tr.

46:5-47:24, 94:8-13 and 98:12-21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13).

94.     Once Miles popped the trunk, he heard it click open immediately followed by the sound of Officer Beck's voice saying, "show me your hands, show me your hands." Miles came around towards the trunk of the car and could see Mr. Calzada's head. Miles knew he had a gun which he was holding high on his chest but Miles could not see which direction the gun was pointing. (Miles Decl. ¶¶ 9-10).

**Response to Defendants' Fact No. 94:** DISPUTED to the extent that this fact suggests that Defendant Beck was talking to, rather than shouting at, Mr. Calzada when the trunk was opened.  As soon as the trunk to the vehicle where Mr. Calzada was lying was opened, Defendant Beck immediately began shouting at Mr. Calzada, "Show me your hands, show me your hands."   Defendant Beck's rifle was drawn and aimed at Mr. Calzada and Defendant Miles' pistol was drawn and pointed at Mr. Calzada even though Mr. Calzada was posing no threat to anyone but himself as he had his handgun on his chest pointed toward his head which was on the opposite side of the trunk from where Defendant Beck and the other officers were standing.  (Miles Tr. 46:5-47:24, 94:8-13 and 98:12-21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13; Rob Carpenter's Interview with John Beck at page 15 of 24 Ex. 42 to Carpenter Tr., Plaintiffs' App. Ex. 14).

96.     Beck specifically instructed Mr. Calzada to let go of the gun, let it fall to his chest, and the SWAT Members would help him get out of the trunk. Beck told Calzada he was not in trouble and we wanted to get him to the hospital for help. (Beck Decl. ¶ 32).

**Response to Defendants' Fact No. 96:** DISPUTED to the extent that this fact

suggests that these were the only instructions Defendant Beck gave to Mr. Calzada.  Defendant

Beck shouted several confusing and contradictory instructions at Mr. Calzada, making it virtually

impossible for Mr. Calzada to comply with all of them.  For example, Defendant Beck "told him

not to move," to "let go of the gun," "to exit the vehicle" and to "show me your hands."  Mr.

Calzada complied with the first instruction and did not move. (Rob Carpenter's Interview with

John Beck at pages 16-17 of 24 Ex. 42 to Carpenter Tr., Plaintiffs' App. Ex. 14; Beck Tr.

112:10-22, Plaintiffs' App. Ex. 15; Miles Tr. 46:5-47:24, 94:8-13 and 98:12-21, Plaintiffs' App.

Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13)

97.     This all happened as Perez entered the garage. Perez heard Miles and Beck

immediately give verbal commands to Mr. Calzada to put down his gun. Perez heard that he had

a gun in his mouth. Perez began to move toward the car but was told his location was where the

gun was pointed. Perez moved back to the man door. (Perez Decl. ¶¶ 32-33).

**Response to Defendants' Fact No. 97:**  DISPUTED to the extent that this fact suggest

the officer knew exactly where the gun was pointing where Defendants' contradictory statements

suggest they were unclear exactly where the gun was pointed. (Miles Depo. Tr. 118:25-119:5,

Plaintiff's App. Ex. 2; Beck Depo. Tr. 109:17-22, Plaintiff's App. Ex. 15; Perez Depo. Tr.

124:11-127:25, Plaintiff's App. Ex. 20).

99.     From the look in Mr. Calzada's eyes, it was Beck's belief that Jose could hear and

understand him. Calzada was moving his eyes, looking at his surroundings and then back to

Beck, but he did not move his body or respond. Mr. Calzada did not verbally respond to anything

Beck said to him. Deputy Miles talked with Mr. Calzada about their similar military experiences

and that Mr. Calzada still had a lot of options. Miles told Mr. Calzada that if he dropped his

weapon things could still end peacefully but there was no response from Mr. Calzada. (Beck

Decl. ¶¶ 35-36).

    **Response to Defendants' Fact No. 99:**  DISPUTED, IMMATERIAL and

IRRELEVANT.  Defendant Beck's subjective beliefs and motivations are IRRELEVANT and,

therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v.*

*Fisher*, 130 S. Ct. at 548.)

    Plaintiffs also DISPUTE this fact to the extent that it suggests that it is undisputed that

Mr. Calzada could hear and understand the instructions shouted at him.  He was intoxicated and

had drunk approximately one gallon of Seagram's 7 and he had been up all night.  Other officers

testified that he did not seem to understand or comprehend. (Fulton Depo Tr. 84:25-85:2, 85:20-

86:25, Plaintiff's App. Ex. 7; Miles Depo. Tr. 102:12-13, 102:19-20, Plaintiff's App. Ex. 2.).

    101.    Perez contacted Lt. Pledger, informing him that Calzada had been located, and

that he was armed with a handgun. Perez was concerned, not only for the safety of Mr. Calzada,

but also the neighbors. Beck could hear this conversation through his earpiece radio. (Perez Decl.

¶¶ 34-35; Pledger Decl. ¶ 67; Beck Decl. ¶ 38).

    **Response to Defendants' Fact No. 101**: DISPUTED, IMMATERIAL and

IRRELEVANT.  Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore,

IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S.

Ct. at 548.)

    103.    Mackley stood next to Perez, Mackley could see inside the trunk of the vehicle

and saw a small elevated platform and the front two feet of a rifle barrel that was within a foot of

Mr. Calzada. The rifle barrel was pointed toward our group that was stationed in the garage. Mackley could not see Calzada's hands. They were behind his head. Mackley was very concerned that he could not see Calzada's hands. (Mackley Decl. ¶¶ 25-26).

**Response to Defendants' Fact No. 103:**  DISPUTED.  The rifle barrel was <u>not</u> pointed at the group of officers.  (Exhibit 17 to the Vanderwarf Tr., Plaintiffs' App. Ex. 11; Exhibit 30 to the Butler Tr., Plaintiffs' App. Ex. 16.)

Furthermore, Mackley's motivations and beliefs (including his concerns) are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

106.    For about seven minutes after Mr. Calzada was discovered in the trunk of the car, members of SWAT and the expert negotiator Jason Vanderwarf attempted to communicate with Mr. Calzada asking him to put down his weapons and that they did not want to hurt him, only that the team wanted to get him help. (Pledger Decl. ¶ 71).

**Response to Defendants' Fact No. 106:** DISPUTED to the extent that this fact suggests that these were the only communications from law enforcement to Mr. Calzada during these seven minutes.  Rather, the officers <u>shouted</u> several confusing and contradictory instructions at Mr. Calzada, making it virtually impossible for Mr. Calzada to comply with all of them.  For example, Defendant Beck "told him not to move," to "let go of the gun," "to exit the vehicle" and to "show me your hands."  Mr. Calzada complied with the first instruction and did not move. (Rob Carpenter's Interview with John Beck at pages 16-17 of 24 Ex. 42 to Carpenter Tr., Plaintiffs' App. Ex. 14; Beck Tr. 112:10-22, Plaintiffs' App. Ex. 15; Miles Tr. 46:5-47:24, 94:8-

13 and 98:12-21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr.,

Plaintiffs' App. Ex. 13.)

107.    Deputy Miles and Officer Beck continued to give verbal commands to Jose to

drop his weapon. Perez moved next to Officer Beck next to the second vehicle that did not

contain Mr. Calzada. Perez could see Mr. Calzada in the trunk of the first vehicle. (Perez Decl.

¶¶ 39-38).

**Response to Defendants' Fact No. 107:** DISPUTED to the extent that this fact suggests

that these were the only communications from law enforcement to Mr. Calzada during these

seven minutes.  Rather, the officers <u>shouted</u> several confusing and contradictory instructions at

Mr. Calzada, making it virtually impossible for Mr. Calzada to comply with all of them.  For

example, Defendant Beck "told him not to move," to "let go of the gun," "to exit the vehicle"

and to "show me your hands."  Mr. Calzada complied with the first instruction and did not move.

(Rob Carpenter's Interview with John Beck at pages 16-17 of 24 Ex. 42 to Carpenter Tr.,

Plaintiffs' App. Ex. 14; Beck Tr. 112:10-22, Plaintiffs' App. Ex. 15; Miles Tr. 46:5-47:24, 94:8-

13 and 98:12-21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr.,

Plaintiffs' App. Ex. 13.)

108.    No officers ever heard Mr. Calzada respond to any questions or orders. (Lavely

Decl. ¶ 23; Fulton Decl. ¶ 14; Mackley Decl. ¶ 27).

**Response to Defendants' Fact No. 108**: DISPUTED as to the fact that Mr. Calzada's

failure to auditorily respond to Defendants' verbal commands suggests that Mr. Calzada did not

respond any of Defendants' commands. Defendants were shouting conflicting orders at Mr.

Calzada such as "don't move" and "show me your hands" which requires a visual response, not

an auditory one. Mr. Calzada complied with the first instruction and did not move. (Rob

Carpenter's Interview with John Beck at pages 16-17 of 24 Ex. 42 to Carpenter Tr., Plaintiffs'

App. Ex. 14; Beck Tr. 112:10-22, Plaintiffs' App. Ex. 15; Miles Tr. 46:5-47:24, 94:8-13 and

98:12-21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr., Plaintiffs'

App. Ex. 13.)

      109.    Butler was unable to shoot Mr. Calzada with his non-lethal beanbag rounds

because the only shot he had from his vantage point would have hit Mr. Calzada in the face,

which would have been fatal. (Butler Decl. ¶ 19).

      **Response to Defendants' Fact No. 109:**  DISPUTED that it was impossible for

Defendant Butler to shoot Mr. Calzada with his non-lethal beanbag rounds.  If, in fact, Defendant

Butler's vantage point did not provided a good shot, Butler could have and should have moved.

Other Defendants testified that they moved and changed positions during the seven minutes from

the time Defendants located Mr. Calzada in the trunk until they killed him.  (Perez Decl. ¶ 13,

Defendants' App.; Miles Decl. ¶ 14, Defendants' App.) Butler chose where he would stand.  If

his vantage point truly made it impossible for him to shoot, he could have moved positions to

find a better vantage point.  Because he chose not to shoot his non-lethal beanbag rounds and/or

to change vantage points, Butler did not follow the instruction given at approximately 11:14:13

am over the SWAT team radio, "Butler, get ready to pound him with a beanbag."  (Recording of

Audio Call, Defendant's Bates No. 000334c at time stamp 0:56:11, Defendants' App. Ex. 3; and

Weber County Sheriff's Office CAD Call Hardcopy, Ex. 3 to Pledger Depo. Tr., Plaintiffs' App.

10).

111.    After the garage door opened, Stirling could see Mr. Calzada with a handgun in his right hand, pointed at his head, and Stirling saw an assault rifle, like an AR-15, either automatic or semi-automatic rifle lying on what appeared to be a speaker shelf in his trunk. From his vantage point, it appeared that the AR-15 rifle was pointed directly at team member Brandon Miles and generally in the direction of the other officers who had gathered to the front left of the vehicle, as Stirling faced the garage. (Stirling Decl. ¶ 23).

**Response to Defendants' Fact No. 111:** DISPUTED to the extent that this fact suggests that Stirling should have continued to erroneously conclude that the rifle was pointed at Defendant Miles.  Miles saw that the rifle was pointing to the west in the direction of Mr. Calzada's head and that the rifle was not pointed toward him or the other officers. Miles cued the mic on the radio and told Robert Stirling basically to "Stop shouting, we know where the rifle is pointing." (Miles Tr. 117:15-118:20, Plaintiffs' App. Ex. 2; Miles Report, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13); see also Exhibit 17 to the Vanderwarf Tr., Plaintiffs' App. Ex. 11; Exhibit 30 to the Butler Tr., Plaintiffs' App. Ex. 16).

114.    Stirling became extremely concerned for the safety of SWAT member Brandon Miles, who was standing to the left rear of the trunk of the vehicle that Mr. Calzada was in. Stirling could see what appeared to be a 30-round magazine protruding from the AR-15 and he saw what he believed was the pistol grip of the AR-15 directly to the right of the magazine. This meant that the rifle was pointed in the direction of Brandon Miles. Stirling communicated his concern for Brandon Miles' safety to Denton Harper who relayed that information over the radio. Given the position of Mr. Calzada and the AR-15 rifle, Stirling's concern for Brandon Miles' safety was communicated several times via radio traffic. (Stirling Decl. ¶ 24; Miles Decl. ¶ 10).

**Response to Defendants' Fact No. 114:** DISPUTED, IRRELEVANT and

IMMATERIAL.  This fact is DISPUTED to the extent that this fact suggests that Stirling should

have continued to erroneously communicate that the rifle was pointed at Defendant Miles.  Miles

saw that the rifle was pointing to the west in the direction of Mr. Calzada's head and that the rifle

was not pointed toward him or the other officers. Miles cued the mic on the radio and told Robert

Stirling basically to "Stop shouting, we know where the rifle is pointing." (Miles Tr. 117:15-

118:20, Plaintiffs' App. Ex. 2; Miles Report, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13); see

also Exhibit 17 to the Vanderwarf Tr., Plaintiffs' App. Ex. 21; Exhibit 30 to the Butler Tr.,

Plaintiffs' App. Ex. 16).

Stirling's motivations and beliefs (including his concerns) are IRRELEVANT and,

therefore, IMMATERIAL. (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*,

130 S. Ct. at 548.)

115.    After Brandon Miles moved back, Stirling again became just as concerned for the

safety of the other SWAT officers that had gathered to the far-left side of the garage as he faced

the garage, as he believed the rifle was pointed in their direction. These concerns were again

communicated over the radio to the officers in the garage. (Stirling Decl. ¶ 25).

**Response to Defendants' Fact No. 115:** DISPUTED, IRRELEVANT and

IMMATERIAL.  This fact is DISPUTED to the extent that this fact suggests that Stirling should

have continued to erroneously communicate that the rifle was pointed at Defendant Miles.  Miles

saw that the rifle was pointing to the west in the direction of Mr. Calzada's head and that the rifle

was not pointed toward him or the other officers. Miles cued the mic on the radio and told Robert

Stirling basically to "Stop shouting, we know where the rifle is pointing." (Miles Tr. 117:15-

118:20, Plaintiffs' App. Ex. 2; Miles Report, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13; see also

Exhibit 17 to the Vanderwarf Tr., Plaintiffs' App. Ex. 21; Exhibit 30 to the Butler Tr., Plaintiffs'

App. Ex. 16).

Stirling's motivations and beliefs (including his concerns) are IRRELEVANT and,

therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v.*

*Fisher*, 130 S. Ct. at 548.)

116.    Perez was informed by an officer from the suburban that there was also a rifle in

the trunk. He attempted to see further inside the trunk and could distinguish parts of a rifle

including the magazine and forward grip of the rifle. Perez could not determine which way the

rifle was facing. He could tell it was on some sort of flat surface tucked into the trunk. (Perez

Decl. ¶ 43; Harper Decl. ¶ 22).

**Response to Defendants' Fact No. 116:** DISPUTED, IRRELEVANT and

IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S.

Ct. at 548.) This fact is DISPUTED to the extent that this fact suggests that Perez should not

have known which way the rifle was facing as Perez could see both the magazine and the

forward grip of the rifle.  (Perez Decl. ¶ 43, Defendants' App.)

118.    Mr. Calzada moved his hand toward the rifle and then moved it back to his chest.

Beck gave him several commands to stop. Calzada paused for a second and then continued to

move toward the rifle. Mr. Calzada moved his hand a second time toward the rifle and seemed to

be attempting to manipulate the safety on the rifle. Over the radio, someone from the armored

suburban stated that the rifle appeared to be pointed at Deputy Miles. Perez was in fear for his

life, and the lives of Deputy Miles, Officer Fulton and Officer Beck. Perez believed Mr. Calzada

was trying to fire the rifle from the position it was in by pulling the trigger with his left hand.

Perez, Beck, and Mackley believed deadly force was necessary to prevent death or serious bodily

injury to themselves and the SWAT members around him. (Beck Decl. ¶¶ 46-47; Perez Decl. ¶

44-48; Fulton Decl. ¶ 16; Mackley Decl. ¶¶ 28-29).

**Response to Defendants' Fact No. 118**: DISPUTED, IRRELEVANT and

IMMATERIAL.  Perez's motivations and beliefs (including his concerns) are IRRELEVANT

and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v.*

*Fisher*, 130 S. Ct. at 548.)

Perez testified that he did not ever see the trigger on the rifle, nor could he ever see Mr.

Calzada touch the rifle.  Therefore, his testimony is mere "speculation and it is inadmissible."

*See* Fed. R. Evid. 602.

119.    Mr. Calzada's movements were quick, requiring snap judgment. There was no

time to give additional verbal warnings. (Mackley Decl. ¶ 30).

**Response to Defendants' Fact No. 119:**  Mr. Calzada's movements in reaching toward

the rifle were slow, not fast.  Everyone witness so testified with Mackley being the sole

exception.  (See e.g., Butler Tr. 99:14-17, Plaintiffs' App. Ex. 16).   There was ample time for

Defendants to give a warning that they would or might use deadly force. Defendants had several

communications directed to Mr. Calzada for six or seven minutes prior to shooting him without

ever giving Mr. Calzada a warning that they would or might use deadly force.  Even **after** Mr.

Calzada began to <u>slowly </u>move his left hand toward the rifle <u>twice</u> and appear to Defendants that

he might touch it (Butler Tr. 98:4-99:17, Plaintiffs' App. Ex. 16; Beck Tr. 119:20-120:4,

Plaintiffs' App. Ex. 15), there was still time to give Mr. Calzada a warning that they would or

might use deadly force, yet they failed to do so.  As Mr. Calzada's left hand appeared to move toward the rifle, Defendant Beck had time to shout "several commands to stop" (Beck. Decl. ¶ 46, Defendants' App.)(emphasis added) and to repeatedly shout other communications to Mr. Calzada, such as "Do not touch the gun.  Do not touch the rifle."   Defendants told Defendant Miles to move, which he had time to do (Beck Tr. 123:3-25, Plaintiffs' App. Ex. 15).   Defendant Perez (one of the shooters) had time to inform Defendant Beck that Calzada was trying to manipulate the trigger . (Beck Decl., ¶48, Plaintiffs' App. Ex. 15; Rob Carpenter's Interview with John Beck at pages 16-17 of 24 Ex. 42 to Carpenter Tr., Plaintiffs' App. Ex. 14; Beck Tr. 112:10-22, Plaintiffs' App. Ex. 15).  Certainly, it was feasible for Defendants to give a warning to the effect, "Don't touch the rifle or we'll shoot."

120.    Perez raised his duty rifle, switched the safety off, aimed at Mr. Calzada's head and fired one round from his duty rifle. Within a split second of the shot Mr. Calzada took the handgun that was behind his head and pointed it directly at Beck and at that point Beck fired at him. Beck feared for his life at that moment. After Beck's first shot Mr. Calzada recoiled a little but continued to point his handgun directly at Beck, so he fired 3 or 4 more rounds with the last shot hitting Calzada in the head. Perez witnessed Mr. Calzada's head move back and his left hand leave the rifle. Other shots were fired, and Perez could see Mr. Calzada's body move with each shot. Once Perez believed Mr. Calzada was no longer a threat, he yelled out a cease fire. During the time of the first shot Perez fired and the other shots, Mr. Calzada had drawn his handgun from behind his head and brought it to his chest. (Beck Decl. ¶¶ 48-49; Perez Decl. ¶¶ 49-53).

**Response to Defendants' Fact No. 120:**  DISPUTED. Mr. Calzada never pointed his

handgun at anyone.  (Butler Tr. 133:4-14, Plaintiffs' App. Ex. 16.)  Plaintiffs do not dispute that

Mr. Calzada's handgun did not come out from behind his head until <u>after</u> Defendants had shot

him the first time.( *Id.* 133:15-17, Plaintiffs' App. Ex. 16)  Plaintiffs also assert that Defendants

could not testify whether Mr. Calzada's actions in bringing the handgun from behind his head

were voluntary or involuntary reaction to being shot such as the force of gravity causing Mr.

Calzada's hands to come forward after Mr. Calzada was dead or incapacitated after receipt of a

bullet to the forehead.  Mr. Calzada was shot several times as the handgun came forward even

though he never spoke, sat up or even had his head above the top of the trunk, or provoked the

situation, but rather maintained a "thousand-mile stare."  (Butler Tr. 116:7-23 and 138:18-22,

Plaintiffs' App. Ex. 16.)

121.    At the same time, Mackley fired his weapon at Mr. Calzada. Mackley initially

fired one or two rounds at Mr. Calzada. Mackley could hear that someone else was firing their

weapon at the same time. Mr. Calzada then pointed the pistol in Mackley's direction. Mackley

believed Calzada was going to shoot him. Mackley fired one more round aiming at Calzada's

head. After Mackley fired this round, Perez yelled, "Cease fire!" and all firing stopped. (Mackley

Decl. ¶¶ 31-32).

**Response to Defendants' Fact No. 121:**  DISPUTED.  Mackley did not fire his weapon

at the same time as the first shot. The first shot was taken by Perez before Mr. Calzada's right

hand holding the pistol came forward (Beck Decl. ¶¶ 48-49; Perez Decl. ¶¶ 49-53, Defendants'

App.) But Defendant Mackley testified that he did not take his first shot until after he saw the

pistol come forward.  (Mackley Tr. 104:3-8, Plaintiffs' App. Ex. 26).

122.    Beck heard Perez yell to cease fire, Mr. Calzada's handgun was still pointed at Beck so he moved to the right and out of the path of the barrel. (Beck Decl. ¶ 50).

**Response to Defendants' Fact No. 122**: DISPUTED.  Mr. Calzada never pointed his handgun at anyone, much less left it pointed at Defendant Beck after he had been shot multiple times.  After Mr. After he had been shot and killed, Mr. Calzada was found in the trunk with the handgun lying on his chest under both of his hands with the gun pointing towards his own face. (Fulton Report, Ex. 40 to Fulton Tr., Plaintiffs' App. Ex. 19.) (Perez Decl. ¶¶ 54-56, Defendants' App.; Stirling Decl. ¶ 27, Defendants' App.)

123.    Perez informed Lt. Pledger that shots were fired, and the threat was down. Perez instructed the shield team to approach Mr. Calzada and Deputy Fulton removed the handgun from Mr. Calzada's chest and set it on the ground behind the vehicle. Perez called for the medic, Bob Stirling to do a medical assessment. Stirling indicated that Mr. Calzada was dead and beyond care. (Perez Decl. ¶¶ 54-56; Stirling Decl. ¶ 27).

**Response to Defendants' Fact No. 123:**  DISPUTED to the extent that this fact suggests that Mr. Calzada was ever a threat.

125.    At all times Pledger made decisions and gave orders that he believed were mostly likely to save Calzada's life. (Pledger Decl. ¶ 79).

**Response to Defendants' Fact No. 125:**  Pledger's motivations and beliefs (including his concerns) are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)  Plaintiffs also assert that Pledger's decisions and orders exacerbated the situation and were not the most likely to save Mr. Calzada's

47

life and, in fact, Pledger's decisions and orders ultimately resulted in Defendants' taking Mr. Calzada's life.

Plaintiffs do NOT dispute that Pledger made decisions and gave orders.

126. At some point Pledger could hear the SWAT team officers yelling commands at Jose, so Pledger stepped out of his position and briefly saw Mr. Calzada in the trunk of the car in the garage. Pledger then took more steps to move to a place where he would not be shot at by Calzada if he chose to start shooting. Pledger never gave an order to shoot and was not in a position to even make that determination. However, Pledger knew that the officers in the garage were highly trained and would only use deadly force if they were reasonably in imminent fear of serious bodily harm or death. (Pledger Decl. ¶ 80).

**Response to Defendants' Fact No. 126**: Plaintiffs do not dispute that the SWAT team officers were yelling at Mr. Calzada.  Plaintiffs affirmatively assert that Defendants immediately began shouting at Mr. Calzada after they opened the trunk where Mr. Calzda was lying. The officers shouted several confusing and contradictory instructions at Mr. Calzada, making it virtually impossible for Mr. Calzada to comply with all of them.  For example, Defendant Beck "told him not to move," to "let go of the gun," "to exit the vehicle" and to "show me your hands."  Mr. Calzada complied with the first instruction and did not move. (Rob Carpenter's Interview with John Beck at pages 16-17 of 24 Ex. 42 to Carpenter Tr., Plaintiffs' App. Ex. 14; Beck Tr. 112:10-22, Plaintiffs' App. Ex. 15; Miles Tr. 46:5-47:24, 94:8-13 and 98:12-21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr., Plaintiffs' App. Ex.13.)

Plaintiffs object to this fact on the ground that Pledger's statements that he know the officers would only use deadly force if they were reasonably in imminent fear of serious bodily

harm or death lacks foundation, is without personal knowledge, is mere speculation and is a conclusory statement without probative value.  *See* Fed. R. Evid. 602; *see also Nichols v. Hurley*, (10th Cir. 1990) 921 F.2d 1101, 1112-1113 (conclusory statements have no probative value).

127.    Pledger never wanted to escalate the situation more than necessary but took steps that he believed would preserve Calzada's life while also ensuring officer safety. Pledger was slow and deliberate in decisions he made about how to respond to Mr. Calzada as evidenced by the fact that he was on the scene for several hours before the rest of the SWAT team was called in and sent into the house. (Pledger Decl. ¶ 81).

**Response to Defendants' Fact No. 127**: DISPUTED, IMMATERIAL and IRRELEVANT.  Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

128.    It is unfortunate that lethal force had to be used against Calzada, but Pledger believes all officers involved responded appropriately and that Calzada's constitutional rights were not violated. (Pledger Decl. ¶ 82).

**Response to Defendants' Fact No. 128**: DISPUTED, IMMATERIAL and IRRELEVANT.  Plaintiffs dispute that "lethal force had to be used against Mr. Calzada." Pledger's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL. (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

Also, Plaintiffs object to this alleged "fact" as it is a legal conclusion.  All officers involved did not respond appropriately and Mr. Calzada's constitutional rights were violated, as set forth in greater detail in Plaintiffs' Argument section, *infra*.

Moreover, this is a "conclusory statement" and as such has no probative value.  *Nichols v. Hurley*, (10th Cir. 1990) 921 F.2d 1101, 1112-1113.

129.    This entire situation was deeply troubling for Mackley because he had hoped it would end peacefully. He never wanted to use his rifle against Mr. Calzada, but Mackley knew he had no choice and if he did not shoot, one of the team could be killed. (Mackley Decl. ¶ 35).

**Response to Defendants' Fact No. 129**: DISPUTED, IMMATERIAL and IRRELEVANT.  Mackley's subjective beliefs and motivations are IRRELEVANT and, therefore, IMMATERIAL.  (*See Brigham City,* 547 U.S. at 404-405; *see also Michigan v. Fisher*, 130 S. Ct. at 548.)

Plaintiffs also object to this fact on the grounds of foundation, lack of personal knowledge and mere speculation.  Mackley had no personal knowledge that if he did not shoot, one of the team could be killed. Therefore, his testimony is mere "speculation and it is inadmissible."  *See* Fed. R. Evid. 602.  Moreover, this is a  "conclusory statement" and as such has no probative value.  *Nichols v. Hurley*, (10th Cir. 1990) 921 F.2d 1101, 1112-1113.

## PLAINTIFFS' STATEMENT OF ADDITIONAL  MATERIAL FACTS

1.    Defendant Pledger, as SWAT Team Commander, coordinated the field operation and directed the SWAT Team activities. (Interlocal Agreement, §§ 3.1.1 and 3.1.1 (A), Defendants' App., Ex. 1; and Pledger Decl., ¶¶ 8 and 10, Defendants' App.).

2.    During the entire SWAT Team activation at Mr. Calzada's residence, all individual Defendants (except Pledger) were subordinate to Pledger, the SWAT Team Commander, regardless of their rank within their own agency. (Interlocal Agreement, § 3.1.4, Defendants' App., Ex. 1; and Pledger Decl., ¶¶ 8 and 10, Defendants' App.).

3.      The Weber County Sheriff's Office CAD Call History Report, Defendants' Bates Stamp

Nos. 0025-0060 gives details of the dispatch call between law enforcement and Mr. Calzada.

(Defendants' Initial Disclosures, page 7, ¶ 41, Plaintiffs' App. Ex. 17; and Pledger Tr. 117:5-12,

Plaintiffs' App. Ex. 25).

4.      It was a usual and recurring situation for Defendants to deal with suicidal, mentally ill, or

emotionally disturbed people and people under the influence of alcohol or drugs.  (Fulton 24:7-9,

Plaintiffs' App. Ex. 7 (spoken with suicidal subjects "hundreds" of times);

5.      The training given to Defendants was defective. Defendants were not trained to deal

differently with suicidal, mentally ill, or emotionally disturbed people or people under the

influence of alcohol or drugs than people whose mental state was not compromised. (Fulton Tr.

19:11-25, Plaintiffs' App. Ex. 7; Beck Tr. 40:6-16; Plaintiffs' App. Ex.15.)

6.      Mr. Calzada's statement that he was "going tactical" meant that "he was fortifying his

house against an assault."  (Fulton Tr. 50:6-14; Plaintiffs' App. Ex. 7).

7.      Mr. Calzada told law enforcement that he did not want them to come into his home, and

law enforcement repeatedly reassured Mr. Calzada that they would not enter his home. (Audio of

Dispatch Call, Bates 000260 at 1:10:50, Plaintiffs' App. Ex. 8; Bates 000344B at 0:18:45-

0:19:30, 0:32:21-0:32:37, Defendants' App. Ex. 3; Vanderwarf Decl. ¶ 18, Defendants' App.).

8.      Mr. Calzada repeatedly told law enforcement that the battery on his cell phone was dying.

(CAD Call at 7:18:01 am; CAD Call at 8:39:24 am-8:39:52 am, Plaintiffs' App. Ex. 3.)

9.      Mr. Calzada informed law enforcement that he had been up all night and that he was tired

and that he wanted to go to sleep. (Audio of Dispatch Call, Bates 000344B at 1:58:27

Defendants' App. Ex. 3; CAD call Hardcopy at page 21 of 49 at 8:32:31 am, Plaintiffs' App. Ex. 10.).

10.     Only minutes before losing phone contact, Mr. Calzada stated that he was going to add a new song to his play list in the future. (Audio of Dispatch Call, Bates 000344B at 1:58:27 Defendants' App. Ex. 3; CAD call Hardcopy at page 22 of 49 at 8:32:31 am, Plaintiffs' App. Ex. 10.).

11.     At 8:35:17 a.m., only minutes before losing phone contact, Mr. Calzada stated that he was not going to hurt anyone, included any law enforcement officers, and he was reassured by law enforcement that they knew he would not hurt anyone. (CAD call Hardcopy at page 19 of 49 at 8:20:19 am, Plaintiffs'App. Ex. 10; CAD call Hardcopy at page 22 of 49 at 8:35:17 am, Plaintiffs' App. Ex. 10.).

12.     Mr. Calzada wanted to speak only with people from the suicide crisis line.  He did not want to speak with law enforcement. (Truscott Decl. 8-9, Defendants' App.).

13.     Mr. Calzada informed law enforcement that he was very concerned that law enforcement had entered or would enter his home without his knowledge or consent.  Law enforcement promised Mr. Calzada that they would not enter his home "like that." (Audio of Dispatch Call, Bates 000344B at 0:18:45-0:19:30, 0:32:21-0:32:37, Defendants' App. Ex. 3; Vanderwarf Decl. ¶ 18, Defendants' App.).

14.     Defendant Pledger knew that the SWAT team did not have legal authority to enter Mr. Calzada's home after they lost phone contact with Mr. Calzada. (Pledger Depo. Tr. 62:6-63:10; 90:17-91:05, Plaintiff's App. Ex. 25).

15.     The Consent to Search Form signed by Dona Hotz did not give Defendants consent to search Mr. Calzada's vehicles.  All areas in the "Vehicle" section of the Consent to Search Form are completely blank,. i.e., "- Vehicle – Make _____ Model_____ Color_____ Vin Number_____ License Plate _____." The Consent to Search Form states in pertinent part "I understand that I am giving my consent for the officers to search my property as listed above."  (Emphasis added).  (Consent to Search Form, Defendants' App., Exhibit 4.)

16.     Officer Trent Fusselman, Roy City Police Officer filled out the Consent to Search Form at the Roy City Police Station.  In the "Property description" section, he filled in "Entire Home & Curtilage," but he never explained to Ms. Hotz was curtilage meant."  He then requested that Ms. Hotz sign it.  (Fusselman Depo. Tr. 25:7-26:8; 27:13-18, Plaintiffs' App. Ex. 12.)  Officer Fusselman never asked Ms. Hotz if she consented to the search of Mr. Calzada's vehicles in his garage nor was she ever asked about the ownership of any vehicles on the property.  Ms. Hotz never gave law enforcement the keys to Mr. Calzada's vehicles nor did she ever tell them how to access the vehicles.  (Fusselman Depo. Tr. 27:22-29:2, Plaintiffs' App. Ex. 12).

17.     Mr. Calzada owned both of the vehicles in the garage.  Ms. Hotz did not own either vehicle in the garage. (Maria Calzada Decl., *passim*, Plaintiffs' App. Ex. 18).

18.     Ms. Hotz was not present at Mr. Calzada's home when she signed the Consent to Search Form; she was miles away at the Roy City Police Department.  (Fusselman Decl., ¶¶ 4-6, Defendants' App.).

19.     The other individual Defendants did not question order of their commander, Defendant Pledger, to enter Mr. Calzada's home because the policy and practice of the SWAT Team was

that "as long as your commander says, 'Go in, you go in." (Miles Tr. 74:4-22, Plaintiffs' App. Ex. 2).

20.    Mr. Calzada had told law enforcement that he was going to sleep and had stayed in his home. (Audio of Dispatch Call, Bates 000344B at 1:58:27, Defendants' App. Ex. 3; CAD call Hardcopy at page 21 of 49 at 8:32:31 am-8:32:50 am, Plaintiffs' App. Ex. 10.).

21.    Defendants knew that phone communication is the safest form of communication. (Beck Tr. 67:8-12, Plaintiffs' App. Ex. 15).

22.    Defendant Pledger told the SWAT team that the purpose of their plan was to reestablish communication with Mr. Calzada and once they had located Mr. Calzada they were to back out. (Pledger Depo. Tr. 99:2-6; 125:16-19, Plaintiffs' App. Ex. 25; Perez Depo Tr. 75:5-11, Plaintiff's App. Ex. 20.).

23.    Defendants did not take either a corded throw phone nor a cell phone with them when they entered Mr. Calzada's home. (Perez Depo. Tr. 74:4-9 Plaintiffs' App. Ex 20.).

24.    At the time Defendants entered Mr. Calzada's home, Defendant Pledger and other members of law enforcement had been told that Mr. Calzada had been up all night, had drunk a large quantity of alcohol, possibly consumed prescription medications, hours earlier had expressed a desire to commit suicide, had stated that he wanted to go to sleep and was probably asleep. (Vanderwarf Decl. 11, 13, Defendants' App.; Pledger Decl. 14, Defendants' App.; Beck Decl. 12, Defendants' App.).

25.    As soon as the trunk to the vehicle where Mr. Calzada was lying was opened, Defendant Beck immediately began shouting at Mr. Calzada, "Show me your hands, show me your hands." Defendant Beck's rifle was drawn and aimed at Mr. Calzada even though Mr. Calzada was

posing no threat to anyone but himself as he had his handgun on his chest pointed toward his

head which was on the opposite side of the trunk from where Defendant Beck and the other

officers were standing. (Miles Tr. 46:5-47:24, 94:8-13 and 98:12-21, Plaintiffs' App. Ex. 2;

Miles Report at page 6 of 43, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13.).    The Miles Report

was authenticated by Defendant Miles as being his report which he stated was completely correct

without need of any changes or corrections. (Miles Tr. 46:5-47:24, Plaintiffs' App. Ex. 2.)

For the next six to seven minutes various Defendants then began shouting a barrage of confusing

and contradictory instructions at Mr. Calzada, making it virtually impossible for Mr. Calzada to

comply with all of them. For example, Defendant Beck "told him not to move," to "let go of the

gun," "to exit the vehicle" and to "show me your hands." Mr. Calzada complied with the first

instruction and did not move. (Rob Carpenter's Interview with John Beck at pages 16-17 of 24 Ex.

42 to Carpenter Tr., Plaintiffs' App. Ex. 14; Beck Tr. 112:10-22, Plaintiffs' App. Ex. 15; Miles Tr.

46:5-47:24, 94:8-13 and 98:12-21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to

Miles Tr., Plaintiffs' App. Ex. 13.)

26.    Defendant Stirling was approximately 20 yards away in the armored Suburban and he

erroneously and hysterically yelled that the rifle was pointing towards Miles and the other

officers. (Miles Depo. Tr. 117:13-118:15, Plaintiff's App. Ex. 2).

27.    Defendant Miles, who was less than five feet away saw that the rifle was not pointed

toward him and the other officers. Rather, the rifle was pointing to the west in the direction of

Mr. Calzada's head. Miles cued the mic on the radio and told Robert Stirling basically to "Stop

shouting, we know where the rifle is pointing." (Miles Tr. 117:15-118:20, Plaintiffs' App. Ex. 2;

Miles Report, Ex. 22 to Miles Tr., Plaintiffs' App. Ex. 13). Typically, the SWAT Team

members would not cue the mic "unless it's absolutely necessary" because it is a cumbersome

process to cue the mic while holding a rifle.  (Miles Tr. 99:5-19 and 116:9-17, Plaintiffs' App.

Ex. 2).

28.     An instruction was given at approximately 11:14:13 am over the SWAT team radio,

"Butler, get ready to pound him with a beanbag."  Recording of Audio Call, Defendant's Bates

no. 000344C at 0:56:11-0:56:12, Defendants' App. Ex. 3; CAD Call Hardcopy at 33 of 49 at

11:14:13 am, Plaintiffs' App. Ex. 10.).

29.     The Weber County Sheriff's Office CAD Call Hardcopy gives "details of  dispatch calls"

and Exhibit 3 to Pledger's Tr. Is the CAD Call Hardcopy for the dispatch call during the incident

at Mr. Calzada's residence.  (Defendants' Initial Disclosures at page 7, ¶41, Plaintiffs' App. Ex.

17; Fulton Tr. 50:18-52:25, Plaintiffs' App. Ex. 7).

30.     "Beanbag" is a term used for non-lethal rounds carried by the SWAT team. (Butler Decl.,

¶¶ 5 and 8, Defendants' App.).

31.     Mr. Calzada was not being aggressive during the incident with Defendants. (Fulton Tr.

132:20-22, Plaintiffs' App. Ex. 7.)

32.     Mr. Calzada's right hand holding the hand gun did not come forward from behind his

head until after he was hit with the first shot from Defendants. (Perez Decl. ¶ 53, Defendants'

App.; Beck Decl. ¶ 48, Defendants' App.; Mackley Decl. ¶ 32, Defendants' App.).

33.     Mr. Calzada was never given a warning that Defendants would or might use deadly force.

(Mackley Decl. ¶ 30, Defendants' App.)  There was ample time for Defendants to give a warning

that they would or might use deadly force. Defendants had several communications directed to

Mr. Calzada for six or seven minutes prior to shooting him without ever giving Mr. Calzada a

warning that they would or might use deadly force. (Beck Decl. ¶ 32, 37, 42, Defendants' App.; Miles Decl. ¶ 11, Defendants' App.).

34.     Defendants' communications to Mr. Calzada emphasized that Mr. Calzada was to put down his gun, etc. so that they would not have to watch Mr. Calzada hurt himself. (Beck Decl. ¶ 37, Defendants' App.; Beck Tr. 94:6-95:6, Plaintiffs' App. Ex. 15.) There was never any warning that Mr. Calzada needed to comply with Defendants' instructions else Defendants would resort to deadly force. *Id.*

35.     Even after Mr. Calzada began to slowly move his left hand toward the rifle twice and appear to Defendants that he might touch it, there was still time to give Mr. Calzada a warning that they would or might use deadly force.  As Mr. Calzada's left hand appeared to move toward the rifle, Defendants had time to repeatedly shout other communications to Mr. Calzada, such as "Don't touch the rifle," (Fulton Decl. ¶ 16, Defendants' App.; Butler Decl. ¶¶ 13, 15, Defendants' App.; Beck Decl. ¶ 46, Defendants' App.). Defendants had time to inform each other that he appeared to be touching the rifle, (Butler Decl. ¶ 21, Defendants' App.; Beck Decl. ¶¶ 43-44, Defendants' App.; Perez Decl. ¶¶ 43-45, Defendants' App.; Lavely Decl. ¶ 24, Defendants' App.), and some of the Defendants even moved to different positions after Mr. Calzada began to slowly move his left hand toward the rifle. (Miles Decl. ¶ 14, Defendants' App.; Beck Decl. ¶ 46, Defendants' App.; Butler Decl. 20, Defendants' App.). Certainly, there was ample time to give a warning to the effect, "Don't touch the rifle or we'll shoot."

36.     After he had been shot and killed, Mr. Calzada was found in the trunk with the handgun lying on his chest under both of his hands with the gun pointing towards his own face. (Fulton Report, Ex. 40 to Fulton Tr., Plaintiffs' App. Ex. 19.)

37.     Defendants felt Vanderwarf had been successful in de-escalating the situation. (Pledger Depo. Tr. 95:5-96:11, Plaintiff's App. Ex. 25).

38.     Members of the SWAT team were not issued body cameras and no SWAT team member present during the incident had a body camera. (Perez Depo. Tr. 40:1-5, Plaintiff's App. Ex. 20).

## ARGUMENT

### I.     Standard of review:

"Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law'. Fed. R. Civ. P. 56(c). A disputed fact is 'material if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc*,. 477 U.S. 242, 248 (1986).) The Court, therefore, must "construe the factual record and reasonable inferences therefrom in the light most favorable to the nonmovant." *Allen*, 119 F.3d at 839-840 (citations omitted). Hence, to defeat summary judgment, Plaintiffs need only show a genuine issue as to any one material fact.  Clearly, as shown by Plaintiffs' responses to Defendants' allegedly undisputed material facts, *supra*, Plaintiffs have more than met their burden. Defendants' motion for summary judgment must be denied.

### II.     A Reasonable Jury Could Conclude that Individual Defendants are liable for both alleged Fourth Amendment violations.

Plaintiffs bring suit against the individual Defendants based on the illegal entry and search of Mr. Calzada's home, and (b) the shooting and death of  Mr. Calzada. Defendants admit in their Motion, "Defendants Perez, Beck, Mackley, Lavely, Miles, Fulton, Harper, and Butler all participated in the search of the home." (Motion at 34.)  Defendant Pledger ordered the search

and "directed the [SWAT] team's actions over the radio."  (Pledger Decl. ¶¶ 54 and 56,

Defendants' App.) Finally, Defendants Perez, Beck and Mackley all admit to shooting Mr.

Calzada. (Perez Decl. ¶¶ 49, Defendants' App.; Beck Decl. ¶¶ 48-49, Defendants' App.;

Mackley Decl. ¶¶ 31-32, Defendants' App.) Liability attaches to each of these individual

Defendants for their individual participation in the search of Mr. Calzada's home and vehicles

and/or shooting and death of Mr. Calzada.

### A.  The search of Decedent's home violated the Constitution, or there is a material dispute of fact regarding this issue that precludes Summary Judgment.

Defendants claim that there were two (2) reasons the search of the home was constitutional:

(1) Donna Hotz gave consent, and (2) there was an exigent circumstance.  Neither justification for

entry into Mr. Calzada's home is valid, or at the very least there are hotly contested material issues

of fact that preclude a grant of Summary Judgment.

### 1.  Defendants' did not have valid consent to search Decedent's home.

Mr. Calzada twice informed law enforcement that he did not want them to come into his

home and in both instances Defendants told Mr. Calzada that he had done nothing wrong and

reassured him that they would not enter his home and surprise him. (Audio Call Bates No. 000260

at 1:11:02, Plaintiffs' App. Ex. 8; Vanderwarf Report page 23 of 43, Exhibit 12 to Vanderwarf

Depo. Tr., Plaintiff's App. Ex. 11).)[1] The clearly established rule from the United States Supreme

---

[1] Defendants' Fact No. 51 that Mr. Calzada  "even invited Vanderwarf and Pledger into the home, but Vanderwarf would not agree to because Calzada would not put down his weapons""(Pledger Decl. ¶¶ 35-37) cannot be construed as consent for a search as Calzada would not agree to put his weapons done. Defendant Pledger testified that he did not consider this as consent to search Mr. Calzada's home. (Pledger Tr. 62:6-63:4, Plaintiffs' App. Ex. 25). Pledger also felt he needed to obtain consent from Ms. Hotz "to clearly establish [Defendants'] legal authority to enter that home." (Pledger Report at page 38 of 43, Exhibit 2 to Defendants' App.)

Court in *Georgia v. Randolph* as to a physically present cohabitant is that his refusal of consent is dispositive as to him "regardless of the consent of a fellow occupant."  Accordingly, consent by Donna Hotz, was not valid as to Mr. Calzada, especially where she was not present in the home when she gave consent, and Mr. Calzada was present and had made it clear he did not consent.[2] In 2007, the 10th Circuit clearly acknowledged the rule set forth by the Supreme Court in *Randolph*. [3]

Defendants should not be rewarded for their duplicity in attempting to "mute" Mr. Calzada's stated desire that he did not want Defendants in his home by seeking to obtain consent from Ms. Hotz after Mr. Calzada had told Defendants that he was tired, had been up all night, and that he wanted to go to sleep, and Defendants believed that he was asleep.  *See McKerrell*, 491 F.3d at 1222.  Moreover, the issue of the validity of consent is a "question of fact that is determined from the totality of the circumstances."  *See, e.g., United States v. Mendenhall*, 446 U.S. 544 (1980).  This question of fact should be left for the jury as a reasonable jury could determine that Ms. Hotz's consent to search Mr. Calzada's home was not valid.

Should the Court determine that Donna Hotz' consent was somehow valid under *Randolph*, the scope of consent is still an issue of fact in this case.  Ms. Hotz clearly gave written consent to

---

[2] "We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident."  *Georgia v. Randolph*, 547 U.S. 103, 120 (2006).  "This case invites a straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Georgia v. Randolph*, 547 U.S. 103, 122-123 (2006).

[3] "Before *Randolph* was decided the question remained whether the police may search a home when one occupant sharing the residence consents, but the other occupant, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent. *Randolph* answered this question in the negative."  *United States v. McKerrell*, 491 F.3d 1221, 1225 (2007).

search the house and curtilage.  However, the search consent form contains a section for house and curtilage and another section for vehicles. The section for vehicles is entirely blank. (Consent to Search Form, Defendants' App., Exhibit 4.)

The scope of a consent search is determined by the party permitting the search and described by the exchange between the party giving consent and law enforcement. *See Walter v. United States*, 447 U.S. 649, 656-57 (1980).  Officer Trent Fusselman, Roy City Police Officer filled out the Consent to Search Form and Ms. Hotz signed it at the Roy City Police Station, but Officer Fusselman never mentioned any vehicles, nor did he ask Ms. Hotz if she consented to the search of Mr. Calzada's vehicles[4] in his garage.  (Fusselman Depo. Tr. 25:7-26:8; 27:13-18, 27:22-29:2, Plaintiffs' App. Ex. 12). As Fusselman's exchange with Ms. Hotz was completely devoid of any mention of vehicles, a reasonable jury could determine that searching Mr. Calzada's vehicles exceeded the scope of Ms. Hotz consent.

### 2.  There was no exigency that allowed the search of Decedent's home.

The Tenth Circuit follows a two-part test to determine if "the risk of personal danger created exigent circumstances: . . . whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and [whether] (2) the manner and scope . . . [of the officers' actions] is reasonable." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). A court considering whether exigent circumstances existed must examine the "realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers." *United States v. Gambino-Zavala*, 539 F.3d 1221, 1225

---

[4]Ms. Hotz did not own either of the cars in Mr. Calzada's garage; the cars were both owned by Mr. Calzada.  (Mrs. Calzada Decl. *passim* and Exhibit 2 to Mrs. Calzada Decl., Plaintiffs' App. Ex. 18)

(10th Cir. 2008). "The existence of exigent circumstances is a mixed question of law and fact." *United States v. Martinez*, 643 F.3d 1292, 1296 (10th Cir. 2011)(quoting *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992)).

A review of the facts in this case is particularly instructive to show (taken in the light most favorable to the non-moving party) that no officer could have an objectively reasonable belief that there was an "immediate need to protect the lives or safety of themselves or others."  In this case, the police were involved from around 4:00 a.m.  They then proceeded to discuss things with Mr. Calzada until approximately 8:59 a.m., five (5) hours later, at which point Mr. Calzada indicated that he was tired and wanted to go to sleep.  Mr. Calzada also stated minutes before that he wasn't going to hurt any of the officers.  Mr. Calzada then hung up the phone and had no further communications with officers, presumably relying on their assurances that he had done nothing wrong and that they wouldn't come in and surprise him.  Instead of going in right away because of an objectively reasonable belief there was an "immediate need to protect the lives or safety of themselves or others," the officers waited approximately ninety (90) minutes until around 10:30 a.m. to get the invalid consent from Ms. Hotz before they began their search.  In response to deposition questions as to why they went in, all of the officers who went in stated they went in because they had consent or a warrant.  The basis for going in was consent, not exigent circumstances, as none existed. Even Pledger stated in his report that they waited to **obtain consent from Ms. Hotz "to clearly establish [Defendants'] legal authority to enter that home."  (Pledger Report at page 38 of 43, Exhibit 2 to Defendants' App.)** There was no objectively reasonable basis for officers who waited ninety (90) minutes to obtain consent from Ms. Hotz that there was an immediate need to protect the lives or safety of themselves or others, especially given Mr.

Calzada's statements that (1) he wasn't going to hurt anybody, and (2) that he was tired and wanted to go to sleep.

In considering the "possibility" that Mr. Calzada was in immediate need of aid, the 10th Circuit's decision in *United States v. Martinez* is instructive. "The sanctity of the home is too important to be violated by the mere possibility that someone inside is in need of aid — such a "possibility" is ever-present. It is for this reason that exceptions to the Fourth Amendment's warrant requirement are "subject only to a few specifically established and well-delineated exceptions." [5]

### B. Mr. Calzada's Constitutional rights were violated when Defendants approached and shot him, or disputes of material fact exist that preclude Summary Judgment.

In their Motion, Defendants point to factors set forth in *Graham v. Connor*, 490 U.S. 386, 396 (1989) and *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) to analyze whether the Defendants used excessive force against Mr. Calzada. (Motion at 39-40). These cases and their factors are inapplicable here because the individuals involved in those cases were <u>criminal suspects</u> posing a threat to the safety of officers and others. In our case it is undisputed that the Defendants knew that Mr. Calzada was not a criminal suspect, that he had committed no crimes, that he had stated that he was not going to hurt the officers, that he had not threatened anyone, that he was under the influence of alcohol and/or drugs, that he was suicidal, and that he had most likely fallen asleep. Therefore, a different set of factors apply here.

As the Tenth Circuit reaffirmed in March of this year, the "mentally ill or disburbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses

---

[5] *United States v. Martinez*, 643 F.3d 1292, 1299-1300 (2011) (citations omitted).

to a situation." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019) (quoting *Hastings v. Barnes*, 252 Fed. Appx. 197, 203 (10th Cir. 2007) (unpublished).   In order to determine if the force used in a particular case is excessive, the fact finder must look to the totality of the circumstances surrounding the incident. <u>*Clark v. Colbert*, 895 F.3d 1258, 1262 (10th Cir. 2018)</u>. When considering the totality of the circumstances surrounding Mr. Calzada's death, the court "must determine whether . . . the officers recklessly and deliberately created the need to use deadly force. <u>Such a finding is more likely when the police are dealing with someone who is not suspected of a crime and is not a threat to anyone other than himself.</u>" <u>*Richard v. City of Wichita*, 2016 U.S. Dist. LEXIS 130757 at \*16 (*emphasis added*)</u>.

 "[T]he reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Estate of Ceballos*, 919 F.3d at 1215 (quoting *Allen*, 119 F.3d at at 840.)

Mr. Calzada had called a suicide hotline looking for help; he had never sought nor provoked police involvement. Here, the officers on scene were dealing with a suicidal individual who was under the influence of alcohol and/or drugs who had not committed a crime and was no threat to anyone other than himself. Mr. Calzada had told law enforcement that he would not hurt any of the officers, had said he was tired and that he wanted to go to sleep.  Then he hung up the phone. (Truscott Decl. ¶ 3, Defendants' App.; Pledger Decl. ¶¶ 14, 18, 21).  It is not illegal to possess guns, to drink in one's home or to go to sleep.  There was no need for Defendants to enter Mr. Calzada's home.  (Morris Decl., *passim*, Plaintiffs' App. Ex. 23.) By deploying the SWAT team,

Officer Pledger along with the individual members of the SWAT team recklessly and deliberately created a situation where deadly force was ultimately used against Mr. Calzada.

In their Motion, Defendants attempt to rely on _Clark_ to show no use of unreasonably excessive force. (Motion at 40). However, the facts in _Clark_ are readily distinguishable from the facts here. Officers responded to Mr. Clark's home with the intent of arresting him because he had allegedly attacked his brother. . _Clark v. Colbert_, 895 F.3d 1258, 1261-62 (10th Cir. 2018). When the officers arrived, Mr. Clark was outside his home on his porch holding a large knife and he eventually charged toward the officers with the knife _Id. at 1263_. As a result, the officers used deadly force in order to subdue a charging Mr. Clark. _Id_. Qualified immunity applied in that case of use of deadly force because "[t]he officers . . . confronted an armed and irate suspect who had already attacked his own brother." _Id. at 1258_ (emphasis added).

In contrast to the facts in _Clark_, Mr. Calzada had not committed a crime or was even suspected of committing a crime. (Pledger Decl. ¶ 21). He had simply called the suicide crisis line for help and then had taken up a defensive position when the cops showed up surrounding his property. Defendants maintain that the actions of "checking the perimeter" and "going tactical" coupled with his statement that he wanted to commit suicide by police officer establish his intent to provoke the police into some type of altercation where they are forced to shoot him[6]. (Pledger Decl. ¶ 15; Mackley Decl. ¶ 10). However, a reasonable jury could attribute this behavior "to his irrational fear and an attempt to defend himself against what he perceived to be aggressors." _Hastings,_ 252 Fed. Appx. at 202.

---

[6] Moreover, not all the officers shared Officer Pledger's interpretation of "going tactical." For example, Officer Fulton interpreted "going tactical" to mean that Mr. Calzada was fortifying his home for an assault. (Fulton Tr. 50: 8-14).

However, in our case, Mr. Calzada's concerns were not even necessarily irrational. He had twice expressed concern about law enforcement entering his home and he had twice been reassured by law enforcement that they would not enter his home. (Audio Call Bates No. 000260 at 1:11:02, Plaintiffs' App. Ex. 8; Vanderwarf Report page 23 of 43, Exhibit 12 to Vanderwarf Depo. Tr., Plaintiff's App. Ex. 11).)   The notion that Mr. Calzada was only attempting to defend himself against unwanted aggressors is bolstered by the fact that he expressed his worry that officers will enter, or had already entered his home. Officer Vanderwarf assured Mr. Calzada multiple times that nobody was in the house. (Audio of Dispatch Call, Bates No. 000344B at 0:1:35-0:32:37, Defendants' App. Ex. 3). In light of law enforcement's broken promises that they would not enter his home, Mr. Calzada's fear and distrust of Defendants were not unfounded.

Mr. Calzada stated intention was that he was not going to hurt any of the officers and Officer Vanderwarf told Mr. Calzada that he knew he did not want to hurt them.  (CAD Call Hardcopy at page 22 of 49 at 08:35:17, Ex. 3 to Pledger's Tr, Plaintiffs' App. Ex. 10; Vanderwarf Report pages 22-23 of 43, Exhibit 12 to Vanderwarf  Tr., Plaintiff's App. Ex. 11).  It was only after officers escalated the situation by confronting a suicidal, intoxicated Mr. Calzada seeking shelter inside his trunk, that Defendants found the need to use deadly force.

A reasonable jury could find that Defendants' actions had caused great fear and distrust I Mr. Calzada causing him to hide from their aggression and anticipated assault in the trunk of his car.  Once Defendants located Mr. Calzada in the trunk, they immediately began shouting confusing and contradictory instructions at him.   For the next six to seven minutes various Defendants shouted a barrage of confusing and contradictory instructions at Mr. Calzada, making it virtually impossible for Mr. Calzada to comply with all of them.  For example, Defendant Beck

"told him not to move," to "let go of the gun," "to exit the vehicle" and to "show me your hands."
(Rob Carpenter's Interview with John Beck at pages 16-17 of 24 Ex. 42 to Carpenter Tr., Plaintiffs'
App. Ex. 14; Beck Tr. 112:10-22, Plaintiffs' App. Ex. 15; Miles Tr. 46:5-47:24, 94:8-13 and 98:12-
21, Plaintiffs' App. Ex. 2; Miles Report at page 6 of 43, Ex. 22 to Miles Tr., Plaintiffs' App. Ex.
13.) Defendants' other communications to Mr. Calzada emphasized that Mr. Calzada was to put
down his gun, etc. so that they would not have to watch <u>Mr. Calzada</u> hurt himself, not so
Defendants would not hurt Mr. Calzada. (Beck Decl. ¶ 37, Defendants' App.; Beck Tr. 94:6-95:6,
Plaintiffs' App. Ex. 15.) There was never any warning that Mr. Calzada needed to comply with
Defendants' instructions else Defendants would resort to deadly force. *Id.*

      The United States Supreme Court requires that officers give a warning of the future use
of deadly force when "feasible." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985); *see also* Utah
Code Ann. § 76-2-404(2), and the SWAT Team Use of Force Policy, Plaintiffs' App. Ex. 5)
Here, a reasonable jury could determine that it was feasible for Defendants to have given a
warning of future use of deadly force.  There was ample time for Defendants to give a warning
that they would or might use deadly force. Defendants had several communications directed to
Mr. Calzada for six or seven minutes prior to shooting him without ever giving Mr. Calzada a
warning that they would or might use deadly force.  Even **<u>after</u>** Mr. Calzada began to <u>slowly</u>
move his left hand toward the rifle <u>twice</u> and appear to Defendants that he might touch it (Butler
Tr. 98:4-99:17, Plaintiffs' App. Ex. 16; Beck Tr. 119:20-120:4, Plaintiffs' App. Ex. 15), there
was still time to give Mr. Calzada a warning that they would or might use deadly force, yet they
failed to do so.  As Mr. Calzada's left hand appeared to move toward the rifle, Defendant Beck
had time to shout "<u>several</u> commands to stop" (Beck. Decl. ¶ 46)(emphasis added) and to

repeatedly shout other communications to Mr. Calzada, such as "Do not touch the gun.  Do not touch the rifle."   Defendants told Defendant Miles to move, which he had time to do (Beck Tr. 123:3-25, Plaintiffs' App. Ex. 15).   Defendant Perez (one of the shooters) had time to inform Defendant Beck that Calzada was trying to manipulate the trigger . (Beck Decl., ¶48, Defendants' App; Rob Carpenter's Interview with John Beck at pages 16-17 of 24 Ex. 42 to Carpenter Tr., Plaintiffs' App. Ex. 14; Beck Tr. 112:10-22, Plaintiffs' App. Ex. 15).  Certainly, it was feasible for Defendants to give a warning to the effect, "Don't touch the rifle or we'll shoot."

Here, Defendants clearly violated Mr. Calzada's Fourth Amendment rights by unnecessarily creating a situation where they eventually employed deadly force and where they employed that force without ever giving Mr. Calzada the requisite warning even though it was feasible to do so.

## III.    Plaintiffs' claims against Weber County and Roy City are cognizable.

Plaintiff's Second Cause of Action is a municipal liability cause of action against Roy City and Weber County.[7] "The inadequacy of police training may serve as a basis for § 1983 only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, (1989) 489 U.S. 378, 388.

The Tenth Circuit reiterated in March of this year reiterated that to establish a city's or county's liability under 42 U.S.C. § 1983 for inadequate training of police officers in the use of force, a plaintiff must show "(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring

---

[7] (Compl. ¶¶ 114-121; Doc. No. 37 at 2 ¶ 2).

situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training." *Estate of Ceballos v. Husk* (2019), 919 F.3d 1204, 1221; *citing Carr v. Castle (10th Cir. 2003)*, 337 F.3d 1221, 1228 *(quoting City of Canton v. Harris*, 489 U.S. 378, 388); and  *Allen v. Muskogee*, (1987) 119 F.3d 837, 841-842; *citing Zuchel v. City and County of Denver*, 997 F.2d 730, 734-35 (10th Cir. 1993).[8]

The first requirement is satisfied here because, as shown in the preceding sections, there is evidence to support a claim that the officers exceeded constitutional limitations on the use of force.

"As regards the second and third requirements, a showing of specific incidents which establish a pattern of constitutional violations is <u>not</u> necessary to put the City on notice that its training program is inadequate.  Rather, evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation is sufficient to trigger municipal liability." *Allen*, 119 F.3d at 842 (emphasis added); *citing Board of County Comm'rs v. Brown*, (1997) 117 S. Ct. 1382; *see also, Allen* 119 F.3d at 845 ("A plaintiff can rely on the single incident if there is other evidence of inadequate training.")(Citations omitted).

---

[8] Defendants' assertion notwithstanding, Plaintiffs can find no support in any case law, not even in *Brown* case cited by Defendants, that there is a requirement that Plaintiffs must allege in their complaint a specific policy or training that was constitutionally defective else the claims "must be dismissed on this basis alone". (*See* Defendants' Motion at 50).  Rather, Plaintiffs merely need show the four *Estate of Ceballos* factors.

As regards the second requirement, Defendants' sworn testimony affirms that it was common for officers to have to deal with mentally ill, emotionally disturbed and/or suicidal people and people under the influence of drugs or alcohol and that it was not uncommon for officers to deal with persons armed with deadly weapons.  (See e.g., Fulton Tr. 24:7-9, Plaintiffs' App. Ex. 7.)  "Thus, there [is] evidence that the use of force arose under circumstances that constituted a usual and recurring situation with which police officers must deal."  *See Allen*, 119 F.3d at 842.

"The third requirement is also satisfied.  The record supports an inference that the training demonstrates a deliberate indifference on the part of the [city and county] toward people with whom the  police come into contact."  *See Allen*, 119 F.3d at 842.  As Mr. Morris opined, the officers' actions in this case were contrary to proper police procedures, reckless, and their training so inadequate that the officers were trained to act recklessly in a manner that created a high risk of death and escalation. (Morris Decl., *passim*, Plaintiffs' App. Ex. 23.) Therefore, this "evidence is sufficient to support an inference that the need for different training was so obvious and the inadequacy so likely to result in violation of constitutional rights that the policymakers of the [City and County] could reasonably be said to have been deliberately indifferent to the need."  *See  Allen*, 119 F.3d at 844.

Finally, there is evidence of a direct causal link between the inadequate training and the alleged constitutional deprivation.  It is Mr. Morris's opinion that if the officers had been properly trained in the fundamental principles of backing off and trying to communication from a distance with in a calm manner with armed, suicidal, intoxicated persons, rather than in the reckless manner they did,, this tragic incident would not have happened.  (Morris Decl., *passim*,

Plaintiffs' App. 23.)  "Because there [is] evidence supporting each of the requirements of *Canton*, as explained in *Zuchel*" and *Allen*, it would be clear error to grant summary judgment in favor of Weber County and Roy City.  *See Allen*, 119 F.3d at 844.

**IV.   Lieutenant Pledger can be found liable for his authorization of and participation in the illegal search of Mr. Calzada's residence; therefore, summary judgment must be denied.**

"Under § 1983, government officials are not <u>vicariously</u> liable for the misconduct of their subordinates. . . .  [However, t]his  does not mean that a supervisor may not be liable for the injuries caused by the conduct of one of his subordinates. It does mean that his liability is not vicarious, that is, without fault on his part [¶] Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights " *Serna v. Colo. Dep't of Corr*., 455 F.3d 1146, 1151 (10th Cir. 2006) (citations omitted)(emphasis added)

Liability can attach to Lieutenant Pledger as there is evidence to prove an "affirmative link" existed between Lieutenant Pledger and the actions of his subordinates: (1) personal involvement, (2) causation, and (3) culpable state of mind." <u>*Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)</u>. These elements are not necessarily distinct one from the other and may be proved simultaneously. <u>*Id* at 1196</u>.

Defendant construes the Court's analysis in *Ashcroft v. Iqbal*, 566 U.S. 662 (2009) to mean that the "purpose rather than knowledge" standard required to show discrimination under the First and Fifth Amendments also applies here to satisfy the "personal involvement" element set forth under *Dodds*. (Motion at 55).[9]  However the *Iqbal* Court emphasized that "[t]he factors

---

[9] The issue in *Iqbal* concerned discrimination under the First and Fifth Amendment. <u>566 U.S. at 662</u>. There the Court cited to previous discrimination cases to define the applicable standard, "Where the claim is invidious discrimination in contravention of the First and Fifth Amendments,

necessary to establish a [§ 1983 violation] will vary with the constitutional provision at issue."
*Id. at* 676 (2009).  The Tenth Circuit further clarified and explained that "*Iqbal* does not purport

to overrule existing Supreme Court precedent, . . we do not believe it altered the Supreme Court's

previously enunciated § 1983 causation and personal involvement analysis [i.e., it did not extend

a "purpose rather than knowledge" standard to other constitutional violations apart from First

and Fifth Amendment violations]." *Dodds v. Richardson*, 614 F.3d 1185, 1200 (10th Cir. 2010).

Turning to the first element in *Dodds*, the Tenth Circuit has said, "A plaintiff [can]

establish the defendant-supervisor's personal involvement by demonstrating his "'personal

participation, his exercise of control or direction, or his failure to supervise,'" *Poolaw v.*

*Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) (quoting *Green v. Branson*, 108 F.3d 1296, 1302

(10th Cir. 1997)); *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000).

Although Lieutenant Pledger did not enter Mr. Calzada's home along with the SWAT

team or personally shoot Mr. Calzada, he nonetheless exercised control and direction over the

deployment of the SWAT team that would satisfy the "personal involvement" element here.

Lieutenant Pledger was the Tactical Commander in October 2014, when the events surrounding

Mr. Calzada's death occurred. Lieutenant Pledger had final tactical decision-making authority

for the hands-on October 21, 2014, incident. He was also the only individual at the scene that had

authority to deploy the SWAT team.  Only upon Lieutenant Pledger's order did the SWAT team

---

our decisions make clear that the plaintiff must plead and prove that the defendant acted with
discriminatory purpose." (*See, Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540-
541, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993); *Washington v. Davis*, 426 U.S. 229, 240, 96 S.
Ct. 2040, 48 L. Ed. 2d 597 (1976)). The plaintiff's claim under *Iqbal* required that in order to prove
that "qualified immunity did not apply, plaintiff had to show that Defendant acted with 'purpose
rather than knowledge' . . .to impose . . . liability . . . for *unconstitutional discrimination*" upon a
supervisor. *Ashcroft v. Iqbal,* 566 U.S. 662, 677 (2009)(emphasis added).

enter Mr. Calzada's home. Prior to the SWAT team entering Mr. Calzada's home, Lieutenant Pledger briefed the SWAT team on the situation and the manner in which to conduct the search of Mr. Calzada's home. As the SWAT team moved toward entering the home, Lieutenant Pledger located himself in the SWAT mobile command center to direct the SWAT team's action over the radio. Lieutenant Pledger continuously communicated with and directed the members of the SWAT team while the team searched the home. (Pledger Decl. ¶¶ 7, 10, 16, 18, 48, 54-66, Defendants' App.). These facts show Lieutenant Pledger exercised control over, and directed, the SWAT team, which satisfies the "personal involvement" element under *Dodds*.

The causation and culpable state of mind elements can be satisfied simultaneously. A plaintiff can "establish [a] 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of . . . constitutional rights.'" *Dodds v. Richardson*, 614 F.3d 1185, 1196 (10th Cir. 2010) *quoting Poolaw v. Marcantel*, 565 F.3d 721, 732-733 (10th Cir. 2009).

The "requisite causal connection" can be shown through "'conduct immediately connected with the seizure'" such as police conduct 'arguably creating the need for force' where use of excessive force has been alleged." *Holland v. Harrington*, 268 F.3d 1179, 1189 (10th Cir. 2001) citing *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001). "The decision to use a SWAT team to make a "dynamic entry" [i.e., a forced entry] into a residence constitutes conduct 'immediately connected with the seizure' because it determines the degree of force initially to be applied in effecting the seizure itself." *Holland v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001). Also, Pledger knew or reasonable should have known that ordering that the SWAT team enter Mr. Calzada's without either valid consent or exigent circumstances would cause the

73

SWAT team to deprive Mr. Calzada of right to be free of unreasonable searches. Thus,
Lieutenant Pledger's decision to deploy the SWAT team is enough to satisfy the causal
connection requirement here.

Lieutenant Pledger set in motion a series of events that he knew or reasonably should
have known would deprive Mr. Calzada of his constitutional rights and was aware that these
events and the facts surrounding them, created a substantial risk of serious harm to Mr. Calzada.

Lieutenant Pledger had participated in over 200 SWAT operations and as Tactical
Commander over approximately 85 of those operations. Based on his experience and the facts
surrounding the incident, he knew or could at least have inferred that the deadly force he was
deploying could result in Mr. Calzada's death. Moreover, Lieutenant Pledger felt it necessary to
deploy the SWAT team with weapons drawn and ready for any unwanted confrontation despite
the fact he believed Mr. Calzada had most likely fallen asleep. (Pledger Decl. ¶¶ 7,43, 49
Defendants' App.). "The decision to deploy a SWAT team . . . necessarily involves the decision
to make an overwhelming show of force – force far greater than that normally applied in police
encounters with citizens." *Holland v. Harrington*, 268 F.3d at 1190. This force unnecessarily
escalated the set of events that led to shooting Mr. Calzada and Lieutenant Pledger knew of the
substantial risk of harm that this created.

Regardless of Lieutenant Pledger's physical absence from the home during the search and
from the garage when his subordinate officers shot Mr. Calzada, an "affirmative link" exists
which subjects Officer Pledger to supervisory liability under § 1983.

**V.      Defendants are not entitled to qualified immunity because they violated Mr. Calzada's clearly established constitutional rights.**

Defendants are not entitled to a grant of qualified immunity because Plaintiffs can show, or at a minimum triable issues exist, that "(1) Defendants' actions violated [Mr. Calzada's] constitutional right[s], and (2) the constitutional right[s were] clearly established at the time of Defendants' conduct." *Anderson v. Creighton*, 483 U.S. 635 (1987).

As set forth in greater detail above, a reasonable jury could determine,  when viewing the facts in our case in the light most favorable to Plaintiffs, that: (1) Defendants' actions violated Mr. Calzada's constitutional Fourth Amendment rights when they searched his home and vehicles without a warrant, without valid consent and without exigent circumstances; and (2) Defendants again violated Mr. Calzada's rights when they approached him, a suicidal man under the influence of drugs and/or alcohol, with guns drawn, shouting contradictory and confusing instructions and then shot and killed him without warning him of their use of deadly force.  Thus, Plaintiffs meet the first prong of the Supreme Court's *Anderson* test.

In March of this year, the Tenth Circuit provided additional guidance as to what is necessary to establish the second prong that the rights were clearly established at the time of Defendants' conduct.  The Tenth Circuit clarified that "the clearly established law must be 'particularized' to the facts of the case [citations omitted]. This is not to say that there must be 'a case directly on point for a right to be clearly established.'" *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152)(other citations omitted).  Moreover, "[a]lthough alleged rights violations must be analyzed at the proper level of generality, the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."

*Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)(citations and internal punctuation omitted).

Defendants assert that none of their actions were contrary to clearly established law because there are no cases on point for precise protocol SWAT teams must employ when dealing with armed persons threatening suicide. (Motion at 59). Defendants take a much too narrow view of the caselaw. "[I]t is not necessary for the precise conduct of the defendants to have been previously held unlawful--it is enough if preexisting law gave the defendants fair warning their conduct violated the law." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances").

"[T]he qualified immunity analysis [has shifted] from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

In considering the use of excessive force as it relates to the qualified immunity analysis, the United States Supreme Court has said that police use of excessive force is an established constitutional violation. *Tennessee v. Garner*, 471 U.S. 1 (1985). Additionally, "Tenth Circuit precedent provide[s] . . . officers the requisite fair warning that . . . aggressively confront[ing] an armed and suicidal/emotionally disturbed individual" can be considered unlawful. *Hastings v. Barnes*, 252 Fed. Appx. at 202 (unpublished)[10]. At the time Mr. Calzada was shot by the SWAT officers, his right against the use of excessive force was clearly established.

---

[10] When specifically referring to the *Hastings* opinion, the Tenth Circuit noted that "we have never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established." *Estate of Ceballos*, 919 F.3d 1204 n.3 (2019).

In March of this year, the Tenth Circuit upheld the district court's denial of officer immunity on plaintiff's section 1983 excessive-form clam because clearly established case law provided an objective officer in the officer's position notice that his conduct in shooting and killing an emotionally distraught man violated the Fourth Amendment. *Estate of Ceballos*, 919 F.3d 1204.   There, the Tenth Circuit identified a number of Tenth Circuit cases where qualified immunity was denied because the officer defendants improperly and recklessly dealt with suicidal persons and/or persons under the influence of alcohol or drugs. *See e.g., Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997).   In *Allen*, a man known to officers to be suicidal was holding gun and sitting in vehicle. Officer ran up to the car shouting and confronting man. Officer had to tell bystanders to get back as they approached the car.  Suicidal man then pointed the gun at the officer and the officer shot and killed the man. Even with bystanders present, "the Tenth Circuit held in *Allen* that the officers were not entitled to summary judgment on the issue of whether they violated Allen's constitutional rights." *Estate of Ceballos*, 919 F.3d at 1216.  *See also Sevier v. City of Lawrence*, 60 F. 3d 695, 697-99 (10th Cir. 1995)  In *Sevier*, "officers shot and killed a despondent man who had a knife and had locked himself in his bedroom when, after coaxing him of his room, the man refused to drop his knife and instead lunged at one of the officers."  The district court denied qualified immunity and "both the language and reasoning in Sevier was picked up and quoted in Allen during its analysis of the underlying Fourth Amendment law.*" Estate of Ceballos*, 919 F.3d at 1216.  "after Allen, [the Tenth Circuit] applied the clearly established Fourth Amendment principles recognized in Allen to uphold denying qualified immunity to four officers

called to a home of a suicidal man, after they chased him, causing him to lift the sword and move

toward the offices.  *Id.* (citing *Hastings*, 252 F. App'x at 198-200, 203-07.)[11]

*Quezada v. County of Bernalillo* also has a very similar fact pattern to ours and the found

that the officers were not entitled to qualified immunity when they shot an armed and suicidal

individual in her car after she allegedly pointed a gun at one of the officers. The court found that

the officers use of deadly force was unreasonable based on the actions of the officers which created

the need to use excessive force. *Quezada v. County of Bernalillo, 944 F.2d 710* (10th Cir. 1991).

In *Quezada*, Berlinda Griego ("Ms. Griego"), a suicidal woman reeking of alcohol, was

found by police officers parked in her car. Ms. Griego failed to respond to the officers' commands

to exit the vehicle and was then observed picking up and loading a pistol. *Id*. The officers

responded by drawing their weapons and demanding that Ms. Griego drop the gun and exit the

vehicle. *Id*. Ms. Griego responded by saying "Leave me alone, I want to kill myself," at which

point she placed the gun to her right temple. *Id*. The officers continued to order her to drop

pistol and exit the vehicle. *Id*. However, Ms. Griego did not comply with the officers'

commands and started waving the weapon from the point of her right temple to her mouth. She

also inserted the muzzle of the weapon inside her mouth. *Id*. Deputy Sauser, one of the officers at

the scene, testified that Ms. Griego pointed her weapon at him but that her movements were

"lackadaisical" and "aimless" and that the gun was only pointed in his "general direction." *Id. at*

---

[11] In addition, "[t]he decision to deploy a SWAT team . . . involves . . . [an] overwhelming show of force – force far greater than that normally applied in police encounters with citizens." *Holland v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001). Based on the above, Mr. Calzada's right against excessive force was clearly established prior to his rights being violated.

<u>713</u>. Deputy Sauser continued saying that Ms. Griego's movements were "aimless" until at one point she "turned abruptly, [and] aimed the weapon at me." *Id*.

At this point, Deputy Sauser believed his life was in jeopardy and fired three times with two bullets striking and mortally wounding Ms. Griego. *Id*. The other two officers on scene corroborated Deputy Sauser's testimony by describing Ms. Griego's action as a "movement toward Officer Sauser, and that "[Ms.] Griego 'moved slightly forward in her seat, [and] turned her upper torso towards Officer Sauser's direction.'" *Id*. The entire confrontation lasted approximately seven (7) minutes.

The district court concluded that qualified immunity did not apply because ". . . by standing in the open and close to Ms. Griego's car[,] . . . Deputy Sauser disregarded his own safety by standing where he did. His actions left absolutely no room for error and forced the deadly confrontation because -- given his vulnerable location -- Deputy Sauser's only available option was deadly force." *Id*. at 721. The Tenth Circuit affirmed the denial of qualified immunity.

Like Ms. Griego, the officers here were dealing with a was suicidal Mr. Calzada. Officers knew he had consumed a large amount of alcohol and was armed. (Pledger Decl. ¶ 30). Once Mr. Calzada was located in the trunk of his vehicle, officers pointed their weapons directly at him. (Audio of Dispatch Call, Bates No. 000344C at 0:53:10). Officers were in close proximity to Mr. Calzada. (Beck Decl. ¶¶ 31-33; Miles Decl. ¶ 10). Mr. Calzada did not respond to commands to let the gun drop to his lap and he instead moved the pistol behind his head. (Beck Decl. ¶¶ 36, 45). Mr. Calzada allegedly began to reach his hand toward the rifle, then away, then back toward the rifle multiple times. (Perez Decl. ¶ 44; Beck Decl. ¶ 46).

Regardless of these facts, and the danger they felt Mr. Calzada presented, Officers Perez, Beck, and Fulton, like Deputy Sauser, remained in an open and vulnerable position where Mr. Calzada, could have fired the rifle or pistol toward into their position. (Perez Decl. ¶¶ 39-41, 47; Beck Decl. ¶¶ 47-49). The Tenth Circuit found that a reasonable officer in a similar situation would have moved for cover. *Id*. By remaining in open and vulnerable positions, the officers were placed in a position where the ". . . only option was to use deadly force." *Id*.

Also as detailed above, in *Georgia v. Randolph*, 547 U.S. 103, the Supreme Court clearly established the law that Defendants could not enter Mr. Calzada's home after he had stated that he did not want them to come in, even if a cohabitant gave consent.  In *Tennessee v. Garner, 471 U.S. 1 (1985),* the Supreme Court clearly established that officers are required to give a warning that they will use deadly force prior to using it, if it is feasible to do so. Also, the law is clearly established that Defendants could not enter Defendants' home because they lacked consent and exigent circumstances were not existent.  See e.g., *See McInerney*, 791 F.3d at 1229 and 1233.

WHEREFORE: Based on the foregoing, Defendants' Motion for Summary Judgment should be denied in its entirety.

Dated this 3rd day of July, 2019.

LeBaron & Jensen, P.C.

/s/ L. Miles LeBaron
L. Miles LeBaron
Melinda Checketts Hibbert
Attorneys for Plaintiffs