Frank D. Mylar (5116)
MYLAR LAW, P.C.
2494 Bengal Blvd.
Salt Lake City, Utah 84121
Phone: (801) 858-0700
office@mylarlaw.com

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARIA CALZADA and MANUELA ROSALES, on behalf of the ESTATE OF JOSE CALZADA, <br><br> Plaintiffs, <br><br> v. <br><br> ROY CITY, et al., <br><br> Defendants. | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 1:16-cv-165 <br><br> District Judge David Nuffer <br> Magistrate Judge Evelyn J. Furse |

Defendants Roy City, Weber County, Armando Perez, John Beck, Reid Mackley, Jeff Pledger, Troy Windsor, William Farr, Terance Lavely, Brandon Miles, Tim Fulton, Denton Harper, and Brent Butler, through their attorney Frank D. Mylar, respectfully submit this Reply Memorandum in Support of Their Motion for Summary Judgment as follows:

# **TABLE OF CONTENTS**

Reply Introduction ................................................................................................... 1

Reply to Statement of Undisputed Material Facts ................................................... 1

Defendants' Response to Plaintiff's Statement of Additional Material Facts ........... 13

Objection & Motion to Strike Plaintiff's experts ..................................................... 17

Reply Argument ..................................................................................................... 19

I.      No Defendants committed a Fourth Amendment violation by searching Decedent's home for him. ........................................................................ 20

        A.      The consent to search the home was valid. ................................... 21

                1.      Decedent did not object to law enforcement entering his home. ............. 22

                2.      The consent also allowed the search of the vehicle. ................... 24

        B.      The search of Decedent's home was legal because there was an emergency need to help a suicidal individual. ......................................... 24

II.     Defendants Beck, Mackley, and Perez did not use excessive force upon Decedent. ....... 26

III.    All individual Defendants are shielded by qualified immunity. ..................... 30

IV.     Weber County and Roy City must be dismissed as Defendants. .................... 32

## REPLY INTRODUCTION

Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment[1] attempts to create several disputed facts that they claim are sufficient to defeat summary judgment. However, these facts are immaterial to the issues before the Court. Plaintiffs' opposition muddles the factual record by mischaracterizing and misconstruing undisputed facts. Further, Plaintiffs attempt to impose extra-legal requirements on Defendants not supported in the caselaw. It is always an unfortunate situation when law enforcement must take an individual's life. However, in this situation, despite their best efforts to avoid such a fatal confrontation, it became necessary to use lethal force against Decedent Jose Calzada. There is no basis for constitutional liability in this case and Defendants' summary judgment motion should be granted.

## REPLY TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs do not respond to Defendants' Statement of Undisputed Facts Paragraphs 2-4, 6-7, 11-12, 14-15, 17-18, 21-22, 25-26, 28-29, 31-33, 41-43, 46-48, 52-53, 55, 61, 64-65, 68-71, 74-76, 82, 85, 89-92, 95, 98, 100, 102, 104-105, 110, 112-113, 117, 124, and 130-132.[2] These paragraphs are simply omitted from Plaintiffs' opposition and thus are deemed admitted. The facts that Plaintiffs do respond to includes factual statements that frequently take deposition testimony out-of-context or unnecessarily confuses the material facts, and therefore require the following replies:

**Reply to Paragraph 1:** Plaintiffs misconstrue Defendants' fact. It is simply saying the Sheriff is the sole and final policymaker for Weber County the entity when it comes to law

---

[1] (Doc. No. 86).

[2] (Doc. No. 57 at 4-34) (Plaintiffs' opposition also mislabels Defendants' Paragraphs 9 and 10).

enforcement decisions. This statement is not offering any commentary on the policies of other law enforcement agencies that exist within Weber County.

**Reply to Paragraph 5:** Section 3.1.2(C) of the Interlocal Agreement indicates that all SWAT team member applicants "must possess an exemplary character as evidenced by having no disciplinary action taken against him/her within the preceding three years which resulted in time off without pay." All Defendants met this requirement. For example, Deputy Miles stated in his deposition that he never received time off without pay.[3] In addition, the Notice of Administrative Action indicates it is "held in abeyance for 12 months."[4]

**Reply to Paragraph 8:** A policy's failure to address every conceivable fact pattern does not render it deficient or non-comprehensive. Further, Plaintiffs do not suggest what local policies would supplement these alleged deficiencies in the SWAT policy.

**Reply to Paragraph 9:** Plaintiffs do not actually dispute this fact, but only offer legal argument so it must be deemed ADMITTED.

**Reply to Paragraph 10:** Plaintiffs do not actually dispute this fact, but only offer legal argument so it must be deemed admitted. See also Reply Argument Point IV below.

**Reply to Paragraph 13:** See Reply to Paragraph 8 above. Additionally, Plaintiffs misconstrue Deputy Fulton's testimony because he also stated he had received training on using different levels of force when an individual is under the influence of alcohol or drugs.[5] Further, Fulton is not asked about training he received to deal with suicidal, mentally ill, or emotionally disturbed people contrary to the assertion in Plaintiffs' Response.

---

[3] (Pls.' Ex. 2, Miles Depo. 11:8; 12:10-15; 36:7-9, Doc. No. 86-3 at 6).
[4] (Pls.' Ex. 3, Doc. No. 86-4) (filed under seal).
[5] (Pls.' Ex. 7, Fulton Depo. 19:11-18, Doc. No. 86-8 at 8).

**Reply to Paragraph 16:** Plaintiffs do not offer any facts that dispute whether Officer Truscott was informed by dispatch of Mr. Calzada's stated intention of suicide by cop prior to any of law enforcement arrival on the scene.

**Reply to Paragraph 19:** Again, Plaintiffs do not offer any facts that dispute whether Officer Truscott was informed by dispatch of Mr. Calzada's desire to commit suicide by cop. The fact even acknowledges that none of the officers had spoken with Mr. Calzada at this point in the narrative.

**Reply to Paragraph 20:** Plaintiffs do not dispute that SWAT was not mobilized at this time.

**Reply to Paragraph 23:** See Reply to Paragraph 20 above.

**Reply to Paragraph 24:** Plaintiffs do not dispute that non-Defendant Jason Vanderwarf had experience in successfully resolving threatened suicides in the past.

**Reply to Paragraph 27:** Plaintiffs attempt to dispute this fact with phone conversations that had not yet happened at this point in the narrative. At this point, all Pledger knew was what he had been told by Officer Truscott.

**Reply to Paragraph 30:** Pledger oversaw the SWAT team and had knowledge of the background of people on the SWAT team and how to properly utilize them. Plaintiffs do not dispute this fact.

**Reply to Paragraph 34:** Plaintiff does not dispute any facts offered by Defendants, particularly that Mr. Calzada told Vanderwarf he would only come out of the house with his guns.

**Reply to Paragraph 35:** Mr. Calzada's words speak for themselves and Plaintiffs do not dispute that they were made.

**Reply to Paragraph 36:** It is undisputed that Mr. Calzada did state that law enforcement could enter his home as Plaintiffs admit.   As evidenced by the following exchange between Vanderwarf and Mr. Calzada:

| | |
|---|---|
| Vanderwarf: | But nobody is up at your house, kay? I'm not lying to you on that. Nobody is in your house. Nobody is coming in your house. |
| Decedent: | Why not? |
| Vanderwarf: | Well, because we want to figure out what's going on with you. We're not, we're not just looking to come barging in. That's not, that's not what I'm about. |
| Decedent: | No, I want you to. |
| Vanderwarf: | How many kids do you have? |
| Decedent: | That's not what I said that… I want you to. |
| Vanderwarf: | You want, you want me to come in? |
| Decedent: | You and all of your buddies can come up. |
| Vanderwarf: | Me and all my buddies can come in? |
| Decedent: | Mm-hmm. |
| Vanderwarf: | Well I'm probably not going to do that. I'd rather have you come out, because I don't want to get hurt. |
| Decedent: | But I do.[6] |

**Reply to Paragraph 37:** Vanderwarf is not a Defendant, but he did work to build a rapport with Calzada and their phone conversation evidences this. Vanderwarf was on the phone with Calzada for "several hours."[7] Vanderwarf utilized conversation topics recommended by Mr. Calzada's psychologist.[8] The suicide crisis line workers were the ones who initiated police involvement, and their displeasure at Vanderwarf's handling of the situation is immaterial.

**Reply to Paragraph 38:** Mr. Calzada's words speak for themselves and Plaintiffs do not dispute that they were made or that Pledger overheard them.

---

[6] (Defs.' Ex. 3, Audio File of Phone Call with Decedent at 32:20, Doc. No. 60-2).

[7] (Defs.' Ex. 2, Pledger Report, Doc. No. 60-1 at 4; Pls.' Ex. 11, Vanderwarf Report, Doc. No. 86-11 at 3).

[8] (Pls.' Ex. 11, Vanderwarf Report, Doc. No. 86-11 at 3).

**Reply to Paragraph 39:** The citation offered at 8:35:17 a.m. is only Mr. Calzada speaking with his therapist, nobody from law enforcement, including Vanderwarf, was on the phone at the time. Mr. Calzada said repeatedly he would come outside only if he was armed.[9]

**Reply to Paragraph 40:** It is not conclusory to state alcohol or drugs creates a more unpredictable situation, but simply a matter of common sense.

**Reply to Paragraph 44:** The phone conversation speaks for itself and Plaintiffs do not dispute Pledger was communicating with Dr. Gushman. The suicide workers' displeasure at Vanderwarf's handling of the situation is immaterial in this matter, particularly since Dr. Gushman–Mr. Calzada's personal psychologist–was offering advice on how to interact with him.

**Reply to Paragraph 45:** The phone conversation speaks for itself. Also see Reply to Paragraph 39 above.

**Reply to Paragraph 49:** Plaintiffs do not dispute that Pledger requested an ambulance be stationed at the scene.

**Reply to Paragraph 50:** The phone conversation speaks for itself. Further, Plaintiffs' response does not provide any evidence against Mr. Calzada's military training, or his statements and actions about "going tactical," using a "tac light," and "checking the perimeter." It is undisputed that Mr. Calzada had military training, had multiple weapons, and made these statements and actions. Further, Plaintiffs' reliance on Officer Fulton's statement is misplaced. Officer Fulton was not present when Mr. Calzada made these statements, and prior to Mr. Fulton's

---

[9] (Defs.' Ex. 3, Audio File of Phone Call with Decedent 35:30-36:40; 1:43:30-1:44-31; 2:00:08-2:01:38; 2:11:55-2:15:33, Doc. No. 60-2).

arrival, the context of the situation had changed from requesting Mr. Calzada to come out of his home to a matter of needing to go in and search for him.[10]

**Reply to Paragraph 51:** See Reply to Paragraphs 36 and 44 above.

**Reply to Paragraph 54:** Although Mr. Calzada stated that he did not intend harm to others, his unwillingness to come out without his weapons suggests otherwise. Mr. Calzada knew that coming out with his guns would lead to violence.[11]

**Reply to Paragraph 56:** Plaintiffs' response omits important dialogue between Dr. Gushman and Mr. Calzada that show Pledger could have believed "going to sleep" meant "going to sleep forever":

| | |
|---|---|
| Decedent: | Make it go away. |
| Gushman: | I know you want it to go away and it can. I know it just doesn't feel like it right now. But I need you to trust me. I need you to trust me that it's not always gonna feel like this. |
| Decedent: | I know it. |
| Gushman: | Can you do that? Can you trust me right now? |
| Decedent: | I don't do. I don't do what to do. Ok. I tell you what. |
| Gushman: | Yeah. |
| Decedent: | I've been up all night and it's time for me to go to sleep. |
| Gushman: | I'm sorry can you say that again? I, I didn't quite hear it. |
| Decedent: | I've been up all night and it's time for me to go to sleep. |
| Gushman: | You're gonna go to sleep? |
| Decedent: | Yeah. |
| Gushman: | Ok. Can you talk to one of the officers first before you do? Cuz we can, cuz we need to make sure that you're gonna be ok. |
| Decedent: | Yeah I'm just gonna go to sleep. |
| Gushman: | You're just gonna go to sleep. I think you have had a long night, and I think you need a rest. But not like what you're planning.[12] |

---

[10] (Pls.' Ex. 25, Deposition of Jeff Pledger 64:8-65:21, Doc. No. 86-25 at 19).

[11] (Defs.' Ex. 3, Audio File of Phone Call with Decdent 35:30-36:40; 1:43:30-1:44-31; 2:00:08-2:01:38; 2:11:55-2:15:33, Doc. No. 60-2).

[12] (Defs.' Ex. 3, Audio File of Phone Call with Decedent 1:57:12 – 1:59:07, Doc. No. 60-2).

**Reply to Paragraph 57:** Pledger and other Defendants' assessment of the situation is relevant insofar as it demonstrates they were aware of the objective facts that created an exigency to enter the home. Defendants recognize that the existence of an exigency is based upon an objective standard.[13]

**Reply to Paragraph 58:** See Reply to Paragraph 57 above.

**Reply to Paragraph 59:** See Reply to Paragraph 57 above. Additionally, even if Hotz had somewhere else to go, it is beyond dispute that she and the children could not re-enter the home until the situation with Mr. Calzada had resolved itself.

**Reply to Paragraph 60:** See Reply to Paragraph 57 above.

**Reply to Paragraph 62:** Plaintiffs do not dispute the SWAT team was to locate Mr. Calzada and reestablish communication with him.[14]

**Reply to Paragraph 63:** Plaintiffs only dispute this fact on legal grounds, however caselaw is clear that officers may "unholster their weapons" when they enter potentially dangerous situations.[15]

**Reply to Paragraph 66:** Even if the signed consent did not specifically mention the vehicles, it is also undisputed that they were parked inside a garage attached to the home.[16]

**Reply to Paragraph 67:** Plaintiffs do not dispute any facts offered by Defendant, but only provide legal argument that is addressed in Point I(A) in the Reply Argument below.

**Reply to Paragraph 72:** See Reply to Paragraph 57 above.

---

[13] *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006).

[14] (Pledger Depo. 100:2-7, 101:19-24, Doc. No. 86-25 at 28).

[15] *Estate of Bleck v. City of Alamosa*, 643 F. App'x 754, 756 (10th Cir. 2016) (*quoting United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993)).

[16] (Compl. ¶ 74, Doc. No. 1 at 24).

**Reply to Paragraph 73:** Plaintiffs do not dispute the SWAT team was to locate Mr. Calzada and reestablish communication with him.

**Reply to Paragraph 77:** See Reply to Paragraph 57 above.

**Reply to Paragraph 78:** See Reply to Paragraph 57 above. Further, Plaintiffs do not dispute that the team breached the door using manual tools.

**Reply to Paragraph 79:** See Reply to Paragraph 57 above.

**Reply to Paragraph 80:** Plaintiffs do not dispute that the team moved through the home slowly and methodically. See also Reply to Paragraph 57 above.

**Reply to Paragraph 81:** Plaintiffs do not dispute that Mr. Calzada could have been asleep or have a medical emergency. See also Reply to Paragraph 57 above.

**Reply to Paragraph 83:** Plaintiffs do not dispute that the SWAT team was not trying to search or disturb anything. Plaintiffs also misconstrue the meaning of "back out" to mean that the SWAT team would leave the premises. Rather, it means the team would seek a protected area where they could still communicate with Mr. Calzada.[17] If the team was unable to communicate with Mr. Calzada, they were to perform a slow and deliberate search and potentially take him into custody if he was not awake.[18] See also Reply to Paragraph 57 above.

**Reply to Paragraph 84:** Plaintiffs do not dispute that a rifle case without a rifle was discovered. See also Reply to Paragraph 57 above.

**Reply to Paragraph 86:** See Reply to Paragraph 57 above.

**Reply to Paragraph 87:** See Reply to Paragraph 57 above.

---

[17] (Pledger Depo. 101:5-8; 134:7-10, Doc. No. 86-25 at 28); (Pls.' Ex. 20, Perez Depo. 75:5-11, Doc. No. 86-20 at 22).

[18] (Perez Depo. 77:24-78:17, Doc. No. 86-20 at 22).

**Reply to Paragraph 88:** See Reply to Paragraph 57 above.

**Reply to Paragraph 93:** Even if Beck shouted at Mr. Calzada to show him his hands, Plaintiffs do not dispute that Beck announced himself as a police officer and that Mr. Calzada should not move. These two facts are not mutually exclusive, particularly in a high stress situation where Mr. Calzada undisputedly had been discovered with firearms. All of these things could have occurred.

**Reply to Paragraph 94:** Plaintiffs do not dispute what Miles saw and heard after the trunk was popped.

**Reply to Paragraph 96:** Plaintiffs misconstrue the factual record. It is undisputed that Beck told Mr. Calzada to put the weapon down. Mr. Calzada was non-compliant. It is undisputed that Beck told Calzada he was not in trouble and that the officers were there to help.[19] It also must be noted, that Beck stated he did not recall if someone told Decedent to "let go of the gun."[20] Further, the only support that Beck told Decedent "to exit the vehicle" is contained in the transcript of Carpenter's interview with Beck.[21] Nowhere is the accuracy of this transcript verified, and no audio file of the interview exists; so it cannot create a disputed fact.

**Reply to Paragraph 97:** Plaintiffs do not dispute how Perez responded. He acted upon the information that he was in the way and moved accordingly. Perez could not personally see the weapon when he initially stood at the man door.[22]

---

[19] (Pls.' Ex. 15, Beck Depo. 92:2-12, Doc. No. 86-15 at 26).
[20] (Beck Depo. 112:18-22, Doc. No. 86-15 at 31).
[21] (Pls.' Ex. 14, Carpenter Interview of John Beck, Doc. No. 86-14 at 18).
[22] (Perez Depo. 110:6-23, Doc. No. 86-20 at 31).

**Reply to Paragraph 99:** See Reply to Paragraph 57 above. Additionally, Plaintiffs misconstrue Fulton and Miles's testimony. Fulton states Mr. Calzada had a blank expression.[23] Miles states Mr. Calzada had "a thousand-yard stare" but seemed resigned to whatever decision he had made.[24] These statements do not equate to an inability to understand or comprehend.

**Reply to Paragraph 101:** See Reply to Paragraph 57 above.

**Reply to Paragraph 103:** Plaintiffs cite evidence that was only available with hindsight. At the time, Mackley stated the rifle was pointing toward him and his fellow officers, as did at least one other officer.[25] See also Reply to Paragraph 57 above.

**Reply to Paragraph 106:** Plaintiffs do not dispute that the interaction lasted about seven minutes and that Vanderwarf attempted to communicate with Mr. Calzada.

**Reply to Paragraph 107:** See Reply to Paragraph 93 above.

**Reply to Paragraph 108:** Mr. Calzada did not comply with the instruction that he should not move since he moved his hand holding the handgun behind his head and reached for the rifle that was in the trunk.[26]

**Reply to Paragraph 109:** Butler did not have a shot with less-lethal ammunition that would not have been lethal against Mr. Calzada.[27] Butler was not ready to "pound him with a beanbag" because he did not have the proper angle for such a shot.[28]

---

[23] (Fulton Depo. 84:25-85:25, Doc. No. 86-8 at 24).
[24] (Miles Depo. 102:11-25, Doc. No. 86-3 at 29).
[25] (Pls.' Ex. 26, Mackley Depo. 102:13-103:12, Doc. No. 86-26 at 29).
[26] (Mackley Depo. 97:20-98:11, Doc. No. 86-26 at 27); (Beck Depo. 119:7-120:11, Doc. No. 86-15 at 33); (Perez Depo. 145:25-146:5, Doc. No. 86-20 at 39).
[27] (Pls.' Ex. 16, Butler Depo. 124:2-125:25, Doc. No. 86-16 at 34).
[28] (Butler Depo. 111:7-21, 115:4-10, Doc. No. 86-16 at 31).

**Reply to Paragraph 111:** Plaintiffs do not dispute that Stirling saw the rifle pointing toward Miles. Regardless, there is no agreement among Defendants which way the rifle was pointing. Plaintiffs misconstrue the factual record to claim that all Defendants knew the rifle was not pointed at any of the officers. For example, after citing Miles's deposition testimony that he said over the radio "we know where the rifle is pointing," his deposition continues to say he was not certain which way the rifle was facing.[29] Mackley stated the rifle was pointing toward him and his fellow officers, as did at least one other officer.[30] Perez stated that he could make out a magazine and forward grip but was not sure which direction the rifle was facing.[31] Beck thought the rifle was facing the officers.[32] Harper was unsure which way the rifle was facing.[33] Fulton also mistook the possible direction of the rifle at the time of the incident.[34] Stirling was unclear which way the rifle was pointed, but due to the movements of Mr. Calzada warned Miles to step out of the way of potential gunfire.[35] Vanderwarf did not state which direction he saw the rifle, but he did state that Mr. Calzada was reaching for "what appeared to me to be the handle grip of his rifle."[36]

**Reply to Paragraph 114:** See Reply to Paragraph 111 above.

**Reply to Paragraph 115:** See Reply to Paragraph 111 above.

---

[29] (Miles Depo. 117:15-119:5, Doc. No. 86-3 at 32).
[30] (Mackley Depo. 102:13-103:12, Doc. No. 86-26 at 29).
[31] (Perez Depo. 124:8 - 125:14, Doc. No. 86-20 at 34).
[32] (Beck Depo. 121:4-6, Doc. No. 86-15 at 33).
[33] (Harper Depo. 93:5-12, attached to this Reply Memorandum as Defendants' Exhibit 5).
[34] (Fulton Depo. 98:20-101:17, Doc. No. 86-8 at 28).
[35] (Report of Bob Stirling, attached to this Reply Memorandum as Exhibit 6).
[36] (Pls.' Ex. 11, Vanderwarf Report, Doc. No. 86-11 at 4).

**Reply to Paragraph 116:** Perez could not distinguish which was the forward grip and which was the magazine.[37]

**Reply to Paragraph 118:** Perez believed Calzada was manipulating the safety of his rifle.[38]

**Reply to Paragraph 119:** It is undisputed that Mr. Calzada reached toward the rifle.

**Reply to Paragraph 120:** It is also undisputed that Calzada was perceived as a threat, even after the first shot was fired at him and he was fired at until he was no longer a threat.

**Reply to Paragraph 121:** It is undisputed that all the shots were fired at Mr. Calzada around the same time and in rapid succession.

**Reply to Paragraph 122:** How the handgun came to rest does not show that it was not pointed at Beck immediately after the shots had been fired.

**Reply to Paragraph 123:** Plaintiffs do not dispute this fact with any evidence.

**Reply to Paragraph 125:** As stated, Plaintiffs do not dispute that Pledger made decisions and gave orders.

**Reply to Paragraph 126:** See Reply to Paragraph 93 above. Regardless, Plaintiffs do not dispute that Pledger never gave an order to shoot and was not in a position to make that determination.

**Reply to Paragraph 127:** See Reply to Paragraph 57 above.

**Reply to Paragraph 128:** See Reply to Paragraph 57 above.

**Reply to Paragraph 129:** See Reply to Paragraph 57 above.

---

[37] (Perez Depo. 125:8-14, Doc. No. 86-20 at 34).
[38] (Perez Depo. 154:25-155:6, Doc. No. 86-20 at 42).

## DEFENDANTS' RESPONSE TO PLAINTIFF'S
## STATEMENT OF ADDITIONAL MATERIAL FACTS

Much of the information contained in "Plaintiffs' Statement of Additional Material Facts" is duplicative of what is contained in "Plaintiffs' Response to Statement of Material Facts." Further, many of these facts are not material to any matters before the Court. As such, Defendants do not respond to every single one of these new facts, but where Plaintiffs mischaracterizes the factual record on an important fact, Defendants offer the follow Responses:

**Response to Plaintiffs' Paragraph 1:** Admit that Pledger was the director and trainer of the SWAT team during the relevant time period but note that Sheriff Thompson was the final policymaker with the authority to make any changes to SWAT policy.[39]

**Response to Plaintiffs' Paragraph 5:** Plaintiffs misconstrue the cited deposition testimony. Fulton and Beck were only asked if they had received training related to someone who was under the influence of drugs and alcohol. Both of their responses indicate they had received such training.[40] Plaintiffs' statement is misleading insofar as Beck and Fulton do not speak to any training they had received related to suicidal, mentally ill, or emotionally disturbed people because they were not asked this question.

**Response to Plaintiffs' Paragraph 6:** Plaintiffs' reliance on Officer Fulton's statement for the meaning of "going tactical" is misplaced. Officer Fulton was not present when Mr. Calzada made these statements, and prior to Mr. Fulton's arrival, the context of the situation had changed from requesting Mr. Calzada to come out of his home to a matter of needing to go in and search

---

[39] (Thompson Decl. ¶¶ 11-13, Doc. No. 58 at 3).
[40] (Fulton Depo. 19:11-18, Doc. No. 84-8 at 8); (Beck Depo. 40:6-16. Doc. No. at 13).

for him.[41] To Pledger this statement and other comments referred generally to military maneuvers where Calzada might deploy his firearms against some target outside his home. In fact, Calzada seemed to indicate there would be some sort of show down where he would "test the officers" and see what they are made of.[42]

**Response to Plaintiffs' Paragraph 7:** This statement is a mischaracterization of the record as explained in the Reply Argument Point I(A)(1) below.

**Response to Plaintiffs' Paragraph 9:** Pledger interpreted that Mr. Calzada stating that he wanted to sleep meant that he wanted to sleep forever or end his life.[43]

**Response to Plaintiffs' Paragraph 14:** This is a legal argument but there was legal authority to enter Decedent's home as explained in Point I of Defendants' Reply Argument below.

**Response to Plaintiffs' Paragraph 15:** See Defendants' Reply to Paragraph 66 in the section above.

**Response to Plaintiffs' Paragraph 16:** See Defendants' Reply to Paragraph 66 in the section above.

**Response to Plaintiffs' Paragraph 19:** Admit but note that law enforcement may rely on the conclusions of fellow law enforcement as long as that reliance is objectively reasonable as Explained in Point I of the Reply Argument below.

**Response to Plaintiffs' Paragraph 20:** See Defendants' Response to Plaintiffs' Paragraph 9 above.

---

[41] (Pledger Depo. 64:8-65:21, Doc. No. 86-25 at 19).
[42] (Pledger Decl. ¶ 34, Doc. No. 60 at 6).
[43] (Pledger Decl. ¶ 40, Doc. No. 60 at 7).

**Response to Plaintiffs' Paragraph 22:** The SWAT team was to locate Mr. Calzada and reestablish communication with him.[44] Pledger decided the best course of action was to covertly insert SWAT team members into the house who would hopefully find Mr. Calzada asleep. Pledger believed this plan had the highest likelihood of taking Mr. Calzada safely into custody for transport to the hospital and presented the least risk to law enforcement and the surrounding neighbors. If Mr. Calzada was not asleep, SWAT team members could locate him and hopefully convince him to peacefully surrender or at least re-establish productive peaceful negotiations.[45]

**Response to Plaintiffs' Paragraph 25:** Decedent was undisputedly discovered in the trunk of the car with two firearms. Beck immediately announced himself as a police officer and told Decedent not to move. Beck then backed up behind the other car and again stated that he was a police officer and that he was there to help.[46] Further, the statements offered by Plaintiffs did not happen at the same time, but, as they note, occurred over a nearly seven-minute time period. All the initial commands given to Decedent were universally to put down his weapon.[47] It also must be noted, Plaintiff misconstrues the record because Beck stated he did not recall if someone told Decedent to "let go of the gun."[48] Further, the only support that Beck told Decedent "to exit the vehicle" is contained in the transcript of Carpenter's interview with Beck.[49] Nowhere is the accuracy of this transcript verified and no audio file of the interview exists so it cannot create a disputed fact.

---

[44] (Pledger Depo. 100:2-7; 101:19-24. Doc. No. 86-25 at 28).
[45] (Pledger Decl. ¶ 48, Doc. No. 60 at 11).
[46] (Beck Decl. ¶ 31, Doc. No. 74 at 6).
[47] (Beck Decl. ¶ 32, Doc. No. 74 at 6); (Perez Decl. ¶¶ 32-33, Doc. No. 65 at 5); (Miles Decl. ¶¶ 9-10, Doc. No. 71 at 2).
[48] (Beck Depo. 112:18-22, Doc. No. 86-15 at 31).
[49] (Carpenter Interview of John Beck, Doc. No. 86-14 at 18).

**Response to Plaintiffs' Paragraph 26:** Defendants' dispute Plaintiffs characterization of Stirling yelling hysterically. Stirling became extremely concerned for the safety of SWAT member Brandon Miles, who was standing to the left rear of the trunk of the vehicle that Mr. Calzada was in. Stirling could see what appeared to be a 30-round magazine protruding from the AR-15 and he saw what he believed was the pistol grip of the AR-15 directly to the right of the magazine. This meant that the rifle was pointed in the direction of Brandon Miles. Stirling communicated his concern for Brandon Miles' safety to Denton Harper who relayed that information over the radio. Given the position of Mr. Calzada and the AR-15 rifle, Stirling's concern for Brandon Miles' safety was communicated several times via radio traffic.[50]

**Response to Plaintiffs' Paragraph 27:** See Defendants' Reply to Paragraph 111 above.

**Response to Plaintiffs' Paragraph 31:** Decedent was not complaint with the orders given to him. He did not verbally respond to anything Beck said to him.[51] No officers ever heard Mr. Calzada respond to any questions or orders.[52] Eventually Mr. Calzada moved his hand toward the rifle and then moved it back to his chest. Beck gave him several commands to stop. Calzada paused for a second and then continued to move toward the rifle. Mr. Calzada moved his hand a second time toward the rifle and seemed to be attempting to manipulate the safety on the rifle. Over the radio, someone from the armored suburban stated that the rifle appeared to be pointed at Deputy Miles. Perez was in fear for his life, and the lives of Deputy Miles, Officer Fulton and Officer Beck. Perez believed Mr. Calzada was trying to fire the rifle from the position it was in by pulling

---

[50] (Stirling Decl. ¶ 24, Doc. No. 64 at 4); (Miles Decl. ¶ 10, Doc. No. 71 at 3).

[51] (Beck Decl. ¶¶ 35-36, Doc. No. 74 at 6).

[52] (Lavely Decl. ¶ 23, Doc. No. 67 at 4); (Fulton Decl. ¶ 14, Doc. No. 68 at 3); (Mackley Decl. ¶ 27, Doc. No. 66 at 5).

the trigger with his left hand. Perez, Beck, and Mackley believed deadly force was necessary to prevent death or serious bodily injury to themselves and the SWAT members around him.[53]

**Response to Plaintiffs' Paragraph 32:** Regardless of when Mr. Calzada's hand holding the gun came forward, he was fired upon until he was no longer a threat.[54]

**Response to Plaintiffs' Paragraph 33:** Plaintiffs are looking for magic words related to a warning. However, it is undisputed that Beck specifically instructed Mr. Calzada to let go of the gun, let it fall to his chest, and the SWAT Members would help him get out of the trunk.[55] Miles also told Decedent that if he dropped his weapon things could still end peacefully.[56] Further, Vanderwarf attempted to communicate with Mr. Calzada asking him to put down his weapons and that they did not want to hurt him, only that the team wanted to get him help.[57] The facts clearly show Decedent was instructed numerous times to drop his weapon but he did not comply with any of them.

**Response to Plaintiffs' Paragraph 34:** See Response to Plaintiffs' Paragraph 33 above.

**Response to Plaintiffs' Paragraph 35:** See Response to Plaintiffs' Paragraph 33 above.

## OBJECTION & MOTION TO STRIKE PLAINTIFF'S EXPERTS

Defendants **object** to and move to strike the testimony of either Earl Morris[58] and Denise Brooks[59] because it is not admissible evidence.[60] First, Morris and Brooks have never been

---

[53] (Beck Decl. ¶¶ 46-47, Doc. No. 74 at 7); (Perez Decl. ¶ 44-48, Doc. No. 65 at 7); (Fulton Decl. ¶ 16, Doc. No. 68 at 3); (Mackley Decl. ¶¶ 28-29, Doc. No. 66 at 5).

[54] (Beck Decl. ¶¶ 48-49, Doc. No. 74 at 7); (Perez Decl. ¶¶ 49-53, Doc. No. 65 at 7).

[55] (Beck Decl. ¶ 32, Doc. No. 74 at 6).

[56] (Beck Decl. ¶ 36, Doc. No. 74 at 6).

[57] (Pledger Decl. ¶ 71, Doc. No. 60 at 14).

[58] (Doc. No. 86-23).

[59] (Doc. No. 86-9).

[60] Fed. R. Civ. P. 56(c)(2).

disclosed as a witness in this matter. Neither was mentioned in Plaintiff's initial disclosures as a witness.[61] Similarly, they were not included in Plaintiff's Interrogatory Answers as potential witnesses.[62] Plaintiff simply objects that the Rules do not require this information to be disclosed. This does not give Defendants any notice as to who might be called as a witness. If Plaintiffs wanted to use either testimony on summary judgment, they should have been disclosed before summary judgment so that Defendants could depose him. As it stands currently, their testimony has not been subject to cross-examination, and Defendants have not had any opportunity to depose either of them. As such, the Court should disallow their testimony.

Second, with respect to Morris, he does not meet the requirements of Federal Rule of Evidence 702 to be qualified as an expert. His declaration does not adequately state his "knowledge, skill, experience, training, or education" to testify regarding this matter.[63] The Declaration simply states that Morris spent 38 years working in law enforcement or security.[64] It does not state if he has any experience with SWAT or with suicidal and intoxicated persons. This is crucial experience needed to render an expert opinion in this situation.

Third, Morris has no personal knowledge of any of the events alleged in the Complaint. He opines on what he believes is the proper procedure, but his conclusions do not and cannot create any disputed issue of material fact. "[A]n expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding

---

[61] (Plaintiffs' Third Supplemental Initial Disclosures, which contained all the information of their original initial disclosures plus additions, attached to this Reply Memorandum as Exhibit 7).

[62] (Plaintiffs' Second Supplemental Response Defendants' First Set of Interrogatories and Request for Production of Documents Answers 17 and 18 attached to this Reply Memorandum as Exhibit 8).

[63] Fed. R. Evid. 702.

[64] (Doc. No. 86-23 at 2 ¶ 6).

function. However, when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case."[65] Morris's declaration improperly attempts to establish the legal standard in this matter. His testimony cannot establish what is required to show a Fourth Amendment or Constitutional violation. For all these reasons, the Court should disregard his testimony.

## REPLY ARGUMENT

Plaintiffs' opposition unsuccessfully argues that there was no legal basis to search Decedent Jose Calzada's home. In Plaintiffs' view the better course of action would have been to leave Decedent, who was clearly intoxicated and suicidal, alone in his home–left to his own devices and for his domestic partner and her children and Jose's niece to fend for themselves as to when they should return to their residence. This would have been irresponsible on the part of Defendants and had a higher probability of leading to Decedent's death and the potential injury of civilians. Instead, after a protracted negotiation, Defendants made difficult choices that they determined were most likely to lead to Decedent surviving this incident. It is unfortunate that his life could not be saved, but just because he was killed does not, and cannot, lead to constitutional liability for any Defendants in this instance. Defendants made difficult choices in a stressful situation and these choices were all objectively reasonable.

---

[65] *Specht v. Jensen*, 853 F.2d 805, 809-10 (10th Cir. 1988).

I.      **No Defendants committed a Fourth Amendment violation by searching Decedent's home for him.**

Although Defendants were not searching the home per se, but actually trying to locate Mr. Calzada, Defendants could legally search Decedent's home for at least two reasons. First, they had obtained a consent to search the home from co-occupant Dona Hotz. Second, there was an exigency that existed since Decedent was threatening suicide and thus in need of emergency medical attention.

However, as an opening point, even if the consent was invalid and no exigency existed, no liability can attach to any Defendant because they reasonably relied on the information communicated to them about the situation from other law enforcement personnel. "A police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable."[66] This is because "[e]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."[67] As such, "the 'good faith' defense shields objectively reasonable good faith reliance on the statements of a fellow officer, but does not protect deliberate, reckless, or grossly negligent reliance on the flawed conclusions of a fellow officer."[68]

All Defendants reasonably relied on information communicated to them about the consent to search Decedent's home as well as the suicidal condition of Decedent. Roy City Police Officers

---

[66] *Felders v. Malcom*, 755 F.3d 870, 882 (10th Cir. 2014) (internal quotation marks omitted).
[67] *Oliver v. Woods*, 209 F.3d 1179, 1191 (10th Cir. 2000) (*quoting United States v. Hensley*, 469 U.S. 221, 231 (1985)).
[68] *Felders*, 755 F.3d at 882.

Trent Fusselman and Hammond informed Defendants that the female occupant of the home had given consent to enter the house and its curtilage.[69] Neither Fusselman nor Hammond are Defendants in this matter. Similarly, it had been communicated to Defendants from non-Defendant Jason Vanderwarf that Decedent had consumed large quantities of alcohol and prescription medications, had been threatening suicide, and that a female occupant and three children had left the home earlier for their own safety.[70]

This reliance on information from other officers led Defendants to reasonably believe that (A) they had consent to enter the home from an occupant, and (B) Decedent's health and safety were in peril.[71] By relying on this information relayed to them from non-Defendant officers, they reasonably believed they were making a legal entry into Decedent's home. As such, there can be no liability that attaches to them for reasonably relying on this information.

However, the underlying search was legal because there was a valid consent and an exigency existed as discussed below:

### A.   The consent to search the home was valid.

Plaintiffs argue in their opposition that the consent to search Decedent's home from co-occupant Dona Hotz was invalid because (1) Decedent objected to the police entering his home, and (2) the consent did not specifically authorize the search of the vehicles.[72] Both of these arguments fail since the undisputed material facts show that Decedent actually wanted law

---

[69] (Fusselman Decl. ¶¶ 4-7, Doc. No. 63 at 2).
[70] (Pledger Decl. ¶¶ 29-30, 44, Doc. No. 60 at 6).
[71] (Fusselman Decl. ¶ 7, Doc. No. 63 at 2); (Pledger Decl. ¶ 44, ¶ 50, Doc. No. 60 at 10).
[72] (Doc. No. 86 at 61-63).

enforcement to enter his home and the consent did not have to specifically mention vehicles as long as they were on the premises.

### 1.   Decedent did not object to law enforcement entering his home.

Plaintiffs argue that any consent given by co-occupant Dona Hotz was invalid as to Decedent. This is based upon her incorrect interpretation of *Georgia v. Randolph*, 547 U.S. 103 (2006) and facts that she inappropriately reads into the record. *Randolph* is only concerned with searches of a property where one co-occupant consents to a search, but another co-occupant immediately objects to the search. In such instances, then "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."[73] Further, *Randolph* is limited to "merely evidentiary searches."[74]

First, as a legal matter, *Randolph* is not applicable since its holding is limited to evidentiary searches. There was no search for evidence that was occurring when Defendants entered Decedent's home. They were only looking for Mr. Calzada, and so *Randolph* does not provide insight into the legality of the search.

Second, even if *Randolph* were applicable, there are no facts that suggest Decedent objected to any search of his home. Plaintiffs claim in conclusory fashion that Decedent "had made it clear he did not consent,"[75] but provides no evidentiary support for this proposition in their argument. To be fair, Plaintiffs' statement of fact number 7 also claims Decedent did not want law enforcement to come in his home and does provide a scintilla of evidentiary support.[76] However,

---

[73] *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006).
[74] *Id*. at 119.
[75] (Doc. No. 86 at 62).
[76] (Doc. No. 86 at 53).

examining the substance of this evidence does not show Decedent objected to any search of his property. For example, Plaintiffs' Exhibit 8 is audio of Decedent speaking with the crisis worker, Nobody from any law enforcement agency is on the phone at this time, including SWAT negotiator Jason Vanderwarf.  The Defendants, therefore, would have no knowledge of this conversation. Moreover, the portion of the phone call offered by Plaintiffs[77] occurs <u>before</u> the parts of the phone conversation where Decedent encouraged the police to enter his home. As evidenced by the following exchanges:

| | |
|---|---|
| Vanderwarf: | "Nobody is in your house, nobody is coming in your house. |
| Decedent: | "Why not?" |
| Vanderwarf: | "Well because we want to figure out what's going on with you." |
| | "We're not, we're not just looking to come barging in. That's not, that's not what I'm about." |
| Decedent: | "No, I want you to."[78] |

| | |
|---|---|
| Decedent: | "I want you to." |
| Vanderwarf: | "You want me to come in?" |
| Decedent: | "You and all of your buddies can come up." |
| Vanderwarf: | "Me and all my buddies can come in?" |
| Decedent: | "Mm-hmm." |
| Vanderwarf: | "Well I'm, I'm probably not going to do that. I'd rather have you come out. Cuz I don't want to get hurt." |
| Decedent: | "But I do." |
| Negotiator: | "You don't, you don't wanna get hurt, Jose." |
| Decedent: | "Yeah I do."[79] |

| | |
|---|---|
| Decedent: | "They can come in right now."[80] |

These statements can in no way be interpreted to mean Decedent was objecting to the police coming into his home. In fact, they demonstrate that he was inviting the officers into his home.

---

[77] (Defs.' Ex. 3, Audio File of Phone Call with Decedent at 18:41, <u>Doc. No. 60-2</u>).

[78] (*Id*. at 32:28, <u>Doc. No. 60-2</u>).

[79] (*Id*. at 33:00, <u>Doc. No. 60-2</u>).

[80] (*Id*. at 48:56, <u>Doc. No. 60-2</u>).

Therefore, the consent obtained from Hotz remained valid and even show Decedent himself consented to law enforcement entering his home.

### 2.     The consent also allowed the search of the vehicle.

Plaintiffs also claim that the consent is invalid because it did not specifically authorize the search of any vehicles. However, the consent did not need to specifically mention the vehicles as long as they were within the attached garage. For comparison, a search warrant that does not specifically mention vehicles, still authorizes a search of such vehicles as long as they are on the premises and "the objects of the search might be located therein." [81] By extension then, if a search warrant does not even require such particularity, there is no reason that a consent has to specifically name vehicles either as long as they are on the premises.

### B.     The search of Decedent's home was legal because there was an emergency need to help a suicidal individual

Even if there was not a consent, Defendants entry into Decedent's home did not violate the Fourth Amendment because there was an emergency need to render assistance to an undisputedly suicidal individual. Plaintiffs claim there was no exigency because Defendants waited too long to enter the home after losing contact with Decedent on the phone. Plaintiffs also argue that Defendants did not believe there was an exigency, but only entered the home because they had the consent.[82] These arguments fail for several reasons.

First, it is inconsistent to say if Defendants had immediately entered the home after losing phone contact then there would be an exigency but waiting ninety minutes somehow diminishes the exigency. It is undisputed that Decedent had been threatening suicide for hours previously and

---

[81] *United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990).
[82] (Doc. No. 86 at 62).

had also consumed a large amount of alcohol. The possibilities then were that Decedent either

needed help or was already dead. The passage of ninety minutes does not somehow negate the

exigency in this instance. After such a long negotiation, where Decedent had constantly threatened

his own life and even prepared a will, the only thing that could have removed the exigency would

have been Decedent receiving medical attention. Decedent clearly needed help, but Defendants

were certainly allowed to be prudent in devising a plan that they thought would be most likely to

help him while simultaneously taking safeguards to ensure their own safety. The exigency posed

a "continuous immediate danger," even if only to Decedent, so it did not disappear.[83]

Second, even if all Defendants thought they could only go into the house because of the

consent, this is irrelevant as a matter of law as to whether there was an exigency to enter the home.

The officer's actions only need to be objectively reasonable; "[t]he officer's subjective motivation

is irrelevant."[84] From an objective standpoint it is beyond dispute the Decedent needed assistance.

Even if threatening to commit suicide is not a crime, this does not diminish the exigency that

Decedent needed emergency aid. The emergency aid exigency does not require that a crime has

been committed, only that officers have "an objectively reasonable basis to believe there is an

immediate need to protect the lives or safety of themselves or others."[85]

Finally, Plaintiffs cite *United States v. Martinez*, 643 F.3d 1292 (10th Cir. 2011) for the

proposition that the possibility someone needs aid is an insufficient reason to enter a home, but

---

[83] *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).
[84] *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (Defendants cited this case in their opening brief as well but mistakenly wrote the word "motion" instead of "motivation." "Motivation" is the word used in the actual quote and Defendants apologize to the Court for misquoting it in their opening motion.).
[85] *Najar*, 451 F.3d at 718.

this is also misguided.[86] In *Martinez*, the Tenth Circuit held a warrantless search of a home was illegal after receiving a 911 call from the location where there was only static on the line. This was because "a static 911 call is insufficient to create an objectively reasonable belief that someone inside the home is in need of aid."[87]

This case is readily distinguishable from *Martinez*. In *Martinez* it was unknown whether anybody needed help.  In this case, Decedent had been engaged in an hours long standoff with police where he had constantly been threatening to take his own life or "go tactical." No argument can be made that Decedent did not need assistance; it was a certainty. As such, there was an objectively reasonable basis to believe Decedent needed emergency aid and therefore the search for Mr. Calzada, in his home, was not illegal.

## II.     Defendants Beck, Mackley, and Perez did not use excessive force upon Decedent.

Only three officers deployed force against Decedent and, therefore, any excessive force claim against any other defendant must be dismissed.  However, there are no facts that show Decedent was subjected to excessive force. Plaintiffs argue that *Graham v. Connor*, 490 U.S. 386 (1989) is not controlling because Decedent was not a criminal suspect.[88] Plaintiffs do not suggest a different excessive force standard for non-criminal suspects, but instead cite cases where the *Graham* factors are still analyzed. *Graham* is the quintessential Supreme Court case related to excessive force claims and is controlling in this situation. This standard "asks whether the police employed objectively reasonable force given the totality of the circumstances."[89]

---

[86] (Doc. No. 86 at 65).
[87] *United States v. Martinez*, 643 F.3d 1292, 1296 (10th Cir. 2011).
[88] (Doc. No. 86 at 63).
[89] *Clark v. Colbert*, 895 F.3d 1258, 1262 (10th Cir. 2018) (*citing Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009)).

Defendants recognize that Decedent's criminal suspect or mental health status play into this totality of the circumstances calculus, but these factors are not determinative in and of themselves. As argued in Defendants' opening motion, other factors "include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[90]

Further, many of the cases cited by Plaintiffs where there was police liability involve fact patterns where force was used within minutes of the police arriving on the scene. *See Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019) (The decedent was shot "within a minute" of police arriving on the scene); *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) (The "entire incident lasted less than four minutes."); *Richard v. City of Wichita*, No. 15-1279-EFM-KGG, 2016 U.S. Dist. LEXIS 130757 (D. Kan. 2016) (A district court case ruling on a motion to dismiss where the officers entered the home "[w]ithin five minutes of arriving on scene."); *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) ("The entire sequence . . . lasted approximately ninety seconds."); *Sevier v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995) ("Less than five minutes had elapsed" from the time when the officers arrived on scene and the decedent was shot.). In these cases, it is the officers' haste that leads to the constitutional violation.

This matter is easily distinguishable insofar as it took hours of negotiation and planning before Defendants even attempted to physically engage with Decedent. Even after he was discovered in the trunk of his car, Defendants pleaded with Decedent for over six minutes to drop

---

[90] *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

his weapons and leave the trunk peacefully. Moreover, *Clark v. Colbert*, 895 F.3d 1258, 1262 (10th Cir. 2018) is more analogous because there the officers waited ten minutes for backup and then formulated a plan, and the court found no constitutional violation. It would be inconsistent then to fault Defendants in this matter for taking their time and developing a thorough plan.

  Plaintiffs also claim that Defendants unnecessarily escalated the situation by coming into the home.[91] However, Defendants attempted for hours to get Decedent to come out of the home peacefully. After ending phone contact, Decedent went and hid himself in the trunk of his car with two firearms; all before any officers had entered his home. Decedent's actions were not a sort of instinctual self-defense, but rather were calculated and intentional before any Defendant had ever set foot upon his property.

  Plaintiffs' reliance on *Quezada v. County of Bernalillo*, 944 F.2d 710 (10th Cir. 1991) is also misplaced and misleading. The Tenth Circuit's holding in *Quezada* was limited to finding the district court's factual findings were inadequate because *Graham v. Connor*, 490 U.S. 386 (1989) had been published between the time of the district court's entry of judgment and when the Tenth Circuit was hearing the appeal.[92] As such, the Tenth Circuit remanded the case to make new factual findings consistent with *Graham*.[93] Further, the *Quezada* defendant was denied qualified immunity for reasons that are not applicable to this case. That is, it was denied because (1) it was unclear if it had been asserted properly, and (2) the court used a now antiquated legal standard when it stated that "in excessive force cases the substantive inquiry that decides whether the force exerted by police was so excessive that it violated the *Fourth Amendment* is the same inquiry that decides

---

[91] (Doc. No. 86 at 66).
[92] *Quezada v. County of Bernalillo*, 944 F.2d 710, 717 (10th Cir. 1991).
[93] *Id*.

whether the qualified immunity defense is available to the government actor."[94] This statement is clearly contrary to the recent United States Supreme Court decisions cited by Defendants in their opening motion that require the law be clearly established with specificity to not be entitled to qualified immunity.[95] The similar fact pattern notwithstanding, *Quezada* makes no judgment about the defendants' actions but only remanded the case to the district court for further proceedings. Quite bluntly, *Quezada* does not hold what Plaintiff suggests, and it is inappropriate for Plaintiffs to rely on it like they did.

Moreover, to the extent Plaintiffs are arguing Defendants were required to take cover, this is not the law in the Tenth Circuit since "officers are *not required* to take cover when they are faced with a deadly threat."[96] The three officers that ultimately shot Decedent–Beck, Mackley, and Perez–responded to the situation in an objectively reasonable manner and therefore did not use excessive force.

Finally, Plaintiffs argue that Decedent's constitutional rights were violated because Defendants commands were confusing and contradicting and did not warn him that they might use deadly force.[97] This argument is self-defeating in that (1) all commands directed at Decedent invariably were to put down his weapons, (2) Decedent clearly was aware deadly force might be used against him given his military training, and (3) Decedent was undeniably suicidal and so for

---

[94] *Id*. at 718.
[95] *See* *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) *and* *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018).
[96] *Pauly v. White*, 814 F.3d 1060, 1076 n. 6 (10th Cir. 2016) (emphasis in original) (*citing* *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001)).
[97] (Doc. No. 86 at 68-70).

Defendants to expressly warn him that they might use deadly force might have actually encouraged Decedent to take actions that would have been more likely to evoke deadly force.

Regardless, Defendants complied with the constitutional requirements to warn Decedent before they used deadly force. This is because orders to drop a weapon are sufficient warning when events unfold quickly.[98] Beck specifically instructed Mr. Calzada to let go of the gun, let it fall to his chest, and the SWAT Members would help him get out of the trunk.[99] Miles also told Decedent that if he dropped his weapon things could still end peacefully.[100] Further, Vanderwarf attempted to communicate with Mr. Calzada asking him to put down his weapons and that they did not want to hurt him, only that the team wanted to get him help.[101] The facts clearly show Decedent was instructed numerous times to drop his weapon but he did not comply with any of these orders. While this ended tragically for Decedent, his constitutional rights were not violated.

## III. All individual Defendants are shielded by qualified immunity.

At the very least, individual Defendants are entitled to qualified immunity. A defendant who raises an affirmative defense of qualified immunity effectively shifts the burden to the plaintiff as a matter of law to show that (1) the defendant's actions violated a constitutional right and (2) the right was clearly established at the time of the defendant's conduct.[102] Ordinarily a Tenth Circuit Court of Appeals or United States Supreme Court decision on point is needed to show a law is clearly established.[103]

---

[98] *Cordova v. City of Albuquerque*, 816 F.3d 645, 661 (10th Cir. 2016).
[99] (Beck Decl. ¶ 32, Doc. No. 74 at 6).
[100] (Beck Decl. ¶ 36, Doc. No. 74 at 6).
[101] (Pledger Decl. ¶ 71, Doc. No. 60 at 14).
[102] *Anderson v. Creighton*, 483 U.S. 635 (1987); *Romero v. Board of County Comm'rs*, 60 F.3d 702 (10th Cir. 1995).
[103] *Woodward v. Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992).

It is Plaintiffs' burden to show how Decedent's rights were clearly established at the time of the incident. Plaintiffs identify several cases, but they are all distinguishable insofar as none of them involve a suicidal individual that the police negotiated with for hours before attempting to make physical contact with him as discussed above. This is an important distinction and shows how the law was not clearly established. "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. . . ."[104]

Defendants were motivated by a desire to save Jose Calzada and a reasonable officer in their "shoes" would not think for a second that they were violating Jose's constitutional rights. Qualified immunity shields an officer from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."[105]  Even if the Court finds anything constitutionally deficient in the conduct of any of the individual officers, they are still entitled to qualified immunity because they misapprehended the law in this situation.  The "particularized acts of the Defendants would not place a reasonable officer on notice that they were violating clearly established law.  (The inquiry is the more "particularized" acts of the defendants in the case at hand).[106]  In this case, the Defendants did not "knowingly violate the law"[107] by their particular actions.

---

[104] *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (*quoting* *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018)).

[105] *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

[106] *Id.* at 199.

[107] *Id.*

Plaintiffs do not identity, and Defendants did not find, any case where constitutional liability was found with a similar fact pattern as this matter. For this reason, the law was not clearly established, and Defendants are entitled to qualified immunity.

**IV.    Weber County and Roy City must be dismissed as Defendants.**

Plaintiffs cannot show with undisputed material facts that there is any basis for liability against Weber County or Roy City. As explained in the opening memorandum, for liability to be shown against the County or City, Plaintiffs must show (1) a constitutionally defective policy or custom, (2) that the final policymaker who implemented the policy or custom acted with "deliberate indifference" to the constitutional rights of the plaintiff (or Decedent in this case), and (3) that the policy or custom "directly caused" and was the "moving force" behind an underlying constitutional violation that caused constitutional harm to the plaintiff.[108]

The SWAT team is solely administered by the Weber County Sheriff's Office.[109] The Weber County Sheriff is the final policymaker for all SWAT team policies and procedures.[110] Roy City could not have changed the SWAT team policy.  All of the Defendants were part of the SWAT team.  SWAT has its own policies and procedures, but if there is no applicable policy or procedure then each officer is bound by the procedure of their employing agency.[111] However, the SWAT team had a comprehensive use of force policy that governed the situation with Jose Calzada.[112] Therefore, only Weber County can be held liable for any alleged defects in the SWAT team's

---

[108] *See generally Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997).
[109] (Thompson Decl. ¶ 11, Doc. No. 58 at 3).
[110] (Thompson Decl. ¶ 13, Doc. No. 58 at 3); (Elliott Decl. ¶¶ 6-7, Doc. No. 59 at 2).
[111] (Thompson Decl. ¶ 12, Doc. No. 58 at 3).
[112] (Thompson Decl. ¶ 14, Doc. No. 58 at 3).

policies and procedures, and Roy City can be dismissed for this reason alone since it cannot be a final policymaker for the SWAT team.

Regardless, Plaintiffs are unable to show a constitutionally defective policy or custom, particularly when they provide no evidence that the SWAT team had killed a suicidal individual in similar circumstances in the past. To hold the County and the City liable, Plaintiffs cannot show merely a defect in a policy, but they must show that a constitutionally defective policy "directly caused" the injury and that the final policymaker made a "conscious choice among various alternatives to implement a policy or training which would and did cause the constitutional deprivation.[113]

Plaintiffs instead argue that lack of training in this instance is enough to incur liability against the County and City. However, the undisputed facts show there are no grounds to find liability against either Defendant. Persistent practices may amount to policy within a municipality, but they must be "so persistent and widespread as to practically have the force of law." [114] "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[115] Plaintiffs must show that the Sheriff made a conscious choice between readily available alternatives and "deliberately chose a [policy, practice, or] training which would prove inadequate."[116] Plaintiffs must also show more than a mere single instance of unconstitutional activity, unless the policy itself is inherently unconstitutional.[117] *See also* Connick v. Thompson, 563 U.S. 51, 62 (2011) (where four prior instances of unconstitutional activity was insufficient to

---

[113] *See generally* City of Oklahoma v. Tuttle, 471 U.S. 808, 824 (1985).
[114] Connick v. Thompson, 563 U.S. 51, 60 (2011).
[115] Id.
[116] City of Oklahoma v. Tuttle, 471 U.S. 808, 824 (1985).
[117] Id.

put the final policymaker on notice that the training was inadequate). This means that the mere fact that Decedent died is insufficient to show a County-wide policy.

A single incident is insufficient to create an official policy or custom.[118] *See also Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident–or even three incidents–do not suffice."); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (holding that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995) (holding that two incidents of alleged excessive force are insufficient to show policy or custom). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation."[119]

Plaintiffs cite *Allen v. Muskogee*, 119 F.3d 837, 845 (10th Cir. 1997) for the proposition that a single incident can lead to constitutional liability for a municipality. However, *Allen* was decided before the Supreme Court's decision in *Connick*, and regardless *Allen* also requires that

---

[118] *Williams v. City of Tulsa*, 627 F. App'x 700, 704 (10th Cir. 2015).
[119] *Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

there is evidence of inadequate training. In conclusory fashion Plaintiffs claim that it was "common for officers to have to deal with mentally ill, emotionally disturbed and/or suicidal people and people under the influence of drugs or alcohol and that it was not uncommon for officers to deal with persons armed with deadly weapons." Plaintiffs then say nothing about the training these officers received, and the undisputed material facts show that "[a]ll team members had received training in proper search and seizures protocols and when it is appropriate to use force including deadly force."[120]

Moreover, even if the SWAT training was somehow deficient (which it was not), Plaintiffs have not shown that it was implemented with deliberate indifference, or that there is a direct causal link to the training and Decedent's death.[121] That is, there is no training that actively encouraged deputies to shoot suicidal individuals without provocation, and therefore, no liability can attach to the County or City.

**WHEREFORE:** This Court should set a time for a hearing and enter summary judgment in favor of Defendants and against Plaintiffs and dismiss all of Plaintiffs' claims with prejudice.

Dated this 9th day of August, 2019.

/s/ *Frank D. Mylar*

_____

Frank D. Mylar
Attorney for Defendants

---

[120] (Pledger Decl. ¶ 9, Doc. No. 60 at 2).
[121] *See generally Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997).