CALZADA

vs

ROY CITY

DENTON HARPER

December 05, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH NORTHERN DIVISION

```
                         )
MARIA CALZADA, et al.,   )
                         )
          Plaintiffs,    )
                         )  Civil No. 1:16-CV-165
vs.                      )
                         )  Honorable David Nuffer
ROY CITY, et al.,       )
                         )
          Defendants.    )
                         )
```

DEPOSITION OF DENTON HARPER

**COPY**

Location:   Weber County Sheriff's Office
            721 West 12th Street
            Ogden, Utah   84404

Date:     Wednesday, December 5, 2018

Time:     2:10 p.m. to 5:11 p.m.

Reported by Teena Green, RPR, CRR, CBC

---

**2**

1                    APPEARANCES
2        FOR THE PLAINTIFF:
3        MELINDA CHECKETTS HIBBERT, ESQ.
         L. MILES LEBARON, ESQ.
4        LEBARON & JENSEN, P.C.
         1513 North Hill Field Road, Suite 1
5        Layton, Utah  84041
         (801) 773-9488
6        melinda@lebaronjensen.com
         miles@lebaronjensen.com
7
         FOR THE DEFENDANT:
8
         FRANK D. MYLAR, ESQ.
9        MYLAR LAW, P.C.
         2494 East Bengal Boulevard
10       Salt Lake City, Utah  858-0700
         mylar-law@comcast.net
11
         ALSO PRESENT:  LIEUTENANT JEFF PLEDGER
12
13                     I N D E X
14       Witness:                               Page
15       DENTON HARPER
16           Examination by Ms. Checketts Hibbert   4
             Examination by Mr. Mylar              95
17           Further Exam by Ms. Checketts Hibbert 108
             Further Examination by Mr. Mylar      112
18
19
20
21
22
23
24
25

---

**3**

1                   E X H I B I T S
2
         No.    Description                       Page
3
4        33     Weber County Sheriff's Office       33
                General Offense Hardcopy
5               2 of 43
                (1 page)
6
7        PREVIOUSLY MARKED EXHIBITS REFERRED TO
8
         No.    Description                       Page
9
10       2      Weber County Sheriff's Office       52
                General Offense Hardcopy
11              32-43
                (12 pages)
12
13       3      Weber County Sheriff's Office       57
                CAD Call Hardcopy 1-37 (of 49)
14              (37 pages)
15       14     Color photo 0392                    42
                (1 page)
16       15     Color photo 0393                    67
                (1 page)
17
         16     Color photo 0394                    62
18              (1 page)
19       17     Color photo 0442                   105
                (1 page)
20
21       30     Color copy of photo (1 page)        93
22
23
24
25

---

**4**

1       December 5, 2018                   2:10 p.m.
2               P R O C E E D I N G S
3               DENTON HARPER,
4       called as a witness for and on behalf of plaintiff,
5       being first duly sworn, was examined and testified as
6       follows:
7               EXAMINATION
8       BY MS. CHECKETTS HIBBERT:
9       **Q.   Will you please state your full name.**
10      A.   Denton Harper.
11      **Q.   And, Mr. Harper, have you ever had your**
12      **deposition taken before?**
13      A.   Yes, I have.
14      **Q.   How many times?**
15      A.   Once.
16      **Q.   And could you tell me what that was in**
17      **relation to?**
18      A.   Geez, I'm thinking of the year, but it was
19      in relation to a vehicle pursuit where a subject lost
20      his life.
21      **Q.   Were you driving one of the vehicles?**
22      A.   A patrol vehicle, yes.
23      **Q.   And how was it that the subject lost his**
24      **life?  Was it in a motor vehicle accident?**
25      A.   He intentionally crashed his vehicle, so it

---

**5**

1       was more of a suicide-type thing, but...
2       **Q.   As opposed to like -- it wasn't a shooting?**
3       A.   Correct.
4       **Q.   And how was it you say he intentionally**
5       **crashed his vehicle?**
6       A.   Well, he ran off the road going at a very
7       high rate of speed intentionally.
8       **Q.   And we're going to come back to that.  I'm**
9       **going to go over some of the ground rules, if you**
10      **will, of the deposition.**
11      **You've had your deposition taken before;**
12      **correct?**
13      A.   Correct.
14      **Q.   And I'm sure that you've spoken with your**
15      **attorney about this deposition.  And so you're aware**
16      **that we have a court reporter taking down every word**
17      **that's said here.**
18      A.   Uh-huh.  (In the affirmative.)
19      **Q.   And the "uh-huh," if I could get you to**
20      **answer with a word such as "yes" or "no" or even**
21      **"okay," it's better than "uh-huhs" and "huh-uhs,"**
22      **because that's just hard to transcribe.**
23      A.   Okay.
24      **Q.   Also, shakes and nods of the head can't**
25      **be transcribed, so audible responses are good to make**

6

1    a clear record.  Also, in normal everyday
2    conversation, we often anticipate what the other
3    person is going to say, you know, it just happens.
4    And so we often interrupt or cut off each other.  And
5    it's not considered rude or -- it's just how we
6    communicate, except for it makes it very difficult
7    for the court reporter to get that down.
8           So I'll do my best to try to wait for you to
9    finish your response before I speak.  And if you'll
10   do the same, wait for me to finish speaking before
11   you begin speaking, that would be helpful.  Okay?
12       A.  Okay.
13       Q.  Also, I am going to be asking you a lot of
14   questions.  And I'm not trying to trick you or
15   anything like that, I'm just trying to find out what
16   happened and get facts.  So if I ask you a question
17   that you don't understand or if it is in some way
18   unclear to you, please ask me to repeat it or
19   rephrase it or let me know that you don't understand
20   and I'll do my best to try to make the question
21   better.  Okay?
22       A.  Okay.
23       Q.  If you do answer, I'll assume you understood
24   my question.  Okay?  Also, there may be times when
25   your attorney will object to one of my questions.

7

1    And that's fine, but if he objects, you're still to
2    answer my question unless he instructs you not to
3    answer.
4        A.  Okay.
5        Q.  Is there any reason why you can't give your
6    best testimony today?
7        A.  I don't believe so.
8        Q.  Have you taken any medications within the
9    past 24 hours?
10       A.  No.
11       Q.  Have you had any alcohol to drink in the
12   past 24 hours?
13       A.  No.
14       Q.  Okay.  We had begun speaking about the
15   incident where an individual lost his life in a
16   vehicle pursuit.  Let's go back to that.
17          Do you remember approximately how long ago
18   that was?
19       A.  I believe it was in 2012.
20       Q.  Just to put it --
21       A.  2010 maybe, even.  So it's somewhere in that
22   timeframe, it's been a long time ago.
23       Q.  Okay.  So you realize the reason we're here
24   today is we're discussing -- we'll mainly be
25   discussing an incident on October 21st, 2014, which

8

1    was the shooting of Jose Calzada.
2           You understand that?
3        A.  Correct.
4        Q.  And so you know, I represent the estate of
5    Mr. Calzada and its personal representatives, his
6    mother and his wife, but just to put it in context,
7    the incident involving the man who died in the
8    vehicle pursuit, that was before the shooting of
9    Mr. Calzada; is that correct?
10       A.  Yes.
11       Q.  Okay.  Now, I believe your prior testimony
12   was that the driver of that vehicle who was being
13   pursued intentionally drove his car off the road.
14          Why do you say that?
15          MR. MYLAR:  Objection, asked and answered.
16   BY MS. CHECKETTS HIBBERT:
17       Q.  You may answer.
18       A.  Because he was suicidal and he was in a
19   stolen vehicle and his -- I was following him for
20   around -- I mean I think it ended up being around 50
21   seconds is all.  He veered his vehicle off the road
22   going at a very high rate of speed and made a very
23   sharp turn on a two-lane road.  So that would be the
24   reason I would believe it was suicidal.  And he had
25   let everybody know that he was suicidal.

9

1        Q.  How had he let everyone know he was
2    suicidal?
3        A.  His mother called into the police department
4    to say he stole a car and he mentioned something
5    about he was feeling suicidal.
6        Q.  His mother reported that?
7        A.  Correct.
8        Q.  Did you ever have any verbal communication
9    with that subject?
10       A.  No.
11       Q.  Are you aware if there was any investigation
12   of that incident?
13       A.  As far as what?
14       Q.  Whether or not your actions in the vehicle
15   pursuit were appropriate or inappropriate?
16       A.  Yes.  There was an investigation and it was
17   deemed that there was no policy or procedure violated
18   and I was clear of any wrongdoing, if that's what
19   you're asking.
20       Q.  Do you know why your deposition was taken?
21       A.  Do I know why?  Yes.  The family decided a
22   couple of years after the fact that they wanted to
23   sue the department for whatever reason.
24       Q.  Do you think the reason was because their
25   son, their family member had died?

---

10

1        MR. MYLAR:  Objection, calls for
2    speculation, calls for a mental impression.
3    BY MS. CHECKETTS HIBBERT:
4        **Q.  You may answer.**
5        A.  Could you restate your question.
6        **Q.  You stated that the family had decided to**
7    **sue the department for whatever reason.  And I asked,**
8    **could it have been because they'd had a family member**
9    **killed?**
10       A.  Sure.
11       MR. MYLAR:  And, again, same objection,
12   calls for speculation and calls for a mental
13   impression.
14   BY MS. CHECKETTS HIBBERT:
15       **Q.  Was there anyone else traveling in the**
16   **vehicle with you during that vehicle pursuit?**
17       A.  No.
18       **Q.  Have you been involved in any other**
19   **incidents where an individual has died during a**
20   **situation in your years as a law enforcement officer?**
21       MR. MYLAR:  Objection, vague.
22   BY MS. CHECKETTS HIBBERT:
23       **Q.  You may answer.**
24       A.  If the question is if I've ever been
25   involved in any other person that's passed away -- is

---

11

1    that what you're asking?
2        **Q.  Yes.**
3        A.  Over a 12-year career, quite a few times,
4    yes.
5        **Q.  Let's talk about those.**
6        **What's the first one that you can remember?**
7        A.  I guess I don't understand the question,
8    because I mean I've been a patrol officer for most of
9    those 12 years, probably 11 -- at least 10 of those
10   12 years.  And I'm called numerous times, sometimes
11   everyday numerous times to suicidal subjects or dead
12   body investigations or things of that nature.
13       **Q.  Okay.  I'm not talking -- okay.  That's**
14   **fair.  I'm not talking about instances like motor**
15   **vehicle accidents before there were any law**
16   **enforcement on scene.  Okay?  So not involving**
17   **vehicle pursuits, just two private parties have a**
18   **motor vehicle accident, I'm not talking about that.**
19       **What I am talking about, where there was any**
20   **other instances where law enforcement was**
21   **investigated as potentially being at fault for the**
22   **death.**
23       MR. MYLAR:  Let me be clear.  Are you asking
24   whether he was involved in those or just any in
25   general?

---

12

1    BY MS. CHECKETTS HIBBERT:
2        **Q.  Well, not unlike Jose Calzada where you're**
3    **not -- no one is suggesting that you shot**
4    **Mr. Calzada, but you were certainly on scene.**
5        **So any instance where you were involved --**
6        A.  In other cases?
7        **Q.  In other cases, yes.**
8        A.  Yeah.  Up to that point, I'm sure there was
9    quite -- there was probably a number of instances
10   where somebody lost their life, whether it was a SWAT
11   call-out or something of that nature.
12       **Q.  Are you a part of the SWAT team?**
13       A.  Am I now?  No, I'm not a part of a SWAT team
14   now.
15       **Q.  Why not?**
16       A.  Because I'm almost 40 years old and I have
17   four daughters and it's just -- I'm just getting too
18   old.  Interests change.
19       **Q.  Did the department say you were too old?**
20       A.  I don't -- well, no department's told me I'm
21   too old for anything.  I made a decision on my own
22   that that was one chapter in my life and I don't like
23   to be called out in the middle of the night anymore.
24   And, you know, there's a lot of training that -- I
25   just have kind of closed that chapter in my life.

---

13

1        **Q.  Is it stressful being on the SWAT team?**
2        A.  Yes, it can be very stressful.
3        **Q.  Did you dislike being on the SWAT team?**
4        A.  No.  I loved being on the SWAT team.
5        **Q.  What did you love about it?**
6        A.  Being able to help people, being able to --
7    we were always highly trained, we were able to go to
8    a number of different trainings that I just wouldn't
9    have gotten in a patrol.  And it's a higher level --
10   it's a high level of police work that, you know, you
11   should be proud of and hold yourself to a high
12   standard.
13       **Q.  When did you graduate from high school?**
14       A.  I'm sorry.  What's that?
15       **Q.  When did you graduate from high school?**
16       A.  1998.
17       **Q.  And after high school, did you have any**
18   **education beyond high school?**
19       A.  I did.
20       **Q.  What did you have?**
21       A.  I graduated with a Bachelor's degree in
22   history education from Utah Valley State College in
23   2006.
24       **Q.  And then what did you do for employment**
25   **after graduating with your Bachelor's degree?**

---

**14**

1    A.  I got a job with the Weber County Sheriff's
2  Office in -- I want to say -- I believe I was hired
3  in the early part of 2007.
4    Q.  Did you go through some sort of police
5  academy or law enforcement training?
6    A.  Yes.
7    Q.  Which one?
8    A.  It was held here at the Sheriff's Office, so
9  it was a basic police academy.
10   Q.  And so in approximately 2007, you joined the
11  Weber County Sheriff's Office?
12   A.  Correct.
13   Q.  Are you still employed with the Weber County
14  Sheriff's Office?
15   A.  No.
16   Q.  Where are you employed, then?
17   A.  I am working for the Salt Lake City Police
18  Department.
19   Q.  When did you begin working for them?
20   A.  I started working -- let's see.  I think it
21  was March 17th, 2016.
22   Q.  Why did you change positions?
23   A.  Because they paid much more than I could
24  make up here.
25   Q.  Were you asked to resign --

**15**

1    A.  No.
2    Q.  -- from Weber County?
3    A.  No.
4    Q.  Did you leave with any discipline pending
5  here at the Weber County Sheriff's Office?
6    A.  I didn't leave here to go to Salt Lake.  I
7  left here on my own will to go to Ogden City Police
8  Department and was there for three years before I
9  went to Salt Lake City.  So I've never left any
10  agency with any pending discipline problems or
11  anything.
12   Q.  When did you go over to -- when did you
13  leave Weber County Sheriff's Office to go to Ogden
14  City Police Department?
15   A.  I believe it was in July of 2013.
16   Q.  So the incident in question here on
17  October 21st, 2014, involving Jose Calzada, were you
18  at that time employed by Ogden City Police
19  Department?
20   A.  That's correct.
21   Q.  Thank you for that clarification.
22      What was your position with the Ogden City
23  Police Department in October of 2014?
24   A.  I tried to think of that.  I was either on
25  patrol or in their community policing bureau.

**16**

1    Q.  And at that time, you were on the SWAT team;
2  correct?
3    A.  Correct.
4    Q.  And when did you first join the SWAT team
5  or -- is that the term you'd use or --
6    A.  Sure.
7      The summer of 2008.
8    Q.  So within a year of being hired?
9    A.  Correct.
10   Q.  Do you know how you were selected for the
11  SWAT team?
12   A.  I know, yes.  There's numerous physical
13  requirements and there's even a selection day where
14  you go through a full day and they decide whether
15  they like some of the abilities that you might bring
16  to the team.  And then if you're selected from the
17  selection day to go to Hell Week, is what they called
18  it, then you're invited to Hell Week.  And they put
19  you through, I believe, a 120-hour course of a very
20  high-stress, no sleep-type environment to see if you
21  have what it takes to meet the requirements for the
22  team.
23   Q.  Were you trained on different weapons as
24  part of your SWAT training?
25   A.  Yes.

**17**

1    Q.  Which weapons were you trained on?
2    A.  I trained on a duty pistol.  I mean I know
3  it was a Glock.  If you want specifics, you might
4  have to talk to somebody else, because I'm not the
5  biggest -- I don't have all the knowledge of guns,
6  but you're trained on firearms with your pistol,
7  you're trained on a long rifle or -- you know, which
8  could be an AR15.  You're trained on shotgun work,
9  trained on some other things.
10   Q.  Did you receive some sort of certification
11  allowing you to use the Glock or the handgun?
12   A.  A certification like paper?  No.  You have
13  to do all those in order to be even a part of the
14  team, but, no, I don't believe I was ever handed a
15  qualification card that said I passed or anything.
16   Q.  But you passed some sort of qualifying
17  event?
18   A.  Correct.
19   Q.  Was it your use of the handgun or your
20  knowledge about a handgun?
21   A.  I believe it was a quarterly qualification.
22  So every three months, you went to the range and you
23  had to shoot 100 percent with a pistol and
24  100 percent with a rifle in order to pass the
25  qualifications.

18

1    Q.  And what about the rifles?
2    A.  What about the rifles?
3    Q.  Are you qualified on the use of rifles?
4    A.  Yes.
5    Q.  Which type of rifle?
6    A.  I personally was qualified with the AR15.
7    Q.  And when did you become qualified with the
8  AR15?
9    A.  Well, it would have had to have been at
10  least in August of 2008 -- or summer, I'll say, of
11  2008, because that's when Hell Week was.  And so I'm
12  assuming somewhere around that time.
13    Q.  Did you have to have quarterly
14  qualifications for the AR15?
15    A.  Yes.
16    Q.  Do you own an AR15?
17    A.  Me personally?  Yes, I do.
18    Q.  When did you first acquire your own personal
19  AR15?
20    A.  It was years later, because I could never
21  afford one, to be honest with you.  So I think I
22  bought one in 2016.
23    Q.  Prior to that time, had you been issued one
24  by either -- any of your employers?
25    A.  Yes.

19

1    Q.  When were you first issued an AR15?
2    A.  I would just be guessing at the dates, but,
3  again --
4    MR. MYLAR:  Just objection to speculation.
5    But go ahead.
6  BY MS. CHECKETTS HIBBERT:
7    Q.  Go ahead.
8    A.  Oh, I'm sorry.
9    MR. MYLAR:  I just don't want you to
10  speculate, but if you have some idea.
11  BY MS. CHECKETTS HIBBERT:
12    Q.  I'm entitled to your best estimate.  I don't
13  want you to speculate, but your best estimate as to
14  when you would have been issued that.
15    A.  It was somewhere in the summer of 2008.
16    Q.  Was there ever a point in time when you were
17  asked to return your AR15?
18    A.  I believe it was issued -- even though it
19  was -- you know, the SWAT team is a Metro unit.  And
20  when I left the Sheriff's Office on my own will
21  because I wanted to go work for Ogden City, I was
22  allowed to keep my AR15 because I was still on the
23  same SWAT team.
24    So was your question when did I return that?
25    Q.  Yes.

20

1    A.  It would have been when I left Ogden, I'm
2  assuming.  Again, it's a guess, but when I went to
3  Salt Lake, would have been when I -- or, I'm sorry,
4  probably when I left the SWAT team is when I would
5  have given the AR15 back.
6    Q.  So sometime in 2016 would be your best
7  estimate?
8    A.  Somewhere in there, yes.
9    Q.  And did you have to qualify quarterly with
10  your AR15?
11    A.  Yes.
12    Q.  Are there any other weapons that you have to
13  qualify to be allowed to use as either a SWAT member
14  or a police officer?
15    A.  I mean it depends on what discipline you
16  were asked to do on the SWAT team, but I was never a
17  sniper, so I never had to be trained on sniper
18  rifles.  I was a breacher, so we did do shotgun work.
19  I can't really think of any other weapons, per se,
20  that I was asked to be qualified on.
21    Q.  Now, you say you were asked to be a
22  breacher.
23    What does that mean?
24    A.  A breacher is a guy that typically -- you
25  know, if a SWAT team went to a structure and the door

21

1  was barricaded or somewhat secure, you could use
2  shotgun ammunition, certain types at least to breach
3  that door, hence, the term "breacher."
4    Q.  Was there a certain time period during your
5  service as a SWAT team member that you were a
6  breacher or was it -- I guess my question, I'm trying
7  to figure out was it like for X number of years or
8  months you were a breacher and the rest of the time
9  you were a different type of SWAT team member, or did
10  it depend on the particular operation you were
11  involved in as to what your role was?
12    A.  I believe the majority of the time I was on
13  the SWAT team, if not the entire time I was on there,
14  that was my job was, I was one of the breachers.
15    Q.  Okay.  And so you had to be qualified
16  quarterly on the shotgun, then?
17    A.  That, I do not recall specifics.  I know we
18  were trained in, you know, certain different things
19  with the shotgun, but I don't recall if there were
20  quarterly qualifications with that.
21    Q.  Was there a certain requirement while you
22  were employed by Ogden City and/or on the SWAT team
23  as to how often you had to go to the shooting range
24  to practice your target shooting?
25    A.  Are you asking how often Ogden trained us?

**22**

1       As far as I understand it, if you're on the
2    SWAT team, the Metro SWAT team, that was so much more
3    qualifications than any department would train their
4    patrol officers.  And I believe, if I'm not mistaken,
5    that most departments would say, "Oh, you're
6    qualifying with SWAT.  Well, that's far more advanced
7    than what our patrol functions do.  So they would
8    acknowledge those qualifications.
9       **Q.  Okay.  So you've told me and I appreciate**
10   **that you had to certify on a quarterly basis on the**
11   **handgun, the rifle and the shotgun; correct?  Maybe**
12   **not the shotgun.**
13      A.  Yeah, I can't confirm the shotgun.
14      **Q.  But my question is, in addition to just**
15   **certifying quarterly, was there any requirement that**
16   **you actually had to go practice or be on the shooting**
17   **range more often than quarterly?**
18      A.  I think there were numerous -- I mean it's
19   not like the SWAT team only shot four times a year at
20   the range.  We shot a lot more and were trained far
21   more than just four times a year.  Sometimes it was a
22   few times a month.  The qualifications, if I remember
23   right, were quarterly for at least the rifle and the
24   handguns.
25      **Q.  So in any given month while you were on the**

**23**

1    **SWAT team, how often would you say you shot your**
2    **handgun?**
3       A.  On average?
4       **Q.  Yes.**
5       A.  I mean it could be a couple of times, it
6    could be -- or else sometimes none.  So if I had to
7    average -- I believe I was on the SWAT team for just
8    under eight -- about seven years.  And you're asking
9    me how many times a month?
10      **Q.  And, yeah.  And I'm not talking just about**
11   **in an active operation but also like on the shooting**
12   **range.**
13      A.  Sure.  How often we were on --
14      **Q.  How often you would estimate in a month you**
15   **would shoot your handgun?**
16      A.  At least a couple of times, probably.
17      **Q.  How about the rifle, the AR15?**
18      A.  Probably the same.
19      **Q.  And what about the shotgun?**
20      A.  It wasn't as often as the pistols or the
21   rifles.
22      **Q.  Was there a reason for that?**
23      A.  I don't know.
24      **Q.  Was that your choice or a department policy**
25   **as to the number of times you would shoot?**

**24**

1       A.  A shotgun?
2       **Q.  Uh-huh.  (In the affirmative.)**
3       A.  It just all depended on what the training
4    was for that day.  So sometimes we wouldn't go on the
5    range at all and then sometimes we would go
6    back-to-back trainings, which were usually every
7    other week.  So why the shotgun was used less, I
8    couldn't answer that.  I don't know.
9       **Q.  In your service as a SWAT team member, would**
10   **you most often carry a shotgun or a rifle or both?**
11      A.  On a deployment, I would carry a rifle more
12   than I would carry a shotgun.
13      **Q.  Even if you were the breacher?**
14      A.  Right.  And it all depended on what the
15   mission was and what -- how many doors needed to be
16   breached.  So every mission was different, so...
17      **Q.  How often would you clean your weapons?**
18   **After every shooting exercise?**
19      A.  I know that was recommended.  I mean, yeah,
20   I'm sure I didn't clean it after every single time I
21   ever went to the range.  I'm sure there were some
22   days that I was busy with the kids and running around
23   and all that as far as -- and the numerous other
24   things we're asked to do, but, yeah, it was highly
25   encouraged to keep your weapons clean.

**25**

1       **Q.  How familiar would you say you are with the**
2    **parts of an AR15?**
3       A.  Like the nomenclature?
4       **Q.  Just identifying the parts of an AR15.**
5       A.  Not very well.
6       **Q.  You couldn't visually identify if it was an**
7    **AR15 or could you?**
8       A.  Something similar, sure.  I know there's a
9    lot of officers that they love -- they're gun gurus
10   and they do their own loads and -- I mean on their
11   off time.  I've never been a guy to really care to go
12   and -- I don't own numerous guns in my safe and I
13   don't -- so, no.  I mean I could probably point out
14   if something was an AR15, but I'm not the expert by
15   any means.
16      **Q.  If there's an AR15, could you identify the**
17   **magazine on it?**
18      A.  Sure.
19      **Q.  Could you identify the front grip on it?**
20      A.  Sure.
21      **Q.  What type of training were you given with**
22   **respect to searches of homes in your service as a law**
23   **enforcement officer?**
24      A.  Searches as in search and seizure law or the
25   actual search of a home for --

26

1    Q.  Fair question.
2        In October of 2014, if you can kind of try
3    to place yourself in that timeframe, what was your
4    understanding of search and seizure laws as they
5    pertain to law enforcement officers entering an
6    individual's home?
7        MR. MYLAR:  Objection to the extent that
8    asks a legal question.
9        But go ahead, you can answer.
10       THE WITNESS:  I'd been a police officer
11   for -- that's 2014, right -- so seven years.  So to
12   answer your question, how familiar was I with search
13   and seizure laws?
14   BY MS. CHECKETTS HIBBERT:
15       Q.  And what was your understanding of when law
16   enforcement could enter?
17       A.  Well, that could be on -- there are so many
18   factors to that that there's no way -- there's no
19   standard answer for that.
20       Q.  Had you been given any training as to when
21   it was appropriate to enter homes or not?
22       A.  As a patrol officer, absolutely.  Things are
23   different when they have -- they call out SWAT for a
24   very heated subject.
25       Q.  Okay.  So tell me the difference.  What was

27

1    your understanding of when it was lawful for law
2    enforcement to enter a person's home.
3        A.  I mean are you asking for the factors -- I
4    mean I guess I'm not understanding your question,
5    because --
6        Q.  Is it lawful to enter if you have a search
7    warrant?
8        A.  Yes.
9        Q.  Okay.  What's another instance where it's
10   lawful to enter?
11       A.  Consent.
12       Q.  And who can give consent?  What was your
13   understanding?
14       A.  We could talk about this at length for hours
15   at a time.
16       Who?  Well, I would say the homeowner, the
17   person who has standing to the home can give consent.
18   There's a lot of people that can give consent to a
19   home.
20       Q.  A lot of people?
21       A.  Sure.
22       Q.  Tell me what your understanding was as to
23   who could give consent.
24       A.  Well, if an officer came to my house, my
25   kids could allow somebody into the home, my wife.  If

28

1    my parents are there, they could invite somebody in.
2    And me, the homeowner, obviously I could, too.  So
3    there are a lot of people that could invite somebody
4    into a home.
5        As a patrol officer, when I go to a call, I
6    don't have to make sure I'm talking to the landlord
7    who owns the home in order to get permission to go
8    into the home.  So there's numerous people that can
9    allow you to enter.
10       Q.  Okay.  And I'm just asking you to enumerate
11   the individuals that you believe can give consent to
12   enter a home.
13       A.  And I gave those.
14       Q.  So people that are in the home?
15       A.  Sure, or a homeowner if he's in the Bahamas,
16   or I mean there's a lot of people that can give you
17   consent to go into a home.
18       Q.  Can a person who's not in the home but is
19   not a homeowner give consent to enter the home?
20       A.  It depends on what standing they have to
21   that house.  Are they the spouse, are they the
22   live-in girlfriend that that's their residence?
23   Then, yes, they can give you consent to go in.
24       Q.  Can a person who is away from the home and
25   not a homeowner give consent to enter the home which

29

1    is valid if a person inside the home is not allowing
2    the entry?
3        MR. MYLAR:  Objection.
4    BY MS. CHECKETTS HIBBERT:
5        Q.  What was your understanding at that time, in
6    October of 2014?
7        MR. MYLAR:  Objection, it assumes facts
8    contrary to evidence.
9        Go ahead.
10       THE WITNESS:  Could you rephrase that,
11   please.
12   BY MS. CHECKETTS HIBBERT:
13       Q.  In the general sense, what was your
14   understanding, if an individual away from the home,
15   did not own the home, gave consent, but the
16   individual in the home who owned the home did not
17   give consent, would that be valid consent to --
18       A.  Well, that depends on what standing that --
19       MR. MYLAR:  Let me object first.
20       I'm going to object because it's an
21   incomplete hypothetical and it is assuming facts
22   contrary to the evidence of this case.
23       But go ahead.
24       THE WITNESS:  See, and then I forget the
25   question, but anyway --

30

1    BY MS. CHECKETTS HIBBERT:
2        Q.  We can have Teena --
3        A.  No, you're fine.
4        Q.  Do you understand my question?
5        A.  I believe I do, but, again, that depends on
6    what standing to the home does that person who's not
7    at the home have to give consent or not?
8            So that's a great question.  I don't know --
9    I mean can somebody -- is your question, can somebody
10   away from the home who doesn't own the home, can they
11   give consent?  Absolutely, if they're a live-in
12   girlfriend, if they're a son or daughter.  I mean
13   absolutely you can get consent to search.
14       Q.  That was one piece of my question.
15           The second piece is, is that consent valid
16   if the person who owns the home is in the home and
17   has not given consent to enter?
18       A.  And, again, there's numerous factors.
19   That's a great question.  I mean and every situation
20   is different.
21           Is that person in dire need of help?  Is
22   that person -- I mean there's just not a definitive
23   yes or no.  There's so many factors that fall into
24   that line.
25       Q.  Give me specifics as to your understanding

31

1    of when that would be valid for police officers to
2    enter.
3        A.  Welfare checks.  We go on those numerous
4    times as patrol officers.  Somebody says, you know,
5    I'm concerned for my daughter or whatever, you know,
6    because I haven't heard from them and it's not like
7    them.  We go to that residence and we're not getting
8    a response.  I mean there's so much that can go into
9    do we go in for -- you know, to make sure that
10   they're okay.  And, you know, there's obviously so
11   many factors that play into that.
12           Are they on medication?  What type of
13   history do they have with health problems?  So I
14   don't know if there's -- I mean I'm sure there's
15   numerous other instances if you want me to expound.
16   If not --
17       Q.  Can you think of other instances when it
18   would be lawful for law enforcement to enter?
19       A.  I'm sure I could think of a few others, if
20   you gave me time, but I mean that's kind of on the
21   spot.
22       Q.  Okay.  Let's talk about October 21st, 2014.
23           You were called to Mr. Calzada's home;
24   correct?
25       A.  Correct.

32

1        Q.  Do you know who requested that you report to
2    that scene?
3        A.  With it being so many years ago, I mean I
4    don't remember the specifics, but typically, we get a
5    page on our cell phone being a member of the SWAT
6    team saying, "Hey, we have an incident at this
7    address, you know, if you're -- please respond," kind
8    of thing.
9        Q.  Do you recall if you were on duty at the
10   time that you received notification to respond?
11       A.  I do remember I was on duty with Ogden
12   Police Department, yes.
13       Q.  Do you recall approximately what time it was
14   that you received that notification?
15       A.  I want to say it was in the morning time,
16   somewhere in the morning.
17       Q.  Do you recall what information you were
18   given by dispatch as to what was going on?
19       A.  I don't, other than probably a barricaded
20   subject, suicidal subject-type thing.  And anything
21   more than that, I don't recall.
22       Q.  And you reported to the scene?
23       A.  Correct.
24       Q.  Do you recall who you spoke to when you
25   reported to the scene?

33

1        A.  Usually when you show up, you would report
2    to whoever was in charge of -- you know, as far as
3    the SWAT structure goes, and let them know you were
4    there.  And then they would probably tell you, all
5    right, go get into your gear, your SWAT gear.  And
6    then I don't recall exactly who I reported to, no, I
7    don't.
8            (Exhibit No. 33 was marked.)
9    BY MS. CHECKETTS HIBBERT:
10       Q.  Do you recognize this document?
11       A.  Yes, I do.
12       Q.  What is it?
13       A.  It would have been my report that I wrote in
14   regards to the incident on -- is it 10/23/2014?
15       Q.  Could that be 10/21/2014?
16       A.  You know what, it might be.  It seems like a
17   very blurry copy, but, sure, it might be 10/21.
18       Q.  When's the last time you read this report?
19       A.  It's probably been a few days ago.
20       Q.  Why don't you take time to reread it.  It's
21   just one page.
22       A.  Okay.
23           (Witness reads document.)
24           Okay.  I'm finished.
25       Q.  Upon rereading and reviewing your report,

---

34

1    Exhibit 33, are there any corrections that you feel
2    need to be made to this report?
3        A.  I don't believe so.
4        Q.  So is this report an accurate
5    memorialization or writing of what occurred, from
6    your perspective, on October 21st, 2014?
7        A.  Yes.
8        Q.  So looking at the first paragraph, the
9    second sentence, will you read that.
10       A.  Where again?
11       Q.  First paragraph, second sentence.
12       A.  "After I arrived on scene, members of the
13   SWAT team were briefed by Lieutenant Pledger."
14       Q.  Does that refresh your recollection as to
15   who you spoke to about this incident when you
16   arrived?
17       A.  I don't recall me walking up to him, but if
18   I wrote it, then I'm sure it happened, yes, because
19   that's just what we did when we showed up, we went to
20   whoever was in charge.  And it sounds like on this
21   day, yes, that's what happened.
22       Q.  Do you recall the specifics of the briefing
23   that you received?  What do you recall about the
24   briefing you received?
25       A.  Can I read the next couple of sentences

---

35

1    and -- I believe that would cover it.
2        Q.  Okay.  Please read them.
3        A.  "We were told the subject, Jose Calzada, was
4    heavily intoxicated and had made comments about
5    having police shoot him.  We were instructed to
6    perform a slow and deliberate search of the house for
7    Jose."
8        Q.  Do you have a separate and specific
9    recollection of that being told to you during the
10   briefing?
11       A.  If you're asking if I remember exact details
12   four years ago, no, I don't.  I remember that this
13   would -- again, if I wrote it down, with it being so
14   long ago, I have no doubt that happened, if that's
15   what I wrote.
16       Q.  Do you recall being informed that
17   Mr. Calzada had not violated any crimes -- or not
18   violated any -- had not committed any crimes?
19       A.  I would not recall that ever being brought
20   up.
21       Q.  Do you recall being told that Mr. Calzada
22   had not threatened anyone?
23       A.  Well, clearly, I wrote he was threatening to
24   shoot police.  So I don't recall him threatening
25   nobody.

---

36

1        Q.  I didn't see here threatening to shoot
2    police.
3        A.  Third sentence, "We were told the subject,
4    Jose Calzada, was heavily intoxicated and had made
5    comments about having police shoot him."
6            So in exchange of fire with the police is, I
7    guess, what was brought up.
8        Q.  So it's your testimony that your statement
9    here about having made comments about having police
10   shoot him was the same as saying he was going to
11   shoot police?
12       A.  Could you rephrase your question.
13       Q.  I'm just trying to understand your testimony
14   where you said that -- you wrote that Jose Calzada
15   said that he was going to shoot police and I asked
16   you to point that out.
17       A.  Okay.
18       Q.  And so, again, what language do you say in
19   your report states that Jose Calzada said he was
20   going to shoot police?
21       A.  I guess I wrote he had made comments about
22   having police shoot him, so I guess I read it wrong
23   when you asked.
24       Q.  So do you have an independent recollection
25   of being told that Mr. Calzada had made any threats

---

37

1    about shooting police?
2        A.  I don't recall that.  I just recall what's
3    in the report, so...
4        Q.  Do you recall being told that Mr. Calzada
5    had called the suicide crisis line?
6        A.  I wouldn't recall the specifics of
7    remembering that, no.
8        Q.  Do you recall being told how long law
9    enforcement had been negotiating and speaking with
10   Mr. Calzada?
11       A.  No.
12       Q.  Do you recall being told that Lieutenant
13   Pledger thought that Mr. Calzada had probably fallen
14   asleep?
15       A.  I don't recall that.
16       Q.  Do you recall being told that Mr. Calzada
17   had stated that he had been up all night?
18       A.  No.
19       Q.  Do you recall being told that Mr. Calzada
20   had consumed large quantities of alcohol?
21       A.  No.
22       Q.  Do you recall being told that Mr. Calzada
23   had taken prescription medication that likely would
24   have made him drowsy?
25       A.  No.

---

38

1      Q.  Do you recall being told that Lieutenant
2   Pledger thought that it was likely that Mr. Calzada
3   had passed out from the drugs and alcohol?
4      A.  No.
5      Q.  Do you recall Lieutenant Pledger informing
6   SWAT team members that Mr. Calzada had not committed
7   any crimes?
8      A.  No.
9      Q.  Do you recall Lieutenant Pledger or anyone
10  informing the SWAT team that Mr. Calzada had not
11  threatened anyone?
12     A.  No.
13     Q.  Do you recall Lieutenant Pledger telling --
14  or anyone telling the SWAT team that Mr. Calzada had
15  allowed the other occupants in the home to leave of
16  their own accord during this incident?
17     A.  No.
18     Q.  What were your instructions from Lieutenant
19  Pledger when you were told to enter the home?  What
20  was your objective?
21     A.  Our objective would be to search for
22  Mr. Calzada.
23     Q.  Why?
24     A.  For his welfare.
25     Q.  Were you informed by Lieutenant Pledger that

---

39

1   Mr. Calzada had told law enforcement officers that he
2   was tired and he wanted to go to sleep?
3      A.  I don't remember hearing that or if it was,
4   I just don't recall it.
5      Q.  Were you told that it was at approximately
6   4:00 a.m. when Mr. Calzada first called the suicide
7   crisis line?
8      A.  I don't recall.
9      Q.  Were you informed that it was at
10  approximately 8:59 a.m. that law enforcement lost
11  phone contact with Mr. Calzada?
12     A.  No.
13     Q.  And you were not informed that prior to
14  losing phone contact Mr. Calzada had told law
15  enforcement that he was tired and wanted to go to
16  sleep?
17     A.  I'm not saying I wasn't informed of
18  anything.  I'm saying when you're doing this four
19  years later, I don't recall specific details like
20  that.
21     Q.  After being given the instruction that the
22  SWAT team should locate Mr. Calzada, what further
23  instructions did you receive from Lieutenant Pledger
24  as to what SWAT team members were to do if they
25  located Mr. Calzada?

---

40

1      A.  I believe it would have been to safely take
2   him into custody so that we could get him the help he
3   needed.
4      Q.  Were you told that it was a goal of the plan
5   to try to re-establish communication with
6   Mr. Calzada?
7      A.  I don't recall.
8      Q.  If that had been the instruction, what would
9   have that meant to you?
10     A.  That's complete speculation.  I have no
11  idea.
12     Q.  So when your superior gives the instruction
13  to try to re-establish communication, you would have
14  no idea what that meant?
15     A.  No.  You gave a hypothetical question.  And
16  how do I answer a hypothetical question?
17     Q.  At this time, in 2014, you'd had at least
18  seven years on the job.
19         Given that background, bringing that to
20  bear, what would that mean to you to have been given
21  the instruction that your objective was to
22  re-establish communication with Mr. Calzada?
23     A.  To talk to him.
24     Q.  But you don't recall being given that
25  instruction?

---

41

1      A.  No, I don't.
2      Q.  Were you given any instruction that you
3   should back off or back out once you found him?
4      A.  No.
5      Q.  What was your understanding that you
6   should -- you stated that it would be your goal to
7   apprehend him and take him into custody; correct?
8      A.  Correct.
9      Q.  How did you anticipate being able to do
10  that?
11     A.  Well, most of these types of SWAT call-outs
12  end very peacefully.  When we had gone in and were
13  able to safely apprehend the subject and give them --
14  you know, ultimately, it's everybody's goal at the
15  end of the day to go home safe.  And that was the
16  goal, no doubt, that day and getting the help he
17  needed.  If he was suicidal, let's get you up to a
18  counselor to talk to a counselor.  If you need --
19  whatever avenue, let's get you the help you need.
20     Q.  Will you read the final sentence of your
21  first paragraph aloud, please.
22     A.  "We were instructed to perform a slow and
23  deliberate search of the house for Jose."
24     Q.  What did that instruction mean to you?
25     A.  That means, to me, that when you go in the

---

42

1    house, you're not going in there running through it
2    as fast as you can.  You're usually -- slow and
3    deliberate means you -- once you gain entry, in this
4    case in the garage, you sit for a number of minutes
5    to try and listen to anything out of the -- you know,
6    when there's an air conditioner going on, when is
7    this going on, and basically become -- to understand
8    the environment you're in.  And when it's deemed that
9    we've had enough time to, you know, become acquainted
10   with the environment, then in a very slow manner, you
11   look for where anybody could be hiding.
12       Q.   Will you read the next sentence of your
13   report, the first sentence of the next paragraph.
14       A.   "The SWAT team approached the house with the
15   cover of an armored Suburban."
16       Q.   And I believe it says, "Of the armored
17   Suburban"; correct?
18       A.   Yes.
19       Q.   I'm going to show you what's previously
20   marked as Exhibit 14.
21            (Previously marked Exhibit No. 14 was
22   referred to.)
23   BY MS. CHECKETTS HIBBERT:
24       Q.   Is that the armored Suburban?
25       A.   Yes.

43

1    Q.   Do you recognize this photo?
2    A.   Yes.
3    Q.   Do you recognize the home in the photo?
4    A.   Yes.
5    Q.   What is that home?
6    A.   It appears to be the home of Mr. Calzada.
7    Q.   Now, what do you mean when you say, "The
8    SWAT team approached the house with the cover of the
9    armored Suburban"?
10       A.   Usually, if we have the luxury of having an
11   armored Suburban on scene, you would approach a house
12   by standing behind it.  As the driver slowly drove up
13   to it, you would take cover behind there and -- just
14   to avoid getting hurt.
15       Q.   So that would be the usual instance;
16   correct?
17       A.   Yeah, I think so.
18       Q.   On October 21st, 2014, how did it play out?
19       A.   We approached the house with the cover of
20   the armored Suburban.
21       Q.   Meaning that the Suburban drove in front and
22   the SWAT team was behind it?
23       A.   I'm assuming in this case, but I would
24   assume that was the case.  Again, the specific
25   details, this will happen quite often on a lot of

44

1    other calls, so I would assume that that's what we
2    did in this case, is approached the house as it was
3    slowly driving up to it by standing behind it.
4        Q.   You were a part of the team that entered the
5    home; correct?
6        A.   Correct.
7        Q.   Okay.  The next sentence in your report,
8    will you read that, to the first comma.
9        A.   "After the Suburban was parked in the
10   driveway of the residence."
11       Q.   Okay.  Do you remember which direction the
12   Suburban was facing when it was parked in the
13   driveway?
14       A.   No, I don't.
15       Q.   You don't remember if it was head in or back
16   in or --
17       A.   I do not recall.
18       Q.   Okay.  And then the next -- after the comma,
19   keep reading.
20       A.   "The team gained entry into the house by
21   breaching a man door on the west side of the garage."
22       Q.   Were you the one who breached the man door?
23       A.   I don't even recall that.
24       Q.   Do you know if you were carrying a shotgun
25   and/or a rifle in this operation?

45

1        A.   I don't recall.
2        Q.   After entering the garage, what is the next
3    thing you recall doing?
4        A.   Do you mind if I look at my report?
5        Q.   You may look at your report.
6        A.   We held our position, meaning we hunkered
7    down, if you will, took a knee, whatever --
8             MR. MYLAR:  Just for the record, the witness
9    is reading basically -- or testifying from Exhibit 33
10   right now.
11            Go ahead.
12            THE WITNESS:  In an attempt to determine
13   whether or not we could hear where Jose was located.
14   And I checked to see if Jose was inside any of the
15   vehicles in the garage.  Typically, that's a visual
16   thing by looking in the window, seeing if he's laying
17   in a back seat.  And I even pulled up on both trunks
18   to determine if -- and excuse me, and determined they
19   were safely latched.
20   BY MS. CHECKETTS HIBBERT:
21       Q.   Aside from reading your report, which is
22   Exhibit 33, do you have an independent recollection
23   of doing those actions?
24       A.   Yes, I do.
25       Q.   Do you recall anything being said prior to

46

1    entering the garage?
2        A.  I don't recall, no.
3        Q.  Do you recall anything being said by the
4    SWAT team members while you were in the garage?
5        A.  I do not.
6        Q.  Did you have a body camera on you?
7        A.  I do not think I did.  I don't recall.
8        Q.  Why do you think you did not?
9        A.  Because there was a transition of this --
10   the world of law enforcement.  I mean this was
11   probably in the beginning stages of body cameras.
12   And I don't think I ever carried a camera -- I know I
13   never carried a camera on patrol with the Sheriff's
14   Office or Ogden.  And I don't remember wearing one in
15   this instance for the SWAT team.
16       Q.  Did you carry with you any less lethal -- I
17   don't know if weapon is the right word, or
18   instrument, device?
19       A.  I don't remember if I was or not.
20       Q.  If you'd been carrying a shotgun, would that
21   typically be loaded with less lethal ammunition?  Is
22   that the correct term --
23       A.  Sure.
24       Q.  -- less lethal?
25       A.  Sure.

47

1        Whether that shotgun would have been loaded
2    with -- typically, whether it's loaded at the time
3    with less lethal or lethal, you always have the
4    capability of less lethal.  So if it was loaded with
5    regular ammunition, such as breaching ammunition,
6    since primarily that's what shotguns are for in a
7    SWAT environment, I believe you would always have --
8    again, this is years ago, but you would always have
9    less lethal options so that if some situation turned
10   different, then you had that capability.
11       Q.  Did you carry with you a taser?
12       A.  I do not believe I carried one on a SWAT
13   belt.
14       Q.  Were you required to be certified with a
15   taser as part of the SWAT team?
16       A.  Yeah, I believe so.  I recall trainings
17   where they went over tasers and how they operated.
18       Q.  Do you recall there being any sort of policy
19   if the members of the SWAT team should carry tasers
20   when they enter different operations?
21       A.  I can't recall those, no.
22       Q.  Do you recall any sort of a policy that
23   required that there be other less lethal options
24   carried on the person of a SWAT team member entering
25   different operations or situations?

48

1        A.  No, I don't recall.
2        Q.  Do you know if there was a search warrant
3    obtained to enter Mr. Calzada's home?
4        A.  I couldn't tell you.
5        Q.  Did you ask?
6        A.  No, I wouldn't have asked.  I would have
7    trusted the leadership that, if that was needed, then
8    that would have been done.
9        Q.  Did you think that this was a situation that
10   warranted a search warrant?
11       A.  Looking back now or at the time --
12       Q.  No, at the time.
13       A.  Can I say that my job to show up if the SWAT
14   team's been called out is not to play "what if," you
15   know, and to second-guess the entire SWAT element.  I
16   would assume that if we got called out, we are there
17   for a good reason.  And Lieutenant Jeff Pledger, I
18   thought extremely highly of him, I still do.  And if
19   he called out the SWAT team, he is a guy that is very
20   by the book.
21       Q.  So was your habit to just do whatever you
22   were told?
23       A.  I had great faith in the leadership.  And he
24   would never put us in a position that we weren't --
25   he would never put us in a position that we shouldn't

49

1    be in.
2        Q.  So you never turned it over in your mind as
3    to whether or not it would be appropriate to enter
4    Mr. Calzada's home?
5        A.  Well, first of all, I wasn't there from the
6    start when it was with Roy.  So, no, I'm not in the
7    position of showing up on a call and questioning the
8    patrol officer and his sergeant and his lieutenant
9    and then questioning the SWAT lieutenant and the SWAT
10   commander.  I mean, no.  If we're there, we're there
11   for a good reason.  So, no, I don't sit there and
12   mull these questions over.  I respond and I do what
13   I'm asked to do.
14       Q.  So what basis did you think you had for
15   entering Mr. Calzada's home?
16       A.  We were there to help him on a welfare
17   check, to get him the help he needed.
18       Q.  Do you recall how many officers entered
19   Mr. Calzada's home?
20       A.  I don't have a specific number, but I would
21   assume probably at least seven or eight of us.
22       Q.  Do you recall if you had audio communication
23   among the members of the SWAT team?
24       A.  Yes, we had radio communications with each
25   other.

50

1    Q.  Do you recall where Lieutenant Pledger was
2  at this time that you entered the home?
3    A.  He was probably out on the main street there
4  at the end of the cul-de-sac in some type of mobile
5  command center.
6    Q.  Do you know if there was any sort of
7  visual -- ability to visually see the home from where
8  he was located?
9    MR. MYLAR:  Objection, calls for
10  speculation, calls for a mental impression.
11    But you can answer.
12  BY MS. CHECKETTS HIBBERT:
13    Q.  You had been at the command center getting
14  briefed; correct?
15    A.  Yeah.
16    Q.  Could you see the home from there?
17    A.  I don't recall.
18    Q.  Do you recall getting any instructions from
19  Lieutenant Pledger or from anyone over the radio
20  while you were conducting the search?
21    A.  It's common practice to stay in
22  communications with each other, updating, you know,
23  the mobile command what we're seeing, if -- so, yeah,
24  again, the specifics I wouldn't have a clue, but it's
25  common to stay in communications with the leadership

51

1  of the SWAT team who typically aren't even in the
2  house.  And in this case, over in the mobile command.
3    Q.  Do you know how the commander can direct a
4  operation that they can't see?
5    A.  Well, they have leaders and they trust those
6  leaders inside the house.  And typically that's how
7  it's conducted.
8    Q.  And so after you got into the garage, were
9  all the SWAT members who entered the home -- how long
10  did they remain in the garage?
11    A.  I would say ten minutes is probably a fair
12  estimate of how long we stayed in there and listened
13  to see if we could hear him in an upstairs bedroom or
14  whatnot.  So, yeah, I'd give it about ten minutes.
15    Q.  And then who made the decision to enter into
16  the home -- I mean depart the garage and enter into
17  the home?
18    A.  I don't recall who gave the actual
19  instruction.
20    Q.  Now, I understand that Lieutenant Pledger
21  was back at the command center on another street.
22    Who was the leader, or was there a leader
23  designated among those of you who entered the home?
24    A.  There's always a leader.
25    Q.  And who was that during this operation?

52

1    A.  I don't recall.  Sometimes you have --
2    Q.  Could it have been Armando Perez?
3    A.  Yeah, it could have been.
4    Q.  Do you think it was?
5    A.  Well, there's more than one leader in any
6  environment.  There are squad leaders, there's
7  assistant squad leaders, there's leaders of a sniper
8  team.  So it very well could have been Armando Perez.
9    Q.  Okay.  I'm going to ask you to look at
10  Exhibit 2.
11    (Previously marked Exhibit No. 2 was
12  referred to.)
13  BY MS. CHECKETTS HIBBERT:
14    Q.  It's been previously marked.  It was marked
15  during Lieutenant Pledger's deposition.  I'll
16  represent to you that this report was given to us by
17  your attorney and that Lieutenant Pledger testified
18  that this was the report that he had written.
19    So if we go to -- turn to page 38 of 43 on
20  the bottom of this exhibit.
21    A.  Thirty-eight of forty-three?
22    Q.  Yeah, exactly.  And you'll see about halfway
23  down, he says, "The following SWAT personnel
24  responded to my request," and then there's a listing
25  of names.

53

1    Do you see that?
2    A.  Yes.
3    Q.  Reviewing these names and their titles, or
4  assignments, I suppose, does this refresh your
5  recollection as to who was the leader while you were
6  inside the home?
7    A.  No, because there's more than one leader.
8    Q.  Okay.  Help me understand.
9    A.  Well, when you get in the home, there's some
10  people that go upstairs, there's some people that
11  stay on the main floor.  And if there's a basement --
12  I mean you don't -- you split up once you're inside
13  the home.  So any one of these guys could have
14  stepped up, not just Armando.
15    For example, I was the assistant squad
16  leader with the Bravo squad, but if somebody has a
17  better vantage point or has more intel than -- I
18  mean, in theory, we're all leaders on a SWAT team.
19    Q.  Okay.  I do see here, yes, "Denton Harper
20  Bravo Quad assistant squad leader."
21    Who was the Bravo squad leader or was there
22  one?
23    A.  Well, somebody was and they weren't on
24  scene, I guess.  So either they didn't respond to the
25  call -- I'm not even sure who it was at that time on

54

1    the team, but --
2        Q.   So did that then fall to you to be the
3    leader?
4        A.   Of the Bravo squad, sure.  I mean if the
5    squad leader, per se, wasn't there, then, yeah,
6    you're the next one down, but, again, faith is put
7    into all these guys.  So it's not like we get into
8    the garage and one guy raises his hand, he's like,
9    all right, I'm the leader.  We just perform the
10   mission and perform what tasks need to be done.
11       Q.   Okay.  Where it says -- on page 38 of 43, do
12   you see where it says, "Armando Perez"?
13       A.   Yes.
14       Q.   It says, "Armando Perez 'Alpha' squad's
15   leader (Entry team)."
16           Do you see that?
17       A.   Yeah.
18       Q.   What does that signify to you?
19       A.   That he's the squad leader of Alpha team.
20       Q.   So were there two entry teams or was the
21   combination of Alpha and Bravo that entered that home
22   considered the entry team?
23       A.   Yes.  That would be the case, that the
24   combination of these people, whether you're on Alpha
25   or Bravo, you made entry and you're all on the entry

55

1    team.  And then once you get into a different
2    situation, an open door here or a set of staircases
3    there, I mean even the lowest guy on this totem pole
4    here, so to speak, could say, "Hey, somebody come
5    with me, we're going to go up there and do this."
6           And, you know, these are competent people
7    that we have faith in.
8        Q.   So did any member of the SWAT team give a
9    direction that it was time to enter the home?
10       A.   I don't recall if it was somebody inside the
11   garage, I don't recall if it was somebody from the
12   mobile command, but if we have -- so, no, I don't
13   recall somebody stepping up to the plate, so to
14   speak, and saying, all right, we're going in.  It was
15   just -- typically, you clear that with leadership in
16   the mobile command and they say, "Okay."
17       Q.   Okay.  So do you recall entering the home?
18       A.   I do, yes.
19       Q.   What did you do after you entered the home?
20       A.   You know, once we're in the home from the
21   garage, I mean we're just looking in any bedroom,
22   under beds, anywhere a human body could be hiding.  I
23   don't recall if I went upstairs to the top floor, I
24   don't recall if I stayed on the main level or even if
25   there was even a basement in this home.  I couldn't

56

1    tell you the specifics, but I do recall we went in
2    and our initial search we didn't find him.
3        Q.   Okay.  And so do you recall about how long
4    that initial search took?
5        A.   It was a lot slower than I -- I'm not a very
6    patient person, so we always have to just take it
7    very, very slow.  And I wouldn't even know how long
8    that took.
9        Q.   And then what did you do after you -- okay,
10   the team didn't find him with the initial search.
11           So then what do you recall being instructed
12   to do?
13       A.   I remember thinking to myself, well, that's
14   odd.  I mean typically you get called in, you find
15   the person.  So then we were called to do a secondary
16   search of the residence.
17       Q.   And how did the secondary search differ or
18   did it from the initial search?
19       A.   I think you go slower and you look even into
20   more nooks and crannies.  I mean it's not uncommon
21   for people to go up in attics and things of that
22   nature.  So we would have been even more thorough
23   than we were the first time.
24       Q.   Do you recall specifically what you searched
25   during the secondary search?

57

1        A.   I do not, no.
2        Q.   Do you recall who you were with?
3        A.   I don't, because it can change once you get
4    to the kitchen, once you get to the basement.  I mean
5    it can always -- it's just an evolving thing.  So,
6    no, I couldn't tell you exactly who I was with.
7        Q.   Do you recall anything that you saw of
8    interest or significance in the home?
9        A.   No.
10       Q.   If you'll go to your report, Exhibit 33 --
11       A.   Okay.
12       Q.   -- the third paragraph, third sentence
13   beginning with, "Ogden Fire Paramedic B. Stirling."
14           Can you read that.
15       A.   Sure.
16           "Ogden Fire Paramedic B. Stirling advised me
17   over the radio he had located an unlocked door to a
18   travel trailer on the west side of the garage."
19       Q.   Thank you.
20           Now, if you'll turn to Exhibit 3 here.
21           (Previously marked Exhibit No. 3 was
22   referred to.)
23           THE WITNESS:  Is that the tab?
24   BY MS. CHECKETTS HIBBERT:
25       Q.   Yeah.  And it's been marked as Exhibit 3 and

58

1    it was marked during Lieutenant Pledger's deposition.
2        Do you recognize this document?
3        A.  I don't.
4        Q.  As you look at it, what does it appear to
5    you to be?
6        A.  I don't know.
7        Q.  I'll represent to you that I received this
8    from your attorney.
9        And at the top, it says, "Weber County
10   Sheriff's Office CAD Call Hardcopy."
11       Does this give you some information as to
12   what this might be?
13       A.  I don't even know what that means.
14       Q.  Well, other witnesses in this case have
15   testified that it appears to be the dispatch's --
16   notation of the dispatch communications between
17   dispatch and law enforcement officers during this
18   incident.
19       A.  Okay.
20       Q.  And you see that the date at the beginning
21   on that first page is October 21, 2014, at 4:13:30?
22       A.  Okay.
23       Q.  All right.  If you will turn to page 31 of
24   49 of Exhibit 3.
25       Okay.  Now, look back at your report,

59

1    Exhibit 33.  It says that Officer Stirling advised --
2    you said, "Advised me over the radio."
3        Did he advise you specifically or the team
4    in general that he had unlocked the door to the
5    travel trailer?
6        A.  I couldn't tell you if it was me.  I would
7    think, by reading that, it was me specifically, but
8    sometimes they just say things over the radio and
9    say, "Hey, I got this," like an unlocked door to a
10   travel trailer.  So I...
11       Q.  Okay.  Now, going back, then, to Exhibit 3,
12   page 31, will you read this second entry down.  It
13   states that it's 2014-10-21.  Then it says,
14   "11:02:14."
15       Do you see that?
16       A.  Yes.
17       Q.  Okay.  Will you read that aloud, please.
18       A.  "Z1M1 door on trailer is unlocked."
19       Q.  So do you have any reason -- or does the
20   notation that it was at 11:02 comport with your
21   recollection of approximately when it was that the
22   trailer door was found to be unlocked?
23       MR. MYLAR:  Objection, lack of foundation.
24       You can answer if you have one.
25       THE WITNESS:  I don't even know what the

60

1    question was, I'm sorry.
2    BY MS. CHECKETTS HIBBERT:
3        Q.  Okay.  I'm just trying to put into context
4    of approximately when it was that the trailer door
5    was found to be unlocked.
6        Does it seem like it was probably around
7    11:02 or in that neighborhood?
8        MR. MYLAR:  Objection, calls for
9    speculation.
10       THE WITNESS:  Sure, that would make sense to
11   me.
12   BY MS. CHECKETTS HIBBERT:
13       Q.  You don't have any reason to dispute it?
14       A.  Exactly.
15       Q.  Okay.  And you do recall over the radio
16   hearing words to the effect that the trailer door was
17   unlocked; correct?
18       A.  Correct.  Yes.
19       Q.  Okay.  Great.
20       Then will you read the next sentence on
21   Exhibit 33, on your report, "I grabbed," the last
22   sentence of paragraph 3.
23       A.  "I grabbed B. Butler and T. Fulton and told
24   them to respond to the trailer with me so we could
25   search it."

61

1        Q.  Do you recall doing that?
2        A.  Yes.
3        Q.  Okay.  So what happened after you grabbed
4    them?  Did you actually get into the trailer?
5        A.  You know, I don't remember.  I just remember
6    at some point, it was shortly thereafter, that is
7    when Mr. Calzada was discovered back in the garage.
8    So I don't recall going in and -- it just -- it
9    happened pretty quick --
10       Q.  Okay.
11       A.  -- from when we were told it was unlocked
12   and let's go search that to, hey, people yelling at
13   him to show him hands and things.
14       Q.  Okay.  So do you recall being informed by
15   dispatch over the radio that they'd located
16   Mr. Calzada?
17       A.  No.  I remember B. Miles.
18       Q.  Who is B. Miles?
19       A.  Brandon Miles.
20       Q.  Okay.  A member of the SWAT team?
21       A.  Yes.  I remember hearing him say, "Show me
22   your hands," and thinking, he's in the garage, like,
23   where is the subject for Brandon Miles to be saying
24   that?
25       Q.  Where were you when you heard Brandon Miles

62

1    yell, "Show me your hands"?
2        A.  I believe I was about ready to make entry
3    into the travel trailer or probably just outside of
4    the garage out into the open air when those commands
5    were given.
6        Q.  So when you heard Officer Miles shout, "Show
7    me your hands," what did you do then?
8        A.  Well, again, I remember being surprised
9    that, well, they found somebody.  And I saw the trunk
10   to one of the -- a car in the garage was open.  And
11   they were --
12       Q.  Okay.  So wait.  Just so I can make sure
13   that we're clear here, I'm going to have you look at
14   Exhibit 16.
15       (Previously marked Exhibit No. 16 was
16   referred to.)
17   BY MS. CHECKETTS HIBBERT:
18       Q.  I'll have to look at it that way.  How about
19   that?
20       Okay.  So is the travel trailer that you're
21   talking about this white trailer on the --
22       A.  West side.
23       Q.  -- west side?
24       A.  Yes.
25       Q.  And the right side of the photograph, right

63

1    side of the garage?
2        A.  Yes.
3        Q.  So when you heard Officer Miles shout, "Show
4    me your hands," you could not see in the garage;
5    correct?
6        A.  I don't recall exactly where I was standing,
7    but I do remember shortly thereafter, if not at that
8    time, I could see what -- looked over to see what he
9    was doing and there was a trunk of a car open.
10       MR. MYLAR:  Could we just take a break?
11   We've been going for about an hour and a half.
12       MS. CHECKETTS HIBBERT:  Sure.  Yeah, let's
13   take a break.
14       (A recess was taken.)
15   BY MS. CHECKETTS HIBBERT:
16       Q.  We're back on the record, Mr. Harper.
17       And do you understand that you're still
18   under oath; correct?
19       A.  Yes.
20       Q.  Okay.  Now, I'm trying to think where we got
21   to.
22       Okay.  We were looking at Exhibit 16 and you
23   had testified that you heard Officer Miles shout
24   words to the effect, "Show me your hands," and you
25   were over by the trailer.

64

1        And is it the trailer that's visible in this
2    picture --
3        A.  Yes.
4        Q.  -- on the right-hand side of the picture?
5        Then how did you enter the garage, if you
6    recall?
7        A.  These doors were closed, so it would have
8    been through that same man door.
9        Q.  And when you say "these doors," you're
10   pointing to the roll-up doors, the big doors; right?
11       A.  That's correct.
12       Q.  And was the man door, then, on the side of
13   the garage next to the trailer?
14       A.  Yes.
15       Q.  And do you recall who was in the garage at
16   the time?
17       A.  I know Brandon Miles was.  I mean that's the
18   only one I can verify and be for sure on.  I could
19   speculate on others, which I won't, but I just --
20   yeah, I was in the vicinity of that trailer when I
21   heard Brandon Miles' voice and I know Brandon well
22   and recognized his voice.
23       Q.  Okay.  So when you entered the garage from
24   the man door, you saw the trunk open; correct?
25       A.  Correct.

65

1        Q.  Could you see anything or anyone in the
2    trunk?
3        A.  The angle I was at, I don't recall seeing
4    anybody at that time.  I remember thinking, because
5    I'd checked that trunk, like, wow, there's actually
6    somebody in there, you know, because I'd gone -- one
7    of the first things I did was I would just lift up on
8    the trunk to see if it was securely latched, which I
9    did the first time, before any of the slow and
10   deliberates.  And I remember Brandon was standing at
11   the car, at the trunk.  And that was my first
12   impression was, wow, there's actually been somebody
13   hiding in that thing this whole time.
14       Q.  Okay.  So where was Officer Miles standing
15   when you entered the man door?
16       A.  He had to have been standing right next to
17   the car to even get a visual.  So, again, I couldn't
18   even tell you what side of the car he was standing
19   on, other than he was speaking to an individual who
20   was inside the trunk.
21       Q.  And could you see that individual?
22       A.  No.
23       Q.  So what did you do next or what did you hear
24   next?
25       A.  The next thing I recall is wanting light to



66

1    be inside that garage.  And it was a very dark
2    environment.  And I thought it was in the team's and
3    everybody's best interest to grab Bob Stirling and
4    exit the garage through the same man door and get a
5    better vantage point by getting in the Suburban and
6    parking it -- it would have been a little further
7    back than what this picture shows, but parking it
8    perpendicular to where Mr. Calzada was at.
9        **Q.  And when you say "park it a little further**
10   **from what this picture shows," you're pointing to**
11   **Exhibit 16.  And the white vehicle in this picture**
12   **does not appear to be in front of the garage or in**
13   **the driveway.  So it's your testimony it would have**
14   **been backed up -- so was it -- and when you say**
15   **perpendicular, you mean it would have been across the**
16   **driveway.  As opposed to the usual when you pull into**
17   **a driveway head in, it would have been the --**
18       A.  Correct.
19       **Q.  -- body -- the length of the Suburban was**
20   **parallel with the home, correct, or perpendicular to**
21   **the driveway?**
22       A.  It was perpendicular to the driveway, yes.
23       **Q.  Okay.  And did you drive the vehicle and put**
24   **it in that position?**
25       A.  You know, I couldn't even tell you if it was

67

1    me that drove it or moved it from where it was to
2    reposition it or if it was Bob Stirling.  I don't
3    recall -- I do recall once it was where we wanted it,
4    I then preceded to open one of these windows that you
5    can see here.  Again, this is not -- I believe we
6    would have been further to the west.
7        **Q.  So let's look at Exhibit 15.**
8            (Previously marked Exhibit No. 15 was
9    referred to.)
10   BY MS. CHECKETTS HIBBERT:
11       **Q.  And when you pointed to one of these**
12   **windows, are you meaning a window in the back, a long**
13   **window, the back side window?**
14       A.  I believe it was this one on the right
15   passenger's side.  They also have these things.
16   They're called gun ports.
17       **Q.  In the door, then, of the second row of the**
18   **Suburban?**
19       A.  Correct.
20       **Q.  And do you recall, was the Suburban crossing**
21   **the driveway or was it crossing the sidewalk or was**
22   **it in front of the sidewalk or was it in the street?**
23       A.  I know -- I mean we would have -- if I had
24   to guess, it was like we repositioned -- and it might
25   have been slightly on the sidewalk, but it wasn't in

68

1    the driveway.  I mean it was between the sidewalk and
2    the street.
3        **Q.  Okay.  And going back to your comment a few**
4    **moments ago, when you said you needed more light in**
5    **the garage, did you do anything to provide more light**
6    **to the garage?**
7        A.  I didn't, but when we were finally in
8    position with the Suburban where we wanted to be, I
9    believe I contacted somebody on the radio and said,
10   "Hey, okay, hit the garage door button."
11           And they opened, in which I could finally
12   see Mr. Calzada in the trunk.  I could see the SWAT
13   team members engaging him in conversation, which it
14   just allowed a lot more light inside the garage,
15   which is always way more beneficial than to be in the
16   dark.
17       **Q.  Okay.  After the garage doors were opened,**
18   **rolled up, the roll-up doors were opened, and the**
19   **Suburban was in place, where were you physically**
20   **located?**
21       A.  Inside the Suburban.
22       **Q.  In that second row?**
23       A.  I believe it was that second row door.
24       **Q.  Okay.  Now, let's go back to your report,**
25   **Exhibit 33.**

69

1        **The fourth paragraph down where it says --**
2    **I'm sorry, I guess we're going back to when you were**
3    **in the garage prior to getting in the Suburban.**
4        **Can you read the first three sentence, "As**
5    **we were about."**
6        A.  "As we were about to make entry into the
7    trailer, I heard B. Miles yell, 'Show me your hands.'
8    When I looked over I noticed Miles had the trunk of a
9    vehicle open inside the garage.  Miles told me Jose
10   was inside the trunk and he had a gun inside of his
11   mouth."
12       **Q.  So how close did you get to Officer Miles?**
13       A.  I'm sure I walked up to the point where -- I
14   mean I can't recall giving you an exact distance, but
15   I mean it was to the point I wanted to see who he was
16   talking to.
17       **Q.  And did you see who he was talking to?**
18       A.  I don't recall.
19       **Q.  And when you say that, "Miles told me Jose**
20   **was inside the trunk and he had a gun inside of his**
21   **mouth," did Officer Miles tell that to you like in a**
22   **face-to-face, person-to-person conversation or was**
23   **that over the radio?**
24       A.  Well, it was more like, hey, we have him
25   here in the trunk and he's got a gun in his mouth.

70

1    So I'm sure that was yelled out so that everybody
2    could be aware, because typically, when law
3    enforcement comes across a gun, we make it very well
4    known to everybody else for their own safety that we
5    have a guy with a gun.
6        Q.  So when you said, "He told me," it wasn't
7    just to you?
8        A.  That's a fair statement.
9        Q.  Is that correct?
10       A.  Yeah.
11       Q.  Okay, but did you ever see Mr. Calzada with
12   a gun in his mouth?
13       A.  I believe it wasn't until I went out in the
14   Suburban and I -- once we were in position, the
15   garage door was finally -- the roll doors, if you
16   will, open, that's when I first saw Mr. Calzada with
17   a gun.
18       Q.  Okay.  Will you please read the next
19   sentence beginning with, "Miles and J. Beck."
20       A.  "Miles and J. Beck gave Jose" -- sorry, it's
21   a bad copy -- "very clear instructions to put the gun
22   down, but Jose would not comply with their orders or
23   even respond to them."
24       Q.  Did you see Mr. Calzada at this point in
25   time?

71

1        A.  I don't recall.  There was no engagement,
2    there was no dialogue between Mr. Calzada and
3    Mr. Miles -- or Officer Miles and Officer Beck.  It
4    was -- they were telling him to, you know, drop the
5    gun type thing, and he just wouldn't comply or -- he
6    acted like he didn't even understand what was going
7    on.
8        Q.  When you say he acted like he didn't
9    understand what was even going on, did you see him?
10       A.  No, but typically, there's --
11       Q.  How do you know that, then?
12       A.  Because there was no conversation, there was
13   just -- he just wasn't doing anything that they were
14   ordering him to do.
15       Q.  How do you know that?
16       A.  Because they repeated it numerous times.
17       Q.  When you say Jose would not comply with
18   their orders, you couldn't see him complying or not
19   complying, could you?
20       A.  No, I couldn't.
21       Q.  So why did you put that in your report?
22       A.  Because typically when people start
23   complying with orders, they are given new sets of
24   instructions, such as -- if the gun was -- I'm
25   assuming, this is just, you know, as a police

72

1    officer.  If the guy complies and puts the gun away,
2    then the next instruction would be, get out of the
3    trunk, lay on your stomach, put your arms behind your
4    back.  And it was the same order over and over and
5    over.  So one could assume that he wasn't doing what
6    he was instructed to do.
7        Q.  So this was an assumption that he did not
8    comply with the orders, not your personal knowledge
9    that he didn't comply with the orders?
10       A.  If he would have complied, there would have
11   been new sets of instructions.
12       Q.  So you assumed he hadn't complied; correct?
13       A.  Sure.
14       Q.  Because you didn't have a visual on him at
15   this point?
16       A.  Not that I can recall, no.
17       Q.  Okay.  Then we talked about you getting into
18   the Suburban and moving it perpendicular at the end
19   of the driveway, maybe crossing the sidewalk but not
20   on to the driveway, correct, or thereabouts?
21       A.  Somewhere in there, sure.
22       Q.  How far of a distance would you say it was
23   from where the Suburban was parked, that portal that
24   you were looking out of and the trunk where
25   Mr. Calzada was?

73

1        A.  Thirty feet, give or take, twenty-five or
2    thirty feet.
3        Q.  When you were in that position in the
4    passenger row -- or the second row of the Suburban,
5    looking through the portal, could you see
6    Mr. Calzada?
7        A.  Yes.
8        Q.  What could you see of Mr. Calzada?
9        A.  Do you mind if I take a look at my report?
10       Q.  First, I want to ask you your present
11   recollection, then you can look at your report.
12           What do you presently recall that you could
13   see?
14       A.  He was inside the trunk.
15       Q.  Was he kneeling in the trunk?
16       A.  No.  He was laying on his back and he had a
17   gun, I believe, on his chest.
18       Q.  What kind of a gun?
19       A.  A handgun.
20       Q.  A handgun on his -- and you saw it on his
21   chest?
22       A.  Or near his chest.
23       Q.  Was he holding it or was it just laying
24   there?
25       A.  He would have been holding it.

74

1      Q.  Okay.  Now, if you want to look at your
2   report, you can look at it.  Okay?
3      A.  Okay.
4      Q.  Now, does reading this refresh your
5   recollection as to who made the decision to raise the
6   garage doors?
7      A.  No.
8      Q.  But you advised Officer Perez that you were
9   in position and that he could raise the garage doors;
10   correct?
11      A.  Again, if that's -- I would definitely trust
12   the report if that's -- but, yeah, I mean I'm sure I
13   let him know at some point that we were in position
14   and whoever -- I mean I don't know if it was him,
15   because I mean the doors were closed.  So I don't
16   know who opened the garage door, but he was advised
17   that, hey, hit the garage door buttons and then
18   let's, you know, open them.
19      Q.  And you advised him this after -- as it says
20   according to your report, the third sentence of this third
21   sentence of the fifth paragraph, "I them jumped" -- I
22   think you mean "I then jumped," right, "in the back
23   seat"?
24      A.  Is that a question?
25      Q.  Will you please read that sentence.

75

1      A.  Oh, I'm sorry.  "I then" -- you're right, I
2   probably had a typo there, "jumped in the back seat
3   and opened one of the gun ports and placed the barrel
4   of my AR15 through it."
5      Q.  Okay.  Then the next sentence?
6      A.  "I advised A. Perez I was in position for
7   him to open the garage door."
8      Q.  And then the garage doors were opened;
9   correct?
10      A.  Yes.
11      Q.  Now, as you previously -- will you read the
12   last three sentences of that or actually just read
13   the last four sentences and then we'll talk about
14   them.
15      A.  Starting with?
16      Q.  "A few seconds."
17      A.  Okay.  "A few seconds later the garage door
18   opened and I saw Jose lying on his back in the trunk
19   of a vehicle.  I observed Jose holding a black
20   colored handgun on his chest.  Jose was told numerous
21   times to put the gun down.  After a while he
22   eventually put the handgun behind his head and
23   dropped the weapon."
24      Q.  Thank you.
25          Did you ever see Mr. Calzada move from the

76

1   position of lying down?
2      A.  To?
3      Q.  To sitting up, to -- did you ever see him
4   move to --
5      A.  I saw him move numerous times.
6      Q.  Move what part of his body?
7      A.  His arm.  He kept reaching -- if I were to
8   lie on my back, he kept reaching -- and, again, I
9   don't know if it was his left hand or his right hand,
10   but he was reaching.  And Bob Stirling and I kept
11   saying, "He's reaching for something.  What is that
12   he's reaching for?"
13          It appeared there --
14      Q.  What could you see?  Describe visually what
15   you could see in the trunk.
16      A.  It appeared that he was laying next to like
17   a subwoofer or a speaker box inside the trunk of the
18   vehicle, and I only know that because I used to have
19   one.  So I remember -- and he kept reaching.  And
20   it's extremely nervous when you have a guy that --
21   there's at least one gun in that car that we observed
22   him having.  And he's engaging with police officers
23   or at least he sees that he's surrounded and he keeps
24   reaching.  And so I didn't know what he was reaching
25   for.  My fear was he was reaching for another gun,

77

1   because he was trying to do it in such a slow manner,
2   that my fear was that he was going to pull the
3   trigger of a rifle and seriously injure or kill one
4   of our officers that was standing by the car.
5      Q.  Why were you afraid he was going to pull the
6   trigger of a rifle?
7      A.  As opposed to a handgun?  I'm not sure what
8   the question is.
9      Q.  Yeah.  You testified you could see a
10   subwoofer.
11          Could you see a rifle?
12      A.  Well, there was some black object on top of
13   the subwoofer that he made it clear to me that he was
14   reaching for.  And --
15      Q.  And he reached for it, you said, slowly?
16      A.  He was reaching for it slowly, right.  And
17   just through training and experience, he wasn't
18   following orders, and I was in fear that some serious
19   bodily injury or death was going to come upon
20   officers, was my fear.
21      Q.  Wasn't following orders?
22      A.  No.
23      Q.  Didn't you just state that he'd dropped his
24   weapon?
25      A.  Well, the instructions of show me your

78

1    hands, keep your hands where I can see them type
2    nature, it's very common for police to say that. You
3    know, there was a lot of yelling and screaming to
4    show me your hands from the people that were inside
5    the garage.
6        Q.   Now, did you ever see Jose make any
7    aggressive movements toward the other law enforcement
8    officers?
9            MR. MYLAR:  Objection, vague as to
10   aggressive movements.
11           THE WITNESS:  Define "aggressive."
12   Noncompliant to me is -- can be aggressive.
13   BY MS. CHECKETTS HIBBERT:
14       Q.   But was it in this instance?
15       A.   His actions -- I was extremely fearful
16   something was about to happen.
17       Q.   But you stated he hadn't said a word and
18   that the last thing you wrote was that he dropped his
19   weapon?
20       A.   I said I didn't hear him engaging with
21   Mr. Miles when I was in the garage.  Again, this
22   Suburban is armored, meaning bulletproof.  And I have
23   one little tiny gun port open, so I had no idea if
24   there was an engagement after I left the garage, but,
25   yes, his actions, I was growing increasingly nervous

79

1    that something -- he was doing something that was
2    going to get somebody hurt.
3        Q.   Okay.  Will you read the first sentence of
4    the next paragraph, the, "B. Stirling."
5        A.   The last paragraph of the --
6        Q.   Yeah, the first sentence of the last
7    paragraph.
8        A.   "B. Stirling was sitting inside the Suburban
9    with me when he told me it appeared there was a rifle
10   inside the trunk."
11       Q.   Could you see a rifle inside the trunk?
12       A.   I couldn't make it out.
13       Q.   Why do you think it was that B. Stirling --
14   would that be Bob Stirling?
15       A.   Yes.
16       Q.   Why do you think it was that Bob Stirling
17   could make out the rifle and you could not?
18       A.   Different shadows or, you know, maybe he had
19   a better vantage point from wherever he was sitting
20   inside that Suburban compared to where I was sitting.
21   I don't know if there was an obstruction, low light,
22   there could have been a number of reasons that he saw
23   it and I didn't.
24       Q.   So the angle from the Suburban wasn't very
25   good to see what was inside the trunk?

80

1        A.   I mean where -- it's never perfect, that's
2    for sure.  It was the best we could do to be in an
3    armored vehicle and to -- you know, I thought we were
4    in a great position.  I'm just not sure where he was
5    sitting when he saw the rifle as opposed to where I
6    was sitting.
7        Q.   Okay.  Then your next sentence, will you
8    read that.
9        A.   "I got on the radio and told the other team
10   members that there may be a rifle in the trunk with
11   Jose."
12       Q.   Was there a reason why you got on the radio
13   and said that, as opposed to Bob Stirling?
14       A.   No, I don't see any reason why.  I just
15   wanted to let -- if that was what was being believed
16   that he was potentially reaching for, I wanted to
17   make it very clear that there may be a rifle in there
18   and to let the other officers know for their own
19   safety.
20       Q.   Do you recall informing the officers that
21   there may be a rifle or that there was a rifle?
22       A.   I wrote in here that there may be a rifle.
23       Q.   So do you recall what you said to the
24   officers over the radio?
25       A.   Verbatim, no, I don't.  I'm sure there was

81

1    something to do with he's reaching for something, you
2    know, there might be a rifle in there, just take
3    extreme caution.
4        Q.   So if you will turn to Exhibit 3, page 32 of
5    49.
6        A.   Okay.
7        Q.   Do you recall when Mr. Calzada dropped the
8    weapon behind his head, did you report that action
9    over the radio to the other members of the team?
10       A.   I don't believe I do, because they would
11   have had a much better vantage point of seeing up
12   close than me being some distance away.
13       Q.   Okay.  On page 32 out of 49 of Exhibit 3, if
14   you go down about two-thirds of the way to the entry
15   at 11:12:28.  Do you see that?
16       A.   Uh-huh.  Yes.
17       Q.   Where it says, "Gun is behind head now"?
18       A.   Yes.
19       Q.   Would that have been a communication you
20   would have made?
21       A.   You should be able to find out who made that
22   transmission.
23       Q.   Do you recall making a transmission to that
24   effect?
25       A.   I don't.  No, I don't.

82

1    Q.  Do you recall hearing a transmission to that
2  effect?
3    A.  I don't recall, no.
4    Q.  Do you recall hearing Bob Stirling making
5  any transmissions?
6    A.  I don't.
7    Q.  In this scenario, was it Bob Stirling kind
8  of talking to you and then you relaying the
9  information?
10    A.  In regards to the rifle, I would definitely
11  say yes, since he was the one that saw it and I was
12  the one that got on the radio to make -- to tell them
13  to be very careful.
14    Q.  Okay.  The next entry after "The gun is
15  behind his head now," the next entry is at 11:12:42.
16      Do you see that?
17    A.  Yes.
18    Q.  Where it says, "Get shield up here now."
19    A.  Yes.
20    Q.  Do you recall making that request?
21    A.  I personally don't.
22    Q.  Okay.  Then the next entry at 11:13:56, do
23  you see that?
24    A.  Yes, I do.
25    Q.  Will you read that entry.

83

1    A.  "Thinks he may got rifle in trunk be
2  careful."
3    Q.  Do you recall making that communication?
4    A.  I very well could have.  I do recall saying
5  the next one.
6    Q.  You did say that one?
7    A.  I have no -- yeah.
8    Q.  At 11:14:06, will you read that.
9    A.  Sure.  "Mile" -- I mean these are
10  transcribed by dispatchers, but that would say, "Mile
11  step back rifle might be pointed right at you."
12    Q.  Could you see which way the rifle was
13  pointed?
14    A.  No, I couldn't.
15    Q.  Could you even see the rifle?
16    A.  I couldn't, but, again, I was a ways away.
17    Q.  So did anyone tell you the rifle might be
18  pointed at Miles?
19    A.  No.  It was just a total precautionary
20  thing, it may be pointed right at you.  That was what
21  my fear was, is that he's slowly reaching up and was
22  going to -- had even the capability of hurting one of
23  the officers.
24    Q.  Did you ever see Mr. Calzada touch the
25  rifle?

84

1    A.  Again, I've told you, I never saw a rifle.
2  I can tell you he put his hand on top of that speaker
3  box.  And if Bob Stirling believed that there may be
4  a rifle or that he was reaching for a rifle, then,
5  yeah, we're going to treat it as though, worst case
6  scenario, he's reaching for something.  Just use
7  extreme caution was the only thing I wanted to relay.
8    Q.  Do you recall the tone of your voice when
9  you were relaying this information to the other
10  officers over the radio?
11    A.  No, I don't recall the tone of my voice.
12    Q.  Were you yelling?
13    A.  I was nervous that something was about to
14  happen.  And when you think that somebody potentially
15  is going to do harm to officers, yeah, I could have
16  yelled.  I wouldn't doubt that I yelled.
17    Q.  In your report, in the sixth paragraph,
18  would you read the third sentence.
19    A.  Starting with, "It was about"?
20    Q.  Uh-huh.  (In the affirmative.)
21    A.  "It was about that time Stirling and I
22  noticed Jose slowly reaching for what we believed was
23  to be the rifle."
24    Q.  And you believed this because Bob Stirling
25  thought that maybe it was a rifle?

85

1    A.  Right.  I mean I had no reason to question
2  Bob at all.
3    Q.  And when you say you saw Jose slowly
4  reaching, I'd like you to think back to that day when
5  you saw Mr. Calzada lying in the trunk.  Can you now
6  recall whether it was the arm closest to the opening
7  of the trunk or the arm closest to the subwoofer that
8  you saw reaching for the rifle?
9    A.  I don't recall.
10    Q.  Do you recall if Mr. Calzada reached slowly
11  once or twice, or how many times did he slowly reach
12  for what you thought might be a rifle?
13    A.  This went on for minutes of trying to get
14  him to just let's end this peacefully.  I mean that's
15  the goal of every officer, every SWAT call-out, let's
16  all go home.  And I don't recall how many times he
17  reached his hand up to the subwoofer box.
18    Q.  Do you recall if it was once?
19    A.  I don't recall.  I could assume all I want,
20  but I'm not going assume, but when you're sitting
21  there negotiating with a guy for a very long time, he
22  didn't -- I don't believe he did it just once.  I
23  mean I believe he was constantly moving his hands
24  into places that we couldn't see what he was exactly
25  reaching for.  I know I couldn't.

86

1    Q.  Why do you believe he was constantly moving
2  his hands?  What's the basis for your belief?
3    A.  Because I -- I mean reading and looking at
4  your exhibit, that there's transcriptions that say
5  he's moving his hands, he's moving his hands.
6    Q.  So you're saying that this lasted several
7  minutes or several moments?
8    A.  I don't know what the difference would be.
9    Q.  Well, let's look at your report, Exhibit 33,
10 paragraph 6, where you just read, what, the third
11 sentence, "It was about that time Stirling and I
12 noticed Jose slowly reaching for what we believed was
13 to be the rifle."  It says, "I advised team members
14 of Jose's actions."
15   And then what's the next thing you wrote?
16   A.  "A few moments later I heard numerous shots
17 fired and I noticed Jose had been hit."
18   Q.  After advising the team members that Jose
19 was -- I assume you advised them of -- would you be
20 advised them that he appeared to slowly be reaching
21 for a rifle.
22   Did you see any other movements made by
23 Mr. Calzada?
24   A.  No.
25   Q.  Did you hear him make any statements?

87

1    A.  No.
2    Q.  Did you ever hear him make any threats to
3  anyone?
4    A.  No, I don't recall any.
5    Q.  Did you ever see him move his torso above
6  the floor of the trunk?
7    A.  I don't recall that.  I don't.
8    Q.  Do you recall seeing him move his legs?
9    A.  I mean he wasn't as stiff as a board.  I
10 mean that would be impossible to lay there, but I
11 mean, again --
12   Q.  Do you recall seeing --
13   MR. MYLAR:  Wait, wait, wait, wait.  Let him
14 finish his sentence.
15   Go ahead.
16   THE WITNESS:  Moments seem like minutes seem
17 like hours.  I mean there were times where all time
18 stops and you're so focused on what is he doing.  So
19 I don't recall him kicking his legs, moving his legs,
20 no, I don't.
21 BY MS. CHECKETTS HIBBERT:
22   Q.  You don't recall him putting a foot outside
23 the opening of the trunk?
24   A.  I don't remember anything like that, no.
25   Q.  You read that you heard numerous shots

88

1  fired, "And I noticed Jose had been hit."
2    How many shots did you hear fired?
3    A.  I couldn't even begin to count how many
4  shots were fired.  I mean there was numerous.
5    Q.  Did you see who was firing those shots?
6    A.  No.
7    Q.  Did you see Mr. Calzada fire a weapon?
8    A.  I did not see him fire a weapon, no.
9    Q.  Did you see him aim a weapon?
10   A.  No, but my fear was -- if Bob Stirling said
11 he saw a rifle, my fear was it's very easy to put
12 your hand up and pull a trigger.  So, no, I didn't
13 see him aim a weapon, but my fear was that he didn't
14 have to aim a weapon to hurt the other officers in
15 the garage.
16   Q.  Did you have binoculars in the Suburban?
17   A.  No.
18   Q.  Is that standard protocol not to have
19 binoculars in the Suburban?
20   A.  I have no idea why you would want binoculars
21 on -- I mean that's just stuff -- you pack people in
22 there to get them from one location to another as
23 safely as possible.  And I don't know if there's ever
24 been binoculars in the Suburban.  I wouldn't have a
25 clue.

89

1    Q.  I thought you testified earlier that you
2  moved the Suburban to get a better visual of a
3  subject.
4    Is that not also the purpose of an armored
5  vehicle?
6    A.  Sure.  As far as binoculars, I don't know
7  what that has to do with moving the Suburban.
8    Q.  Perhaps to get a better view, a more
9  accurate view?
10   A.  Well, when I have a rifle sticking through a
11 gun port, I'm not going between my rifle sites and
12 binoculars.
13   Q.  Does your rifle site magnify things?
14   A.  No, mine does not, or did not, I should say.
15   Q.  Going back to Exhibit 3, you read the entry
16 that you informed the team that -- and Miles to step
17 back because the rifle might be pointed right at you.
18   Do you recall that at 11:14:06, at the
19 bottom, toward the bottom of the page?
20   A.  Yes.
21   Q.  Then the next entry at 11:14:13, will you
22 read that.
23   A.  "Get ready to pound him with beanbag."
24   Q.  What does that mean to you?
25   A.  That would mean that somebody with a shotgun

90

1   that was inside the garage is saying, "Hey, get
2   ready, I'm going to hit him with a beanbag round soon
3   or just get prepared for it."
4       **Q.   Do you recall who made the instruction that**
5   **he was to be pounded with a beanbag?**
6       A.   I wouldn't have a clue.
7       **Q.   Do you recall hearing that transmitted?**
8       A.   I don't.
9       **Q.   Did you ever hear any command or direction**
10  **negating that instruction?**
11      A.   Negating as in like canceling that request?
12      **Q.   Yes.  That's a better way of phrasing it.**
13      A.   No.
14      **Q.   Do you know why the less lethal option of**
15  **beanbags was not utilized in this instance?**
16      A.   The only reason it wouldn't have been used,
17  especially if somebody's saying that -- get ready for
18  it, is that Mr. Calzada's actions forced somebody to
19  believe that they were in fear of their life.
20      **Q.   Or perhaps improper instructions made people**
21  **too nervous?**
22      A.   No.
23      **Q.   If you'll read down, it's the bottom entry**
24  **of page 32 onto page 33 of Exhibit 3, at 11:14:34,**
25  **what does it say next?**

91

1       A.   "Miles that barrel is pointed at your
2   waist."
3       **Q.   Do you recall who said that?**
4       A.   I don't.
5       **Q.   Was it you?**
6       A.   I don't believe it was me.
7       **Q.   Do you recall hearing that?**
8       A.   No.
9       **Q.   You testified earlier that afterwards you**
10  **went and looked at Mr. Calzada; correct?**
11      A.   Correct.
12      **Q.   What did you observe?**
13      A.   Well, the reason I went up there -- Bob
14  Stirling and I went up there at the same time to --
15  he's a paramedic, to see if there was any lifesaving
16  measures that could be rendered.  And I observed
17  Mr. Calzada laying in the trunk with numerous -- he'd
18  been shot numerous times.
19      **Q.   Have you ever carried a shotgun with less**
20  **lethal beanbags in them, loaded in it?**
21      A.   I can't recall specifics, but I have no
22  doubt if I was on a deployment with a shotgun and --
23  I would have less lethal with me.  That's always an
24  option.
25      **Q.   Have you been trained in the use of less**

92

1   **lethal ammunition?**
2       A.   Yes.
3       **Q.   What part of the body is to be aimed at, if**
4   **you will, when using less lethal ammunition?**
5       A.   It's been years since I've been through the
6   training, but I believe it's major areas, abdomens,
7   legs, things like that.
8       **Q.   When you went and observed Mr. Calzada after**
9   **he had been shot, where had he been shot?**
10      A.   I couldn't even tell -- I mean I would say
11  all over.  And I know that's a broad term, but --
12      **Q.   Where would you say the majority of the**
13  **bullets had --**
14          MR. MYLAR:  I'm going to object, just calls
15  for speculation and also lack of foundation.
16          But go ahead.
17  BY MS. CHECKETTS HIBBERT:
18      **Q.   Where did it appear that a majority of the**
19  **bullets had entered his body?**
20      A.   To be honest with you, I don't even recall,
21  because I'm not one to declare somebody deceased.
22      **Q.   I wasn't asking whether he was deceased, but**
23  **you viewed his body; correct?**
24      A.   Well, I didn't sit there and examine it, by
25  any means.  I could tell this guy had been shot

93

1   numerous times and I made sure that I -- I started to
2   check are any of the officers shot, are they okay,
3   doing one of those things, while somebody more
4   trained could deal with Mr. Calzada.
5       **Q.   Do you recall seeing anything else in the**
6   **trunk besides Mr. Calzada?**
7       A.   There was a rifle in the trunk.
8       **Q.   Where was the rifle?**
9       A.   Where we thought it was, on the speaker box
10  or whatever that ended up being.
11      **Q.   Which way was it facing?**
12      A.   I couldn't tell you.
13      **Q.   I'm going to show you what's been marked as**
14  **Exhibit 30.**
15      (Previously marked Exhibit No. 30 was
16  referred to.)
17  BY MS. CHECKETTS HIBBERT:
18      **Q.   Do you recognize this photograph?**
19      A.   Yes.
20      **Q.   Does this refresh your recollection as to**
21  **where it appeared a majority of the bullets entered**
22  **Mr. Calzada?**
23          MR. MYLAR:  I'm going to object again, lack
24  of foundation, lack of personal knowledge.
25          Go ahead.

94

1    THE WITNESS:  Well, it appears he's been hit
2  in the torso or the upper torso.
3  BY MS. CHECKETTS HIBBERT:
4    Q.  Do you recall where Officer Miles was
5  standing?  Do you recall on which side of the vehicle
6  he was standing?
7    A.  I believe he was standing on -- I will say
8  the east side of the vehicle.
9    Q.  So where Mr. Calzada's feet -- on that side
10  of the vehicle, correct, where his feet are facing?
11    A.  Correct.  If I remember right, that's where
12  I believe he was standing.
13    Q.  And which way is the rifle pointing?
14    A.  In the opposite direction.
15    Q.  Do you recall seeing where the handgun was?
16    A.  I don't.
17    Q.  After Mr. Calzada dropped his handgun behind
18  his head, as you previously testified, do you recall
19  him touching his handgun again, seeing him touch his
20  handgun again?
21    A.  No, I don't recall.
22    Q.  After you went and saw Mr. Calzada, what did
23  you do after that?
24    A.  We checked to make sure everybody was -- if
25  any of the other officers were hit and ended up

95

1  walking back to the mobile command and having a
2  debrief of some nature of we like to sit inside a
3  vehicle, a transporter vehicle and just knowing that
4  we've involved in some type of officer-involved
5  shooting and that there was going to be a major
6  investigation.  And, you know, we typically just
7  remain silent.  I mean we ask questions like, "Are
8  you okay, are you okay?" but we don't talk about what
9  happened.
10    Q.  Were you questioned as part of this deeper
11  investigation after the fact?
12    A.  I remember going to the Roy Police
13  Department and asking, you know, those who were
14  involved in the shooting, that there was some
15  investigation, but, no, I do not recall being
16  interviewed about it, no, I don't.
17    MS. CHECKETTS HIBBERT:  Okay.  I don't have
18  anything further at this time.  Thank you.
19    MR. MYLAR:  Okay.  I just have a few
20  follow-up questions.
21    EXAMINATION
22  BY MR. MYLAR:
23    Q.  You had said that you saw him moving his
24  hand and you weren't sure which hand it was; is that
25  correct?

96

1    A.  Correct.
2    Q.  Is it fair to say that he was at least
3  moving it more than once toward that gun or do you
4  remember one way or the other?
5    MS. CHECKETTS HIBBERT:  Asked and answered.
6  BY MR. MYLAR:
7    Q.  Go ahead.
8    A.  I'm sorry.  I don't know when to go or not,
9  but he was making movements.  And it wasn't just one
10  time, because we were there for a long time.  That
11  would have been the slowest movement if it was just
12  once.  So he was constantly moving his hands to the
13  speaker box.
14    Q.  Was he sometimes -- I'm going to motion with
15  my hand, my left hand.  There was some evidence from
16  other witnesses that it was actually his left hand
17  that he was using, crossing his body, which would be
18  a little bit farther of a reach, potentially.
19    MS. CHECKETTS HIBBERT:  Leading.
20  BY MR. MYLAR:
21    Q.  Was he moving it like back and forth and
22  just not moving it all the way back or can you tell
23  me which -- he touched the shelf at some point, I
24  think you said.
25    Did he kind of like bring it back but not

97

1  all the way back or what do you remember?  Tell us
2  what you remember.
3    MS. CHECKETTS HIBBERT:  Leading, form.
4    MR. MYLAR:  It's not leading.  I'm asking
5  him an option.
6    Go ahead.
7    THE WITNESS:  It almost appeared to me that
8  he was -- I don't know what other term to use, but to
9  bait.  It was like he was baiting them to do
10  something to him.
11  BY MR. MYLAR:
12    Q.  By the movement of his hand?
13    A.  By constantly doing things that you were not
14  ordered to do.  And I mean, man, if we just saw his
15  hands the whole time and if he would have just exited
16  the vehicle, then this unfortunate thing never had to
17  happen.  So there was numerous commands to stop doing
18  that, stop moving your hands, keep your hands where
19  we can see them, stop reaching, because it scares --
20  it really puts everybody's -- I mean you're just
21  scared for your safety, you're scared for everybody
22  else there.  I mean what could be done?
23    I mean, again, I'm not an expert on firearms
24  by any stretch of the imagination.  I don't know
25  who knew -- we just had no idea what he was doing by

98

1  doing that.  So it led me to believe that he was
2  baiting the officers to shoot him or something,
3  because it was just -- he just wasn't following
4  simple, simple instructions.
5      Q.  All right.  Is it fair to say it was a
6  pretty tense few minutes there when he was in the
7  trunk?
8      A.  Very.
9      Q.  Back on this Exhibit 3 that you were asked
10 about earlier, if you could look at page 32 on that.
11     A.  Is that this one?
12     Q.  Yes, 32 of 49, it's actually Exhibit 3.  So
13 page 32.
14     A.  Okay.
15     Q.  So you can see at the bottom, the last full
16 entry there, it says, "Keeps moving hand move back
17 all you guys to house."
18         Do you know whether you said that or not?
19     A.  You know, these are just summaries of what's
20 being said anyway, so it's hard to say what you said
21 and what you didn't.  I mean I think technology
22 exists that they can tell you who keyed the mic and
23 whose radio was keying the mic, but I know that's
24 beside the point.
25     Q.  Could some of these in this log be directed

99

1  at different people to take different action?
2      A.  Sure.  I remember just pleading, getting on
3  the radio, and, he's reaching, he's reaching, there
4  might be a rifle, get back, like get back, or
5  something to that effect of just use extreme caution
6  is all I could -- I mean it's like, here I'm in a
7  vehicle, you know, in an armored vehicle and some
8  distance away and I'm just pleading with the guys,
9  hey, just make sure you're watching, because I always
10 had that fear something was about to happen.
11     Q.  Yeah, yeah.  And two entries up there, it
12 says, "Mile step back rifle might be pointed at you."
13         You may have said that, but you don't
14 remember; is that correct?
15     A.  I very well could have said that, but I
16 can't put a guarantee, by any means, on it, but those
17 were the pleas I was having with everybody in the
18 garage.
19     Q.  All right.  Do you remember anyone else
20 saying that type of thing?
21     A.  Over the radio?
22     Q.  Yes.
23     A.  There was a lot of communication.  And it
24 was very chaotic, very stressful.  So specifics, no,
25 I don't remember what was said or who said what.

100

1      Q.  If you'll go up a few more, right to the
2  point where it says, "Gun is behind head now."  Do
3  you see that?
4      A.  Yes.
5      Q.  Now, other officers that have been deposed
6  in these depositions have indicated that the right
7  hand had the gun in his mouth when they first saw him
8  and that's what you had heard Miles tell you or other
9  officers when you started to go to the garage; is
10 that correct?
11         MS. CHECKETTS HIBBERT:  Misstates prior
12 testimony.
13 BY MR. MYLAR:
14     Q.  Is that correct?
15     A.  I have no clue what a hand the gun was in.
16     Q.  What he said.
17     A.  He said -- do you care if I take a look at
18 this, my report?
19     Q.  That's fine.
20     A.  Essentially Brandon said, "He's got a gun in
21 his mouth."
22     Q.  Right.  So you heard that when you were in
23 the garage?
24     A.  What hand was being -- I don't know.
25     Q.  You don't know what hand at all, but the

101

1  other officers that were there in the garage
2  testified, including Miles, I believe, in his
3  testimony, said he took the gun and put it back to
4  the -- with his right hand to the right of his head.
5          Now, you were in a Suburban and you would
6  have been looking from this way toward his left; is
7  that correct?
8      A.  Correct.
9      Q.  Could you have seen whether he was actually
10 holding that gun or not from that direction?
11         MS. CHECKETTS HIBBERT:  Leading.
12         THE WITNESS:  It very well could have been
13 but I didn't see the gun.
14 BY MR. MYLAR:
15     Q.  Okay.
16     A.  Because it would have been -- I mean by
17 looking at the pictures and remembering, if it's to
18 the side of his head, yes, I was -- his head would
19 have obstructed the --
20     Q.  Completely?
21     A.  Yes.
22     Q.  All right.  Why did you think that he had
23 put the gun down?
24     A.  I couldn't even -- I don't know.  I was
25 hoping he was going to give up.

102

1   Q.  Okay.
2   A.  I mean I was hoping there would have been a
3   peaceful resolution to this whole thing.
4   Q.  All right.  Yeah.  And then you're
5   watching -- it says the gun's behind the head, and
6   then it talks about the rifle being pointed.  Then it
7   talks about -- here as we get to the bottom of the
8   page, keeps moving his hand back and forth.
9       Where were your eyes focused during this?
10  A.  I was watching his hands 100 percent.
11  Q.  Okay.  And that's the hand that kept
12  reaching toward the AR15?
13      MS. CHECKETTS HIBBERT:  Misstates testimony.
14      MR. MYLAR:  No.  He just gave his testimony.
15      MS. CHECKETTS HIBBERT:  He said, "I was
16  watching his hands," plural.
17  BY MR. MYLAR:
18  Q.  Okay.  Did you see both hands reach toward
19  that AR15 ever --
20  A.  I don't --
21  Q.  -- at the same time?
22  A.  I mean I don't recall him using both hands,
23  but meaning what was -- your question was what was I
24  observing?
25  Q.  Yes.

103

1   A.  It's always hands.
2   Q.  Okay.  So you were focused on that.
3   A.  Right.
4   Q.  And you were seeing at least -- were you
5   seeing one hand or two hands when he was -- you said
6   he was reaching for the speaker box, which was where
7   the AR15 was.  Were you seeing ever two hands at the
8   same time ever reach toward that speaker box?
9   A.  No.  It very well could have been -- with
10  the position he was in, it could have been impossible
11  for both hands to reach, but, no, we're always
12  looking for hands, where is his hands going.  And,
13  no, I don't remember him using both hands to reach up
14  on top of the speaker box.  No, I don't recall that.
15  Q.  Okay.  All right.  So when you saw a hand
16  move toward it, it was always a singular hand, there
17  was never two hands moving toward that speaker box at
18  the same time?
19  A.  That's correct.
20  Q.  All right.  And you've had training on less
21  lethal or nonlethal weapons; is that correct?
22  A.  Yes.
23  Q.  If somebody has a gun that you believe may
24  be loaded and you have other guns, would you ever use
25  the nonlethal weapon there instead of a live

104

1   ammunition in that situation?
2       MS. CHECKETTS HIBBERT:  Lack of foundation,
3   incomplete hypothetical.
4       THE WITNESS:  I would never use less lethal
5   if I believed somebody had a lethal weapon.
6   BY MR. MYLAR:
7   Q.  All right.  And in this instance, other
8   reports but also part of your testimony is he had a
9   pistol, may have been a rifle, but others did see a
10  rifle that were in the garage.
11      Would use of a nonlethal weapon at that
12  point against Mr. Calzada be indicated when he has
13  two guns with him?
14  A.  Could you rephrase that so I can know
15  exactly what you're asking?
16  Q.  Yeah.
17      If Mr. Calzada had two guns with him, an
18  AR15 and a pistol, and the other officers testified
19  that he had the pistol still in his right hand the
20  entire time, would it ever be indicated that you must
21  use a nonlethal round in that situation?
22      MS. CHECKETTS HIBBERT:  Leading, misstates
23  prior testimony, incomplete hypothetical, lack of
24  foundation.
25      THE WITNESS:  Nobody in the world would

105

1   expect you, especially with such a quick movement, to
2   ever put -- no, you would never -- in my training and
3   experience, we would never be told, yep, just take
4   two or three rounds while you're shooting a beanbag
5   round at this guy.  No, that would not happen.
6   BY MR. MYLAR:
7   Q.  And you saw these pictures you were shown
8   earlier of Mr. Calzada with his head up a little bit
9   and his knees up a little bit.  That's not quite the
10  one I'm looking for.  Where's the one that -- maybe
11  it's 16 or 17 here.  Let me see here.  Not that one.
12  So let's look at 17.
13      (Previously marked Exhibit No. 17 was
14  referred to.)
15  BY MR. MYLAR:
16  Q.  In 17, it looks like his head's up a little;
17  is that correct?  And his knees are up a little; is
18  that correct?
19  A.  Correct.
20  Q.  And if an officer is over here, which would
21  be to the extreme left of this picture, it looks like
22  he's got potentially a groin shot, between his legs,
23  or that he would hit his legs.
24      If someone has a pistol in their hand and
25  they hit his legs, what good is that in terms of

106

1 protecting the officers from that pistol in his hand?
2       MS. CHECKETTS HIBBERT:  Leading.
3       THE WITNESS:  It wouldn't protect them.
4 BY MR. MYLAR:
5       Q.  If someone was shot in the knee with a
6 beanbag and they had a pistol in their hand, would
7 they still -- would they or would they not be able to
8 still bring that pistol around and shoot the
9 individuals?
10      A.  Very capable of still shooting.
11      Q.  Now, again, if they're doing this -- if
12 they're standing again to the extreme left of this
13 picture over by the -- in the garage, some of them
14 are in the garage and right to the edge of the
15 garage, they are shooting almost the length of his
16 body toward his head.  The head's at least a
17 dangerous target there for them to hit.
18      Is it or is it not ever indicated that you
19 use a nonlethal weapon against somebody's head?  Were
20 you ever taught that?
21      A.  No, that's not a target you would -- what am
22 I trying to say?  That's not -- I can't even find the
23 words.  No, that would not be wise to be shooting
24 somebody in the head with a beanbag, because that
25 very well could be a lethal shot.

107

1       Q.  All right.
2       MS. CHECKETTS HIBBERT:  And I'm just going
3 to place an objection to that question on the record,
4 I forgot to do it, as leading.
5 BY MR. MYLAR:
6       Q.  Okay.  And in your nonlethal weapons
7 training, if you can't get a clear shot to the
8 abdomen or the legs but there's danger of hitting the
9 head, what were you taught regarding that kind of a
10 shot?  Should you take it or should you not take it?
11      MS. CHECKETTS HIBBERT:  Leading.
12      MR. MYLAR:  It's not leading.  I'm giving
13 him an option.
14      THE WITNESS:  Should you take --
15 BY MR. MYLAR:
16      Q.  Is that indicated in your training that you
17 would take that kind of a shot if it's --
18      A.  With a beanbag round --
19      Q.  Yes.
20      A.  -- to be used as a less lethal option?
21      Q.  Yes, that could hit his head.
22      A.  No, that would be highly discouraged.  You
23 wouldn't even attempt that.
24      Q.  All right.  So you were in the Suburban with
25 your AR15 through the gun port, I think you testified

108

1 earlier; is that correct?
2       A.  Yes.
3       Q.  And is it possible that Bob Stirling, if he
4 was not in the gun port, could he have had a better
5 view of this trunk than you did?
6       A.  Sure.
7       MR. MYLAR:  I don't have any further
8 questions.
9       MS. CHECKETTS HIBBERT:  I just have a couple
10 of follow-up questions.
11           FURTHER EXAMINATION
12 BY MS. CHECKETTS HIBBERT:
13      Q.  Now, your attorney asked you if you ever saw
14 more than one hand reaching up toward the subwoofer
15 where you believed there was a rifle, and you stated
16 no, but you also testified that you could see
17 Mr. Calzada's hands moving; correct?
18      A.  When I say hands, I mean -- I may
19 interchange that with -- may have used a plural, but
20 there was furtive movement is essentially what I
21 meant to say.  There's always some movement going on
22 and I can't tell you exactly which hand.
23      Q.  In either hand did you ever --
24      MR. MYLAR:  Let him finish his sentence,
25 please.  I think he did finish it, but you kind of

109

1 jumped on him.
2       MS. CHECKETTS HIBBERT:  Sorry.  Sorry.
3 BY MS. CHECKETTS HIBBERT:
4       Q.  In either hand did you see a gun?
5       A.  I saw a gun when I -- when the garage door
6 was first opened, because it was laying on his chest.
7       Q.  After you saw him put the gun behind his
8 head, you later said that you saw his hands moving,
9 his hands kept moving.
10      Did you see a gun in either hand?
11      A.  No.
12      Q.  You testified that he was not complying
13 because he'd been told, "Show us your hands," and he
14 kept moving his hands.
15      If you could see his hands, how was that not
16 showing us his hands?
17      A.  He was not complying, because he was not
18 coming out of the trunk.
19      Q.  Was he ever asked to come out of the trunk?
20      A.  I don't know.  I was in the Suburban in
21 almost a soundproof, bulletproof vehicle, but when
22 you say, "Show me your hands," again, if they saw
23 both hands and he was complying, then a new set of
24 instructions would start, which would be, okay, exit
25 the vehicle, lay on the ground.  So, no, I don't ever

110

1   imagine that if he was complying with their orders by
2   showing his hands, it clearly wasn't happening
3   because he kept reaching towards the rifle.
4       Q.   So in the Suburban, you could not hear what
5   was being shouted at Mr. Calzada, you could only hear
6   what was over the radio.
7       Is that your testimony?
8       A.   I could hear -- again, please keep in mind
9   this gun port is this big and it's just enough to get
10  pretty much the barrel of a rifle through.
11      MR. MYLAR:  How big?  Just like
12  three inches?  She can't see you -- the transcription
13  can't see the size of your hands there.
14      THE WITNESS:  Oh, I'm sorry.  I don't know
15  what three inches is, but it's enough -- I mean it's
16  less than a baseball, I'll say that.
17      MR. MYLAR:  Okay.  Sorry.
18      THE WITNESS:  No, you're fine.
19      So there was a lot of shouting going on.
20  The specifics, I could only assume what they were
21  asking, which is every officer just says as long as
22  we can see both hands are empty and no weapons, then
23  we move on to a new set of orders.
24  BY MS. CHECKETTS HIBBERT:
25      Q.   But you never heard any order that

111

1       Mr. Calzada should get out of the vehicle, did you?
2       A.   I personally did not hear those set of
3   instructions, no, which led me to believe he wasn't
4   even complying with the first set of orders, which
5   was show me your hands, because then we moved to the
6   next step and that didn't happen.
7       Q.   But you testified, and someone else said
8   over the dispatch, that they could see his hands
9   moving.
10      So his hands were not hidden; correct?
11      A.   That's not correct.
12      Q.   What's incorrect about that?
13      A.   That very well could have been interpreted
14  as he's moving, he's moving.  Hands, hand, it was all
15  very suspicious or movements -- furtive movements
16  that make people nervous, very nervous, especially if
17  they'd already seen him with a gun.
18      Q.   What furtive movement did you see aside from
19  him slowly reaching toward the subwoofer?
20      A.   I don't recall any other behaviors or
21  movements per se, but, again, where there was a
22  weapon involved, it's just -- and you're not doing --
23  and it's just -- it has nothing to do with other than
24  we all want to go home, nobody wants to get shot.
25  Nobody wanted to shoot Mr. Calzada, I can assure you

112

1   that, but if you're not following simple, basic
2   instructions that -- it makes people extremely
3   nervous when we knew that there was at least one gun
4   in the vehicle.  So...
5       Q.   But I'm just trying to have you clarify your
6   testimony.
7       When you said his hands were making furtive
8   movements, I want to know what those furtive
9   movements were that you saw, not that you assumed --
10      A.   Sure.
11      Q.   -- but what you saw.
12      A.   I answered one hand was constantly going up
13  to the speaker box that I could see.
14      Q.   Constantly.
15      Your prior testimony was you couldn't
16  testify whether it was even more than once?
17      A.   No.  My testimony said if it was once, it
18  was the longest movement.  And there was minutes that
19  evolved, so there was more than one movement toward
20  the speaker box.  I can't give you an exact count,
21  but it wasn't one constant, long, drawn-out movement.
22      Q.   But that would be the only furtive movement
23  you can identify at this time?
24      A.   From my standpoint in the Suburban, yes.
25      MS. CHECKETTS HIBBERT:  I think that's all I

113

1   have.
2       MR. MYLAR:  I just have a couple of
3   follow-ups from that.
4       FURTHER EXAMINATION
5   BY MR. MYLAR:
6       Q.   As you sit here today, can you recollect at
7   that time ever seeing this right hand actually empty?
8       A.   I don't recall.
9       Q.   All right.  Also, after he was shot, do you
10  remember seeing a gun on his chest, a pistol?
11      A.   After we walked up?
12      Q.   Yes.
13      A.   I don't recall where the handgun was.
14      Q.   All right.  Do you remember somebody -- I'm
15  not sure if it was Stirling or who it was, but do you
16  remember if somebody -- somebody taking that gun out
17  of his hand and putting it on the ground on the
18  cement in the garage?  Do you remember that at all?
19      A.   No, I don't.
20      MR. MYLAR:  All right.  I don't have anymore
21  questions.
22      My client wants the right to be able to
23  review the deposition and sign it.  And you can send
24  it to Salt Lake City Police Department, 475 South 300
25  East.      (Concluded at 5:11 p.m.)

114

```
 1                    CERTIFICATE
 2        STATE OF _____)
 3        COUNTY OF _____)           :ss.
 4
 5        I HEREBY CERTIFY that I, _____
          (DEPONENT PRINT FULL NAME) have read the testimony
 6        consisting of _____ pages, and the same is a true and
          correct transcription of said testimony with the
 7        exception of the corrections I have listed below in
          ink.
 8
 9        Page___Line___Correction_____
          Reason for change_____
10        Page___Line___Correction_____
          Reason for change_____
11        Page___Line___Correction_____
          Reason for change_____
12        Page___Line___Correction_____
          Reason for change_____
13        Page___Line___Correction_____
          Reason for change_____
14        Page___Line___Correction_____
          Reason for change_____
15        Page___Line___Correction_____
          Reason for change_____
16        Page___Line___Correction_____
          Reason for change_____
17        Page___Line___Correction_____
          Reason for change_____
18        Page___Line___Correction_____
          Reason for change_____
19        Page___Line___Correction_____
          Reason for change_____
20
21        SUBSCRIBED AND SWORN to at _____, this
22        _____day of _____, _____.
23
          _____
24        NOTARY PUBLIC
          My Commission Expires:
25        _____
```

115

```
 1                    CERTIFICATE
 2
 3        This is to certify that the witness in the
 4   foregoing deposition was duly sworn to testify to the
 5   truth, the whole truth, and nothing but the truth in
 6   the within-entitled cause;
 7        That said deposition was taken at the time and
 8   place herein named;
 9        That the testimony of said witness was reported
10   by me in stenotype and thereafter transcribed into
11   written form;
12        That review of this deposition was requested
13   and, therefore, pursuant to Rule 30(e) of the Utah
14   Rules of Civil Procedure the witness shall have 30
15   days in which to review and make changes to the
16   transcript.
17        I further certify that I am not of kin or
18   otherwise associated with any of the parties of said
19   cause of action and that I am not interested in the
20   event thereof.
21
22        Teena Green
23        Teena Green, RPR, CSR, CRR, CBC
24
25
```

December 05, 2018

**Exhibits**

**Harper Exhibit 33**  33:8
34:1 45:9,22 57:10 59:1
60:21 68:25 86:9

**1**

**10**  11:9
**10/21**  33:17
**10/21/2014**  33:15
**10/23/2014**  33:14
**100**  17:23,24 102:10
**11**  11:9
**11:02**  59:20 60:7
**11:02:14**  59:14
**11:12:28**  81:15
**11:12:42**  82:15
**11:13:56**  82:22
**11:14:06**  83:8 89:18
**11:14:13**  89:21
**11:14:34**  90:24
**12**  11:9,10
**12-year**  11:3
**120-hour**  16:19
**14**  42:20,21
**15**  67:7,8
**16**  62:14,15 63:22 66:11
105:11
**17**  105:11,12,13,16
**17th**  14:21
**1998**  13:16

**2**

**2**  52:10,11
**2006**  13:23
**2007**  14:3,10
**2008**  16:7 18:10,11 19:15
**2010**  7:21
**2012**  7:19
**2013**  15:15
**2014**  7:25 15:17,23 26:2,11
29:6 31:22 34:6 40:17
43:18 58:21
**2014-10-21**  59:13
**2016**  14:21 18:22 20:6
**2018**  4:1
**21**  58:21
**21st**  7:25 15:17 31:22 34:6

43:18
**24**  7:9,12
**2:10**  4:1

**3**

**3**  57:20,21,25 58:24 59:11
60:22 81:4,13 89:15 90:24
98:9,12
**30**  93:14,15
**300**  113:24
**31**  58:23 59:12
**32**  81:4,13 90:24 98:10,12,
13
**33**  33:8 34:1 45:9,22 57:10
59:1 60:21 68:25 86:9
90:24
**38**  52:19 54:11

**4**

**40**  12:16
**43**  52:19 54:11
**475**  113:24
**49**  58:24 81:5,13 98:12
**4:00**  39:6
**4:13:30**  58:21

**5**

**5**  4:1
**50**  8:20
**5:11**  113:25

**6**

**6**  86:10

**8**

**8:59**  39:10

**A**

**a.m.**  39:6,10
**abdomen**  107:8
**abdomens**  92:6
**abilities**  16:15
**ability**  50:7
**absolutely**  26:22 30:11,13
**academy**  14:5,9
**accident**  4:24 11:18

**accidents**  11:15
**accord**  38:16
**accurate**  34:4 89:9
**acknowledge**  22:8
**acquainted**  42:9
**acquire**  18:18
**acted**  71:6,8
**action**  81:8 99:1
**actions**  9:14 45:23 78:15,
25 86:14 90:18
**active**  23:11
**actual**  25:25 51:18
**addition**  22:14
**address**  32:7
**advanced**  22:6
**advise**  59:3
**advised**  57:16 59:1,2 74:8,
16,19 75:6 86:13,19,20
**advising**  86:18
**affirmative**  5:18 24:2
84:20
**afford**  18:21
**afraid**  77:5
**agency**  15:10
**aggressive**  78:7,10,11,12
**ahead**  19:5,7 26:9 29:9,23
45:11 87:15 92:16 93:25
96:7 97:6
**aim**  88:9,13,14
**aimed**  92:3
**air**  42:6 62:4
**alcohol**  7:11 37:20 38:3
**allowed**  19:22 20:13 38:15
68:14
**allowing**  17:11 29:1
**aloud**  41:21 59:17
**Alpha**  54:14,19,21,24
**ammunition**  21:2 46:21
47:5 92:1,4 104:1
**and/or**  21:22 44:25
**angle**  65:3 79:24
**anticipate**  6:2 41:9
**anymore**  12:23 113:20
**appeared**  76:13,16 79:9
86:20 93:21 97:7
**appears**  43:6 58:15 94:1
**apprehend**  41:7,13
**approach**  43:11
**approached**  42:14 43:8,
19 44:2

**approximately**  7:17 14:10
32:13 39:5,10 59:21 60:4
**AR15**  17:8 18:6,8,14,16,19
19:1,17,22 20:5,10 23:17
25:2,4,7,14,16 75:4
102:12,19 103:7 104:18
107:25
**areas**  92:6
**arm**  76:7 85:6,7
**Armando**  52:2,8 53:14
54:12,14
**armored**  42:15,16,24 43:9,
11,20 78:22 80:3 89:4 99:7
**arms**  72:3
**arrived**  34:12,16
**asks**  26:8
**asleep**  37:14
**assignments**  53:4
**assistant**  52:7 53:15,20
**assume**  6:23 43:24 44:1
48:16 49:21 72:5 85:19,20
86:19 110:20
**assumed**  72:12 112:9
**assumes**  29:7
**assuming**  18:12 20:2
29:21 43:23 71:25
**assumption**  72:7
**assure**  111:25
**attempt**  45:12 107:23
**attics**  56:21
**attorney**  5:15 6:25 52:17
58:8 108:13
**audible**  5:25
**audio**  49:22
**August**  18:10
**avenue**  41:19
**average**  23:3,7
**avoid**  43:14
**aware**  5:15 9:11 70:2

**B**

**Bachelor's**  13:21,25
**back**  5:8 7:16 20:5 41:3
44:15 45:17 48:11 51:21
58:25 59:11 61:7 63:16
66:7 67:12,13 68:3,24 69:2
72:4 73:16 74:22 75:2,18
76:8 83:11 85:4 89:15,17
95:1 96:21,22,25 97:1
98:9,16 99:4,12 101:3
102:8
**back-to-back**  24:6
**backed**  66:14

background 40:19
bad 70:21
Bahamas 28:15
bait 97:9
baiting 97:9 98:2
barrel 75:3 91:1 110:10
barricaded 21:1 32:19
baseball 110:16
basement 53:11 55:25 57:4
basic 14:9 112:1
basically 42:7 45:9
basis 22:10 49:14 86:2
beanbag 89:23 90:2,5 105:4 106:6,24 107:18
beanbags 90:15 91:20
bear 40:20
Beck 70:19,20 71:3
bedroom 51:13 55:21
beds 55:22
begin 6:11 14:19 88:3
beginning 46:11 57:13 58:20 70:19
begun 7:14
behalf 4:4
behaviors 111:20
belief 86:2
believed 80:15 84:3,22,24 86:12 104:5 108:15
belt 47:13
beneficial 68:15
big 64:10 110:9,11
biggest 17:5
binoculars 88:16,19,20,24 89:6,12
bit 96:18 105:8,9
black 75:19 77:12
blurry 33:17
board 87:9
Bob 66:3 67:2 76:10 79:14, 16 80:13 82:4,7 84:3,24 85:2 88:10 91:13 108:3
bodily 77:19
body 11:12 46:6,11 55:22 66:19 76:6 92:3,19,23 96:17 106:16
book 48:20
bottom 52:20 89:19 90:23 98:15 102:7
bought 18:22
box 76:17 84:3 85:17 93:9 96:13 103:6,8,14,17

112:13,20
Brandon 61:19,23,25 64:17,21 65:10 100:20
Bravo 53:16,20,21 54:4, 21,25
breach 21:2
breached 24:16 44:22
breacher 20:18,22,24 21:3,6,8 24:13
breachers 21:14
breaching 44:21 47:5
break 63:10,13
briefed 34:13 50:14
briefing 34:22,24 35:10
bring 16:15 96:25 106:8
bringing 40:19
broad 92:11
brought 35:19 36:7
bulletproof 78:22 109:21
bullets 92:13,19 93:21
bureau 15:25
busy 24:22
Butler 60:23
button 68:10
buttons 74:17

—

C

CAD 58:10
call 26:23 28:5 49:7 53:25 58:10
call-out 12:11 85:15
call-outs 41:11
called 4:4 9:3 11:10 12:23 16:17 31:23 37:5 39:6 48:14,16,19 56:14,15 67:16
calls 10:1,2,12 44:1 50:9, 10 60:8 92:14
Calzada 8:1,5,9 12:2,4 15:17 35:3,17,21 36:4,14, 19,25 37:4,10,13,16,19,22 38:2,6,10,14,22 39:1,6,11, 14,22,25 40:6,22 43:6 61:7,16 66:8 68:12 70:11, 16,24 71:2 72:25 73:6,8 75:25 81:7 83:24 85:5,10 86:23 88:7 91:10,17 92:8 93:4,6,22 94:17,22 104:12, 17 105:8 110:5 111:1,25
Calzada's 31:23 48:3 49:4,15,19 90:18 94:9 108:17
camera 46:6,12,13

cameras 46:11
canceling 90:11
capability 47:4,10 83:22
capable 106:10
car 8:13 9:4 62:10 63:9 65:11,17,18 76:21 77:4
card 17:15
care 25:11 100:17
career 11:3
careful 82:13 83:2
carried 46:12,13 47:12,24 91:19
carry 24:10,11,12 46:16 47:11,19
carrying 44:24 46:20
case 29:22 42:4 43:23,24 44:2 51:2 54:23 58:14 84:5
cases 12:6,7
caution 81:3 84:7 99:5
cell 32:5
cement 113:18
center 50:5,13 51:21
certification 17:10,12
certified 47:14
certify 22:10
certifying 22:15
change 12:18 14:22 57:3
chaotic 99:24
chapter 12:22,25
charge 33:2 34:20
check 49:17 93:2
checked 45:14 65:5 94:24
CHECKETTS 4:8 8:16 10:3,14,22 12:1 19:6,11 26:14 29:4,12 30:1 33:9 42:23 45:20 50:12 52:13 57:24 60:2,12 62:17 63:12, 15 67:10 78:13 87:21 92:17 93:17 94:3 95:17 96:5,19 97:3 100:11 101:11 102:13,15 104:2,22 106:2 107:2,11 108:9,12 109:2,3 110:24 112:25
checks 31:3
chest 73:17,21,22 75:20 109:6 113:10
choice 23:24
City 14:17 15:7,9,14,18,22 19:21 21:22 113:24
clarification 15:21
clarify 112:5
clean 24:17,20,25

clear 6:1 9:18 11:23 55:15 62:13 70:21 77:13 80:17 107:7
client 113:22
close 69:12 81:12
closed 12:25 64:7 74:15
closest 85:6,7
clue 50:24 88:25 90:6 100:15
College 13:22
colored 75:20
combination 54:21,24
comma 44:8,18
command 50:5,13,23 51:2,21 55:12,16 90:9 95:1
commander 49:10 51:3
commands 62:4 97:17
comment 68:3
comments 35:4 36:5,9,21
committed 35:18 38:6
common 50:21,25 78:2
communicate 6:6
communication 9:8 40:5, 13,22 49:22 81:19 83:3 99:23
communications 49:24 50:22,25 58:16
community 15:25
compared 79:20
competent 55:6
complete 40:10
Completely 101:20
complied 72:10,12
complies 72:1
comply 70:22 71:5,17 72:8,9
complying 71:18,19,23 109:12,17,23 110:1 111:4
comport 59:20
concerned 31:5
concluded 113:25
conditioner 42:6
conducted 51:7
conducting 50:20
confirm 22:13
consent 27:11,12,17,18, 23 28:11,17,19,23,25 29:15,17 30:7,11,13,15,17
considered 6:5 54:22
constant 112:21
constantly 85:23 86:1 96:12 97:13 112:12,14

consumed 37:20

contact 39:11,14

contacted 68:9

context 8:6 60:3

contrary 29:8,22

conversation 6:2 68:13 69:22 71:12

copy 33:17 70:21

correct 5:3,12,13 8:3,9 9:7 14:12 15:20 16:2,3,9 17:18 22:11 31:24,25 32:23 41:7, 8 42:17 43:16 44:5,6 46:22 50:14 60:17,18 63:5,18 64:11,24,25 66:18,20 67:19 70:9 72:12,20 74:10 75:9 91:10,11 92:23 94:10, 11 95:25 96:1 99:14 100:10,14 101:7,8 103:19, 21 105:17,18,19 108:1,17 111:10,11

corrections 34:1

counselor 41:18

count 88:3 112:20

County 14:1,11,13 15:2,5, 13 58:9

couple 9:22 23:5,16 34:25 108:9 113:2

court 5:16 6:7

cover 35:1 42:15 43:8,13, 19

crannies 56:20

crashed 4:25 5:5

crimes 35:17,18 38:7

crisis 37:5 39:7

crossing 67:20,21 72:19 96:17

cul-de-sac 50:4

custody 40:2 41:7

cut 6:4

---

**D**

danger 107:8

dangerous 106:17

dark 66:1 68:16

date 58:20

dates 19:2

daughter 30:12 31:5

daughters 12:17

day 16:13,14,17 24:4 34:21 41:15,16 85:4

days 24:22 33:19

dead 11:11

deal 93:4

death 11:22 77:19

debrief 95:2

deceased 92:21,22

December 4:1

decide 16:14

decided 9:21 10:6

decision 12:21 51:15 74:5

declare 92:21

deemed 9:17 42:8

deeper 95:10

Define 78:11

definitive 30:22

degree 13:21,25

deliberate 35:6 41:23 42:3

deliberates 65:10

Denton 4:3,10 53:19

depart 51:16

department 9:3,23 10:7 12:19 14:18 15:8,14,19,23 22:3 23:24 32:12 95:13 113:24

department's 12:20

departments 22:5

depend 21:10

depended 24:3,14

depends 20:15 28:20 29:18 30:5

deployment 24:11 91:22

deposed 100:5

deposition 4:12 5:10,11, 15 9:20 52:15 58:1 113:23

depositions 100:6

Describe 76:14

designated 51:23

details 35:11 39:19 43:25

determine 45:12,18

determined 45:18

device 46:18

dialogue 71:2

died 8:7 9:25 10:19

differ 56:17

difference 26:25 86:8

difficult 6:6

dire 30:21

direct 51:3

directed 98:25

direction 44:11 55:9 90:9 94:14 101:10

discipline 15:4,10 20:15

discouraged 107:22

discovered 61:7

discussing 7:24,25

dislike 13:3

dispatch 32:18 58:16,17 61:15 111:8

dispatch's 58:15

dispatchers 83:10

dispute 60:13

distance 69:14 72:22 81:12 99:8

document 33:10,23 58:2

door 20:25 21:3 44:21,22 55:2 57:17 59:4,9,18,22 60:4,16 64:8,12,24 65:15 66:4 67:17 68:10,23 70:15 74:16,17 75:7,17 109:5

doors 24:15 64:7,9,10 68:17,18 70:15 74:6,9,15 75:8

doubt 35:14 41:16 84:16 91:22

drawn-out 112:21

drink 7:11

drive 66:23

driver 8:12 43:12

driveway 44:10,13 66:13, 16,17,21,22 67:21 68:1 72:19,20

driving 4:21 44:3

drop 71:4

dropped 75:23 77:25 78:18 81:7 94:17

drove 8:13 43:12,21 67:1

drowsy 37:24

drugs 38:3

duly 4:5

duty 17:2 32:9,11

---

**E**

earlier 89:1 91:9 98:10 105:8 108:1

early 14:3

east 94:8 113:25

easy 88:11

edge 106:14

education 13:18,22

effect 60:16 63:24 81:24 82:2 99:5

element 48:15

employed 14:13,16 15:18 21:22

employers 18:24

employment 13:24

empty 110:22 113:7

encouraged 24:25

end 41:12,15 50:4 72:18 85:14

ended 8:20 93:10 94:25

enforcement 10:20 11:16, 20 14:5 25:23 26:5,16 27:2 31:18 37:9 39:1,10,15 46:10 58:17 70:3 78:7

engagement 71:1 78:24

engaging 68:13 76:22 78:20

enter 26:16,21 27:2,6,10 28:9,12,19,25 30:17 31:2, 18 38:19 47:20 48:3 49:3 51:15,16 55:9 64:5

entered 44:4 49:18 50:2 51:9,23 54:21 55:19 64:23 65:15 92:19 93:21

entering 26:5 45:2 46:1 47:24 49:15 55:17

entire 21:13 48:15 104:20

entitled 19:12

entries 99:11

entry 29:2 42:3 44:20 54:15,20,22,25 59:12 62:2 69:6 81:14 82:14,15,22,25 89:15,21 90:23 98:16

enumerate 28:10

environment 16:20 42:8, 10 47:7 52:6 66:2

essentially 100:20 108:20

estate 8:4

estimate 19:12,13 20:7 23:14 51:12

event 17:17

eventually 75:22

everybody's 41:14 66:3 97:20

everyday 6:1 11:11

evidence 29:8,22 96:15

evolved 112:19

evolving 57:5

exact 35:11 69:14 112:20

EXAMINATION 4:7 95:21 108:11 113:4

examine 92:24

examined 4:5

exchange 36:6

excuse 45:18

exercise 24:18

**exhibit** 33:8 34:1 42:20,21
    45:9,22 52:10,11,20 57:10,
    20,21,25 58:24 59:1,11
    60:21 62:14,15 63:22
    66:11 67:7,8 68:25 81:4,13
    86:4,9 89:15 90:24 93:14,
    15 98:9,12 105:13
**exists** 98:22
**exit** 66:4 109:24
**exited** 97:15
**expect** 105:1
**experience** 77:17 105:3
**expert** 25:14 97:23
**expound** 31:15
**extent** 26:7
**extreme** 81:3 84:7 99:5
    105:21 106:12
**extremely** 48:18 76:20
    78:15 112:2
**eyes** 102:9

---

**F**

**face-to-face** 69:22
**facing** 44:12 93:11 94:10
**fact** 9:22 95:11
**factors** 26:18 27:3 30:18,
    23 31:11
**facts** 6:16 29:7,21
**fair** 11:14 26:1 51:11 70:8
    96:2 98:5
**faith** 48:23 54:6 55:7
**fall** 30:23 54:2
**fallen** 37:13
**familiar** 25:1 26:12
**family** 9:21,25 10:6,8
**farther** 96:18
**fast** 42:2
**fault** 11:21
**fear** 76:25 77:2,18,20
    83:21 88:10,11,13 90:19
    99:10
**fearful** 78:15
**feel** 34:1
**feeling** 9:5
**feet** 73:1,2 94:9,10
**figure** 21:7
**final** 41:20
**finally** 68:7,11 70:15
**find** 6:15 56:2,10,14 81:21
    106:22
**fine** 7:1 30:3 100:19 110:18

**finish** 6:9,10 87:14 108:24,
    25
**finished** 33:24
**fire** 36:6 57:13,16 88:7,8
**firearms** 17:6 97:23
**fired** 86:17 88:1,2,4
**firing** 88:5
**floor** 53:11 55:23 87:6
**focused** 87:18 102:9
    103:2
**follow-up** 95:20 108:10
**follow-ups** 113:3
**foot** 87:22
**forced** 90:18
**forget** 29:24
**forgot** 107:4
**form** 67:25
**forty-three** 52:21
**found** 41:3 59:22 60:5 62:9
**foundation** 59:23 92:15
    93:24 104:2,24
**fourth** 69:1
**front** 25:19 43:21 66:12
    67:22
**full** 4:9 16:14 98:15
**Fulton** 60:23
**functions** 22:7
**furtive** 108:20 111:15,18
    112:7,8,22

---

**G**

**gain** 42:3
**gained** 44:20
**garage** 42:4 44:21 45:2,15
    46:1,4 51:8,10,16 54:8
    55:11,21 57:18 61:7,22
    62:4,10 63:1,4 64:5,13,15,
    23 66:1,4,12 68:5,6,10,14,
    17 69:3,9 70:15 74:6,9,16,
    17 75:7,8,17 78:5,21,24
    88:15 90:1 99:18 100:9,23
    101:1 104:10 106:13,14,15
    109:5 113:18
**gave** 28:13 29:15 31:20
    40:15 51:18 70:20 102:14
**gear** 33:5
**Geez** 4:18
**general** 11:25 29:13 59:4
**girlfriend** 28:22 30:12
**give** 7:5 27:12,17,18,23
    28:11,16,19,23,25 29:17
    30:7,11,25 41:13 51:14
    55:8 58:11 73:1 101:25

112:20
**giving** 69:14 107:12
**Glock** 17:3,11
**goal** 40:4 41:6,14,16 85:15
**good** 5:25 48:17 49:11
    79:25 105:25
**grab** 86:3
**grabbed** 60:21,23 61:3
**graduate** 13:13,15
**graduated** 13:21
**graduating** 13:25
**great** 30:8,19 48:23 60:19
    80:4
**grip** 25:19
**groin** 105:22
**ground** 5:9 109:25 113:17
**growing** 78:25
**guarantee** 99:16
**guess** 11:7 20:2 21:6 27:4
    36:7,21,22 53:24 67:24
    69:2
**guessing** 19:2
**gun** 25:9 67:16 69:10,20,
    25 70:3,5,12,17,21 71:5,24
    72:1 73:17,18 75:3,21
    76:21,25 78:23 81:17
    82:14 89:11 96:3 100:2,7,
    15,20 101:3,10,13,23
    103:23 107:25 108:4
    109:4,5,7,10 110:9 111:17
    112:3 113:10,16
**gun's** 102:5
**guns** 17:5 25:12 103:24
    104:13,17
**gurus** 25:9
**guy** 20:24 25:11 48:19 54:8
    55:3 70:5 72:1 76:20 85:21
    92:25 105:5
**guys** 53:13 54:7 98:17
    99:8

---

**H**

**habit** 48:21
**half** 63:11
**halfway** 52:22
**hand** 54:8 76:9 84:2 85:17
    88:12 95:24 96:16 97:12
    97:12 98:16 100:7,15,24,
    25 101:4 102:8,11 103:5,
    15,16 104:19 105:24
    106:1,6 108:14,22,23
    109:4,10 111:14 112:12
    113:7,17
**handed** 17:14

**handgun** 17:11,19,20
    22:11 23:2,15 73:19,20
    75:20,22 77:7 94:15,17,19,
    20 113:13
**handguns** 22:24
**hands** 61:13,22 62:1,7
    63:4,24 69:7 78:1,4 85:23
    86:2,5 96:12 97:15,18
    102:10,16,18,22 103:1,5,7,
    11,12,13,17 108:17,18
    109:8,9,13,14,15,16,22,23
    110:2,13,22 111:5,8,10,14
    112:7
**happen** 43:25 78:16 84:14
    97:17 99:10 105:5 111:6
**happened** 6:16 34:18,21
    35:14 61:3,9 95:9
**happening** 110:2
**hard** 5:22 98:20
**Hardcopy** 58:10
**harm** 84:15
**Harper** 4:3,10,11 53:19
    63:16
**head** 5:24 44:15 66:17
    75:22 81:8,17 82:15 94:18
    100:2 101:4,18 102:5
    105:8 106:16,19,24 107:9,
    21 109:8
**head's** 105:16 106:16
**health** 31:13
**hear** 45:13 51:13 65:23
    78:20 86:25 87:2 88:2 90:9
    110:4,5,8 111:2
**heard** 31:6 61:25 62:6
    63:3,23 64:21 69:7 86:16
    87:25 100:8,22 110:24
**hearing** 39:3 60:16 61:21
    82:1,4 90:7 91:7
**heated** 26:24
**heavily** 35:4 36:4
**held** 14:8 45:6
**Hell** 16:17,18 18:11
**helpful** 6:11
**hey** 32:6 55:4 59:9 61:12
    68:10 69:24 74:17 90:1
    99:9
**HIBBERT** 4:8 8:16 10:3,
    14,22 12:1 19:6,11 26:14
    29:4,12 30:1 33:9 42:23
    45:20 50:12 52:13 57:24
    60:2,12 62:17 63:12,15
    67:10 78:13 87:21 92:17
    93:17 94:3 95:17 96:5,19
    97:3 100:11 101:11
    102:13,15 104:2,22 106:2
    107:2,11 108:9,12 109:2,3
    110:24 112:25

**hidden** 111:10

**hiding** 42:11 55:22 65:13

**high** 5:7 8:22 13:10,11,13, 15,17,18

**high-stress** 16:20

**higher** 13:9

**highly** 13:7 24:24 48:18 107:22

**hired** 14:2 16:8

**history** 13:22 31:13

**hit** 68:10 74:17 86:17 88:1 90:2 94:1,25 105:23,25 106:17 107:21

**hitting** 107:8

**hold** 13:11

**holding** 73:23,25 75:19 101:10

**home** 25:25 26:6 27:2,17, 19,25 28:4,7,8,12,14,17, 18,19,24,25 29:1,14,15,16 30:6,7,10,16 31:23 38:15, 19 41:15 43:3,5,6 44:5 48:3 49:4,15,19 50:2,7,16 51:9,16,17,23 53:6,9,13 54:21 55:9,17,19,20,25 57:8 66:20 85:16 111:24

**homeowner** 27:16 28:2, 15,19,25

**homes** 25:22 26:21

**honest** 18:21 92:20

**hoping** 101:25 102:2

**hour** 63:11

**hours** 7:9,12 27:14 87:17

**house** 27:24 28:21 35:6 41:23 42:1,14 43:8,11,19 44:2,20 51:2,6 98:17

**huh-uhs** 5:21

**human** 55:22

**hunkered** 45:6

**hurt** 43:14 79:2 88:14

**hurting** 83:22

**hypothetical** 29:21 40:15, 16 104:3,23

**I**

**idea** 19:10 40:11,14 78:23 88:20 97:25

**identify** 25:6,16,19 112:23

**identifying** 25:4

**imagination** 97:24

**imagine** 110:1

**impossible** 87:10 103:10

**impression** 10:2,13 50:10 65:12

**improper** 90:20

**inappropriate** 9:15

**inches** 110:12,15

**incident** 7:15,25 8:7 9:12 15:16 32:6 33:14 34:15 38:16 58:18

**incidents** 10:19

**including** 101:2

**incomplete** 29:21 104:3, 23

**incorrect** 111:12

**increasingly** 78:25

**independent** 36:24 45:22

**individual** 7:15 10:19 29:14,16 65:19,21

**individual's** 26:6

**individuals** 28:11 106:9

**information** 32:17 58:11 82:9 84:9

**informed** 35:16 38:25 39:9,13,17 61:14 89:16

**informing** 38:5,10 80:20

**initial** 56:2,4,10,18

**injure** 77:3

**injury** 77:19

**inside** 29:1 45:14 51:6 53:6,12 55:10 65:20 66:1 68:14,21 69:9,10,20 73:14 76:17 78:4 79:8,10,11,20, 25 90:1 95:2

**instance** 12:5 27:9 43:15 46:15 78:14 90:15 104:7

**instances** 11:14,20 12:9 31:15,17

**instructed** 35:5 41:22 56:11 72:6

**instruction** 39:21 40:8,12, 21,25 41:2,24 51:19 72:2 90:4,10

**instructions** 38:18 39:23 50:18 70:21 71:24 72:11 77:25 90:20 98:4 109:24 111:3 112:2

**instructs** 7:2

**instrument** 46:18

**intel** 53:17

**intentionally** 4:25 5:4,7 8:13

**interchange** 108:19

**interest** 57:8 66:3

**Interests** 12:18

**interpreted** 111:13

**interrupt** 6:4

**interviewed** 95:16

**intoxicated** 35:4 36:4

**investigated** 11:21

**investigation** 9:11,16 95:6,11,15

**investigations** 11:12

**invite** 28:1,3

**invited** 16:18

**involved** 10:18,25 11:24 12:5 21:11 95:4,14 111:22

**involving** 8:7 11:16 15:17

**issued** 18:23 19:1,14,18

**J**

**Jeff** 48:17

**job** 14:1 21:14 40:18 48:13

**join** 16:4

**joined** 14:10

**Jose** 8:1 12:2 15:17 35:3,7 36:4,14,19 41:23 45:13,14 69:9,19 70:20,22 71:17 75:18,19,20 78:6 80:11 84:22 85:3 86:12,17,18 88:1

**Jose's** 86:14

**July** 15:15

**jumped** 74:21,22 75:2 109:1

**K**

**keyed** 98:22

**keying** 98:23

**kicking** 87:19

**kids** 24:22 27:25

**kill** 77:3

**killed** 10:9

**kind** 12:25 26:2 31:20 32:7 73:18 82:7 96:25 107:9,17 108:25

**kitchen** 57:4

**knee** 45:7 106:5

**kneeling** 73:15

**knees** 105:9,17

**knew** 97:25 112:3

**knowing** 95:3

**knowledge** 17:5,20 72:8 93:24

**L**

**lack** 59:23 92:15 93:23,24 104:2,23

**Lake** 14:17 15:6,9 20:3 113:24

**landlord** 28:6

**language** 36:18

**large** 37:20

**lasted** 86:6

**latched** 45:19 65:8

**law** 10:20 11:15,20 14:5 25:22,24 26:5,15 27:1 31:18 37:8 39:1,10,14 46:10 58:17 70:2 78:7

**lawful** 27:1,6,10 31:18

**laws** 26:4,13

**lay** 72:3 87:10 109:25

**laying** 45:16 73:16,23 76:16 91:17 109:6

**leader** 51:22,24 52:5 53:5, 7,16,20,21 54:3,5,9,15,19

**leaders** 51:5,6 52:6,7 53:18

**leadership** 48:7,23 50:25 55:15

**leading** 96:19 97:3,4 101:11 104:22 106:2 107:4,11,12

**leave** 15:4,6,13 38:15

**led** 98:1 111:3

**left** 15:7,9 19:20 20:1,4 76:9 78:24 96:15,16 101:6 105:21 106:12

**legal** 26:8

**legs** 87:8,19 92:7 105:22, 23,25 107:8

**length** 27:14 66:19 106:15

**lethal** 46:16,21,24 47:3,4, 9,23 90:14 91:20,23 92:1,4 103:21 104:4,5 106:25 107:20

**level** 13:9,10 55:24

**lie** 76:8

**lieutenant** 34:13 37:12 38:1,5,9,13,18,25 39:23 48:17 49:8,9 50:1,19 51:20 52:15,17 58:1

**life** 4:20,24 7:15 12:10,22, 25 90:19

**lifesaving** 91:15

**lift** 65:7

**light** 65:25 68:4,5,14 79:21

**listen** 42:5
**listened** 51:12
**listing** 52:24
**live** 103:25
**live-in** 28:22 30:11
**loaded** 46:21 47:1,2,4 91:20 103:24
**loads** 25:10
**locate** 39:22
**located** 39:25 45:13 50:8 57:17 61:15 68:20
**location** 88:22
**log** 98:25
**long** 7:17,22 17:7 35:14 37:8 51:9,12 56:3,7 67:12 85:21 96:10 110:21 112:21
**longest** 112:18
**looked** 63:8 69:8 91:10
**losing** 39:14
**lost** 4:19,23 7:15 12:10 39:10
**lot** 6:13 12:24 22:20 25:9 27:18,20 28:3,16 43:25 56:5 68:14 78:3 99:23 110:19
**love** 13:5 25:9
**loved** 13:4
**low** 79:21
**lowest** 55:3
**luxury** 43:10
**lying** 75:18 76:1 85:5

**M**

**made** 8:22 12:21 34:2 35:4 36:4,9,21,25 37:24 51:15 54:25 74:5 77:13 81:20,21 86:22 90:4,20 93:1
**magazine** 25:17
**magnify** 89:13
**main** 50:3 53:11 55:24
**major** 92:6 95:5
**majority** 21:12 92:12,18 93:21
**make** 5:25 6:20 14:24 28:6 31:9 60:10 62:2,12 69:6 70:3 78:6 79:12,17 80:17 82:12 86:25 87:2 94:24 99:9 111:16
**makes** 6:6 112:2
**making** 81:23 82:4,20 83:3 96:9 112:7
**man** 8:7 44:21,22 64:8,12, 24 65:15 66:4 97:14

**manner** 42:10 77:1
**March** 14:21
**marked** 33:8 42:20,21 52:11,14 57:21,25 58:1 62:15 67:8 93:13,15 105:13
**meaning** 43:21 45:6 67:12 78:22 102:23
**means** 25:15 41:25 42:3 58:13 92:25 99:16
**meant** 40:9,14 108:21
**measures** 91:16
**medication** 31:12 37:23
**medications** 7:8
**meet** 16:21
**member** 9:25 10:8 20:13 21:5,9 24:9 32:5 47:24 55:8 61:20
**members** 34:12 38:6 39:24 46:4 47:4 49:23 51:9 68:13 80:10 81:9 86:13,18
**memorialization** 34:5
**mental** 10:2,12 50:10
**mentioned** 9:4
**Metro** 19:19 22:2
**mic** 98:22,23
**middle** 12:23
**Mile** 83:9,10 99:12
**Miles** 61:17,18,19,23,25 62:6 63:3,23 64:17 65:14 69:7,8,9,12,19,21 70:19,20 71:3 78:21 83:18 89:16 91:1 94:4 100:8 101:2
**Miles'** 64:21
**mind** 45:4 49:2 73:9 110:8
**mine** 89:14
**minutes** 42:4 51:11,14 85:13 86:7 87:16 98:6 112:18
**mission** 24:15,16 54:10
**misstates** 100:11 102:13 104:22
**mistaken** 22:4
**mobile** 50:4,23 51:2 55:12, 16 95:1
**moments** 68:4 86:7,16 87:16
**month** 22:22,25 23:9,14
**months** 17:22 21:8
**morning** 32:15,16
**mother** 8:6 9:3,6
**motion** 96:14

**motor** 4:24 11:14,18
**mouth** 69:11,21,25 70:12 100:7,21
**move** 75:25 76:4,5,6 87:5, 8 98:16 103:16 110:23
**moved** 67:1 89:2 111:5
**movement** 96:11 97:12 105:1 108:20,21 111:18 112:18,19,21,22
**movements** 78:7,10 86:22 96:9 111:15,21 112:8,9
**moving** 72:18 85:23 86:1,5 87:19 89:7 95:23 96:3,12, 21,22 97:18 98:16 102:8 103:17 108:17 109:8,9,14 111:9,14
**mull** 49:12
**MYLAR** 8:15 10:1,11,21 11:23 19:4,9 26:7 29:3,7, 19 45:8 50:9 59:23 60:8 63:10 78:9 87:13 92:14 93:23 95:19,22 96:6,20 97:4,11 100:13 101:14 102:14,17 104:6 105:6,15 106:4 107:5,12,15 108:7, 24 110:11,17 113:2,5,20

**N**

**names** 52:25 53:3
**nature** 11:12 12:11 56:22 78:2 95:2
**needed** 24:15 40:3 41:17 48:7 49:17 68:4
**negating** 90:10,11
**negotiating** 37:9 85:21
**neighborhood** 60:7
**nervous** 76:20 78:25 84:13 90:21 111:16 112:3
**night** 12:23 37:17
**nods** 5:24
**nomenclature** 25:3
**Noncompliant** 78:12
**nonlethal** 103:21,25 104:11,21 106:19 107:6
**nooks** 56:20
**normal** 6:1
**notation** 58:16 59:20
**noticed** 69:8 84:22 86:12, 17 88:1
**notification** 32:10,14
**number** 12:9 13:8 21:7 23:25 42:4 49:20 79:22
**numerous** 11:10,11 16:12 22:18 24:23 25:12 28:8 30:18 31:3,15 71:16 75:20

76:5 86:16 87:25 88:4 91:17,18 93:1 97:17

**O**

**oath** 63:18
**object** 6:25 29:19,20 77:12 92:14 93:23
**objection** 8:15 10:1,11,21 19:4 26:7 29:3,7 50:9 59:23 60:8 78:9 97:17
**objective** 38:20,21 40:21
**objects** 7:1
**observe** 91:12
**observed** 75:19 76:21 91:16 92:8
**observing** 102:24
**obstructed** 101:19
**obstruction** 79:21
**obtained** 48:3
**occupants** 38:15
**occurred** 34:5
**October** 7:25 15:17,23 26:2 29:6 31:22 34:6 43:18 58:21
**odd** 56:14
**Office** 14:2,8,11,14 15:5, 13 19:20 46:14 58:10
**officer** 10:20 11:8 20:14 25:23 26:10,22 27:24 28:5 49:8 59:1 62:6 63:3,23 65:14 69:12,21 71:3 72:1 74:8 85:15 94:4 105:20 110:21
**officer-involved** 95:4
**officers** 22:4 25:9 26:5 31:1,4 39:1 49:18 58:17 76:22 77:4,20 78:8 80:18, 20,24 83:23 84:10,15 88:14 93:2 94:25 98:2 100:5,9 101:1 104:18 106:1
**Ogden** 15:7,13,18,22 19:21 20:1 21:22,25 32:11 46:14 57:13,16
**open** 55:2 62:4,10 63:9 64:24 67:4 69:9 70:16 74:18 75:7 78:23
**opened** 68:11,17,18 74:16 75:3,8,18 109:6
**opening** 85:6 87:23
**operated** 47:17
**operation** 21:10 23:11 44:25 51:4,25
**operations** 47:20,25

**opposed** 5:2 66:16 77:7 80:5,13

**opposite** 94:14

**option** 90:14 91:24 97:5 107:13,20

**options** 47:9,23

**order** 17:13,24 28:7 72:4 110:25

**ordered** 97:14

**ordering** 71:14

**orders** 70:22 71:18,23 72:8,9 77:18,21 110:1,23 111:4

**owned** 29:16

**owns** 28:7 30:16

---

**P**

**p.m.** 4:1 113:25

**pack** 88:21

**paid** 14:23

**paper** 17:12

**paragraph** 34:8,11 41:21 42:13 57:12 60:22 69:1 74:21 79:4,5,7 84:17 86:10

**parallel** 66:20

**paramedic** 57:13,16 91:15

**parents** 28:1

**park** 66:9

**parked** 44:9,12 72:23

**parking** 66:6,7

**part** 12:12,13 14:3 16:24 17:13 44:4 47:15 76:6 92:3 95:10 104:8

**parties** 11:17

**parts** 25:2,4

**pass** 17:24

**passed** 10:25 17:15,16 38:3

**passenger** 73:4

**passenger's** 67:15

**past** 7:9,12

**patient** 56:6

**patrol** 4:22 11:8 13:9 15:25 22:4,7 26:22 28:5 31:4 46:13 49:8

**peaceful** 102:3

**peacefully** 41:12 85:14

**pending** 15:4,10

**people** 13:6 27:18,20 28:3, 8,14,16 53:10 54:24 55:6 56:21 61:12 71:22 78:4 88:21 90:20 99:1 111:16

112:2

**percent** 17:23,24 102:10

**Perez** 52:2,8 54:12,14 74:8 75:6

**perfect** 80:1

**perform** 35:6 41:22 54:9, 10

**period** 21:4

**permission** 28:7

**perpendicular** 66:8,15, 20,22 72:18

**person** 6:3 10:25 27:17 28:18,24 29:1 30:6,16,21, 22 47:24 56:6,15

**person's** 27:2

**person-to-person** 69:22

**personal** 8:5 18:18 72:8 93:24

**personally** 18:6,17 82:21 111:2

**personnel** 52:23

**perspective** 34:6

**pertain** 26:5

**phone** 32:5 39:11,14

**photo** 43:1,3

**photograph** 62:25 93:18

**phrasing** 90:12

**physical** 16:12

**physically** 68:19

**picture** 64:2,4 66:7,10,11 105:21 106:13

**pictures** 101:17 105:7

**piece** 30:14,15

**pistol** 17:2,6,23 104:9,18, 19 105:24 106:1,6,8 113:10

**pistols** 23:20

**place** 26:3 68:19 107:3

**places** 85:24

**plaintiff** 4:4

**plan** 40:4

**plate** 55:13

**play** 31:11 43:18 48:14

**pleading** 99:2,8

**pleas** 99:17

**Pledger** 34:13 37:13 38:2, 5,9,13,19,25 39:23 48:17 50:1,19 51:20 52:17

**Pledger's** 52:15 58:1

**plural** 102:16 108:19

**point** 12:8 19:16 25:13 36:16 53:17 61:6 66:5

69:13,15 70:24 72:15 74:13 79:19 81:11 96:23 98:24 100:2 104:12

**pointed** 67:11 83:11,13, 18,20 89:17 91:1 99:12 102:6

**pointing** 64:10 66:10 94:13

**pole** 55:3

**police** 9:3 13:10 14:4,9,17 15:7,14,18,23 20:14 26:10 31:1 32:12 35:5,24 36:2,5, 6,9,11,15,20,22 37:1 71:25 76:22 78:2 95:12 113:24

**policing** 15:25

**policy** 9:17 23:24 47:18,22

**port** 78:23 89:11 107:25 108:4 110:9

**portal** 72:23 73:5

**ports** 67:16 75:3

**position** 15:22 45:6 48:24, 25 49:7 66:24 68:8 70:14 73:3 74:9,13 75:6 76:1 80:4 103:10

**positions** 14:22

**potentially** 11:21 80:16 84:14 96:18 105:22

**pound** 89:23

**pounded** 90:5

**practice** 21:24 22:16 50:21

**precautionary** 83:19

**preceded** 67:4

**prepared** 90:3

**prescription** 37:23

**present** 73:10

**presently** 73:12

**pretty** 61:9 98:6 110:10

**previously** 42:19,21 52:11,14 57:21 62:15 67:8 75:11 93:15 94:18 105:13

**primarily** 47:6

**prior** 8:11 18:23 39:13 45:25 69:3 100:11 104:23 112:15

**private** 11:17

**problems** 15:10 31:13

**procedure** 9:17

**protect** 106:3

**protecting** 106:1

**protocol** 88:18

**proud** 13:11

**provide** 68:5

**pull** 66:16 77:2,5 88:12

**pulled** 45:17

**purpose** 89:4

**pursued** 8:13

**pursuit** 4:19 7:16 8:8 9:15 10:16

**pursuits** 11:17

**put** 7:20 8:6 16:18 48:24,25 54:6 60:3 66:23 70:21 71:21 72:3 75:21,22 84:2 88:11 99:16 101:3,23 105:2 109:7

**puts** 72:1 97:20

**putting** 87:22 113:17

---

**Q**

**Quad** 53:20

**qualification** 17:15,21

**qualifications** 17:25 18:14 21:20 22:3,8,22

**qualified** 18:3,6,7 20:20 21:15

**qualify** 20:9,13

**qualifying** 17:16 22:6

**quantities** 37:20

**quarterly** 17:21 18:13 20:9 21:16,20 22:10,15,17,23

**question** 6:16,20,24 7:2 10:5,24 11:7 15:16 19:24 21:6 22:14 26:1,8,12 27:4 29:25 30:4,8,9,14,19 36:12 40:15,16 60:1 74:24 77:8 85:1 102:23 107:3

**questioned** 95:10

**questioning** 49:7,9

**questions** 6:14,25 49:12 95:7,20 108:8,10 113:21

**quick** 61:9 105:1

---

**R**

**radio** 49:24 50:19 57:17 59:2,8 60:15 61:15 68:9 69:23 80:9,12,24 81:9 82:12 84:10 98:23 99:3,21 110:6

**raise** 74:5,9

**raises** 54:8

**ran** 5:6

**range** 17:22 21:23 22:17, 20 23:12 24:5,21

**rate** 5:7 8:22

**re-establish** 40:5,13,22

**reach** 85:11 96:18 102:18 103:8,11,13

**reached** 77:15 85:10,17

**reaching** 76:7,8,10,11,12, 19,24,25 77:14,16 80:16 81:1 83:21 84:4,6,22 85:4, 8,25 86:12,20 97:19 99:3 102:12 103:6 108:14 110:3 111:19

**read** 33:18 34:9,25 35:2 36:22 41:20 42:12 44:8 57:14 59:12,17 60:20 69:4 70:18 74:20,25 75:11,12 79:3 80:8 82:25 83:8 84:18 86:10 87:25 89:15,22 90:23

**reading** 44:19 45:9,21 59:7 74:4 86:3

**reads** 33:23

**ready** 62:2 89:23 90:2,17

**realize** 7:23

**reason** 7:5,23 8:24 9:23,24 10:7 23:22 48:17 49:11 59:19 60:13 80:12,14 85:1 90:16 91:13

**reasons** 79:22

**recall** 21:17,19 32:9,13,17, 21,24 33:6 34:17,22,23 35:16,19,21,24 37:2,4,6,8, 12,15,16,19,22 38:1,5,9,13 39:4,8,19 40:7,24 44:17,23 45:1,3,25 46:2,3,7 47:16, 18,21,22 48:1 49:18,22 50:1,17,18 51:18 52:1 55:10,11,13,17,23,24 56:1, 3,11,24 57:2,7 60:15 61:1, 8,14 63:6 64:6,15 65:3,25 67:3,20 69:14,18 71:1 72:16 73:12 80:20,23 81:7, 23 82:1,3,4,20 83:3,4 84:8, 11 85:6,9,10,16,18,19 87:4,7,8,12,19,22 89:18 90:4,7 91:3,7,21 92:20 93:5 94:4,5,15,18,21 95:15 102:22 103:14 111:20 113:8,13

**receive** 17:10 39:23

**received** 32:10,14 34:23, 24 58:7

**recess** 63:14

**recognize** 33:10 43:1,3 58:2 93:18

**recognized** 64:22

**recollect** 113:6

**recollection** 34:14 35:9 36:24 45:22 53:5 59:21 73:11 74:5 93:20

**recommended** 24:19

**record** 6:1 45:8 63:16 107:3

**referred** 42:22 52:12 57:22 62:16 67:9 93:16 105:14

**refresh** 34:14 53:4 74:4 93:20

**regular** 47:5

**relation** 4:17,19

**relay** 84:7

**relaying** 82:8 84:9

**remain** 51:10 95:7

**remember** 7:17 11:6 22:22 32:4,11 35:11,12 39:3 44:11,15 46:14,19 56:13 61:5,17,21 62:8 63:7 65:4,10 76:19 87:24 94:11 95:12 96:4 97:1,2 99:2,14, 19,25 103:13 113:10,14, 16,18

**remembering** 37:7 101:17

**rendered** 91:16

**repeat** 6:18

**repeated** 71:16

**rephrase** 6:19 29:10 36:12 104:14

**report** 32:1 33:1,13,18,25 34:2,4 36:19 37:3 42:13 44:7 45:4,5,21 52:16,18 57:10 58:25 60:21 68:24 71:21 73:9,11 74:2,12,20 81:8 84:17 86:9 100:18

**reported** 9:6 32:22,25 33:6

**reporter** 5:16 6:7

**reports** 104:8

**reposition** 67:2

**repositioned** 67:24

**represent** 8:4 52:16 58:7

**representatives** 8:5

**request** 52:24 82:20 90:11

**requested** 32:1

**required** 47:14,23

**requirement** 21:21 22:15

**requirements** 16:13,21

**reread** 33:20

**rereading** 33:25

**residence** 28:22 31:7 44:10 56:16

**resign** 14:25

**resolution** 102:3

**respect** 25:22

**respond** 32:7,10 49:12 53:24 60:24 70:23

**responded** 52:24

**response** 6:9 31:8

**responses** 5:25

**rest** 21:8

**restate** 10:5

**return** 19:17,24

**review** 113:23

**reviewing** 33:25 53:3

**rifle** 17:7,24 18:5 22:11,23 23:17 24:10,11 44:25 77:3, 6,11 79:9,11,17 80:5,10, 17,21,22 81:2 82:10 83:1, 11,12,15,17,25 84:1,4,23, 25 85:8,12 86:13,21 88:11 89:10,11,13,17 93:7,8 94:13 99:4,12 102:6 104:9, 10 108:15 110:3,10

**rifles** 18:1,2,3 20:18 23:21

**right-hand** 64:4

**road** 5:6 8:13,21,23

**role** 21:11

**roll** 70:15

**roll-up** 64:10 68:18

**rolled** 68:18

**round** 90:2 104:21 105:5 107:18

**rounds** 105:4

**row** 67:17 68:22,23 73:4

**Roy** 49:6 95:12

**rude** 49:5

**rules** 5:9

**running** 24:22 42:1

---

**S**

**safe** 25:12 41:15

**safely** 40:1 41:13 45:19 88:23

**safety** 70:4 80:19 97:21

**Salt** 14:17 15:6,9 20:3 113:24

**scared** 97:21

**scares** 97:19

**scenario** 82:7 84:6

**scene** 11:16 12:4 32:2,22, 25 34:12 43:11 53:24

**school** 13:13,15,17,18

**screaming** 78:3

**search** 25:24,25 26:4,12 27:6 30:13 35:6 38:21 41:23 48:2,10 50:20 56:2, 4,10,16,17,18,25 60:25 61:12

**searched** 56:24

**searches** 25:22,24

**seat** 45:17 74:23 75:2

**second-guess** 48:15

**secondary** 56:15,17,25

**seconds** 8:21 75:16,17

**secure** 21:1

**securely** 65:8

**sees** 76:23

**seizure** 25:24 26:4,13

**selected** 16:10,16

**selection** 16:13,17

**send** 113:23

**sense** 29:13 60:10

**sentence** 34:9,11 36:3 41:20 42:12,13 44:7 57:12 60:20,22 69:4 70:19 74:21, 25 75:5 79:3,6 80:7 84:18 86:11 87:14 108:24

**sentences** 34:25 75:12,13

**separate** 35:8

**sergeant** 49:8

**service** 21:5 24:9 25:22

**set** 55:2 109:23 110:23 111:2,4

**sets** 71:23 72:11

**shadows** 79:18

**shakes** 5:24

**sharp** 8:23

**shelf** 96:23

**Sheriff's** 14:1,8,11,14 15:5,13 19:20 46:13 58:10

**shield** 82:18

**shoot** 17:23 23:15,25 35:5, 24 36:1,5,10,11,15,20,22 98:2 106:8 111:25

**shooting** 5:2 8:1,8 21:23, 24 22:16 23:11 24:18 37:1 95:5,14 105:4 106:10,15, 23

**shortly** 61:6 63:7

**shot** 12:3 22:19,20 23:1 91:18 92:9,25 93:2 105:22 106:5,25 107:7,10,17 111:24 113:9

**shotgun** 17:8 20:18 21:2, 16,19 22:11,12,13 23:19 24:1,7,10,12 44:24 46:20 47:1 89:25 91:19,22

**shotguns** 47:6

**shots** 86:16 87:25 88:2,4,5

**shout** 62:6 63:3,23

**shouted** 110:5

**shouting** 110:19

**show** 33:1 42:19 48:13

61:13,21 62:1,6 63:3,24
69:7 77:25 78:4 93:13
109:13,22 111:5

**showed** 34:19

**showing** 49:7 109:16
110:2

**shown** 105:7

**shows** 66:7,10

**side** 44:21 57:18 62:22,23,
25 63:1 64:4,12 65:18
67:13,15 94:5,8,9 101:18

**sidewalk** 67:21,22,25 68:1
72:19

**sign** 113:23

**significance** 57:8

**signify** 54:18

**silent** 95:7

**similar** 25:8

**simple** 98:4 112:1

**single** 24:20

**singular** 103:16

**sit** 42:4 49:11 92:24 95:2
113:6

**site** 89:13

**sites** 89:11

**sitting** 76:3 79:8,19,20
80:5,6 85:20

**situation** 10:20 30:19 47:9
48:9 55:2 104:1,21

**situations** 47:25

**sixth** 84:17

**size** 110:13

**sleep** 39:2,16

**sleep-type** 16:20

**slightly** 67:25

**slow** 35:6 41:22 42:2,10
56:7 65:9 77:1

**slower** 56:5,19

**slowest** 96:11

**slowly** 43:12 44:3 77:15,16
83:21 84:22 85:3,10,11
86:12,20 111:19

**sniper** 20:17 52:7

**somebody's** 90:17
106:19

**son** 9:25 30:12

**sort** 14:4 17:10,16 47:18,
22 50:6

**soundproof** 109:21

**sounds** 34:20

**South** 113:24

**speak** 6:9 55:4,14

**speaker** 76:17 84:2 93:9
96:13 103:6,8,14,17
112:13,20

**speaking** 6:10,11 7:14
37:9 65:19

**specific** 35:8 39:19 43:24
49:20

**specifically** 56:24 59:3,7

**specifics** 17:3 21:17 30:25
32:4 34:22 37:6 50:24 56:1
91:21 99:24 110:20

**speculate** 19:10,13 64:19

**speculation** 10:2,12 19:4
40:10 50:10 60:9 92:15

**speed** 5:7 8:22

**split** 53:12

**spoke** 32:24 34:15

**spoken** 5:14

**spot** 31:21

**spouse** 28:21

**squad** 52:6,7 53:15,16,20,
21 54:4,5,19

**squad's** 54:14

**stages** 46:11

**staircases** 55:2

**standard** 13:12 26:19
88:18

**standing** 27:17 28:20
29:18 30:6 43:12 44:3 63:6
65:10,14,16,18 77:4 94:5,
6,7,12 106:12

**standpoint** 112:24

**start** 49:6 71:22 109:24

**started** 14:20 93:1 100:9

**Starting** 75:15 84:19

**state** 4:9 13:22 77:23

**stated** 10:6 37:17 41:6
78:17 108:15

**statement** 36:8 70:8

**statements** 86:25

**states** 36:19 59:13

**stay** 50:21,25 53:11

**stayed** 51:12 55:24

**step** 83:11 89:16 99:12
111:6

**stepped** 53:14

**stepping** 55:13

**sticking** 89:10

**stiff** 87:9

**Stirling** 57:13,16 59:1 66:3
67:2 76:10 79:4,8,13,14,16
80:13 82:4,7 84:3,21,24
86:11 88:10 91:14 108:3

113:15

**stole** 9:4

**stolen** 8:19

**stomach** 72:3

**stop** 97:17,18,19

**stops** 87:18

**street** 50:3 51:21 67:22
68:2

**stressful** 13:1,2 99:24

**stretch** 97:24

**structure** 20:25 33:3

**stuff** 88:21

**subject** 4:19,23 9:9 26:24
32:20 35:3 36:3 41:13
61:23 89:3

**subject-type** 32:20

**subjects** 11:11

**Suburban** 42:15,17,24
43:9,11,20,21 44:9,12
66:5,19 67:18,20 68:8,19,
21 69:3 70:14 72:18,23
73:4 78:22 79:8,20,24
88:16,19,24 89:2,7 101:5
107:24 109:20 110:4
112:24

**subwoofer** 76:17 77:10,13
85:7,17 108:14 111:19

**sue** 9:23 10:7

**suggesting** 12:3

**suicidal** 8:18,24,25 9:2,5
11:11 32:20 41:17

**suicide** 37:5 39:6

**suicide-type** 5:1

**summaries** 98:19

**summer** 16:7 18:10 19:15

**superior** 40:12

**suppose** 53:4

**surprised** 62:8

**surrounded** 76:23

**suspicious** 111:15

**SWAT** 12:10,12,13 13:1,3,
4 16:1,4,11,24 19:19,23
20:4,13,16,25 21:5,9,13,22
22:2,6,19 23:1,7 24:9
26:23 32:5 33:3,5 34:13
38:6,10,14 39:22,24 41:11
42:14 43:8,22 46:4,15
47:7,12,15,19,24 48:13,15,
19 49:9,23 51:1,9 52:23
53:18 55:8 61:20 68:12
85:15

**sworn** 4:5

**T**

**tab** 57:23

**takes** 16:21

**taking** 5:16 113:16

**talk** 11:5 17:4 27:14 31:22
40:23 41:18 75:13 95:8

**talked** 72:17

**talking** 11:13,14,18,19
23:10 28:6 62:21 69:16,17
82:8

**talks** 102:6,7

**target** 21:24 106:17,21

**taser** 47:11,15

**tasers** 47:17,19

**tasks** 54:10

**taught** 106:20 107:9

**team** 12:12,13 13:1,3,4
16:1,4,11,16,22 17:14
19:19,23 20:4,16,25 21:5,
9,13,22 22:2,19 23:1,7
24:9 32:6 34:13 38:6,10,14
39:22,24 42:14 43:8,22
44:4,20 46:4,15 47:15,19,
24 48:19 49:23 51:1 52:8
53:18 54:1,15,19,22 55:1,8
56:10 59:3 61:20 68:13
80:9 81:9 86:13,18 89:16

**team's** 48:14 66:2

**teams** 54:20

**technology** 98:21

**Teena** 30:2

**telling** 38:13,14 71:4

**ten** 51:11,14

**tense** 98:6

**term** 16:5 21:3 46:22 92:11
97:8

**terms** 105:25

**testified** 4:5 52:17 58:15
63:23 77:9 89:1 91:9 94:18
101:2 104:18 107:25
108:16 109:12 111:7

**testify** 112:16

**testifying** 45:9

**testimony** 7:6 8:11 36:8,
13 66:13 100:12 101:3
102:13,14 104:8,23 110:7
112:6,15,17

**theory** 53:18

**thereabouts** 72:20

**thing** 5:1 32:8,20 45:3,16
57:5 65:13,25 71:5 78:18
83:20 84:7 86:15 97:16
99:20 102:3

**things** 11:12 17:9 21:18 24:24 26:22 56:21 59:8 61:13 65:7 67:15 89:13 92:7 93:3 97:13

**thinking** 4:18 56:13 61:22 65:4

**Thinks** 83:1

**thirty** 73:1,2

**Thirty-eight** 52:21

**thought** 37:13 38:2 48:18 66:2 80:3 84:25 85:12 89:1 93:9

**threatened** 35:22 38:11

**threatening** 35:23,24 36:1

**threats** 36:25 87:2

**time** 7:22 15:18 16:1 18:12, 23 19:16 21:4,8,12,13 24:20 25:11 27:15 29:5 31:20 32:10,13,15 33:18, 20 40:17 42:9 47:2 48:11, 12 50:2 53:25 55:9 56:23 63:8 64:16 65:4,9,13 70:25 84:21 85:21 86:11 87:17 91:14 95:18 96:10 97:15 102:21 103:8,18 104:20 112:23 113:7

**timeframe** 7:22 26:3

**times** 4:14 6:24 11:3,10,11 22:19,21,22 23:5,9,16,25 31:4 71:16 75:21 76:5 85:11,16 87:17 91:18 93:1

**tiny** 78:23

**tired** 39:2,15

**titles** 53:3

**today** 7:6,24 113:6

**told** 12:20 22:9 35:3,9,21 36:3,25 37:4,8,12,16,19,22 38:1,19 39:1,5,14 40:4 48:22 60:23 61:11 69:9,19 70:6 75:20 79:9 80:9 84:1 105:3 109:13

**tone** 84:8,11

**top** 55:23 58:9 77:12 84:2 103:14

**torso** 87:5 94:2

**total** 83:19

**totem** 55:3

**touch** 83:24 94:19

**touched** 96:23

**touching** 94:19

**trailer** 57:18 59:5,10,18,22 60:4,16,24 61:4 62:3,20,21 63:25 64:1,13,20 69:7

**train** 22:3

**trained** 13:7 16:23 17:1,2, 6,7,8,9 20:17 21:18,25 22:20 91:25 93:4

**training** 12:24 14:5 16:24 24:3 25:21 26:20 77:17 92:6 103:20 105:2 107:7, 16

**trainings** 13:8 24:6 47:16

**transcribe** 5:22

**transcribed** 5:25 83:10

**transcription** 110:12

**transcriptions** 86:4

**transition** 46:9

**transmission** 81:22,23 82:1

**transmissions** 82:5

**transmitted** 90:7

**transporter** 95:3

**travel** 57:18 59:5,10 62:3, 20

**traveling** 10:15

**treat** 84:5

**trick** 6:14

**trigger** 77:3,6 88:12

**trunk** 62:9 63:9 64:24 65:2, 5,8,11,20 68:12 69:8,10, 20,25 72:3,24 73:14,15 75:18 76:15,17 79:10,11, 25 80:10 83:1 85:5,7 87:6, 23 91:17 93:6,7 98:7 108:5 109:18,19

**trunks** 45:17

**trust** 51:5 74:11

**trusted** 48:7

**turn** 8:23 52:19 57:20 58:23 81:4

**turned** 47:9 49:2

**twenty-five** 73:1

**two-lane** 8:23

**two-thirds** 81:14

**type** 18:5 21:9 25:21 31:12 50:4 71:5 78:1 95:4 99:20

**types** 21:2 41:11

**typically** 20:24 32:4 45:15 46:21 47:2 51:1,6 55:15 56:14 70:2 71:10,22 95:6

**typo** 75:2

---

**U**

**uh-huh** 5:18,19 24:2 81:16 84:20

**uh-huhs** 5:21

**ultimately** 41:14

**unclear** 6:18

**uncommon** 56:20

**understand** 6:17,19 8:2 11:7 22:1 30:4 36:13 42:7 51:20 53:8 63:17 71:6,9

**understanding** 26:4,15 27:1,4,13,22 29:5,14 30:25 41:5

**understood** 6:23

**unfortunate** 97:16

**unit** 19:19

**unlike** 12:2

**unlocked** 57:17 59:4,9,18, 22 60:5,17 61:11

**updating** 50:22

**upper** 94:2

**upstairs** 51:13 53:10 55:23

**usual** 43:15 66:16

**Utah** 13:22

**utilized** 90:15

---

**V**

**vague** 10:21 78:9

**valid** 29:1,17 30:15 31:1

**Valley** 13:22

**vantage** 53:17 66:5 79:19 81:11

**veered** 8:21

**vehicle** 4:19,22,24,25 5:5 7:16 8:8,12,19,21 9:14 10:16 11:15,17,18 66:11, 23 69:9 75:19 76:18 80:3 89:5 94:5,8,10 95:3 97:16 99:7 109:21,25 111:1 112:4

**vehicles** 4:21 45:15

**verbal** 9:8

**Verbatim** 80:25

**verify** 64:18

**vicinity** 64:20

**view** 89:8,9 108:5

**viewed** 92:23

**violated** 9:17 35:17,18

**visible** 64:1

**visual** 43:15 50:7 65:17 72:14 89:2

**visually** 25:6 50:7 76:14

**voice** 64:21,22 84:8,11

---

**W**

**waist** 91:2

**wait** 6:8,10 62:12 87:13

**walked** 69:13 113:11

**walking** 34:17 95:1

**wanted** 9:22 19:21 39:2,15 67:3 68:8 69:15 80:15,16 84:7 111:25

**wanting** 65:25

**warrant** 27:7 48:2,10

**warranted** 48:10

**watching** 99:9 102:5,10, 16

**ways** 83:16

**weapon** 46:17 75:23 77:24 78:19 81:8 88:7,8,9,13,14 103:25 104:5,11 106:19 111:22

**weapons** 16:23 17:1 20:12,19 24:17,25 103:21 107:6 110:22

**wearing** 46:14

**Weber** 14:1,11,13 15:2,5, 13 58:9

**week** 16:17,18 18:11 24:7

**welfare** 3:13 38:24 49:16

**west** 44:21 57:18 62:22,23 67:6

**whatnot** 51:14

**When's** 33:18

**white** 62:21 66:11

**wife** 8:6 27:25

**window** 45:16 67:12,13

**windows** 67:4,12

**wise** 106:23

**witnesses** 58:14 96:16

**word** 5:16,20 46:17 78:17

**words** 60:16 63:24 106:23

**work** 13:10 17:8 19:21 20:18

**working** 14:17,19,20

**world** 46:10 104:25

**worst** 84:5

**wow** 65:5,12

**writing** 34:5

**written** 52:18

**wrong** 36:22

**wrongdoing** 9:18

**wrote** 33:13 34:18 35:13, 15,23 36:14,21 78:18 80:22 86:15

---

**Y**

**year** 4:18 16:8 22:19,21

December 05, 2018

**years** 9:22 10:20 11:9,10
12:16 15:8 18:20 21:7 23:8
26:11 32:3 35:12 39:19
40:18 47:8 92:5

**yell** 62:1 69:7

**yelled** 70:1 84:16

**yelling** 61:12 78:3 84:12

---

### Z

**Z1m1** 59:18