

| | WEBER COUNTY SHERIFF'S OFFICE |
| --- | --- |
| | GENERAL OFFENSE HARDCOPY |
| GO# WC 2014-32336 CLOSED/COMPLETED | 7399-98 PUB ORD-SWAT CALL |

## Related Image - Other Misc. Documents

Attachment Description: **BOB STIRLING**
Reference Number:

Synopsis: Upon arrival to the scene, SWAT officers were briefed on the ongoing situation involving a male person who had made contact sometime that morning around 0400. A negotiator had been speaking with the subject trying to get him to come out of the home. At the time of our briefing, there was no one else in home other than the suspect. Further information was given that the subject did have an assault rifle and handgun.

Upon my arrival and receiving the brief, Robert Stirling (ZM1) began to establish medical operations. Roy Ambulance 31 was already staged on scene and Roy Fire Chief Poulson was also on scene. Establishing the location of the house, the staging point for medical was around the corner to the South of 3779 West 5300 South. The target house is located inside of a circle, the third house up on the South side. The evacuation point was identified as behind the panel van which was the Command Post (CP). A Casualty Collection Point (CCP) would be established once the team moved up to the target house. Once all SWAT units were on scene, a final brief was given. The plan was to approach the house using the suburban as cover. The suburban would pull into the driveway and SWAT units would open the garage door and hold to see if that would prompt the subject to communicate with the negotiator. Where the subject was located in the house was unknown. Windows were shut with blinds closed making it impossible to see inside. As part of the pre-movement Robert Stirling (ZM1) coordinated with A31 and advised them of the potential threats and to be ready. A phone call was made to ORMC, which was determined to be the closest trauma facility with a direct route, to be prepared to receive any casualties that may result from the operation. Dr. Sheffield was the physician who answered and was informed of the situation. Chief Poulson and A31 were advised that ORMC would be our primary hospital for any wounded. With a high degree of confidence of the level of threat posed to the SWAT team members, it was decided that a rescue from Roy should be called to standby along with A31. A31 and Chief Poulson were briefed on the medical plan in the event officers were wounded they would go to ORMC and if the suspect was wounded as well they would be transported to Mckay-Dee. Rescue 31 was requested and dispatched to standby.

Upon completion of medical planning and all equipment was assembled, the team began to move tactically using the armored suburban as cover. Among the officers deploying were, Armando Perez (A1, squad leader), Terance Lavely (A2), Brandon Miles (A4, less lethal), Tim Fulton (A6, shield), Reid Mackley (A7), Denton Harper (B2), Brent Butler (B3, less lethal), John Beck (B7), Robert Stirling (M1, medical), Jeff Pledger (Z1), Troy Windsor (Z2). As we approached, Z1 and Z2 broke from the formation and linked up with the perimeter officers located at the house on the East side of the target home. As the suburban pulled into the drive way, the formation moved to the red side of the structure. A shield team then approached the garage door and attempted to open it using the code that was provided. It was attempted three or four times without success. A man door was located on the red side that led into the garage. The team moved around to this door and conducted a breach using a ram. Once the door was breached, officers attempted a number of callouts without any response from inside. The team held position and listened for any type of movement or response from inside the structure for approx. 5 or 6 minutes. When no response was heard, the team then entered slowly to conduct a slow and deliberate search.



**WEBER COUNTY SHERIFF'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# WC 2014-32336 CLOSED/COMPLETED     7399-98 PUB ORD-SWAT CALL

It was at this point that the team entered and as the only medic on scene I remained outside on the red side in the event an engagement with the subject resulted. From my position any wounded could be brought to me or I could make my way to their location. In my immediate area there was a shed and a camp trailer. I made my way around the camp trailer and quickly checked inside the shed which had a window in the back. I could not see anyone inside or any movement. I then moved around and maintained a position on the red/black corner. Harper was at the white/red corner and was replaced by a Roy patrol officer. B2 then went inside the home to assist with the slow and deliberate. With cover from the Roy officer I quickly opened the door to the shed and made one final check to make sure it was clear. Opening the door there was enough view to be confident the subject was not located inside the shed. Again I posted on the black/red corner. After sometime, A1 reported the house was clear but there were two locations that could not be searched. These areas posed a significant risk to the officers and a K9 unit was requested. A secondary search was then begun to make sure there were no additional hiding spots that might have been overlooked. A1 announced over the radio that they had found a gun case and the weapon was missing along with a magazine. M1 informed Z1 that there was a camp trailer located on the red side that had not been searched. With cover from the Roy officer, M1 quietly approached and checked the door to the camp trailer to determine if it was unlocked. After determining the door to the camp trailer was unlocked, M1 backed away from the trailer and notified Z1 of the status. Z1 ordered to lock down the trailer and allow the interior team to finish secondary searches. Eventually B4, B3, and A6 came out of the door and were going to assist with clearing the trailer. As we were developing our plan, officers inside the garage began yelling for someone to "show me your hands!" A1 announced over the radio that the subject had been located in the trunk of a car in the garage. One officer stated the subject had a gun in his hand and had it in his mouth. Z1 advised members to move back from the subject but do not lose sight and begin communications. Officers could be heard inside talking with the subject to put the gun down. At no time did I hear any response from the subject. The only people I could hear talking were the officers pleading with the subject to give himself up and put the gun down. B2 then grabbed me and had me go with him to the suburban. We moved around the front and repositioned the suburban so it was parallel to the house in the driveway. B2 then manned one of the weapon ports and the garage door was opened so we could have a clear vantage point to see the subject.

Once the suburban was set B2 notified A1 to raise the garage door. As the door raised B2 and M1 could see the subject laying in the trunk of a car. At first the subject could be seen holding a gun in his right hand pointed at his head. There were two cars in the garage, one which the subject was in was on the right and another to the left. A4 was standing in the middle of the cars with direct view of the subject. He was giving the subject verbal commands to lay down is weapons and give up. The subject then put his hands behind his head, but he still had the pistol in his hand when he did. Z1 ordered that we maintain our positions and attempt to talk the patient into giving up. Z1 also stated that N1 would be moving to the suburban to begin communication with the subject. A4 maintained his position as the rest of the shield team moved to the far side of car on the left side of the garage. B2 and M1 could see the subject while the rest of the team moved into position. The team moved into position where they had a good view of the subject. During this time



**WEBER COUNTY SHERIFF'S OFFICE**
**GENERAL OFFENSE HARDCOPY**

GO# WC 2014-32336 CLOSED/COMPLETED                    7399-98 PUB ORD-SWAT CALL

frame M1 noticed that there appeared to be a weapon sitting on top of something in the back of the car within easy reach of the subject. Unknown if what it was sitting on was a speaker box or some other type of shelf, but the bottom of a weapon magazine could be seen. At this time it was also noted by B2 and M1 that the subject was moving is hand up towards the weapon. It was unclear which direction the weapon was facing. N1 arrived at the suburban and began to speak out to the subject from the back of the suburban. At no time did I hear the subject ever respond to any officers or the negotiator since contact was made. As the subject moved his hand toward the weapon he rested it on a portion that was thought to be the grip. B2 and M1 discussed if we could clearly tell where he was resting his hand but could not definitively tell. Concerned he may be holding the grip, B2 called to A4 to inform him that there was a weapon, potentially a long rifle, sitting on top of something inside the trunk that may be pointed toward him. B4 also announced that the subject was moving his hand up and along the suspected weapon. A4 moved back a couple of steps but still remained in visual contact with the subject. From where he moved to he appeared to still be in the line of fire of the weapon the subject was trying to get to. The subject continued to move his hand along the weapon moving farther down towards where A4 was standing. Concerned the subject may be trying to get to the trigger or figure a way to grab the weapon to engage officers, M1 informed A4 that the subject appears to be trying to retrieve the rifle and if he shoots it could potential strike A4 at this current location. During this time, N1 was still trying to get the subject to respond to him without success. A4 backed away and moved closer to the front of the vehicles in the garage.

As the subject moved his hand up the weapon, he seemed to reach the point in which he had intended. Throughout this time, officers were still giving verbal commands for the subject to show his hands and put down his weapons. A single shot was heard, followed by a very brief pause as officers engaged the subject. Unknown who engaged or how many shots were actually fired. From the vantage point of M1, at least one round impacted the subject's chest and face. Shots fired was announced over the radio. As we moved in to assess the subject, SWAT officers were pulled back, but maintained security. M1 was called in to examine the subject by Z1. From this point the subject will be referred to as the patient.

M1 and Z1 approached the patient. Upon approach, there is a small semi-auto pistol laying on the ground just outside the trunk of the car where the patient is located. There is also an AR-15 laying in the trunk of the car on top of some shelf, it looks like a speaker box, but unknown for sure. Patient is slumped down with a pool of blood coming from his mouth and does not show any signs of life. There is no rise and fall of the chest. One bullet hole is noted to the left cheek which is consistent with what M1 witnessed when shots were fired. Patient has significant blood coming from both ears. Patient does not have any palpable pulses and no signs of agonal breathing. M1 attempted to locate bullet hole in the chest but is unable to move the patient enough to visualize them. Patient has on a grey t-shirt that has some small tears in it around the chest area. Movement of the patient was kept at a minimum to preserve the crime scene in the event the patient was not workable. While attempting to lift the patient's chin to identify any further facial wounds, crepitus could be felt in the top part of the patient skull and the forehead. Further palpation reveals the skull is fractured in multiple places. To the back side of the patient it is also noted there are some

|  | **WEBER COUNTY SHERIFF'S OFFICE** |  |
|---|---|---|
|  | **GENERAL OFFENSE HARDCOPY** |  |
|  | GO# WC 2014-32336 CLOSED/COMPLETED | 7399-98 PUB ORD-SWAT CALL |

exit holes from the rounds fired, all appear to be in central location consistent with multiple shots to the chest and face. Based on the assessment and available information, M1 determined that the patient was deceased as a result of his injuries and any further efforts of resuscitation would be in vain. M1 informed Z1 of the assessment who was present during the examination. Z1 at this time ordered SWAT officers to move away from the scene and back to the panel van. M1, concerned of the noted exit wounds from the car examined the house to determine if any rounds may have exited the structure. It did not appear that any rounds had gone through the wall of the garage, but as a precaution M1 went over to the house next door and made contact with the owners and confirmed there were no reported injuries. In addition, M1 requested the Roy officers do the same to two other houses that could be in the potential impact area if any rounds did penetrate the structure. This was conducted prior to releasing the ambulance. No further injuries were reported. Contact was made with Ogden Regional Medical Center following the event. M1 initially spoke with an ER nurse about the patient who, after hearing the details, asked if M1 would speak with the doctor. Dr. Bringhurst got on the phone and M1 gave him the patient details. Dr. Bringhurst concurred based on the assessment that the patient was deceased as a result of his injures and resuscitative efforts would not be beneficial at this point. //NOTHING FOLLOWS//