THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| MARIA CALZADA, on behalf of the ESTATE OF JOSE CALZADA,<br><br>        Plaintiff,<br><br>v.<br><br>ROY CITY; WEBER COUNTY; ARMANDO PEREZ, a SWAT Team Officer; JOHN BECK, a SWAT Team Officer; REID MACKLEY, a SWAT Team Officer; LT. JEFF PLEDGER, SWAT Team Commander; TROY WINDSOR, a SWAT Team Officer; WILLIAM FARR, a SWAT Team Officer; TERANCE LAVELY, a SWAT Team Officer; BRANDON MILES, a SWAT Team Officer; TIM FULTON, a SWAT Team Officer, DENTON HARPER, a SWAT Team Officer; BRENT BUTLER, a SWAT Team Officer; and JOHN AND JANE DOES 1-70,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:16-cv-00165-DN-DAO<br><br>District Judge David Nuffer |

This case arises from a police encounter with Jose Calzada on the morning of October 21, 2014.[1] The encounter resulted in the shooting death of Mr. Calzada.[2]

These events highlight the difficulties and tensions our society faces when responding to individuals in crisis. When someone is suicidal, in possession of firearms, and has consumed prescription medications and large quantities of alcohol they are a danger to themselves. But they may also be a danger to family members, friends, and the public and first responders that

---

[1] Complaint ¶¶ 31, 36 at 16, docket no. 1, filed Dec. 6, 2016.

[2] *Id*. ¶ 85.

encounter them. Attempting to diffuse a situation while ensuring the safety of the individual, the public, and first responders often leads to tragic results for everyone involved.

Law enforcement officers must make difficult decisions on the spot based on available information. This can mean, as it did in this case, that when contact is lost after several hours of communications, officers decide it is not reasonable to withdraw from the scene or simply wait in hope that the individual does not harm themself, or that the individual is not unconscious and in need of emergency medical services. And when that decision leads officers to come face-to-face with a noncompliant armed individual, split-second decisions on the use of deadly force must be made for officer safety.

The death of Mr. Calzada is a tragedy to everyone involved and to the community. The resulting impact undoubtedly remains deeply felt and weighs heavy on the hearts and minds of the parties and their families now several years later. On a broader scale, this case presents important issues to the community as a whole. The qualified immunity doctrine can lead to results that some may view as harsh or unjust, regardless of the outcome. But the current state of the law necessitates the doctrine's application to the facts of this case. There is no way to reset or change what has happened. Yet being mindful of the past can guide future decisions and conduct to avoid similar unfortunate consequences.

Following Mr. Calzada's death, Plaintiff asserted claims against multiple government entities and law enforcement officers for violation of Mr. Calzada's Fourth Amendment rights, violation of the Utah Constitution, and wrongful death.[3] Plaintiff's Utah Constitution and state tort claims, as well as Defendants Roy City Police Department and Weber Country Sheriff's

---

[3] *Id*. ¶¶ 100-141.

Office have been dismissed.[4] Plaintiff's three remaining claims are for violation of Mr.

Calzada's Fourth Amendment rights under 42 U.S.C. § 1983.[5] Defendants now seek summary

judgment on these claims.[6]

Because the undisputed material facts demonstrate that Mr. Calzada's Fourth

Amendment rights were not violated by individual officer Defendants' entry and search of his

home and vehicles or their use of deadly force, the individual officer Defendants are entitled to

qualified immunity. And because of this, Plaintiff cannot establish municipal liability under

§ 1983 against Defendants Weber County and Roy City, and cannot establish supervisor liability

under § 1983 against Defendant Jeff Pledger. Therefore, Defendants' Motion for Summary

Judgment[7] is GRANTED.

---

[4] Order Granting In Part and Denying In Part Defendants' Motion for Partial Judgment on the Pleadings at 2, docket no. 37, filed Jan. 8, 2018.

[5] Complaint ¶¶ 100-126.

[6] Defendants' Motion for Summary Judgment and Memorandum in Support ("Motion for Summary Judgement") at 32-59, docket no. 57, filed May 23, 2019.

[7] Docket no. 57, filed May 23, 2019.

**Contents**

I.      UNDISPUTED FACTS ................................................................................ 5
II.     DISCUSSION ........................................................................................... 41
        A.      The testimony and opinions of Plaintiff's purported expert have no effect on the
                disposition of Defendant's Motion for Summary Judgment ................................ 42
        B.      Nonparticipating individual officer Defendants are not liable under § 1983 ....... 44
        C.      The individual officer Defendants are entitled to qualified immunity ................ 45
                1.      The individual officer Defendants did not violate Mr. Calzada's rights by
                        entering and searching his home and vehicles .......................................... 47
                2.      Mr. Calzada's rights were not clearly established at the time of the
                        challenged entry and search of his home and vehicles ............................ 67
                3.      The individual officer Defendants are entitled to qualified immunity for
                        their entry and search of Mr. Calzada's home and vehicles .................... 74
                4.      Mr. Calzada's rights were not violated by Officers Perez, Beck, and
                        Mackley's use of deadly force against him ............................................. 75
                5.      Mr. Calzada's rights were not clearly established at the time of the
                        challenged use of deadly force ............................................................... 96
                6.      Officers Perez, Beck, and Mackley are entitled to qualified immunity for
                        their use of deadly force against Mr. Calzada ...................................... 100
        D.      Plaintiff cannot establish municipal liability under § 1983 against Weber County
                and Roy City ............................................................................................... 100
        E.      Plaintiff cannot establish supervisor liability under § 1983 against Lieutenant
                Pledger ........................................................................................................ 102
III.    CONCLUSION ........................................................................................ 103
IV.     ORDER .................................................................................................... 103

# I.    UNDISPUTED FACTS[8]

1.    Terry Thompson was the duly elected Sheriff of Weber County, Utah. He took office in January 2011, and left the office in January 2019. Sheriff Thompson was the sole and final policymaker for Weber County regarding all law enforcement decisions in Weber County.[9]

2.    Sheriff Thompson's responsibilities also included oversight of the Ogden Metro Special Weapons and Tactics ("SWAT") team. The SWAT team was formed by an Interlocal Agreement between Ogden City, Roy City, South Ogden City, Riverdale City, North Ogden City, Harrisville City, Weber County, Morgan County, and Weber State University. All the SWAT team's operations took place within Weber County and Morgan County.[10]

3.    The Roy City Police Department was a participant in the SWAT team. Mike Elliott was the Roy City Police Chief from May 2013 to January 2015.[11]

4.    The SWAT team was created to support the participating law enforcement agencies with a tactical response to critical incidents. This included when a response team was needed to deal with and neutralize threats created by barricaded suspects, hostage situations, violent and dangerous incidents, jail disruption, and other unusual law enforcement problems

---

[8] The following Undisputed Facts are taken from the parties briefing on the Motion for Summary Judgment. Motion for Summary Judgment at 2-32; Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Response") at 2-58, docket no. 82, filed July 3, 2019; Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment ("Reply") at 1-17, docket no. 104, filed Aug. 9, 2019. Those facts, or portions thereof, identified in the parties' briefing that do not appear in these Undisputed Facts are either disputed; not supported by the cited evidence; not material; or are not facts, but rather, are characterization of facts or argument. Additionally, these Undisputed Facts contain facts that are not material, but nevertheless provide a more complete background of the events and circumstances and give context to the parties' arguments.

[9] Declaration of Terry Thompson in Support of Defendants' Motion for Summary Judgment ("Thompson Decl.") ¶¶ 1-2, docket no. 58, filed May 23, 2019.

[10] Thompson Decl. ¶¶ 4-5; Ogden Metro Special Weapons and Tactics Team (SWAT) Interlocal Agreement ("Interlocal Agreement"), docket no. 58-1, filed May 23, 2019.

[11] Declaration of Mike Elliott in Support of Defendants' Motion for Summary Judgment ("Elliott Decl.") ¶¶ 1-2, docket no. 59, filed May 23, 2019.

that standard police operations are not capable of dealing with. The SWAT team was only deployed at the request of the law enforcement agency having jurisdiction over an incident.[12]

5.     The SWAT team was composed of individuals employed by the participating law enforcement agencies. These individuals remained employed by their original agency, but agreed that SWAT activities took precedence over their normal responsibilities. The SWAT team members were generally the best law enforcement officers from their respective agencies. They had to demonstrate exemplary character and not have any disciplinary actions, resulting in time off without pay, taken against them for the previous three years before being appointed to the SWAT team.[13]

6.     The SWAT team has an Administrative Board composed of the Weber County Attorney, Morgan County Attorney, and the head of each participant law enforcement agency. The Administrative Board acted in an advisory capacity.[14]

7.     The Interlocal Agreement did not create a new legal entity. Rather, the SWAT team was administered and fiscally managed by the Weber County Sheriff's Office. The SWAT team has its own policies and procedures. However, if there was no applicable SWAT team policy, then each member officer was bound by the policies and procedure of their employing agency. If there was a need to change the SWAT team policy, Sheriff Thompson was the final policymaker with the authority to make any changes, but he would receive input from the Administrative Board.[15]

---

[12] Thompson Decl. ¶ 6.

[13] *Id*. ¶¶ 7-8; Interlocal Agreement § 3.1.2(C).

[14] Interlocal Agreement §§ 2.1, 2.1.1; Thompson Decl. ¶¶ 9-10; Elliott Decl. ¶ 5.

[15] Interlocal Agreement §§ 1.2, 10.1; Thompson Decl. ¶¶ 11-13; Elliott Decl. ¶ 7.

8.      The SWAT team had a use of force policy that governed use of force. No local agency's policy superseded the SWAT team's use of force policy. The policy spelled out that officers were to use reasonably necessary force to accomplish the objectives and effectively bring a situation under control while protecting the life of the team members or another person. Force was only to be in a deliberate and measured manner and only to the extent that was reasonable.[16]

9.      The SWAT team use of force policy also stated that it was to comply with all law concerning the application of force. The use of deadly force was only acceptable when officers met the conditions of Utah Code Ann. § 76-2-404, which states that deadly force is authorized when "the officer reasonably believes that the use of deadly force is necessary to prevent death or serious bodily injury to the officer or another person."[17]

10.     Sheriff Thompson and Chief Elliott are unaware of any defect in the SWAT team's use of force policy. The policy guided the SWAT team's training. Sheriff Thompson was never notified of any defect in the training or the policy of how the SWAT team deployed any use of force.[18]

11.     Lieutenant Jeff Pledger became the director and trainer of the SWAT team in September 2012, and was in this position in October 2014. He has since retired from the position.[19]

12.     During Lieutenant Pledger's time with the SWAT team, he participated in approximately 200 operations, and was the Tactical Commander for approximately 85 of these

---

[16] Thompson Decl. ¶¶ 14-15; Elliott Decl. ¶ 8.

[17] Utah Code Ann. § 76-2-404(1)(c); Thompson Decl. ¶¶ 16-17.

[18] Thompson Decl. ¶ 18; Elliott Decl. ¶ 12.

[19] Declaration of Jeff Pledger ("Pledger Decl.") ¶ 6, docket no. 60, filed May 23, 2019.

operations. Lieutenant Pledger was the Tactical Commander on October 2014, when the events of this lawsuit took place.[20]

13.     The SWAT team members were drawn from the various law enforcement agencies in the Interlocal Agreement. They were all Police Office Standards and Training ("POST") certified and in good standing. All team members had received training in proper search and seizure protocols and regarding when it is appropriate to use force, including deadly force. Serving on the SWAT team is an important responsibility and only offered to the best law enforcement officers from each agency.[21]

14.     As the Tactical Commander of the SWAT team, Lieutenant Pledger was responsible for directing the SWAT team's activities and administrative activity. This included maintaining financial and operation records and reporting as required by the Weber County Sheriff. Lieutenant Pledger was not the final policymaker for the SWAT team. All SWAT team policies were approved by the Administrative Board. Per these policies, as the Tactical Commander, Lieutenant Pledger had final tactical decision-making authority for hands-on incidents.[22]

15.     The SWAT team would only be deployed in situations needing their specialized training and at the request of the law enforcement agency having jurisdiction over the incident. It was Lieutenant Pledger's responsibility to call out the SWAT team once a request was made by a law enforcement agency.[23]

---

[20] *Id*. ¶ 7.

[21] *Id*. ¶ 9.

[22] *Id*. ¶ 10.

[23] *Id*. ¶¶ 11-12.

8

16.     Early on the morning of October 21, 2014, Officer Val Truscott of the Roy City Police Department was contacted by dispatch and informed that a suicide crisis line had a suicidal male named Jose Calzada on the phone with them. Officer Truscott was told Mr. Calzada was at his home in Roy City with his girlfriend, and he later found out there were children in the home. Officer Truscott was also told that Mr. Calzada was threatening "suicide by cop," and that he had an assault rifle with him.[24]

17.     Officer Truscott arrived at Mr. Calzada's residence around the same time as three other officers. Officer Truscott was the ranking officer on the scene and, based on the chain of command, was the officer in charge. Officer Truscott instructed the three other officers to set up a perimeter around Mr. Calzada's home. Setting up a perimeter would enable the officers on scene to witness any movement from the house and disseminate information quickly. Officer Truscott stationed himself at the entrance of the cul-de-sac where Mr. Calzada's home was located. Officer Truscott had not spoken with anyone inside the home or attempted to contact them at this point.[25]

18.     Not knowing if Mr. Calzada's girlfriend or children were free to leave, Officer Truscott called the SWAT Tactical Commander, Lieutenant Pledger, at 4:28 a.m. Officer Truscott told Lieutenant Pledger about Mr. Calzada and how he was threatening suicide, had an assault rifle and three other guns, and that children and his girlfriend were also in the home.[26]

19.     Officer Truscott informed Lieutenant Pledger that no threats had been made to harm the inhabitants of the home, and that the officers had not spoken to Mr. Calzada. However,

---

[24] Declaration of Val Truscott ("Truscott Decl.") ¶¶ 2-3, docket no. 61, filed May 23, 2019.

[25] Id. ¶¶ 4-5.

[26] Id. ¶ 6; Pledger Decl. ¶¶ 13-14; Weber County Sheriff's Office General Offense Hardcopy Case Summary ("Report"), docket no. 60-1, filed May 23, 2019.

Mr. Calzada had threatened "suicide by cop." "Suicide by cop" generally meant to Lieutenant Pledger at that time that a person wanted to provoke the police by threatening or using deadly force at people or law enforcement to cause the police to shoot the person before or during the person's use of force against another person.[27]

20.     After speaking with Officer Truscott, Lieutenant Pledger decided not to mobilize the SWAT team, but told Officer Truscott to try to contact Mr. Calzada to see if he would respond to offers of help. The SWAT team was not mobilized at this time because Mr. Calzada had not made any threats towards the other occupants of the home and had contacted the suicide hotline on his own. Lieutenant Pledger did not want to unnecessarily escalate the situation.[28]

21.     Officer Truscott attempted to contact both Mr. Calzada and his girlfriend, Dona Hotz, via telephone without success. Dispatch informed Officer Truscott that Mr. Calzada got upset when the police attempted to interrupt his phone call with the suicide hotline. However, minutes later Officer Truscott saw Ms. Hotz and the children at the home's front door. Officer Truscott briefly spoke directly with Ms. Hotz after she had exited the home. She informed Officer Truscott that she had dumped out Mr. Calzada's alcohol.[29]

22.     At 4:47 a.m., Officer Truscott called Lieutenant Pledger and informed him that Roy City Police had not had any success speaking to Mr. Calzada, but that Ms. Hotz and the three children had left the home peacefully.[30]

23.     Officer Truscott then requested the assistance of SWAT team. Lieutenant Pledger declined to call out the SWAT team at this time. This was because Mr. Calzada was now alone in

---

[27] Pledger Decl. ¶ 15.

[28] *Id*. ¶ 16.

[29] Truscott Decl. ¶¶ 8-9.

[30] Pledger Decl. ¶ 17.

the home and only an immediate danger to himself. Lieutenant Pledger did not want to escalate the situation any more than necessary. Instead of mobilizing the SWAT team, Lieutenant Pledger offered to assist at the scene personally, which Officer Truscott accepted. Lieutenant Pledger also asked Officer Truscott to contact Roy City Police Officer Jason Vanderwarf. Officer Vanderwarf was the head negotiator for the SWAT team and was experienced and trained for this type of situation.[31]

24.     To become a negotiator, Officer Vanderwarf had been trained in negotiations through the Federal Bureau of Investigation's negotiation class and through Crisis Intervention Training. Officer Vanderwarf had also been certified in forensic interview techniques and had taken additional negotiator training periodically through his time at the Roy City Police Department and the SWAT team. Prior to October 21, 2014, Officer Vanderwarf had responded to several threatened suicides and participated in successfully resolving incidents without loss of life.[32]

25.     Sergeant Morgan and Lieutenant Smith of the Roy City Police Department then arrived on scene and took command. Sergeant Morgan asked Officer Truscott to have dispatch attempt a reverse 911 call to inform Mr. Calzada's neighbors of the potential threat and to ask them to stay inside their homes. However, dispatch stated that the reverse 911 call was not working, so Officer Truscott knocked on the doors of a few of the neighbors and advised them to stay in their homes. One of these neighbors advised Officer Truscott that he had called another neighbor by phone and asked them to stay in their home.[33]

---

[31] *Id*. ¶¶ 18-19.

[32] Declaration of Jason Vanderwarf in Support of Defendants' Motion for Summary Judgment ("Vanderwarf Decl.") ¶¶ 5-6, docket no. 62, filed May 23, 2019.

[33] Truscott Decl. ¶¶ 10-11.

26.     A short while later, Lieutenant Pledger and Officer Vanderwarf arrived down the street from Mr. Calzada's home. When Lieutenant Pledger arrived at the scene, there was a handful of Roy City Police officers on the street outside the home.[34]

27.     Lieutenant Pledger was briefed by Officer Truscott and others on scene. It was decided during this briefing that police were present out of concern for Mr. Calzada's well-being. However, if Mr. Calzada attempted to discharge any of his guns, it would put at risk the various neighbors who lived around him.[35]

28.     Following this briefing, Officer Vanderwarf spoke with Ms. Hotz, who resided at the home, and was told that Mr. Calzada had consumed a large amount of alcohol (approximately one gallon of Seagram's 7 whiskey) and was currently taking three different types of medication for anxiety and depression. Ms. Hotz also provided Officer Vanderwarf with Mr. Calzada's phone number.[36]

29.     The officers knew that phone communication is the safest form of communication.[37] Lieutenant Pledger entered his patrol truck with Officer Vanderwarf because the weather was cold and windy. From there, they contacted Mr. Calzada via cell phone. Although Lieutenant Pledger could hear Mr. Calzada's voice over Officer Vanderwarf's cell phone, Lieutenant Pledger never entered the conversation or said anything over the phone to Mr. Calzada.[38]

---

[34] Vanderwarf Decl. ¶ 9; Pledger Decl. ¶ 20.

[35] Pledger Decl. ¶ 21.

[36] Vanderwarf Decl. ¶ 11.

[37] Deposition of Officer John Beck ("Beck Depo.") at 67:8-12, docket no. 86-15, filed July 8, 2019.

[38] Pledger Decl. ¶ 22.

30.     Officer Vanderwarf is a trained hostage negotiator and has received specialized training in dealing with people in crisis. He has successfully worked as a negotiator in several prior dangerous situations. His purpose was to negotiate a peaceful conclusion of the situation involving Mr. Calzada.[39]

31.     Mr. Calzada's voice was slurred and slow, consistent with being under the influence of alcohol or medications. There were times where Mr. Calzada's voice was difficult to understand.[40]

32.     Over the next several hours, Officer Vanderwarf talked with Mr. Calzada over the phone. The phone was not on speaker, but Lieutenant Pledger could hear Mr. Calzada through the phone. During this call, the suicide hotline operator, who Mr. Calzada had initially contacted, was also on the line. Lieutenant Pledger heard the suicide hotline operator twice interrupt the conversation between Officer Vanderwarf and Mr. Calzada.[41]

33.     Lieutenant Pledger spoke separately to the suicide hotline operator and another employee at the hotline and asked them to stop interrupting and to allow the negotiator to use his expertise. The suicide hotline operator did not interrupt again. Officer Vanderwarf and Lieutenant Pledger also called Mr. Calzada directly instead of conferencing in through dispatch, so they could have a direct and clear line of communication.[42]

34.     The next several hours were spent with Officer Vanderwarf urging Mr. Calzada to come out of the home unarmed. Mr. Calzada refused to come out of the home without his guns. Mr. Calzada specifically told Officer Vanderwarf that if he came out, it would be with his

---

[39] *Id*. ¶ 23.

[40] Vanderwarf Decl. ¶ 13.

[41] Pledger Decl. ¶¶ 24-25.

[42] *Id*. ¶ 26.

guns.[43] Mr. Calzada stated multiple times that he did not want officers to come into his home and was concerned that they had entered his home; he was assured that officers had not enter his home "like that."[44]

35.     Mr. Calzada made many statements that concerned Officer Vanderwarf throughout their conversation. Mr. Calzada stated that he was "locked and loaded" multiple times. Mr. Calzada indicated he had hundreds of rounds of ammunition. Mr. Calzada made several statements about "going tactical." And Mr. Calzada indicated he was doing "perimeter checks" and would be absent from the phone. It was confirmed from officers outside the residence that movements were occurring in different rooms in the house and lights would go on and off during these "perimeter checks."[45]

36.     Officer Vanderwarf continued speaking to Mr. Calzada, attempting to get him to come out of the home unarmed. Mr. Calzada refused to come out unarmed. However, Mr. Calzada said that law enforcement could come into the home. Officer Vanderwarf informed Mr. Calzada that no one wanted to harm him, and that law enforcement were there to help him.[46]

37.     Officer Vanderwarf worked to build a rapport with Mr. Calzada. They discussed Mr. Calzada's employment, military career, and the importance of honor, integrity, and his family. It was Officer Vanderwarf's impression that the issues of honor and integrity were

---

[43] *Id*. ¶ 27.

[44] Ex. 8 Audio of Dispatch Call at 1:10:50, docket no. 79, conventionally filed July 3, 2019; Vanderwarf Decl. ¶ 18; Ex. 3 Audio File at 0:18:45-0:19:30, 0:32:21-0:32:37, docket no. 76, conventionally filed May 24, 2019. Lieutenant Pledger listened to the complete Ex. 3 Audio File of Officer Vanderwarf and Dr. Gushman on the phone dispatch line talking to Mr. Calzada. Lieutenant Pledger affirmed that the audio file appears to be accurate and the same conversation he overheard on Officer Vanderwarf's cell phone when Officer Vanderwarf was talking to Mr. Calzada or listening in on Dr. Gushman's last conversation with Mr. Calzada. Lieutenant Pledger has kept the audio file safe in the ordinary course of business as the SWAT team Tactical Commander. And Lieutenant Pledger affirmed that the audio file is a business record, and that he is charged under the law to keep it safe and unaltered since the date of the incident. Pledger Decl. ¶ 83.

[45] Vanderwarf Decl. ¶ 14.

[46] *Id*. ¶ 15.

important to Mr. Calzada, and Officer Vanderwarf continued to bring this up during the conversation.[47]

38.    Lieutenant Pledger would periodically leave the vehicle where Officer Vanderwarf was speaking to Mr. Calzada to discuss progress or lack of progress with Deputy Chief Calcut and Lieutenant Hammond. He would then return to the vehicle to be able to hear the conversation continue. Lieutenant Pledger personally heard Mr. Calzada say that he would not come out of the home without his guns.[48]

39.    Lieutenant Pledger was told that Mr. Calzada wanted to die by "suicide by cop." This meant to Lieutenant Pledger that Mr. Calzada was planning on somehow engaging the police in some sort of gun battle where Mr. Calzada would be shooting at the police so that they would have to shoot back and kill Mr. Calzada.[49]

40.    Mr. Calzada's speech was lethargic, slow, and sometimes incoherent. It was obvious to Lieutenant Pledger that Mr. Calzada was under the influence of alcohol, drugs, or both. Officer Vanderwarf privately told Lieutenant Pledger that Ms. Hotz stated that Mr. Calzada had consumed up to a gallon of Seagram's 7 whiskey. This was believable to Lieutenant Pledger based upon how Mr. Calzada was speaking. To Lieutenant Pleader, this factor increased the potential unpredictability and risk of danger from Mr. Calzada.[50]

41.    At 6:38 a.m., Lieutenant Pledger spoke directly with Dr. Brian Gushman, the psychologist that had been treating Mr. Calzada.[51]

---

[47] *Id*. ¶ 16.

[48] Pledger Decl. ¶ 28.

[49] *Id*. ¶ 29.

[50] *Id*. ¶ 30.

[51] *Id*. ¶ 31.

42.     Dr. Gushman informed Lieutenant Pledger that Mr. Calzada had been prescribed Remeron as a sleep aid, Effexor XR for anti-anxiety, and Xanax for anti-anxiety.[52]

43.     After approximately an hour talking with Mr. Calzada, Officer Vanderwarf was informed by Lieutenant Pledger that Dr. Gushman was available to speak with Mr. Calzada. Mr. Calzada said that he had spoken with his psychologist a couple weeks before, and did not want to talk to him.[53]

44.     Lieutenant Pledger spoke with Dr. Gushman while Officer Vanderwarf remained on the phone with Mr. Calzada. Lieutenant Pledger relayed to Officer Vanderwarf that when Mr. Calzada had discussed suicide with Dr. Gushman in the past, discussions about provision for his family, being with his children, and the impact that suicide would have on them helped dissuade Mr. Calzada from his suicidal thoughts. Officer Vanderwarf addressed these concerns with Mr. Calzada. Mr. Calzada's demeanor would change throughout the conversation. He expressed strong concern that someone was in his home, either in the basement or on the stairs. Officer Vanderwarf assured him no one had entered the home.[54]

45.     Mr. Calzada's increased agitation and prior comments about weapons and tactics raised Officer Vanderwarf's concern for his well-being and the safety of the officers and surrounding neighbors.[55]

46.     Officer Vanderwarf would periodically ask Mr. Calzada to come outside the home unarmed, but Mr. Calzada refused every time.[56]

---

[52] *Id*. ¶ 32.

[53] Vanderwarf Decl. ¶ 17.

[54] *Id*. ¶ 18.

[55] *Id*. ¶ 19.

[56] *Id*. ¶ 20.

47.     After speaking with Mr. Calzada for several hours, Officer Vanderwarf reminded him that Dr. Gushman would like to speak with him. Mr. Calzada agreed to speak with Dr. Gushman at that time.[57]

48.     Officer Vanderwarf told Dr. Gushman the prior history of the conversation with Mr. Calzada and informed him that during the call, Officer Vanderwarf would remain silent unless Mr. Calzada attempted to address him. Dispatch connected Dr. Gushman into a four-way conference call, between Mr. Calzada, Dr. Gushman, Officer Vanderwarf, and dispatch.[58]

49.     Lieutenant Pledger had also requested an ambulance be stationed at the scene. This was because Mr. Calzada may have consumed a potentially dangerous amount of alcohol and prescription drugs, and could need emergency medical help at any time.[59]

50.     Mr. Calzada made comments to Officer Vanderwarf that "he was going tactical," and that his rifle had a "tac light" on it, which is a flashlight attached to the barrel of the weapon. Mr. Calzada turned on and off the light on his gun, and this could be seen from the street. Mr. Calzada also made comments that he was going to leave the phone to "check the perimeter," and he would leave the conversation for a few moments before returning. These comments, combined with the fact that Lieutenant Pledger was told Mr. Calzada had military training, heightened Lieutenant Pledger's concern for Mr. Calzada's safety and the safety of any people living around him. Lieutenant Pledger believed Mr. Calzada's comments seemed to refer generally to military maneuvers where he might deploy his firearms against some target outside

---

[57] *Id*. ¶ 21.

[58] *Id*. ¶ 22.

[59] Pledger Decl. ¶ 33.

his home. Lieutenant Pledger believed Mr. Calzada's comments seemed to indicate there would be some sort of show down where he would "test the officers" to see what they were made of.[60]

51.     Mr. Calzada let Officer Vanderwarf and Lieutenant Pledger know that he could see a patrol car and could hear officers talking outside the home. Mr. Calzada would not agree to come outside the home without his guns. But he invited Officer Vanderwarf and Lieutenant Pledger into the home. Officer Vanderwarf would not agree because Mr. Calzada would not agree put down his weapons. Officer Vanderwarf tried to build a bond with Mr. Calzada, and they discussed their shared military service and weapons.[61]

52.     When the four-way call was established between Mr. Calzada, Officer Vanderwarf, Dr. Gushman, and dispatch, it was decided that Dr. Gushman and Mr. Calzada could talk on their own without interruption. Officer Vanderwarf and dispatch could listen in, but neither would participate in the discussion unless requested to by Dr. Gushman. Dr. Gushman attempted to get Mr. Calzada to come outside without his guns, but Mr. Calzada refused.[62]

53.     Dr. Gushman talked with Mr. Calzada for over an hour while Officer Vanderwarf took notes about the conversation.[63]

54.     Dr. Gushman discussed with Mr. Calzada the hardships Mr. Calzada was going through with his family and with work. Dr. Gushman also made several attempts to have Mr. Calzada exit the home unarmed. Mr. Calzada told Dr. Gushman that he would come out, but that he was not going to put down his guns. Dr. Gushman tried to explain to Mr. Calzada that this would send the wrong message. At one point near the end of their conversation, Mr. Calzada

---

[60] *Id*. ¶ 34.

[61] *Id*. ¶¶ 35-37.

[62] *Id*. ¶¶ 38-39.

[63] Vanderwarf Decl. ¶ 23.

mentioned that he was tired, that he had a long night, and that he wanted to sleep. Dr. Gushman agreed, but stated that Mr. Calzada should go outside so that he could get some help and get some sleep.[64]

55. Mr. Calzada became very apologetic to Dr. Gushman stating that Dr. Gushman deserved better. At 8:59 a.m., Mr. Calzada stopped talking with Dr. Gushman. Despite several attempts to call Mr. Calzada, neither Officer Vanderwarf, Dr. Gushman, nor dispatch were able to reach Mr. Calzada.[65]

56. Lieutenant Pledger believed, based on Mr. Calzada's tone and his comment about wanting to sleep, that Mr. Calzada wanted to sleep forever or end his life. This belief was also because Mr. Calzada had called the suicide hotline and told them that he wanted to complete suicide. This was an interpretation that Lieutenant Pledger believed Dr. Gushman shared based on the discussion that immediately followed Mr. Calzada's comment. The following are statements made during the phone conversation with Mr. Calzada:[66]

  a. At 50:17, Mr. Calzada stated, "I am done. This is what I am going through and that it. I am done. It's going to happen. . . . I am gonna end my life."

  b. At 1:03:55, Mr. Calzada stated, "I have to end my own life, regardless if its by my own hand or not."

  c. At 1:07:00, Mr. Calzada stated, "I have tried pills and failed and now it's just a bullet."

  d. At 1:37:00, Mr. Calzada told Dr. Gushman that he just finished writing his will and detailing what he wanted his nephew to have.

---

[64] *Id*. ¶ 24.

[65] *Id*. ¶ 25.

[66] The time marks for the following statements are based on the duration of the phone call, not the time on the clock.

e.      At 1:41:33, Mr. Calzada told Dr. Gushman, "I just feel like I can't walk out of here without [putting] a bullet in my head." Dr. Gushman asked, "What makes you say that?" Mr. Calzada replied, "It is what I have been wanting to do."

f.      At 1:43:30, Dr. Gushman encouraged Mr. Calzada to "go out and talk with the police unarmed if for no other reason than for your nephew." Mr. Calzada replied, "I will do it armed, but not unarmed." Dr. Gushman asked, "why do you need to be armed? Tell me about that." Mr. Calzada responded, "if the conversation doesn't go good I ain't saying that I am not going to do harm to anyone else but myself."

g.      At 1:58:48, Dr. Gushman told Mr. Calzada, "You're just going to go to sleep. I think you have had a long night and I think you need a rest, but not like what you're planning."

h.      At 1:59:22, Mr. Calzada talked about a sleep aid he had and Dr. Gushman encouraged him to not take it because he had consumed alcohol and medications already. Dr. Gushman also encouraged Mr. Calzada to come out unarmed. Mr. Calzada replied that he would only talk to the officers if he was still armed. Mr. Calzada then described his rifle by saying "she is locked and loaded" and "so is my side arm."

i.      At 2:02:19, Mr. Calzada told Dr. Gushman that he has "done a lot for me" and that "its just me. It's something I have to do and I'd rather end our conversation with telling you that."

j.      At 2:16:50, Mr. Calzada began to talk about his military flag and his red beret and medals, and that he wanted the flag draped over his casket and he described how it should be done. He stated he wanted his medals placed next to the flag.

k.    Dr. Gushman took the next 20 minutes trying to persuade Mr. Calzada to come out without his guns, and that things will be better if he does.

l.    At 2:21:30, Mr. Calzada told Dr. Gushman that he is going to hang up. Dr. Gushman stayed on the line, but Mr. Calzada was not heard from on the phone again. These statements and the entire conversation gave Lieutenant Pledger a heightened concern that something dangerous was about to happen either involving Mr. Calzada and his guns, or that Mr. Calzada would overdose on something and need immediate medical treatment.[67]

57.    Prior to the officers losing phone contact with Mr. Calzada, he stated that the battery on his cell phone was dying.[68] Minutes before losing phone contact, Mr. Calzada stated that he was going to add a new song to his play list in the future.[69] He also stated that he was not going to hurt anyone, just himself, and Dr. Gushman stated that he knew Mr. Calzada would not hurt anyone.[70] Prior to the final statements by Mr. Calzada, every so often the phone call would be dropped or Mr. Calzada would hang up, but Officer Vanderwarf and Lieutenant Pledger were able to reestablish phone contact. At 8:59 a.m., contact with Mr. Calzada was lost and all subsequent attempts to reestablish telephone contact were unsuccessful. Based upon the prior statements by Mr. Calzada, Lieutenant Pledger felt an increasing sense of urgency the longer it went without hearing from Mr. Calzada.[71]

58.    Lieutenant Pledger believed that Mr. Calzada had most likely fallen asleep because of Ms. Hotz's statements regarding the large consumption of alcohol he had drank, and

---

[67] Pledger Decl. ¶ 40.

[68] Ex. 3 Audio File at 7:18:01 a.m., 8:39:24-8:39:52 a.m.

[69] *Id*. at 1:58:27.

[70] CAD Call Hardcopy at 19 (8:20:19), 22 (8:35:17), docket no. 86-10, filed July 8, 2019.

[71] Pledger Decl. ¶¶ 41-42.

Dr. Gushman's statements that the prescription medications Mr. Calzada was taking combined with the alcohol would likely make him unconscious. The heavily slurred and incoherent speech that Lieutenant Pledger heard from Mr. Calzada also led him to believe Mr. Calzada was most likely sleeping or that he had overdosed and needed emergency medical treatment to save his life.[72]

59.     Lieutenant Pledger discussed the situation with Officer Vanderwarf, and the command staff present from the Roy City Police Department, including Lieutenant Hammond, Deputy Chief Calcut, and Chief Elliott. They agreed that leaving the scene or doing nothing was not a viable option because Mr. Calzada would likely try to harm himself once he woke up or he might leave the house with his firearms, placing more people in danger. The officers also determined they could not allow Ms. Hotz and the children to re-enter the home without the situation being resolved.[73]

60.     Lieutenant Pledger believed there was a very real risk of overdose for Mr. Calzada due to his possible consumption of a large amount of alcohol and prescription medication.[74]

61.     All but one of the windows on the home were covered by curtains. This prevented officers from using mirrors to check on Mr. Calzada. Motion sensing equipment also could not be used effectively to determine Mr. Calzada's well-being because the officers were told there were pets in the home. Lieutenant Pledger asked the perimeter units to remain alert and notify

---

[72] *Id*. ¶ 43.

[73] *Id*. ¶ 44.

[74] *Id*. ¶ 45.

him immediately if they saw or heard any indications that Mr. Calzada was still alive and moving in the home. None were ever reported to Lieutenant Pledger.[75]

62.     Lieutenant Pledger decided the best course of action was to covertly insert SWAT team members into the home, who would hopefully find Mr. Calzada asleep. Lieutenant Pledger believed this plan had the highest likelihood of taking Mr. Calzada safely into custody for transport to the hospital and presented the least risk to law enforcement and the surrounding neighbors. And if Mr. Calzada was not asleep, the SWAT team members could locate him and attempt to convince him to peacefully surrender or, at least, re-establish productive peaceful negotiations.[76]

63.     For purposes of officer safety, it was determined necessary for the SWAT team members to enter the home with their weapons drawn and ready for a potential confrontation. This was because it was unknown whether Mr. Calzada was asleep or awake, and because it was known that Mr. Calzada was armed within the home. Officers had information that Mr. Calzada had in his possession an assault rifle and more than 1,000 rounds of ammunition.[77]

64.     The plan was discussed with the Roy City Police command staff. Lieutenant Pledger asked Lieutenant Hammond to obtain consent to enter the home from Ms. Hotz.[78]

65.     Officer Trent Fusselman of the Roy City Police Department met with Ms. Hotz and the three children at the Roy City Police Department. At 9:21 a.m., Lieutenant Hammon

---

[75] *Id*. ¶¶ 46-47.

[76] *Id*. ¶ 48.

[77] *Id*. ¶ 49.

[78] *Id*. ¶ 50.

called Officer Fusselman and asked him to do a Consent to Search Form with Ms. Hotz to allow officers to enter the home and curtilage at 3779 West 5300 South where she was living.[79]

66.     Officer Fusselman explained the Consent to Search Form to Ms. Hotz, and that it would include the "Entire Home & Curtilage" as defined on the form. He did not recall specifically explaining the definition of "curtilage" to Ms. Holtz. Officer Fusselman did not have personal knowledge of the exact items or locations on the property that the search would entail. Officer Fusselman told Ms. Hotz that she could stop the consent at any time. Officer Fusselman had Ms. Hotz read the paragraphs on the Consent to Search From above where she would sign the form. Ms. Hotz signed the form and Officer Fusselman signed the witness line. The Consent to Search Form stated: "I understand that I am giving my consent for the officers to search my property as listed above."[80]

67.     All areas in the "Vehicle" section of the Consent to Search Form signed by Ms. Hotz were left blank. Officer Fusselman never asked Ms. Hotz about the ownership of any vehicles on the property, or if she consented to a search of the vehicles within the home's garage.[81]

68.     Mr. Calzada was the sole owner of both vehicles in the home's garage.[82]

69.     Officer Fusselman relayed to Lieutenant Hammon that Ms. Hotz had signed the Consent to Search Form and sent him a copy of the signed form via text message. Ms. Hotz

---

[79] Declaration of Trent Fusselman in Support of Defendants' Motion for Summary Judgment ("Fusselman Decl.") ¶¶ 4-5, docket no. 63, filed May 23, 2019.

[80] *Id.* ¶ 6; Deposition of Officer Trent Fusselman ("Fusselman Depo.") at 25:7-26:8, docket no. 86-12, filed July 8, 2019; Roy City Police Department General Offense Hardcopy Consent to Search Form ("Consent to Search Form"), docket no. 57-2, filed May 23, 2019.

[81] Consent to Search Form; Fusselman Depo. at 27:22-29:2.

[82] Declaration of Maria Calzada in Support for Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at ¶¶ 4-5, docket no. 86-18, filed July 8, 2019.

informed Officer Fusselman that the easiest way to enter the home was to go through the garage. She also informed Officer Fusselman that she thought Mr. Calzada had a rifle. Officer Fusselman relayed this information to Lieutenant Hammon.[83]

70.     Sometime around 10:00 a.m., Lieutenant Pledger contacted additional members of the SWAT team through text message. Lieutenant Pledger notified them that he only needed a small portion of the team. The following team members responded on scene to Lieutenant Pledger's request: Corporal Troy Windsor; Sergeant William Farr; Armando Perez; Terance Lavely; Tim Fulton; Reed Mackley; Denton Harper; Brent Butler (who was already on scene for Roy City Police); John Beck; Brandon Miles; and Bob Stirling. Officer Stirling was the SWAT team medic and would be available for any emergency medical needs that Mr. Calzada may experience.[84]

71.     Roy City Ambulance 31 was already on scene and staged around the corner from Mr. Calzada's home as the SWAT team members arrived.[85]

72.     Officer Perez was aware of the phone conversations that had occurred between Officer Vanderwarf and Mr. Calzada. Among the points that were relayed to Officer Perez were that a suicidal individual had a rifle, possibly an AK-47 or SKS military style rifle, and a handgun; and that the individual had military experience and had been consuming alcohol and possibly some medications. Officer Perez was also informed that a female along with some children had left the residence earlier that morning.[86]

---

[83] Fusselman Decl. ¶ 7; Pledger Decl. ¶ 50; Consent to Search Form.

[84] Pledger Decl. ¶¶ 51-53.

[85] Declaration of Robert Stirling in Support of Defendants' Motion for Summary Judgment ("Stirling Decl.") ¶ 12, docket no. 64, filed May 23, 2019.

[86] Armando Perez's Declaration in Support of Defendants' Motion for Summary Judgment ("Perez Decl.") ¶ 12, docket no. 65, filed May 23, 2019.

73.     Lieutenant Pledger also told the SWAT team members that Mr. Calzada mentioned to the negotiator that his intentions were to commit "suicide by cop;" and that Mr. Calzada had purportedly used a tactical light and would periodically perform perimeter checks. Officer Perez further heard that Mr. Calzada had used military tactical terms such as "going tactical, flash and suppression, suicide by cop, etc." The SWAT team members were also told that Mr. Calzada had military training. These comments gave the SWAT team members more concern about the potentially dangerous situation and the threat to the neighborhood if Mr. Calzada started shooting. The SWAT team members were also told that officers had lost communications with Mr. Calzada.[87]

74.     Lieutenant Pledger briefed the SWAT team members on what had transpired during the previous hours, and about the plan he had formulated to get Mr. Calzada out of the home peacefully and to prevent Mr. Calzada from harming himself. This plan was as follows:

      a.     Officer Perez would lead the team that would access the home.

      b.     The team was to attempt to access the home through the garage door. Ms. Hotz had provided the code for the garage door earlier.

      c.     Once the garage door was open, the team would then wait and listen to see if there was any noticeable response from Mr. Calzada. The goal was to reestablish dialogue with Mr. Calzada. Should the team not get any response from Mr. Calzada, the team were to search the home slowly and deliberately to find Mr. Calzada.[88]

---

[87] *Id*. ¶ 16; Declaration of Reed Mackley in Support of Defendants' Motion for Summary Judgment ("Mackley Decl.") ¶¶ 9-10, docket no. 66, filed May 23, 2019.

[88] Pledger Decl. ¶ 54; Declaration of Terance Lavely in Support of Defendants' Motion for Summary Judgment ("Lavely Decl.") ¶ 6, docket no. 67, filed May 23, 2019; Stirling Decl. ¶ 14; Declaration of Tim Fulton in Support of Defendants' Motion for Summary Judgment ("Fulton Decl.") ¶ 6, docket no. 68, filed May 23, 2019.

75.     A slow and deliberate search involves the team searching the home by first examining the garage and its contents and each room with extended mirrors to view around corners and inside closets or under beds without jeopardizing the team's safety. Once a room has been surveyed using the mirror, a team member would enter the room and carefully look in any place where an adult man could be hiding, also utilizing the mirror for safety.[89]

76.     The SWAT team members did not question Lieutenant Pledger's order to enter Mr. Calzada's home because the policy and practice of the SWAT team was that "as long as your commander say, 'Go in, you go in.'"[90]

77.     As the SWAT team's Tactical Commander, Lieutenant Pledger did not enter the home, but instead posted himself at the recently arrived SWAT mobile command center where he could direct the team's actions over the radio. The command center was located down the street and around the corner about 275 feet away and out of view of Mr. Calzada's home.[91]

78.     The SWAT team used a shield as cover to move up to the garage door keypad. Officer Perez was given the garage door code. After a few failed attempts to use the code, the team moved to the west side of the house and found an access door that entered into the garage.[92]

79.     After discussing with Officer Perez over the radio, Lieutenant Pledger decided that entering the home through the access door that entered to the garage was the appropriate action for the team, and ordered them to take this action.[93]

---

[89] Pledger Decl. ¶ 55; Perez Decl. ¶ 20.

[90] Deposition of Detective Brandon Miles ("Miles Depo.") at 74:5-22, docket no. 86-3, filed July 8, 2019.

[91] Pledger Decl. ¶ 56.

[92] *Id*. ¶ 57; Perez Decl. ¶ 19.

[93] Pledger Decl. ¶ 58; Perez Decl. ¶ 20.

80. The team breached the door using manual tools rather than ballistics. Lieutenant Pledger believed this approach would not escalate the situation more than necessary.[94]

81. Upon breaching the garage, the team made several call outs to Mr. Calzada in attempt to reestablish communication with him without further entry. Officer Perez could see that the door from the garage to the residence itself was open. After about three minutes, Officer Perez relayed this information to Lieutenant Pledger, and Lieutenant Pledger approved entrance into the garage and a slow and deliberate search of the residence for Mr. Calzada.[95] The team did not take a corded throw phone or a cell phone with them when they entered Mr. Calzada's home.[96]

82. The team began the slow and deliberate search in the garage. When Mr. Calzada was not found, the team entered and moved through the house slowly to not startle Mr. Calzada. For the next thirty minutes, Officer Perez and his team slowly and methodically cleared the home, but were unable to find Mr. Calzada.[97]

83. It was Officer Perez's understanding that because of the amount of alcohol Mr. Calzada likely consumed and that there were also prescription medications likely consumed, Mr. Calzada could be asleep or be having a medical emergency.[98]

84. The team called out for Mr. Calzada when they entered the garage; when they entered the home; and into the crawlspace under the home.[99]

---

[94] Pledger Decl. ¶ 59.

[95] *Id*. ¶¶ 61-62; Perez Decl. ¶ 21.

[96] Deposition of Armando Perez ("Perez Depo.") at 74:4-9, docket no. 86-20, filed July 8, 2019.

[97] Perez Decl. ¶ 23; Pledger Decl. ¶ 63.

[98] Perez Decl. ¶ 24.

[99] *Id*. ¶ 26.

85.     While going through the home, the team members were not trying to search or disturb anything in the home. The team was only trying to locate Mr. Calzada to reestablish communication with him, or to take him to a hospital or render urgent medical care.[100]

86.     Officer Perez utilized the shield team for protective cover as the remaining members of the team searched the home's upstairs. The team did not find Mr. Calzada, but found the family dog and an empty rifle case. This led Officer Perez to believe that Mr. Calzada was armed.[101]

87.     Officer Beck also saw the empty military type rifle case in one of the bedrooms, along with a large, empty liquor bottle, and a few prescription bottles, but did not locate Mr. Calzada.[102]

88.     The team's search took about an hour. When the team were unable to find Mr. Calzada, it greatly elevated Officer Beck's concern. Office Beck had anticipated to find Mr. Calzada asleep or unconscious, or that he would verbally respond to the team's verbal callouts.[103]

89.     Officer Mackley also felt elevated concern that the team had not found Mr. Calzada at this time because he believed either Mr. Calzada was intentionally hiding and could surprise the team, or that Mr. Calzada had eluded the team and could be in the neighborhood.[104]

---

[100] Lavely Decl. ¶ 11; Fulton Decl. ¶ 10; Declaration of Denton Harper in Support of Defendants' Motion for Summary Judgment ("Harper Decl.") ¶ 11, docket no. 69, filed May 23, 2019; Declaration of Brent Butler in Support of Defendants' Motion for Summary Judgment ("Butler Decl.") ¶ 12, docket no. 70, filed May 23, 2019.

[101] Perez Decl. ¶ 28.

[102] Beck Decl. ¶ 19.

[103] *Id*. ¶¶ 20-21.

[104] Mackley Decl. ¶ 18.

90.     The team had cleared the entire home except for a large crawlspace area that went underneath the kitchen and living room. This crawlspace had been viewed with mirrors, but because of items, such as boxes, inside the crawlspace, Officer Perez felt it was unsafe to send anyone into the crawlspace. Officer Perez asked Lieutenant Pledger for a K-9 unit to search the crawlspace. Officer Perez was told it would be about 20 minutes before a K-9 could arrive. While awaiting the K-9 unit's arrival, Officer Perez instructed Deputy Miles and Officer Beck to retrieve the keys to the two vehicles parked in the garage, and to open the trunks to the vehicles to be certain Mr. Calzada was not in one of the vehicles.[105]

91.     Officer Beck and Deputy Miles found two sets of car keys on the kitchen counter and went to search the vehicles. In the garage were two vehicles: a Chrysler sedan was parked on the east wall of the garage; and an older model Honda Accord was parked next to it.[106]

92.     When clearing the trunk of any vehicle, the SWAT team members utilize a tactic that allows the officer to be the least exposed if they locate someone in the trunk. One officer will pop open the trunk while another officer will crouch off to the side of the car and control the trunk lid with their hand, preventing it from opening quickly and completely.[107]

93.     Deputy Miles opened the trunk of the first car, the Chrysler sedan, using the key fob. Officer Beck controlled the trunk lid's opening. The trunk was empty. There was not a remote for the Honda Accord. Officer Beck got into position behind the left rear quarter panel of the Honda, between the two cars. Deputy Miles opened the driver's side door and released the lid to the trunk. Officer Beck controlled the trunk lid's opening.[108]

---

[105] Declaration of John Beck in Support of Defendants' Motion for Summary Judgment ("Beck Decl.") ¶ 20, docket no. 74, filed May 23, 2019; Perez Decl. ¶¶ 30-31; Pledger Decl. ¶ 64.

[106] Beck Decl. ¶¶ 24-25.

[107] *Id*. ¶ 26.

[108] *Id*. ¶¶ 27-28.

94.     Officer Beck could immediately see a person's leg in the Honda's trunk. As Officer Beck opened the trunk further, he could see Mr. Calzada with a black handgun in his mouth. Mr. Calzada was laying down, but in a way that his head was above the rest of his body. Mr. Calzada's head was on the far side of the trunk. Officer Beck was close enough to Mr. Calzada that he could have touched Mr. Calzada's leg. Officer Beck could see both of Mr. Calzada's hands holding the pistol with the barrel of the pistol in Mr. Calzada's mouth.[109]

95.     Officer Beck immediately announced himself as a police officer and told Mr. Calzada to show his hands and to not move. Officer Beck then backed up behind the Chrysler and again stated that he was a police officer and that he was there to help.[110]

96.     Once Deputy Miles popped the Honda's trunk, he heard it click open immediately followed by the sound of Officer Beck's voice saying, "show me your hands, show me your hands." Deputy Miles came around towards the trunk and could see Mr. Calzada's head. Deputy Miles knew Mr. Calzada had a gun which Mr. Calzada was holding high on his chest, but Deputy Miles could not see which direction the gun was pointing.[111]

97.     Deputy Miles had been equipped with a shotgun with less-than-lethal shells, but had earlier handed the shotgun to Deputy Lavely inside the house while using a mirror to search the crawl space. Deputy Miles did not have the shotgun with him when Mr. Calzada was located in the trunk of the car.[112]

98.     Officer Beck specifically instructed Mr. Calzada to let go of the gun, let it fall to his chest, and that the SWAT team members would help him get out of the trunk. Officer Beck

---

[109] *Id*. ¶¶ 29-30.

[110] *Id*. ¶ 31.

[111] Declaration of Brandon Miles in Support of Defendants' Motion for Summary Judgment ("Miles Decl.") ¶¶ 9-10, docket no. 71, filed May 23, 2019.

[112] *Id*. ¶ 12.

told Mr. Calzada that he was not in trouble, and that they wanted to get him to the hospital for help.[113]

99.    This all happened as Officer Perez entered the garage. Officer Perez heard Deputy Miles and Officer Beck immediately give verbal commands to Mr. Calzada to put down his gun. Officer Perez heard that he had a gun in his mouth. Officer Perez began to move toward the car, but was told his location was where the gun was pointed. Officer Perez than moved back to the main door.[114]

100.    Deputy Miles was near the driver's door between the two vehicles. Officer Beck believed that Deputy Miles could see Mr. Calzada through the gap between the open trunk and the body of the car.[115]

101.    From the look in Mr. Calzada's eyes, Officer Beck believed that Mr. Calzada could hear and understand him. Mr. Calzada was moving his eyes, looking at his surroundings and then back to Officer Beck, but Mr. Calzada did not move his body or respond. Mr. Calzada did not verbally respond to anything Officer Beck said to him. Deputy Miles talked with Mr. Calzada about their similar military experiences, and that Mr. Calzada still had a lot of options. Deputy Miles told Mr. Calzada that if he dropped his weapon things could still end peacefully, but there was no response from Mr. Calzada.[116]

102.    Officer Beck tried again to dissuade Mr. Calzada. Officer Beck told Mr. Calzada to put the gun down, and that Mr. Calzada's family, people who cared about him, were waiting

---

[113] Beck Decl. ¶ 32.

[114] Perez Decl. ¶¶ 32-33.

[115] Beck Decl. ¶¶ 33-34.

[116] *Id*. ¶¶ 35-36.

to see him. Officer Beck told Mr. Calzada, "Please don't do that in front of me. Don't make me watch you kill yourself."[117]

103.    Officer Perez contacted Lieutenant Pledger, informing him that Mr. Calzada had been located, and that Mr. Calzada was armed with a handgun. Officer Perez was concerned, not only for the safety of Mr. Calzada, but also the neighbors. Officer Beck could hear this conversation through his earpiece radio.[118]

104.    Officer Perez instructed Officer Harper to pull the armored SWAT Suburban into the driveway and park parallel to the garage. This would enable the negotiator, Officer Vanderwarf, cover and the opportunity to reestablish communications with Mr. Calzada.[119]

105.    Officer Mackley stood next to Officer Perez. Officer Mackley could see inside the trunk of the vehicle, and saw a small, elevated platform and the front two feet of a rifle barrel that was within a foot of Mr. Calzada. Officer Mackley believed the rifle barrel was pointed toward the group of SWAT team members that was stationed in the garage. Officer Mackley could not see Mr. Calzada's hands. At the time, Mr. Calzada's hands were behind his head. Officer Mackley was very concerned that he could not see Mr. Calzada's hands.[120]

106.    Once the armored SWAT Suburban was in position, Officer Perez personally opened the rolling garage doors with the buttons by the entrance to the home. This was several minutes after Mr. Calzada was discovered.[121]

---

[117] *Id*. ¶ 37.

[118] *Id*. ¶ 38; Perez Decl. ¶¶ 34-35; Pledger Decl. ¶ 67.

[119] Perez Decl. ¶ 36.

[120] Mackley Decl. ¶¶ 25-26.

[121] Perez Decl. ¶ 37; Beck Decl. ¶ 26.

107.    Officer Vanderwarf quickly suited up in his heavy ballistic vest and went to stand behind the armored SWAT Suburban that had been parked in the driveway. Officer Vanderwarf was going to attempt to continue his previous conversation with Mr. Calzada.[122]

108.    For about seven minutes after Mr. Calzada was discovered in the trunk of the car, members of the SWAT team and the negotiator, Officer Vanderwarf, attempted to communicate with Mr. Calzada, asking him to put down his weapon and stating that they did not want to hurt him, and that the team only wanted to get him help.[123]

109.    Deputy Miles and Officer Beck continued to give verbal commands to Mr. Calzada to drop his weapon. Officer Perez moved next to Officer Beck by the vehicle that did not contain Mr. Calzada. Officer Perez could see Mr. Calzada in the trunk of the other vehicle.[124]

110.    No officers ever heard Mr. Calzada respond to any questions or orders.[125]

111.    At approximately 11:14:13 a.m., an instruction was given over the SWAT team radio for "[Officer] Butler, [to] get ready to pound [Mr. Calzada] with a beanbag."[126] Officer Butler was unable to shoot Mr. Calzada with his non-lethal beanbag rounds because the only shot he had from his vantage point would have hit Mr. Calzada in the face, which would have been fatal.[127]

112.    Mr. Calzada had moved the handgun behind his head with both hands. Officer Perez ordered the shield to be brought to his location. Deputy Fulton responded with the shield

---

[122] Pledger Decl. ¶ 70.

[123] *Id*. ¶ 71.

[124] Perez Decl. ¶¶ 38-39.

[125] Lavely Decl. ¶ 23; Fulton Decl. ¶ 14; Mackley Decl. ¶ 27.

[126] Ex. 3 Audio File at 0:56:11-0:56:12; CAD Call Hardcopy at 33 (11:14:13).

[127] Butler Decl. ¶ 19.

and took position between Officer Perez and Officer Beck. Mr. Calzada moved his left hand from behind his head and placed it on his chest.[128]

113.    After the garage door opened, Officer Stirling could see Mr. Calzada with a handgun in his right hand, pointed at his head, and Officer Stirling saw an assault rifle like an AR-15 (either automatic or semi-automatic rifle) lying on what appeared to be a speaker shelf in the car's trunk. From Officer Stirling's vantage point (facing the garage in the armored Suburban), it appeared to him that the rifle was pointed directly at Deputy Miles and generally in the direction of the other officers who had gathered to the front left of the vehicle.[129]

114.    After the garage doors were open, Officer Vanderwarf attempted to communicate with Mr. Calzada from about 30 feet away. Officer Vanderwarf called out to Mr. Calzada letting him know that he was there. Officer Vanderwarf tried to speak with Mr. Calzada for a minute or two. Officer Vanderwarf reiterated to Mr. Calzada what they had talked about on the phone (the importance of Mr. Calzada's children, family, and his honesty and integrity from being in the military) and Officer Vanderwarf implored Mr. Calzada to follow the officers' commands to drop his weapons.[130]

115.    Officer Harper could see Mr. Calzada laying on his back in the trunk of the car. From Officer Harper's position, he could see that Mr. Calzada was holding a handgun on his chest, which Mr. Calzada later moved to a position behind his head.[131]

116.    Officer Stirling became extremely concerned for the safety of Deputy Miles, who was standing to the left rear of the trunk in which Mr. Calzada was located. Officer Stirling could

---

[128] Perez Decl. ¶¶ 40-42.

[129] Stirling Decl. ¶ 23; Miles Depo. at 115:1-2.

[130] Vanderwarf Decl. ¶¶ 33-34.

[131] Harper Decl. ¶ 20.

see what appeared to be a 30-round magazine protruding from the AR-15, and he saw what he believed was the pistol grip of the AR-15 directly to the right of the magazine. This meant to him that the rifle was pointed in the direction of Deputy Miles. Officer Stirling communicated his concern for Deputy Miles's safety to Officer Harper, who relayed that information over the radio. Given the position of Mr. Calzada and the AR-15 rifle, Officer Stirling's concern for Deputy Miles's safety was communicated several times via the radio.[132] Deputy Miles believed the rifle was not pointed at him and communicated over the radio "[s]top shouting, we know where the rifle is pointed," but he moved his position.[133] Because of the process to cue the mic while holding a rifle, the SWAT teams members would not typically cue their mic "unless it's absolutely necessary."[134]

117.    After Deputy Miles moved back, Officer Stirling again became just as concerned for the safety of the other SWAT team members that had gathered to the far-left side of the garage. As he faced the garage, Officer Stirling believed the rifle was pointed in their direction. These concerns were again communicated over the radio to the officers in the garage.[135]

118.    Officer Perez was informed by an officer from the armored Suburban that there was a rifle in the trunk. Officer Perez attempted to see further inside the trunk and could distinguish parts of a rifle, including the magazine and forward grip of the rifle. Officer Perez could not determine which way the rifle was facing. Officer Perez could tell that the rifle was on some sort of flat surface tucked into the trunk.[136]

---

[132] Stirling Decl. ¶ 24; Miles Decl. ¶ 10.

[133] Miles Depo. at 99:5-100-5, 117:15-119:5.

[134] *Id*. at 116:2-17.

[135] Stirling Decl. ¶ 25.

[136] Perez Decl. ¶ 43; Harper Decl. ¶ 22.

36

119.     Officer Beck also heard over the radio that there was a rifle in the trunk on some kind of shelf behind Mr. Calzada. After Officer Beck was alerted to the presence of a rifle, he observed part of the rifle from his position.[137]

120.     Mr. Calzada then moved his hand toward the rifle and then moved it back to his chest. Officer Beck gave Mr. Calzada several commands to stop. Mr. Calzada paused for a second and then continued to move his hand toward the rifle. When Mr. Calzada moved his hand the second time toward the rifle, he seemed to be attempting to manipulate the rifle's safety. Over the radio, an officer from the armored Suburban stated that the rifle appeared to be pointed at Deputy Miles. Officer Perez was in fear for his life, and the lives of Deputies Miles and Fulton and Officer Beck. Officer Perez believed Mr. Calzada was trying to fire the rifle from the position it was in by pulling the trigger with his left hand. Officers Perez, Beck, and Mackley believed deadly force was necessary to prevent death or serious bodily injury to themselves and the SWAT team members around Mr. Calzada.[138]

121.     Officer Perez raised his duty rifle, switched the safety off, aimed at Mr. Calzada's head, and fired one round from his duty rifle. Within a split second of the shot, Mr. Calzada took the handgun that was behind his head and pointed it in the direction of Officer Beck and, at that point, Officer Beck fired at Mr. Calzada. Officer Beck feared for his life at that moment. After Officer Beck's first shot, Mr. Calzada recoiled a little but continued to point his handgun directly at Officer Beck. Officer Beck then fired three or four more rounds with the last shot hitting Mr. Calzada in the head. Officer Perez witnessed Mr. Calzada's head move back and Mr. Calzada's left hand leave the rifle. Other shots were fired, and Officer Perez could see Mr. Calzada's body

---

[137] Beck Decl. ¶¶ 43-44.

[138] *Id*. ¶¶ 46-47; Perez Decl. ¶¶ 44-48; Fulton Decl. ¶ 16; Mackley Decl. ¶¶ 28-29.

move with each shot. Once Officer Perez believed Mr. Calzada was no longer a threat, he yelled

out a cease fire. During the time of Officer Perez's first shot and the other shots, Mr. Calzada had

drawn his handgun from behind his head and brought it to his chest.[139]

122.    Officer Mackley also fired his weapon at Mr. Calzada. Officer Mackley initially

fired one or two rounds at Mr. Calzada. He could hear that someone else was firing their weapon

at the same time. Mr. Calzada had pointed the pistol in Officer Mackley's direction. Officer

Mackley observed Mr. Calzada's movements as quick, requiring snap judgment, and believed

that there was no time to give additional verbal warnings. Officer Mackley believed Mr. Calzada

was going to shoot him. Officer Mackley fired one more round aiming at Mr. Calzada's head.

After Officer Mackley fired this round, Officer Perez yelled, "Cease fire!" and all firing

stopped.[140]

123.    Officer Beck heard Officer Perez yell to cease fire. Mr. Calzada's handgun was

still pointed at Officer Beck, so he moved to the right and out of the barrel's path.[141]

124.    Officer Perez informed Lieutenant Pledger that shots were fired, and the threat

was down. Officer Perez instructed the shield team to approach Mr. Calzada, and Deputy Fulton

removed the handgun, which was laying in the middle of Mr. Calzada's chest under both of his

hands with the top of the gun towards his face. Deputy Fulton placed the handgun on the ground

behind the vehicle. Officer Perez called for the medic, Officer Stirling, to do a medical

assessment. Officer Stirling indicated that Mr. Calzada was dead and beyond care.[142]

---

[139] Beck Decl. ¶¶ 48-49; Perez Decl. ¶¶ 49-53.

[140] Mackley Decl. ¶¶ 30-32.

[141] Beck Decl. ¶ 50.

[142] Perez Decl. ¶¶ 54-56; Stirling Decl. ¶ 27; Officer Fulton Report, docket no. 86-19, filed July 8, 2019.

125.    After almost seven minutes were spent attempting to communicate with Mr. Calzada, Lieutenant Pledger heard multiple shots fired in rapid succession. Based on his years on the SWAT team, Lieutenant Pledger knew that multiple weapons had been fired. The shots only lasted a few seconds, and no more shots were fired after that brief moment.[143]

126.    At all times, Lieutenant Pledger made decisions and gave orders that he believed were most likely to save Mr. Calzada's life.[144]

127.    At some point, Lieutenant Pledger could hear the SWAT team members yelling commands at Mr. Calzada, so he stepped out of his position and briefly saw Mr. Calzada in the trunk of the car in the garage. Lieutenant Pledger then moved to a place where he would not be shot at if Mr. Calzada chose to start shooting. Lieutenant Pledger never gave an order to shoot and was not in a position to make that determination. However, Lieutenant Pledger knew that the officers in the garage were highly trained and believed they would only use deadly force if they were reasonably in imminent fear of serious bodily harm or death.[145]

128.    Lieutenant Pledger never wanted to escalate the situation more than necessary, and took steps that he believed would preserve Mr. Calzada's life while ensuring officer safety. Lieutenant Pledger was slow and deliberate in decisions he made about how to respond to Mr. Calzada. Lieutenant Pledger was on the scene for several hours before the rest of the SWAT team was called out and sent into the house.[146]

---

[143] Pledger Decl. ¶ 73.

[144] *Id.* ¶ 79.

[145] *Id.* ¶ 80.

[146] *Id.* ¶ 81.

129.    Lieutenant Pledger believed it was unfortunate that lethal force was used against Mr. Calzada, but that all officers involved responded appropriately.[147] Lieutenant Pledger also believed that Officer Vanderwarf had been successful in deescalating the situation during his communications with Mr. Calzada.[148]

130.    This entire situation was deeply troubling for Officer Mackley. He had hoped it would end peacefully. Officer Mackley never wanted to use his rifle against Mr. Calzada, but believed he had no choice, and that if he did not shoot, one of the SWAT team members could be killed.[149]

131.    Officer Lavely, Deputy Fulton, Deputy Miles, Officer Harper, and Officer Butler never fired their weapon at any time during the encounter with Mr. Calzada.[150]

132.    Corporal Windsor and Sergeant Farr never entered Mr. Calzada's home with the SWAT team. Both located in the SWAT mobile command center during the entire search of Mr. Calzada's home. The SWAT mobile command center was set up down the city block and around the corner and out of view of Mr. Calzada's home. Corporal Windsor and Sergeant Farr never entered Mr. Calzada's home; never commanded any SWAT team members to enter the home; never spoke with Mr. Calzada; and never fired their weapon at any point during the encounter with Mr. Calzada.[151]

---

[147] *Id*. ¶ 82.

[148] Deposition of Jeff Pledger at 95:5-96:15, docket no. 86-26, filed July 8, 2019.

[149] Mackley Decl. ¶ 35.

[150] Lavely Decl. ¶ 25; Fulton Decl. ¶ 18; Miles Decl. ¶ 15; Harper Decl. ¶ 26; Butler Decl. ¶ 23.

[151] Declaration of Troy Windsor in Support of Defendants' Motion for Summary Judgment ("Windsor Decl.") ¶¶ 6-7, docket no. 72, filed May 23, 2019; Declaration of William Farr ("Farr Decl.") ¶¶ 12-13, docket no. 73, filed May 23, 2019.

133.    The SWAT team members were not issued body cameras and no SWAT team member present during the encounter with Mr. Calzada had a body camera.[152]

## II.    DISCUSSION

Defendants seek summary judgment on each of Plaintiff's claims.[153] Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[154] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way"[155] or "if a reasonable jury could return a verdict for the nonmoving party."[156] A fact is material if "it is essential to the proper disposition of [a] claim."[157] And in ruling on a motion for summary judgment, the factual record and all reasonable inferences drawn therefrom are viewed in a light most favorable to the nonmoving party.[158]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[159] The movant "need not negate the nonmovant's claim, but need only point out . . . that there is an absence of evidence to support the nonmoving party's case."[160] If the moving party carries this initial burden, the nonmoving party "may not rest upon mere allegations or denials of [the]

---

[152] Perez Depo. at 40:1-5.

[153] Motion for Summary Judgment at 32-59.

[154] FED. R. CIV. P. 56(a).

[155] Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

[156] Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

[157] Adler, 144 F.3d at 670.

[158] Id.

[159] Id. at 670-71.

[160] Universal Money Ctrs., Inc., 22 F.3d at 1529 (internal quotations omitted).

pleading[s], but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[161] "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[162]

### A.  The testimony and opinions of Plaintiff's purported expert have no effect on the disposition of Defendant's Motion for Summary Judgment

Before addressing the merits of Defendants' Motion for Summary Judgment, it is necessary to address the Declaration of Earl Morris,[163] Plaintiff's purported expert, which was attached as an exhibit to Plaintiff's Response. Mr. Morris offers testimony and opinions that the individual officer Defendants should not have entered Mr. Calzada's home; unnecessarily and recklessly escalated the situation thereby creating the need to use deadly force against Mr. Calzada; and either failed to follow their training, were improperly trained, or were improperly supervised.[164]

Defendants, in their Reply, objected and moved to strike the Mr. Morris's declaration as improper expert testimony that was untimely disclosed.[165] Such a motion in a Reply is improper under the local rules.[166] But resolution of the motion is unnecessary because Mr. Morris's testimony has no effect on the disposition of Defendants' Motion for Summary Judgment.

Plaintiff does not attempt to use Mr. Morris's testimony and opinions to dispute any material fact asserted by Defendants. Nor does Plaintiff use Mr. Morris's testimony and opinions

---

[161] *Id.* (internal quotations and citations omitted; emphasis in original).

[162] *Id.* (internal quotations omitted).

[163] Docket no. 86-23, filed July 8, 2019.

[164] *Id*.

[165] Reply at 17-19.

[166] DUCivR 7-1(3).

to assert any additional material facts. Indeed, Plaintiff could not use Mr. Morris's testimony and opinions for these purposes because he was not involved in law enforcement's encounter with Mr. Calzada and, beyond his review of the officers' reports and interviews, lacks personal knowledge of the events. Mr. Morris's opinions regarding the appropriateness of Defendants' conduct do not change the undisputed material facts regarding Defendants' conduct.

That Mr. Morris's testimony and opinions do not alter the undisputed material facts also demonstrates the improper nature of his opinions as expert testimony in this case. On summary judgment, if there is no material dispute regarding the underlying events, the determination of whether a government official is entitled to qualified immunity (including the objective legal reasonableness of an officer's conduct) is made as a matter of law.[167] Plaintiff's only citation to and use of Mr. Morris's testimony is for his opinions that Defendants acted improperly and in violation of Mr. Calzada's rights.[168] "[A]n expert is not to opine on the weight of the facts or take a principal role in sifting, weighing and reciting them for the [trier of fact]."[169] "[T]he judge is the sole arbiter of the law and its applicability."[170] "Only evidence can establish proof, only the [trier of fact] can find facts and decide issues . . . and only the attorneys in the case can argue about the meaning of the evidence."[171] Mr. Morris's opinions impermissibly invade these fundamental roles, are not helpful, and are improper as expert testimony in this case.

Therefore, Mr. Morris's testimony and opinions have no effect on the disposition of Defendants' Motion for Summary Judgment.

---

[167] *Mecham v. Frazier*, 500 F.3d 1200, 1203-1204 (10th Cir. 2007); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003).

[168] Response at 64, 70-71.

[169] *Rowe v. DPI Specialty Foods, Inc.*, No. 2:13-cv-00708-DN-EJF, 2015 WL 4949097, *5 (D. Utah Aug. 19, 2015).

[170] *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988).

[171] *Rowe*, 2015 WL 4949097, *5.

**B.  Nonparticipating individual officer Defendants are not liable under § 1983**

Plaintiff's first cause of action under 42 U.S.C. § 1983 alleges that the individual officer Defendants violated Mr. Calzada's Fourth Amendment rights.[172] This claim is subdivided into two parts: (1) the alleged illegal entry and search of Mr. Calzada's home and vehicles; and (2) the use of deadly force against Mr. Calzada.[173] Defendants argue that the individual officer Defendants who did not personally participate in these events cannot be liable under § 1983.[174]

"[V]icarious liability is inapplicable to . . . § 1983 suits[.]"[175] "[A] plaintiff must plead [and prove] that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution."[176] Thus, where it is undisputed that an individual officer Defendant did not participate in the entry and search of Mr. Calzada's home and vehicles, or the use of deadly force against Mr. Calzada, Plaintiff's first cause of action under § 1983 must be dismissed against that individual officer Defendant in whole or in part.[177]

It is undisputed that Corporal Windsor and Sergeant Farr were located in the SWAT mobile command center.[178] They did not enter Mr. Calzada's home and did not fire their weapons during the encounter with Mr. Calzada.[179] It is also undisputed that Corporal Windsor and Sergeant Farr did not order any officer to enter the home or to fire their weapons.[180] And

---

[172] Complaint ¶¶ 100-113.

[173] *Id*.

[174] Motion for Summary Judgment at 33-34.

[175] *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

[176] *Id*.

[177] *C.f. Allen v. Lang*, 738 Fed. App'x 934, 940-941 (10th Cir. 2018).

[178] *Supra*, Undisputed Fact ¶ 132.

[179] *Id*.

[180] *Id*.

they had no authority to override the orders given to the other individual officer Defendants.[181] Therefore, the undisputed material facts demonstrate that Corporal Windsor and Sergeant Farr did not violate Mr. Calzada's Fourth Amendment rights in the search of his home and vehicles, or in the use of deadly force against him. Plaintiff's first cause of action under § 1983 against Corporal Windsor and Sergeant Farr is DISMISSED with prejudice.

Additionally, the undisputed material facts demonstrate that Deputies Miles and Fulton and Officers Lavely, Harper, and Butler did not fire their weapons at Mr. Calzada.[182] They did not order anyone to fire their weapons.[183] And they had no authority to override the orders given to the other individual officer Defendants.[184] Therefore, the undisputed material facts demonstrate that Deputies Miles and Fulton and Officers Lavely, Harper, and Butler did not violate Mr. Calzada's Fourth Amendment rights for the use of deadly force against him. The excessive force portion of Plaintiff's first cause of action under § 1983 against Deputies Miles and Fulton and Officers Lavely, Harper, and Butler is DISMISSED with prejudice.

### C.  The individual officer Defendants are entitled to qualified immunity

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."[185] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[186] "The

---

[181] *Id*. ¶¶ 1-3, 6-7, 11-12, 14, 76.

[182] *Id*. ¶¶ 111, 131.

[183] *Id*. ¶¶ 96-125.

[184] *Id*. ¶¶ 1-3, 6-7, 11-12, 14, 76.

[185] *City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (internal quotations omitted).

[186] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[187] Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and "protects all but the plainly incompetent or those who knowingly violate the law."[188]

"Because qualified immunity is an immunity from suit rather than a mere defense to liability it is effectively lost if a case is erroneously permitted to go to trial."[189] "[T]he driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery."[190] For this reason, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."[191] On summary judgment, if there is no material dispute regarding the underlying events, the determination of whether a government official is entitled to qualified immunity is made as a matter of law.[192]

"[A] plaintiff seeking to avoid summary judgment on qualified immunity grounds must satisfy a 'heavy' two-part burden."[193] The plaintiff must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."[194] The two prongs of qualified immunity may be analyzed in any sequence

---

[187] *Id*. (internal quotations omitted).

[188] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotations omitted).

[189] *Pearson*, 555 U.S. at 231 (internal quotations and punctuation omitted).

[190] *Id*. (internal quotations and punctuation omitted).

[191] *Id*. at 232 (internal quotations omitted).

[192] *Mecham*, 500 F.3d at 1203-1204.

[193] *Id*. at 1204.

[194] *al-Kidd*, 563 U.S. at 735 (internal quotations omitted).

based on the circumstances of the particular case.[195] And "although [courts] review the evidence [at summary judgment] in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied [its] heavy two-part burden; otherwise, the defendants are entitled to qualified immunity."[196]

1. **The individual officer Defendants did not violate Mr. Calzada's rights by entering and searching his home and vehicles**

Plaintiff's first cause of action under § 1983 alleges that the individual officer Defendants violated Mr. Calzada's Fourth Amendment rights by illegally entering and searching his home and vehicles.[197] "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable" unless there is an applicable exception.[198] Defendants argue that two exceptions are applicable to the individual officer Defendants' entry and search in this case:[199] (1) Ms. Hotz gave valid consent for officers to enter and search the home and vehicles;[200] and (2) exigence created by the need to assist Mr. Calzada, whom the officers believed was seriously injured or threatened with such injury.[201]

---

[195] *Pearson*, 555 U.S. at 236.

[196] *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870 (10th Cir. 2014) (internal quotations omitted).

[197] Complaint ¶¶ 100-113.

[198] *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

[199] Motion for Summary Judgment at 34-39.

[200] *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).

[201] *Stuart*, 547 U.S. at 403.

*Ms. Hotz gave valid consent for the individual officer Defendants to enter and search Mr. Calzada's home and vehicles*

"Valid consent [to a search] requires two elements."[202] "First, in the case of third-party consent, the third-party must have had actual or apparent authority to do so."[203] "Second, the consent must be freely and voluntarily given."[204]

"[A] third party has actual authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."[205] "Mutual use of property by virtue of joint access is a fact-intensive inquiry, but [it is] recognize[d that] a third party's entering the premises or room at will, without the consent of the subject of the search, demonstrates joint access."[206] "A full-time resident of the premises," as opposed to an "occasional visitor," may also demonstrate mutual use.[207] "Apparent authority arises from the reasonable . . . belief that the third party has the authority to provide valid consent."[208] "This inquiry is an objective one, based on the 'facts available to the officer[s] at the moment."[209] And "[w]hether a party freely and voluntarily gave [their] consent to a search is a question of fact and is determined from the totality of the circumstances."[210]

The undisputed material facts demonstrate that Ms. Hotz gave valid consent for officers to enter and search the home and vehicles for Mr. Calzada. Ms. Hotz had actual or apparent

---

[202] *United States v. Sanchez*, 608 F.3d 685, 689 (10th Cir. 2010).

[203] *Id.* (internal punctuation and quotations omitted).

[204] *Id.* (internal quotations omitted).

[205] *Id.* (internal punctuation and quotations omitted).

[206] *Id.* (internal quotations omitted).

[207] *Id.*

[208] *Id.* at 689 n.1.

[209] *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)).

[210] *Id.* at 689.

authority to consent. She was Mr. Calzada's girlfriend and was a resident of the home with her children.[211] She and the children freely left the home after officers arrived at the scene, and officers reasonably determined that they, as residents of the home, could not re-enter the home without the situation being resolved.[212] Ms. Hotz also provided officers with detailed information regarding Mr. Calzada, his circumstances, and how to contact him; items within the home; and how to best access the home, including providing the door code for the garage where the vehicles were located.[213]

Plaintiff fails to present sufficient evidence to demonstrate a triable issue of fact regarding Ms. Hotz's actual or apparent authority to consent. Plaintiff does not argue that Ms. Hotz lacked authority to consent to the entry and search of the home. Plaintiff argues only that the scope of Ms. Hotz's consent did not include the vehicles.[214] To support this argument, Plaintiff points to Mr. Calzada's sole ownership of the vehicles; that Officer Fusselman did not discuss the vehicles with Ms. Hotz and does not recall defining "curtilage;" and that the "Vehicle" section of the Consent to Search Form Ms. Hotz signed was left blank.[215]

But these facts are insufficient to demonstrate or allow for a reasonable inference that Ms. Hotz lacked authority to consent to the vehicles' search, or that the scope of her consent was limited to the home. The facts Plaintiff relies on cannot be viewed in isolation; they must be considered in the totality of the circumstances. And in addition to the undisputed material facts demonstrating Ms. Hotz's authority to consent to the entry and search of the home and vehicles

---

[211] *Supra*, Undisputed Facts ¶¶ 18, 28, 65.

[212] *Id*. ¶¶ 21-22, 59.

[213] *Id*. ¶¶ 21, 28, 58, 69, 74.b.

[214] Response at 61.

[215] *Supra*, Undisputed Facts ¶¶ 66-68.

discussed above,[216] it is undisputed that Officer Fusselman met with Ms. Hotz to obtain her consent for officers to enter and search the home and curtilage for Mr. Calzada.[217] Officer Fusselman did not have personal knowledge of the exact items or locations on the property that the search would entail.[218] And there is no evidence that, at the time of Ms. Hotz's consent, officers were aware of the vehicles in the garage or that Mr. Calzada solely owned the vehicles. There is also no record evidence that Ms. Hotz did not understand the Consent to Search Form or its scope. Officer Fusselman explained to Ms. Hotz that the Consent to Search Form included authorization for the entry and search of the "Entire Home & Curtilage."[219] Ms. Hotz reviewed and signed the Consent to Search Form, "giving [her] consent for the officers to search [the Entire Home & Curtilage]."[220] It is objectively reasonable that this consent would include the two vehicles later found within the home's attached garage.[221]

Considering the totality of circumstances, the undisputed material facts demonstrate that Ms. Hotz had mutual use of the home and vehicles by virtue of her joint access. Ms. Hotz had actual authority to consent to the entry and search of the home and vehicles. And Ms. Hotz gave officers her consent to enter and search the home and vehicles. Additionally, based on the information known at the time, officers had an objectively reasonable belief that Ms. Hotz had

---

[216] *Supra*, Discussion at 48-49.

[217] *Supra*, Undisputed Facts ¶¶ 57, 65.

[218] *Id*. ¶ 66.

[219] *Id*.

[220] *Id*.

[221] *C.f. United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990) ("A search warrant authorizing a search of a certain premises generally includes any vehicles located within its curtilage if the objects of the search might be located therein. . . . The scope of the warrant [is defined] to include those automobiles either actually owned or under the control and dominion of the premises owner or, alternatively, those vehicles which appear, based on objectively reasonable indicia present at the time of the search, to be so controlled. Thus where the officers act reasonably in assuming that the automobile is under the control of the premises owner, it is included in the warrant.").

authority to consent to the entry and search of the home and vehicles, and that she gave such consent.[222]

The undisputed material facts further demonstrate that Ms. Hotz freely and voluntarily gave her consent. Plaintiff does not argue that Ms. Hotz's consent was not freely and voluntarily given. And there is no record evidence suggesting that Ms. Hotz's consent was not freely and voluntarily given. Therefore, Ms. Hotz gave valid consent for officers to enter and search the home and vehicles for Mr. Calzada.

Despite Ms. Hotz's authority to consent and the voluntariness of her consent, Plaintiff argues her consent is invalid[223] under *Georgia v. Randolph*.[224] However, *Randolph* is inapplicable to and distinguishable from the circumstances of this case. In *Randolph*, the question before the Supreme Court was whether "an evidentiary seizure is . . . lawful with the permission of one occupant when the other . . . is present at the scene and expressly refuses to consent."[225] The Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to [the present resident] on the basis of consent given to the police by another resident."[226]

---

[222] *Randolph*, 547 U.S. at 122 ("[I]t would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent.") (discussing *Rodriguez*, 497 U.S. 177).

[223] Response at 59-60.

[224] 547 U.S. 103.

[225] *Id*. at 106.

[226] *Id*.

*Randolph*'s holding was admittedly narrow, "drawing a fine line."[227] The case involved an evidentiary search and seizure challenged by a motion to suppress.[228] And the issue involved a physically present occupant that expressly refused consent.[229] The Supreme Court acknowledged that "[t]he undoubted right of the police to enter [a home] in order to protect a victim . . . has nothing to do with the question in this case, whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent."[230] The Supreme Court further acknowledged that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out."[231]

In this case, the individual officer Defendants were not conducting a search for evidence. They were attempting to locate Mr. Calzada to reestablish communications or render emergency medical services.[232] The undisputed material facts also demonstrate that Mr. Calzada did not expressly refuse consent for the officers to enter and search his home and vehicles. Several hours before the search, the suicide hotline operator informed Officer Truscott that Mr. Calzada threatened "suicide by cop,"[233] and dispatch informed Officer Truscott that Mr. Calzada got upset when law enforcement attempted to interrupt his call with the suicide hotline.[234] Mr.

---

[227] *Id*. at 121.

[228] *Id*. at 106-107.

[229] *Id*.

[230] *Id*. at 118-119.

[231] *Id*. at 121.

[232] *Supra*, Undisputed Facts ¶¶ 62, 70-71, 74, 83, 85.

[233] *Id*. ¶¶ 16, 19.

[234] *Id*. ¶ 21.

Calzada, nevertheless, spoke over the phone with Officer Vanderwarf for multiple hours.[235] Throughout this conversation, Officer Vanderwarf urged Mr. Calzada to come out of the home unarmed.[236] Mr. Calzada stated that if he came out, it would be with his guns.[237] Mr. Calzada also stated multiple times that he did not want officers to come into his home and expressed concern that officers had surreptitiously entered the home during the call.[238] From time-to-time, Mr. Calzada left his phone to "go tactical" and "check the perimeter."[239] And Officer Vanderwarf assured him that no one had entered the home, and that it would not happen "like that."[240] However, during the conversation, Mr. Calzada also expressly invited the officers into his home.[241] But Officer Vanderwarf would not agree because Mr. Calzada would not agree to put down his weapons.[242]

The undisputed material facts demonstrate that Mr. Calzada did not want to be taken by surprise by officers entering his home during their phone conversation. But Mr. Calzada was, at best, equivocal regarding his consent to officers entering the home during the conversation with his knowledge. Regardless, the undisputed material facts demonstrate that at the time of the phone conversation, officers were not attempting to enter the home or seeking Mr. Calzada's consent to enter the home. Rather, Officer Vanderwarf was attempting only to persuade Mr. Calzada to exit the home unarmed.

---

[235] *Id*. ¶¶ 29, 32, 34.

[236] *Id*. ¶¶ 34, 36, 46.

[237] *Id*. ¶ 34, 36, 46, 51.

[238] *Id*. ¶¶ 34, 44.

[239] *Id*. ¶¶ 35, 50.

[240] *Id*. ¶¶ 34, 44.

[241] *Id*. ¶¶ 36, 51.

[242] *Id*.

It was not until communications with Mr. Calzada were lost and could not be reestablished that Lieutenant Pledger decided to seek consent for officers to enter the home.[243] At that time, it was unknown whether Mr. Calzada's cell phone battery had died; whether he had broken off communications to go to sleep; whether he was unconscious and in need of emergency medical attention from consuming prescription medications and large quantities of alcohol; or whether he had completed suicide.[244] But regardless of the reason, at that time, Mr. Calzada (through no conduct of the officers) was not present or available for officers to seek his consent to enter the home or to give an express refusal of his consent. Therefore, the officers sought and obtained consent from Ms. Hotz.[245]

The facts of this case are in stark contrast to those of *Randolph*, which "invite[d] a straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to [that inhabitant], regardless of the consent of a fellow occupant."[246] The Supreme Court's narrow holding in *Randolph* is inapplicable here.[247]

Therefore, Ms. Hotz gave valid consent for officers to enter and search Mr. Calzada's home and vehicles. The individual officer Defendants did not violate Mr. Calzada's Fourth Amendment rights when entering the home to search for Mr. Calzada.

---

[243] *Id.* ¶¶ 55, 57, 59, 62.

[244] *Id.* ¶¶ 54, 56-58, 60.

[245] *Id.* ¶¶ 64-66.

[246] *Randolph*, 547 U.S. at 122-123.

[247] *C.f. United States v. McKerrell*, 491 F.3d 1221, 1226-1227 (10th Cir. 2007) (holding that *Randolph* did not apply and a co-tenant's consent to a search of a home was valid where the defendant barricaded himself in his residence to avoid arrest and never expressly objected to a possible search).

*Exigent circumstances justified the individual officer Defendants' entry of the home to search for Mr. Calzada*

The individual officer Defendants' entry and search of Mr. Calzada's home and vehicles is also justified by exigent circumstances. "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."[248] "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."[249] "People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process."[250] "Even the apparently dead often are saved by swift police response."[251] Therefore, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."[252]

"The exigent circumstances exception does not require officers actually see someone inside [a home] in immediate danger."[253] The test to determine if the risk of personal danger creates exigent circumstances is "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."[254] The analysis is "guided by the realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers."[255] "The inquiry determining the existence of an exigency is essentially one of

---

[248] *Stuart*, 547 U.S. at 403.

[249] *Id.* (internal quotations omitted).

[250] *United States v. Najar*, 451 F.3d 710, 714 (10th Cir. 2006) (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).

[251] *Id.* (quoting *Wayne*, 318 F.2d at 212).

[252] *Stuart*, 547 U.S. at 403.

[253] *United States v. Layman*, 244 Fed. App'x 206, 211 (10th Cir. 2007).

[254] *Najar*, 451 F.3d at 718.

[255] *Id.* at 718-719 (internal quotations omitted).

[objectively] reasonable belief."[256] "Reasonable belief does not require absolute certainty; the Supreme Court has explained that the standard is more lenient than the more stringent probable cause standard."[257] And "[t]he officer's subjective motivation is irrelevant."[258]

The undisputed material facts objectively demonstrate that a prudent, cautious, and trained officer would have a reasonable basis to believe there was an immediate need to protect the life and safety of Mr. Calzada when communications with him were lost and could not be reestablished. Officer Truscott responded to Mr. Calzada's home after a suicide hotline operator relayed to dispatch that Mr. Calzada was suicidal and had called the hotline; was at his home with his girlfriend; and was armed with an assault rifle.[259] Officer Truscott was also informed that Mr. Calzada had threatened "suicide by cop."[260] This was generally understood to mean that Mr. Calzada wanted to provoke the police by threatening or using deadly force at people or law enforcement to cause the police to shoot him before or during his use of force.[261] When Ms. Hotz later left the home with her children, she informed Officer Truscott that she had dumped out Mr. Calzada's alcohol.[262] Officer Truscott relayed this information to Lieutenant Pledger.[263]

Lieutenant Pledger initially declined to call out the SWAT team, but offered to assist personally and requested the SWAT team's head negotiator, Officer Vanderwarf, be called to assist.[264] The presence of officers at Mr. Calzada's home was based on an objectively reasonable

---

[256] *Id.* at 719.

[257] *United States v. Gambino-Zavala*, 539 F.3d 1221, 1225 (10th Cir. 2008) (quoting *Stuart*, 547 U.S. at 718).

[258] *Stuart*, 547 U.S. at 404.

[259] *Supra*, Undisputed Facts ¶ 16.

[260] *Id.*

[261] *Id.* ¶¶ 19, 39.

[262] *Id.* ¶ 21.

[263] *Id.* ¶¶ 18-23, 27.

[264] *Id.* ¶¶ 20, 23.

concern for Mr. Calzada's well-being, but also an objectively reasonable concern for the safety of neighbors if Mr. Calzada discharges his firearms. The officers made attempts to contact Mr. Calzada's neighbors and asked them to stay in their homes.[265]

After arriving on the scene, Officer Vanderwarf spoke with Ms. Hotz, who informed him that Mr. Calzada had consumed approximately one gallon of Seagram's 7 whiskey, and was taking three different types of medication for anxiety and depression.[266] Mr. Calzada's psychologist, Dr. Gushman, later confirmed to Lieutenant Pledger that Mr. Calzada had been prescribed Remeron as a sleep aid, Effexor XR for anti-anxiety, and Xanax for anti-anxiety.[267]

Officer Vanderwarf then made phone contact with Mr. Calzada as Lieutenant Pledger listened in.[268] During their hours-long conversation, Mr. Calzada's voice was slurred, lethargic, slow, and at times incoherent which was consistent with his being under the influence of alcohol or medications.[269] And after Dr. Gushman later entered the conversation, Mr. Calzada talked about a sleep aid he had, and Dr. Gushman encouraged him to not take it because he had consumed alcohol and medications already.[270] Based on the information they had, Lieutenant Pledger and Officer Vanderwarf had an objectively reasonable belief that Mr. Calzada was under the influence of alcohol, prescription medications, or both and could be in need of emergency medical help. Lieutenant Pledger requested an ambulance be stationed at the scene.[271]

---

[265] *Id*. ¶ 25.

[266] *Id*. ¶ 28.

[267] *Id*. ¶ 42.

[268] *Id*. ¶ 29.

[269] *Id*. ¶¶ 31, 40.

[270] *Id*. ¶ 56.h.

[271] *Id*. ¶¶ 49, 71.

Officer Vanderwarf repeatedly urged Mr. Calzada to come out of the home unarmed, but Mr. Calzada refused indicating that if he came out, it would be with his guns.[272] Dr. Gushman also urged Mr. Calzada to exit the home unarmed, but Mr. Calzada stated he would not put down his guns.[273] Mr. Calzada also made several statements to Officer Vanderwarf that he was "locked and loaded" and had hundreds of rounds of ammunition.[274] Mr. Calzada's demeanor would change throughout the conversation, and he would become more agitated.[275] At these times he would be absent from the phone indicating he was "going tactical" to perform "perimeter checks" due to his concern that officers had surreptitiously entered the home during the call.[276] This information, combined with the information regarding Mr. Calzada being under the influence and suicidal, gave Lieutenant Pledger and Officer Vanderwarf an objectively reasonable belief that Mr. Calzada had an increased potential to be unpredictable and a risk of danger to himself and the officers.

Throughout the conversation, Mr. Calzada made numerous statements regarding his intent to complete suicide that morning.[277] After several hours of communicating with Officer Vanderwarf and Dr. Gushman, Mr. Calzada became very apologetic to Dr. Gushman.[278] He also stated that he was tired, had a long night, and wanted to sleep.[279] Dr. Gushman agreed but stated

---

[272] *Id.* ¶ 34, 36, 44, 46, 51.

[273] *Id.* ¶¶ 54, 56.f, 56.h, 56.k.

[274] *Id.* ¶ 35.

[275] *Id.* ¶¶ 44-45.

[276] *Id.* ¶¶ 35, 50.

[277] *Id.* ¶¶ 56.a, 56.b, 56.c, 56.d, 56.e, 56.f, 56.i, 56.j, 57.

[278] *Id.* ¶ 55.

[279] *Id.* ¶ 54.

"not like what you're planning," and told Mr. Calzada to go outside so that he could get some help and some sleep.[280] Mr. Calzada refused all requests that he exit the home.

Prior to losing phone contact, Mr. Calzada stated that the battery on his cell phone was dying.[281] Every so often the phone call would be dropped or Mr. Calzada would hang up, but Officer Vanderwarf and Lieutenant Pledger were able to reestablish phone contact.[282] Near the end of the conversation, Mr. Calzada told Dr. Gushman that he was going to hang up.[283]

At 8:59 a.m., Mr. Calzada stopped talking.[284] Despite several attempts to reestablish telephone contact with Mr. Calzada, the officers were unable to reach him.[285] And because all but one of the home's windows were covered by curtains and pets were in the home, officers could not effectively use mirrors or motion sensing equipment to determine Mr. Calzada's well-being.[286]

After communications were lost and could not be reestablished, Lieutenant Pledger had an objectively reasonable belief that there was an immediate need to protect the life and safety of Mr. Calzada. At that time, it was unknown whether Mr. Calzada's cell phone battery had died; whether he had broken off communications to go to sleep; whether he was unconscious and in need of emergency medical attention from consuming prescription medications and large quantities of alcohol; or whether he had completed suicide.[287] But based on Mr. Calzada's tone

---

[280] Id. ¶ 54, 56.g.

[281] Id. ¶ 57.

[282] Id.

[283] Id. ¶ 56.l.

[284] Id. ¶¶ 55, 57.

[285] Id.

[286] Id. ¶ 61.

[287] Id. ¶¶ 54, 56-58, 60.

and statements near the end of the conversation, combined with other known information (including that Mr. Calzada was under the influence, armed, and suicidal), a prudent, cautious, and trained officer would have a reasonable basis to believe there was an immediate need to protect Mr. Calzada's life and safety. The decision that doing nothing was not a viable option was also objectively reasonable because if Mr. Calzada was simply asleep, there remained a real possibility that he would try to harm himself once he woke up, or that he might leave the house with his firearms, placing people in danger.[288]

These exigent circumstances justified Lieutenant Pledger's decision to have the individual officer Defendants enter and search the home and curtilage for Mr. Calzada. This is not the case of a "mere possibility that someone inside [the home wa]s in need of aid."[289] The undisputed facts objectively demonstrate that Mr. Calzada was inside the home and there was a high likelihood that he was either attempting to complete or had completed suicide, or that he was unconscious having consumed prescription medications and large quantities of alcohol. The decision to enter the home to locate Mr. Calzada was an appropriate and legally justified response required by the exigency to reestablish communication with Mr. Calzada or, if necessary, to provide him with emergency medical services.

Plaintiff argues that no emergency existed because approximately five hours had passed between the officers becoming involved and communications being lost, and because the officers waited approximately 90 minutes before entering the home.[290] This argument ignores that "[a] delay caused by a reasonable investigation into the situation facing the officers does not obviate

---

[288] *Id.* ¶ 59.

[289] *United States v. Martinez*, 643 F.3d 1292 (10th Cir. 2011); *McInerney v. King*, 791 F.3d 1224, 1235 (10th Cir. 2015).

[290] Response at 62-63.

the existence of an emergency."[291] It also ignores the multitude of undisputed material facts demonstrating the objectively reasonable basis to believe there was an immediate need to protect Mr. Calzada's life and safety when communications were lost and could not be reestablished.[292]

The five hours of officers' deliberate actions to obtain information and attempts to urge Mr. Calzada to exit the house unarmed (as opposed to rushing a decision to send officers or the SWAT team into the home before or during the phone communications with Mr. Calzada) is objectively reasonable and commendable.

The approximate 90 minutes the officers waited before entering the home is also objectively reasonable based on the undisputed material facts. During that time, the officers sought to further establish the legality of their actions by obtaining Ms. Hotz's consent to enter and search the home and curtilage for Mr. Calzada.[293] The officers sought and obtained information from Ms. Hotz regarding the easiest way to enter the home.[294] Lieutenant Pledger also contacted additional members of the SWAT team to respond on scene.[295] The SWAT team members arrived, and were briefed on the situation and the plan to enter the home to conduct a slow and deliberate search for Mr. Calzada to reestablish communications or render emergency medical services.[296] And the SWAT team members positioned themselves for entry into the home.[297]

---

[291] *Najar*, 451 F.3d at 719.

[292] *Supra*, Discussion at 56-60.

[293] *Supra*, Undisputed Facts ¶¶ 64-66.

[294] *Id*. ¶¶ 69, 74.b.

[295] *Id*. ¶ 70.

[296] *Id*. ¶¶ 70, 72-74.

[297] *Id*. ¶¶ 77-78.

"Exigent circumstances terminate when the factors creating the exigency are negated."[298] The undisputed material facts objectively demonstrate that a prudent, cautious, and trained officer would have a reasonable basis to believe there was an immediate need to protect the life and safety of Mr. Calzada when communications with him were lost and could not be reestablished. And there is insufficient record evidence to demonstrate or permit a reasonable inference that the immediate danger to Mr. Calzada dissipated in the 90 minutes after communications were lost and the individual officer Defendants entered the home. The undisputed material facts demonstrate that the exigency could not have dissipated until the individual officer Defendants searched the home or, otherwise, obtained information that there was no longer an immediate need to protect Mr. Calzada's life and safety.

Therefore, exigent circumstances permitted the individual officer Defendants' entry of the home to search for Mr. Calzada. The individual officer Defendants did not violate Mr. Calzada's Fourth Amendment rights when entering the home to search for Mr. Calzada.

### The search of Mr. Calzada's home and vehicles was objectively reasonable

The individual officer Defendants were legally justified in entering Mr. Calzada's home to search for him by virtue of Ms. Hotz's consent and exigent circumstances.[299] But to avoid a violation of Mr. Calzada's Fourth Amendment rights, the scope and manner of the individual officer Defendants' search must also be objectively reasonable.[300] The undisputed material facts demonstrate that the manner and scope of the individual officer Defendants' search did not

---

[298] *Chivers v. Reaves*, No. 1:13-cv-00171-JNP, 2017 WL 4296726, *33 (D. Utah Sept. 26, 2017) (citing *Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 564 (6th Cir. 2006)).

[299] *Supra*, Discussion at 47-62.

[300] *Najar*, 451 F.3d at 718.

exceed the consent given by Ms. Hotz, and was "strictly circumscribed by the exigencies."[301] The search was objectively reasonable.

Lieutenant Pledger's decision to use the SWAT team to covertly enter the home and search for Mr. Calzada was objectively reasonable based on the circumstances and need for officer safety. It was unknown whether Mr. Calzada was awake, asleep, unconscious, or dead.[302] Mr. Calzada was suicidal; under the influence of prescription medication and alcohol; armed with a handgun and assault rifle and more than 1,000 rounds of ammunition; had military training and had used military tactical terms; had expressed concern with officers surreptitiously entering the home during their phone communications; and had threatened "suicide by cop."[303] These undisputed material facts also made it objectively reasonable for the individual officer Defendants to use a shield for cover and to enter the home with their weapons drawn and ready for a potential violent confrontation.[304] The team did not take a corded throw phone or a cell phone with them when they entered Mr. Calzada's home.[305] But this fact does not render the search unreasonable considering the totality of the circumstances.

Ms. Hotz had given the officers consent to search the "Entire Home & Curtilage" for Mr. Calzada.[306] She also informed officers that the easiest way to enter the home was to go through the garage, and Hs provided the door code to open the garage.[307] The officers reasonably relied

---

[301] *United States v. Porter*, 594 F.3d 1251, 1255 (10th Cir. 2010) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)).

[302] *Supra*, Undisputed Facts ¶¶ 54, 56-58, 60

[303] *Id*. ¶¶ 16, 18-19, 28, 31, 34-36, 38-40, 42, 45-46, 49-52, 54, 56-58, 60, 62-63.

[304] *In re Estate of Bleck ex rel. Churchill*, 643 Fed. App'x 754, 756 (10th Cir. 2016) ("Officers may unholster their weapons when they enter potentially dangerous situations.") (internal quotations and punctuation omitted).

[305] *Supra*, Undisputed Facts ¶ 81.

[306] *Id*. ¶ 66; *Supra*, Discussion at 48-54.

[307] *Supra*, Undisputed Facts ¶¶ 69, 74.b.

on this information, and initially attempted to access the home through the garage door.[308] After

their attempts to use the code failed, the decision was made for the team to enter the garage

through the access door on the west side of the house.[309] The officers used manual tools rather

than ballistics to breach the door.[310] This objectively reasonable decision avoided unnecessarily

escalating the situation.

Upon breaching the garage, the team made several verbal call outs to Mr. Calzada and

waited approximately three minutes before proceeding into the garage.[311] These attempts to

reestablish communication with Mr. Calzada without further entry into the home are objectively

reasonable. They are also another example of the officers taking reasonable measures to avoid

unnecessarily escalating the situation.

The individual officer Defendants then began a slow and deliberate search for Mr.

Calzada in the garage and the rest of the home.[312] This involved the officers searching the home

by first examining the garage and its contents and each room with extended mirrors to view

around corners and inside closets or under beds without jeopardizing officer safety.[313] Once a

room was surveyed using a mirror, an officer entered the room and carefully look in any place

where an adult man could be hiding, also utilizing the mirror for safety.[314] The individual officer

---

[308] *Id*. ¶ 78.

[309] *Id*. ¶¶ 78-79.

[310] *Id*. ¶ 80.

[311] *Id*. ¶ 81.

[312] *Id*. ¶ 82.

[313] *Id*. ¶ 75.

[314] *Id*.

Defendants verbally called out for Mr. Calzada when they entered the garage, and when they entered the home.[315]

The team's search took about an hour.[316] While going through the home, the team members were not trying to search or disturb anything in the home.[317] Rather, they were only trying to locate Mr. Calzada.[318] The team cleared the entire home except for a large crawlspace area that went underneath the kitchen and living room.[319] The crawlspace was viewed with mirrors and the team called out for Mr. Calzada into the crawlspace, but it was determined to be unsafe to send a team member into the crawlspace.[320] To this point, the team was unable to locate Mr. Calzada.[321]

Officer Perez then requested a K-9 unit to search the crawlspace, and was told it would take approximately 20 minutes before the K-9 would arrive.[322] While waiting for the K-9 unit's arrival, Officer Perez instructed Deputy Miles and Officer Beck to retrieve the keys to the two vehicles parked in the garage, and to open the vehicle's trunks to be certain Mr. Calzada was not in one of the vehicles.[323] The vehicles were within the scope of Ms. Hotz's consent to search the "Entire Home & Curtilage."[324] The exigency to protect the life and safety of Mr. Calzada also

---

[315] *Id*. ¶ 84.

[316] *Id*. ¶ 88.

[317] *Id*. ¶ 85.

[318] *Id*.

[319] *Id*. ¶ 90.

[320] *Id*. ¶¶ 84, 90.

[321] *Id*. ¶¶ 82, 86-88.

[322] *Id*. ¶ 90.

[323] *Id*.

[324] *Id*. ¶ 66; *Supra*, Discussion at 48-54.

had not dissipated.[325] And based on the undisputed material facts and totality of circumstances, this decision to search the vehicles for Mr. Calzada was objectively reasonable.

Deputy Miles and Officer Beck obtained the two sets of car keys from the kitchen counter and went to the garage to search the vehicles.[326] When clearing the trunk of any vehicle, the SWAT team members utilize a tactic that allows the officers to be the least exposed if they locate someone in a trunk.[327] One officer will pop open the trunk while another officer will crouch off to the side of the car and control the trunk lid with their hand, preventing it from opening quickly and completely.[328] Deputy Miles and Officer Beck employed this tactic in searching the vehicles' trunks.

Deputy Miles opened the trunk of the first car, a Chrysler sedan, using the key fob, while Officer Beck controlled the trunk lid's opening.[329] The trunk was empty.[330] Because there was not a remote for the second vehicle, a Honda Accord, Officer Beck got into position behind the left rear quarter panel of the vehicle, between the two cars.[331] Deputy Miles then opened the driver's side door and released the lid to the trunk while Officer Beck controlled the lid's opening.[332] As the Honda's trunk lid opened, Officer Beck could immediately see a person's leg in the Honda's trunk.[333] And as Officer Beck further opened the trunk lid, he could see Mr.

---

[325] *Supra*, Discussion at 55-62.

[326] *Supra*, Undisputed Facts ¶ 91.

[327] *Id*. ¶ 92.

[328] *Id*.

[329] *Id*. ¶ 93.

[330] *Id*.

[331] *Id*.

[332] *Id*.

[333] *Id*. ¶ 94.

Calzada with a black handgun in his mouth.[334] Officer Beck immediately announced himself as a police officer and told Mr. Calzada to put down the gun, to show his hands, and to not move.[335] He then back up behind the Chrysler and again stated that he was a police officer and that he was there to help.[336]

Based on the undisputed material facts, the individual officer Defendants' search for Mr. Calzada was objectively reasonable. The officers took reasonable precautions to ensure their safety. They employed reasonable efforts to reestablish communication with Mr. Calzada without further entry into the home. They employed reasonable efforts to avoid unnecessarily escalating the situation. And their search was slow and deliberate, and limited to locating Mr. Calzada. The manner and scope of the individual officer Defendants' search did not exceed the consent given by Ms. Hotz, and was "strictly circumscribed by the exigencies."[337] Therefore, the individual officer Defendants did not violate Mr. Calzada's Fourth Amendment rights when entering and searching the home and vehicles for him.

### 2. Mr. Calzada's rights were not clearly established at the time of the challenged entry and search of his home and vehicles

Although the individual officer Defendants' entry and search of Mr. Calzada's home and vehicles did not violate his Fourth Amendment rights,[338] it is still appropriate to address the second prong of the qualified immunity analysis, *i.e.*, whether Mr. Calzada's rights were clearly established at the time of the individual officer Defendants' challenged conduct.[339]

---

[334] *Id.*

[335] *Id.* ¶¶ 95-96, 98-99.

[336] *Id.* ¶ 95.

[337] *Porter*, 594 F.3d at 1255 (quoting *Mincey*, 437 U.S. at 393).

[338] *Supra*, Discussion at 47-67.

[339] *al-Kidd*, 563 U.S. at 735.

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality."[340] "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that [the officer's] conduct was unlawful in the situation [the officer] confronted."[341] "Such specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."[342]

"While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate."[343] "[T]here must ordinarily be a Supreme Court or Tenth Circuit decision on point, or clearly established weight of authority from other courts."[344] "Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."[345] "But a body of relevant case law is usually necessary to clearly establish the answer."[346]

Plaintiff fails to demonstrate that clearly established law prohibited the individual officer Defendants' entry and search of Mr. Calzada's home and vehicles. Plaintiff identifies general statements of the law regarding consent and exigent circumstances.[347] But this "high level of

---

[340] *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021).

[341] *Id*. (internal quotations omitted).

[342] *Id*. (internal quotations omitted).

[343] *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 504 (2019) (internal quotations and punctuation omitted).

[344] *Mecham*, 500 F.3d at 1206 (internal quotations omitted).

[345] *Emmons*, 139 S.Ct. at 504 (internal quotations omitted).

[346] *Id*. (internal quotations omitted).

[347] Response at 59-63, 75-76, 80.

generality" is insufficient to demonstrate that the contours of Mr. Calzada's rights "were sufficiently definite that any reasonable official in the [individual officer Defendants'] shoes would have understood that [they were] violating it."[348]

Plaintiff identifies only the Supreme Court's opinion in *Randolph*[349] and the Tenth Circuit's opinion in *McKerrell*[350] as clearly establishing that officers should have known Ms. Hotz's consent was invalid.[351] But Plaintiff undertakes no effort to address how the facts and holdings of these cases placed the unlawfulness of the individual officer Defendants' conduct beyond debate. This is likely because neither case supports Plaintiff's argument.

As discussed, *Randolph* is readily distinguishable on its facts, and its holding is inapplicable to this case.[352] *McKerrell*, while being somewhat closer to this case factually than *Randolph*, is readily distinguishable. Its holding also supports the inapplicability of *Randolph* to this case, and that Ms. Hotz's consent was valid.

In *McKerrell*, an anonymous caller informed officers that Mr. McKerrell had outstanding arrest warrants, used methamphetamine, and possessed an assault rifle and a shotgun.[353] Officers investigated the tip and determined Mr. McKerrell's address and that he had two outstanding felony warrants.[354] Two weeks later, another caller informed officers that Mr. McKerrell was

---

[348] *Emmons*, 139 S.Ct. at 503 (internal quotations omitted).

[349] 547 U.S. 103.

[350] 491 F.3d 1221.

[351] Response at 59-61, 80.

[352] *Supra*, Discussion at 51-54.

[353] *McKerrell*, 491 F.3d at 1222.

[354] *Id*. at 1222-1223.

working in the front yard of the home.[355] Several officers responded by surrounding the

residence and announcing their presence.[356]

By that time, Mr. McKerrell was inside the home with his wife and young child, both of

whom resided at the home.[357] Mr. McKerrell quickly closed the garage door and front door to

barricade himself inside.[358] Within minutes, Mrs. McKerrell exited the home, and officers began

negotiating with Mr. McKerrell by calling his cell phone.[359] Mr. McKerrell ultimately

surrendered peacefully; was immediately arrested and handcuffed; and was transported to the

police station about five minute later.[360] During his communications with officers, Mr.

McKerrell never expressly objected to a search of the home and was concerned solely with being

arrested.[361] After Mr. McKerrell's transport to the police station, officers obtained Mrs.

McKerrell's consent to an evidentiary search of the home.[362]

The Tenth Circuit held that *Randolph* was factually distinguishable and inapplicable to

determining the validity of Mrs. McKerrell's consent.[363] The Tenth Circuit determined that

"Mrs. McKerrell exercised authority over the common area that she allowed the officers to

search, and the district court did not clearly err by finding that [Mr.] McKerrell did not object to

the search."[364] And "[i]n light of these facts, [the Tenth Circuit saw] no error in the district

---

[355] *Id*. at 1223.

[356] *Id*.

[357] *Id*.

[358] *Id*.

[359] *Id*.

[360] *Id*.

[361] *Id*.

[362] *Id*. at 1224.

[363] *Id*. at 1226-1227.

[364] *Id*. at 1228.

court's conclusion that the officers complied with the Fourth Amendment by relying on Mrs. McKerrell's consent to search the residence."[365]

The factual distinctions between this case and *McKerrell* are numerous and obvious. And its holding supports that absent an express refusal of consent by a physically present occupant, the rule announced in *Randolph* is inapplicable. *McKerrell* does not support a view that Ms. Hotz's consent was invalid, or that the individual officer Defendants' entry and search of Mr. Calzada's home and vehicles violated clearly established law. *McKerrell* supports the conclusion that the individual officer Defendants' entry and search of Mr. Calzada's home and vehicles was, in fact, lawful.

Regarding exigent circumstances, Plaintiff fares no better. Plaintiff identifies only the Tenth Circuit's opinions in *Martinez*[366] and *McInerney*[367] as clearly establishing that the individual officer Defendants should have known their entry and search of Mr. Calzada's home was not supported by exigent circumstances.[368] Plaintiff again makes no effort to discuss how the facts and holding of *Martinez* and *McInerney* placed the unlawfulness of the individual officer Defendants' conduct beyond debate. And again, this is likely because the cases do not support Plaintiff's argument.

In *Martinez*, a 911 dispatcher received a call from Mr. Martinez's residence, but heard only static on the line.[369] The dispatcher placed a return call to the residence, but there was no answer and she again heard only static on the line.[370] Officers were dispatched to respond to the

---

[365] *Id.*

[366] 643 F.3d 1292.

[367] 791 F.3d 1224.

[368] Response at 61-63.

[369] *Martinez,* 643 F.3d at 1294.

[370] *Id.*

call, which was not considered a priority call.[371] It was well-known to the officers that line problems or bad weather would cause static-only telephone calls.[372]

Officers arrived at Mr. Martinez's home approximately 26 minutes after the 911 call was received.[373] The home was in a rural area, on a secluded lot, and its gate was closed.[374] The officers walked through an opening next to the gate, and then repeatedly knocked on the front door and announced their presence.[375] There was no response; the officers saw no signs of forced entry; and the officers neither saw nor heard anyone inside the home.[376] The officers then walked up an exterior staircase to a second-floor balcony where they found a closed but unlocked sliding glass door.[377]

Through the glass, the officers observed electronics boxes near the door, and that the house looked disheveled.[378] The officers opened the door and again announced their presence, to which they received no response.[379] The officers then entered through the door and conducted a sweep of the home "to ensure no one was injured, unconscious, or deceased."[380] They observed contraband in plain view, but they did not find anyone inside the home.[381] After approximately five minutes, the officers exited and secured the home.[382] Mr. Martinez arrived at the home after

---

[371] *Id.*

[372] *Id.*

[373] *Id.*

[374] *Id.*

[375] *Id.*

[376] *Id.* at 1224-1225.

[377] *Id.* at 1225.

[378] *Id.*

[379] *Id.*

[380] *Id.*

[381] *Id.*

[382] *Id.*

the search was complete but while the officers were still on the property, and the officers took

him into custody.[383] The officers subsequently used information from their search and Mr.

Martinez's statements while in custody to secure a search warrant for the property.[384]

       The Tenth Circuit agreed with the district court that the officers had insufficient

information to objectively support a reasonable belief that someone inside the house was in need

of aid.[385] "The sanctity of the home is too important to be violated by the mere possibility that

someone inside is in need of aid—such a 'possibility' is ever-present."[386] Thus, the Tenth Circuit

held that the district court correctly determined the officers' warrantless entry and search of Mr.

Martinez's home violated his Fourth Amendment rights.[387]

       The facts of *Martinez* are vastly different than this case. The facts of *McInerney* are

equally oceans apart from those of this case, and it is unnecessary to discuss them in detail. It is

sufficed to say, *McInerny* held "if nonspecific and dated information from [the occupant's

nonresident ex-husband] plus a messy house and open doors and windows when the weather is

warm could justify the entry [of the home] that morning, it could have justified an entry on

almost any occasion."[388]

       As discussed, this is not the case of a mere possibility that Mr. Calzada was inside the

home and in immediate need of medical assistance.[389] The undisputed facts objectively

demonstrate that Mr. Calzada was in the home and that there was a high likelihood he was either

---

[383] *Id.*

[384] *Id.*

[385] *Id.* at 1298.

[386] *Id.* at 1299-1300.

[387] *Id.* at 1300.

[388] *McInerney*, 791 F.3d at 1235.

[389] *Supra*, Discussion at 55-62.

attempting to complete or had completed suicide, or that he was unconscious having consumed prescription medications and large quantities of alcohol. *Martinez* and *McInerny* do not support that the individual officer Defendants' entry and search of Mr. Calzada's home and vehicles violated clearly established law. The stark contrast of the information known to the individual officer Defendants compared to the information known to the officers in *Martinez* and *McInerny* supports that exigency legally justified the individual officer Defendants' entry and search of Mr. Calzada's home and vehicles.

Plaintiff fails to demonstrate that clearly established law prohibited the individual officer Defendants' entry and search of Mr. Calzada's home and vehicles. And the undisputed material facts demonstrate that this is not the rare obvious case, where the unlawfulness of the individual officer Defendants' conduct is sufficiently clear even though existing precedent does not address similar circumstances. Therefore, Mr. Calzada's rights were not clearly established at the time of the individual officer Defendants' challenged conduct.

### 3. The individual officer Defendants are entitled to qualified immunity for their entry and search of Mr. Calzada's home and vehicles

The individual officer Defendants did not violate Mr. Calzada's Fourth Amendment rights when entering and searching his home and vehicles.[390] And Mr. Calzada's rights were not clearly established at the time of the individual officer Defendants' challenged conduct.[391] Therefore, the individual officer Defendants are entitled to qualified immunity for their entry and search of Mr. Calzada's home and vehicles. This portion of Plaintiff's first cause of action under § 1983 against the individual officer Defendants is DISMISSED with prejudice.

---

[390] *Id*. at 47-67.

[391] *Id*. at 67-74.

**4. Mr. Calzada's rights were not violated by Officers Perez, Beck, and Mackley's use of deadly force against him**

Plaintiff's first cause of action under § 1983 also alleges that the individual officer Defendants violated Mr. Calzada's Fourth Amendment rights by using deadly force against him.[392] Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[393] The objective reasonableness standard applies to any use of force by a law enforcement officer "in the course of an arrest, investigatory stop, or other seizure."[394]

"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."[395] "[I]ts proper application requires careful attention to the facts and circumstances of each particular case"[396] to determine "whether the totality of the circumstances justified the use of force."[397] This determination is made "without regard to [an officer's] underlying intent or motivation."[398] "[R]elevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest."[399] "The mental illness or disturbed condition of the suspect is [also] a relevant factor in determining reasonableness of an officer's responses to a situation."[400]

---

[392] Complaint ¶¶ 100-113.

[393] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[394] *Id*. at 395 (internal quotations omitted).

[395] *Id*. at 396 (internal quotations omitted).

[396] *Id*.

[397] *Estate of Larsen ex rel. Studivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2009) (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)).

[398] *Hastings v. Barnes*, 252 Fed. App'x 197, 204 (10th Cir. 2007).

[399] *Mecham*, 500 F.3d at 1204 (internal quotations omitted).

[400] *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019).

"The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment they used force but also on whether the officers' own conduct during the seizure unreasonably created the need to use such force."[401] However, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[402] And "officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable."[403]

Where the material facts are not in dispute, the objective legal reasonableness of an officer's use of force is a question of law.[404]

> *Mr. Calzada was not suspected of a crime, but it was reasonable for the individual officer Defendants to be on heightened caution for a potential violent encounter with him*

The first factor to consider in determining whether Officers Perez, Beck, and Mackley's use of deadly force against Mr. Calzada was objectively reasonable is the crime's severity.[405] It is undisputed that Mr. Calzada was not suspected of any crime.[406] This isolated fact may suggest that the use of deadly force against Mr. Calzada was not reasonable. But the totality of the circumstances must be considered.[407] And based on the totality of the circumstances, a reasonable officer in the same circumstances as the individual officer Defendants (and specifically the officers that shot Mr. Calzada: Officers Perez, Beck, and Mackley) would have

---

[401] *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019) (quoting *Hastings*, 252 Fed. App'x at 203).

[402] *Graham*, 490 U.S. at 396-97.

[403] *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004).

[404] *Peterson*, 328 F.3d at 1251.

[405] *Mecham*, 500 F.3d at 1204.

[406] *Supra*, Undisputed Facts ¶¶ 20, 23, 27, 85.

[407] *Murr*, 511 F.3d at 1259.

approached the situation with heightened caution for a potential violent encounter with Mr. Calzada.

Before entering Mr. Calzada's home, the individual officer Defendants were briefed on the situation and the plan to enter the home to search for Mr. Calzada for purposes of reestablishing communications or rendering emergency medical services.[408] As discussed, the use of the SWAT team to conduct the search with weapons drawn and ready for a potential violent confrontation was objectively reasonable based on the circumstances and need for officer safety.[409] And the scope and manner of the individual officer Defendants' search was objectively reasonable.[410] This was not reckless or deliberate conduct that unreasonably created the individual officer Defendants' need to use deadly force. The individual officer Defendants had an objectively reasonable basis for proceeding through the home with heightened caution for a potential violent encounter with Mr. Calzada.

As the search progressed through the home, Officer Beck observed an empty military type rifle case, along with a large, empty liquor bottle, and a few prescription bottles.[411] Officer Perez was also aware of the empty rifle case.[412] And after about an hour of the individual officer Defendants searching the home and verbally calling out to Mr. Calzada, he had not responded and they were unable to locate him.[413] These facts, combined with the information from their briefing, reasonably led Officer Perez to believe that Mr. Calzada was, in fact, armed. This also

---

[408] *Supra*, Undisputed Facts ¶¶ 70-74, 83, 85.

[409] *Supra*, Discussion at 63; *In re Estate of Bleck*, 643 Fed. App'x at 756.

[410] *Supra*, Discussion at 62-67.

[411] *Supra*, Undisputed Facts ¶ 87.

[412] *Id*. ¶ 86.

[413] *Id*. ¶¶ 81, 84, 86-88.

reasonably elevated Officers Beck and Mackley's concern that Mr. Calzada was not asleep but, rather, was intentionally hiding and could surprise the team.

Plaintiff argues that Mr. Calzada was only a threat to himself.[414] It is true that in his communications with Officer Vanderwarf and Dr. Gushman, Mr. Calzada made several statements that he did not want to hurt anyone other than himself.[415] However, he had also threatened "suicide by cop."[416] And Mr. Calzada had made numerous statements and took several actions that would lead a reasonable officer to believe that he was intending for this threat to play out: he was armed with a handgun and an assault rifle; he discussed military terms and tactics such as "going tactical," performing "perimeter checks," and being "locked and loaded;" he let the officers know he could see where they were located outside the home; he refused to come out of the home unarmed; and he invited the officers to come into the home to meet him while he was armed.[417]

Mr. Calzada's home was located in a cul-de-sac with neighboring houses.[418] A reasonable officer under the circumstances would also have had concern for the safety of Mr. Calzada's neighbors caused by stray bullets if Mr. Calzada fired his weapons at the officers or himself. This is not the case of an individual armed with a blade or bat, who could not reasonably be considered an immediate danger to someone outside the individual's close proximity.[419] Mr.

---

[414] Response at 64, 66.

[415] *Supra*, Undisputed Facts ¶¶ 56.a, 56.c, 56.e, 56.f, 57.

[416] *Id*. ¶¶ 16, 19, 39, 56.b.

[417] *Id*. ¶¶ 16, 18, 34-36, 38, 46, 50-52, 54, 56.i, 63.

[418] *Id*. ¶¶ 17, 25, 27, 59.

[419] *C.f. Sheehan*, 575 U.S. at 600; *Husk*, 919 F.3d at 1209-1211; *Hastings*, 252 Fed. App'x at 203; *Sevier*, 60 F.3d at 698.

Calzada was reasonably believed to be armed with a handgun and an assault rifle with over 1,000 rounds of ammunition.[420]

The totality of the circumstances does not support a determination or a reasonable inference that Mr. Calzada posed a threat only to himself. Rather, they objectively demonstrate that a reasonable officer would have approached the situation with heightened caution for a potential violent encounter with Mr. Calzada, and would have reasonable concern for the safety of themselves and others. When this heightened caution is considered in the totality of the circumstances (particularly considering Mr. Calzada's actions after the officers encountered him) the severity of the crime factor does not favor a finding that the individual officer Defendants' reckless and deliberate actions created the need to use deadly force.[421] Nor does it demonstrate or a permit a reasonable inference that Officers Perez, Beck, and Mackley's use of deadly force against Mr. Calzada was unreasonable.

> *When Officers Perez, Beck, and Mackley used deadly force against Mr. Calzada, he*
> *posed an immediate threat of serious physical harm to the individual officer Defendants*

The second factor to consider in determining whether Officers Perez, Beck, and Mackley's use of deadly force was objectively reasonable is the potential threat posed by Mr. Calzada to the safety of the officers and others.[422] The use of deadly force is justified if a reasonable officer in the same circumstances "would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."[423] "[E]ven if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back the officer would be

---

[420] *Supra*, Undisputed Facts ¶¶ 16, 18, 35, 50, 56.h, 63.

[421] *C.f. Clark v. Colbert*, 895 F.3d 1258, 1263 (10th Cir. 2018) ("[E]ven if [an individual] ultimately was not guilty of a crime, [the circumstances] indicated incapacitation was necessary.").

[422] *Mecham*, 500 F.3d at 1204.

[423] *Murr*, 511 F.3d at 1260 (internal quotations and emphasis omitted); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

justified in using more force than in fact was needed."[424] "A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'"[425]

In assessing the degree of threat facing an officer in deadly force cases, the following nonexclusive factors are considered: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[426] A verbal warning, if feasible, should also be given by an officer prior to any use of deadly force.[427] Each of these factors supports that Officers Perez, Beck, and Mackley's use of deadly force against Mr. Calzada was objectively reasonable because he posed an immediate threat of serious physical harm to the individual officer Defendants.

It is undisputed that immediately upon seeing Mr. Calzada armed in the vehicle's trunk, Officer Beck announced himself as a police officer and told Mr. Calzada to put down the gun, to show his hands, and to not move.[428] Officer Beck then backed up behind the other vehicle, again stated that he was a police officer, and informed Mr. Calzada that he was not in trouble and that they wanted to get him to the hospital for help.[429] At this time, Mr. Calzada had his handgun in his mouth.[430]

---

[424] *Murr*, 511 F.3d at 1260 (internal quotations and punctuation omitted).

[425] *Id*. (quoting *People v. Morales*, 603 N.Y.S.2d 319, 320 (N.Y. App. Div. 1993)).

[426] *Id*.

[427] *Garner*, 471 U.S. at 11-12; Utah Code Ann. § 76-2-404(3).

[428] *Supra*, Undisputed Facts ¶¶ 95-96, 98-99.

[429] *Id*. ¶¶ 95, 98.

[430] *Id*. ¶¶ 94, 99.

Deputy Miles, who was positioned near the driver's door in between the two vehicles, also gave Mr. Calzada verbal commands to put down his gun, and attempted to talk with Mr. Calzada about their similar military experiences.[431] Officer Beck repeated his command for Mr. Calzada to put down the gun, and told Mr. Calzada, "Please don't do that in front of me. Don't make me watch you kill yourself."[432] These attempts to communicate with Mr. Calzada, without rushing to physically restrain or subdue him, objectively demonstrate the officers' reasonable efforts to not escalate the situation or unnecessarily agitate Mr. Calzada.

As Officer Beck and Deputy Miles continued to urge Mr. Calzada to drop the gun, Officer Perez entered the garage.[433] He heard Officer Beck and Deputy Miles's commands to Mr. Calzada, and heard that Mr. Calzada had a gun his mouth.[434] Officer Perez began to move towards the vehicle, but was told his location was where the gun was pointed, so he moved back to the main door.[435] Officer Perez informed Lieutenant Pledger of the situation over the radio, and instructed the armored SWAT Suburban to be repositioned in the driveway, parallel to the garage, to enable Officer Vanderwarf to attempt to reestablish his prior conversation with Mr. Calzada.[436] By not rushing to confront Mr. Calzada and instead backing away and calling the negotiator in to reestablish communications with Mr. Calzada, Officer Perez's actions further objectively demonstrate reasonable efforts to not escalate the situation or unnecessarily agitate Mr. Calzada.

---

[431] *Id.* ¶¶ 99-101.

[432] *Id.* ¶ 102.

[433] *Id.* ¶ 99.

[434] *Id.*

[435] *Id.*

[436] *Id.* ¶¶ 103-104, 107, 109.

Officer Mackley stood next to Officer Perez.[437] He could see inside the vehicle's trunk, and he saw a small, elevated platform and the front two feet of a rifle barrel that was within a foot of Mr. Calzada.[438] From his vantage point, Officer Mackley reasonably believed the rifle barrel was pointed toward the group of individual officer Defendants that was positioned in the garage.[439] But he could not see Mr. Calzada's hands,[440] which reasonably elevated his concern.

For approximately seven minutes after Mr. Calzada was discovered in the vehicle's trunk, the individual officer Defendants and Officer Vanderwarf attempted to communicate with Mr. Calzada, asking him to put down his gun and stating that they did not want to hurt him.[441] As this was happening, Mr. Calzada was moving his eyes, looking at his surroundings and then back to Officer Beck, but he did not move his body or verbally respond.[442] Officer Beck, who was only a few feet away from Mr. Calzada, reasonably believed from the look in Mr. Calzada's eyes that he could hear and understand the officers.[443]

At approximately 11:14 a.m., an instruction was given over the radio for Officer Butler to shoot Mr. Calzada with a non-lethal beanbag.[444] However, Officer Butler was unable to shoot the beanbag rounds because the only shot he had from his location would have been lethal, hitting Mr. Calzada in the face.[445] The call to ready use of non-lethal rounds on Mr. Calzada is another example of the individual officer Defendants reasonably attempting to avoid the need for using

---

[437] *Id*. ¶ 105.

[438] *Id*.

[439] *Id*.

[440] *Id*.

[441] *Id*. ¶¶ 108-109, 114, 125.

[442] *Id*. ¶¶ 101, 110.

[443] *Id*. ¶ 101.

[444] *Id*. ¶ 111.

[445] *Id*.

deadly force. And Officer Butler's decision to not take a shot with the beanbag rounds that could have been lethal to Mr. Calzada was objectively reasonable.

Lieutenant Pledger could hear the individual officer Defendants yelling commands at Mr. Calzada, so he stepped out of his position in the armored Suburban and briefly saw Mr. Calzada in the vehicle's trunk.[446] He then moved to a position where he would not be shot at by Mr. Calzada if Mr. Calzada chose to start shooting.[447] It was objectively reasonable for Lieutenant Pledger to attempt to view the situation, rather than relying only on radio communications. It was also objectively reasonable for Lieutenant Pledger to move to a covered location after viewing the situation. And because he was not in a position to give an order for the individual officer Defendants to shoot Mr. Calzada, it was objectively reasonable that Lieutenant Pledger never gave such an order.[448]

Additionally, there is insufficient evidence to demonstrate or permit a reasonable inference that Lieutenant Pledger should have ordered the individual officer Defendants to withdraw from the garage. Mr. Calzada was armed and had threatened suicide by cop, and officers were in close proximity to Mr. Calzada (within a few feet). Based on the undisputed material facts, a reasonable officer in the same circumstances would have a reasonable basis to believe that maintaining the status quo of the situation would allow officers to reestablish communications with Mr. Calzada, and avoid his immediate completion of suicide or directing his weapon at the officers.

As the individual officer Defendants continued their attempts to communicate with Mr. Calzada, Officer Perez repositioned himself next to Officer Beck by the vehicle that did not

---

[446] *Id.* ¶¶ 77, 127.

[447] *Id.* ¶ 127.

[448] *Id.*

contain Mr. Calzada, where he was able to see Mr. Calzada in the other vehicle's trunk.[449] Mr. Calzada had moved his handgun to a position behind his head.[450] Officer Perez ordered the shield to be brought to this location, and Deputy Fulton responded with the shield, positioning it between Officers Perez and Beck.[451] Officer Perez was informed by an officer in the armored Suburban that there was a rifle in the trunk.[452] He attempted to see further inside the trunk and could distinguish parts of a rifle, including the magazine and forward grip on a flat surface tucked into the trunk.[453] But he could not determine which way the rifle was facing.[454]

As the entry team's leader, it was objectively reasonable for Officer Perez to move into a position where he could better view Mr. Calzada and the position of his hands and weapons. A reasonable officer in the same circumstances would have a reasonable basis to believe that this would allow the officer to gauge the situation more effectively; to give appropriate orders to the team; and to relay information to the SWAT command center. Ordering the shield forward was also an objectively reasonable decision for purposes of officer safety. These actions of Officer Perez did not recklessly and unreasonably escalate the situation or create the need to use deadly force against Mr. Calzada.

---

[449] *Id*. ¶ 109.

[450] *Id*. ¶¶ 112, 115.

[451] *Id*. ¶ 112.

[452] *Id*. ¶ 118.

[453] *Id*.

[454] *Id*.

Officer Beck also heard over the radio that there was a rifle in the trunk on some sort of shelf behind Mr. Calzada.[455] And after being alerted to the rifle's presence, he was able to observe part of the rifle from his position.[456]

Officer Stirling, who was positioned in the armored Suburban, observed the assault rifle lying on what appeared to be a speaker shelf in the vehicle's trunk.[457] It appeared to him that the rifle was pointed directly at Deputy Miles and generally in the direction of the other individual officer Defendants located to the front left of the vehicle (Deputy Fulton and Officers Perez and Beck).[458] Officer Stirling reasonably became concerned for the safety of Deputy Miles, and communicated these concerns over the radio.[459] Deputy Miles did not believe the rifle was pointed at him and communicated over the radio "[s]top shouting, we know where the rifle is pointed," but he, nevertheless, moved his position.[460] These actions objectively demonstrate that the individual officer Defendants were taking reasonable efforts to avoid being in the line of fire of Mr. Calzada's weapons while staying in his close proximity.

Mr. Calzada then began moving his hand toward the rifle and back to his chest.[461] As this happened, Officer Beck gave Mr. Calzada several commands to stop.[462] Mr. Calzada paused for a second and then continued to move his hand toward the rifle. The second time Mr. Calzada moved his hand toward the rifle, he appeared to be attempting to manipulate the rifle's safety.[463]

---

[455] *Id.* ¶ 119.

[456] *Id.*

[457] *Id.* ¶ 113.

[458] *Id.*

[459] *Id.* ¶¶ 116-117.

[460] *Id.* ¶116

[461] *Id.* ¶ 120.

[462] *Id.*

[463] *Id.*

Based on Mr. Calzada's hand movements, it reasonably appeared to Officer Perez that Mr. Calzada was trying to fire the rifle from the position it was in by pulling the trigger with his left hand.[464] Based on the totality of the circumstances, Officer Perez was reasonably in fear for his life, and the lives of Officer Beck and Deputies Miles and Fulton.[465]

The officers had repeatedly commanded Mr. Calzada to drop his weapon and when Mr. Calzada began moving his hand toward the rifle, he was given commands to stop. A reasonable officer in the same circumstances would have a reasonable basis to believe that Mr. Calzada heard and understood these commands based on the officers' close proximity, and because Mr. Calzada moved his hand back to his chest and paused before moving it again.

In response to Mr. Calzada's hand movements with the rifle, Officer Perez raised his duty rifle, switched the safety off, aimed at Mr. Calzada's head, and fired one round from his duty rifle.[466] A reasonable officer in the same circumstances would have probable cause to believe that at that moment, Mr. Calzada posed an immediate threat of serious physical harm to the individual officer Defendants. The undisputed material facts demonstrate that Officer Perez was faced with a split-second decision and that it was not feasible to give any additional warnings to Mr. Calzada. It was objectively reasonable for Officer Perez to make the decision to use deadly force against Mr. Calzada without giving an additional warning.[467] And this decision cannot be second-guessed with 20/20 hindsight.

---

[464] *Id.*

[465] *Id.*

[466] *Id.* ¶ 121.

[467] *C.f. Cordova v. City of Albuquerque*, 816 F.3d 645, 661 ("The district court did not abuse its discretion or misstate the law in instructing the jury that a command to 'drop the weapon' is a sufficient warning [before employing deadly force] where events are unfolding quickly.").

Within a split-second of Officer Perez's shot, Mr. Calzada took the handgun that was behind his head and pointed it at Officer Beck and in the direction of Officer Mackley.[468] Officer Mackley observed Mr. Calzada's movements as quick, and reasonably believed they required snap judgment with no time to give additional verbal warnings.[469] Officers Beck and Mackley, reasonably fearing for their lives at that moment, fired at Mr. Calzada.[470] After Officer Beck's first shot, Mr. Calzada recoiled a little but continued to point his handgun directly at Officer Beck.[471] Officer Beck then fired three or four more rounds with the last shot hitting Mr. Calzada in the head.[472] At the same time, Officer Mackley fired his weapon approximately three times at Mr. Calzada, with the last shot aimed at Mr. Calzada's head.[473]

A reasonable officer in the same circumstances would have probable cause to believe that at that moment, Mr. Calzada posed an immediate threat of serious physical harm to Officers Beck and Mackley. The undisputed material facts demonstrate that Officers Beck and Mackley faced split-second decisions and that it was not feasible to give any additional warnings to Mr. Calzada. It was objectively reasonable for Officers Beck and Mackley to make the decision to use deadly force against Mr. Calzada. And their decisions cannot not be second-guessed with 20/20 hindsight.

---

[468] *Supra*, Undisputed Facts ¶¶ 121-122.

[469] *Id*. ¶ 121; *C.f. Cordova*, 816 F.3d at 661.

[470] *Supra*, Undisputed Facts ¶¶ 121-122, 130.

[471] *Id*. ¶ 121.

[472] *Id*.

[473] *Id*. ¶ 122.

Officer Perez observed Mr. Calzada's head move back, and his left hand leave the rifle.[474] He also saw Mr. Calzada's body move with each shot.[475] Once Officer Perez believed Mr. Calzada was no longer a threat, he yelled out "Cease fire!"[476] The shots only lasted a few seconds, and no more shots were fired after that brief moment.[477]

During the time of Officer Perez's first shot and the other shots, Mr. Calzada had drawn his handgun from behind his head and brought it to his chest.[478] The handgun remained pointing at Officer Beck after the order to cease fire, so he moved to the right and out of the barrel's path.[479] Officer Perez informed Lieutenant Pledger that shots were fired, and the threat was down.[480] He then instructed Deputy Fulton to remove the handgun from Mr. Calzada's chest, Deputy Fulton placed the handgun on the ground behind the vehicle.[481] Officer Perez then called for the medic, Officer Stirling, to do a medical assessment.[482] Officer Stirling indicated that Mr. Calzada was dead and beyond care.[483]

The analysis of whether deadly force is justified focuses on whether a reasonable officer in the same circumstances "would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."[484] The undisputed material facts objectively demonstrate that a reasonable officer in the same circumstances as Officers Perez, Beck, and

---

[474] *Id.* ¶ 121.

[475] *Id.*

[476] *Id.* ¶¶ 121-122.

[477] *Id.* ¶¶ 121, 125.

[478] *Id.* ¶ 121.

[479] *Id.* ¶ 123.

[480] *Id.* ¶ 124.

[481] *Id.*

[482] *Id.*

[483] *Id.*

[484] *Murr*, 511 F.3d at 1260 (internal quotations and emphasis omitted); *Garner*, 471 U.S. at 11.

Mackley would have reasonably believed that Mr. Calzada was aware of the individual officer Defendants' presence; heard their commands; refused to comply; and made hostile motions with his rifle and handgun toward the individual officer Defendants.[485]

The undisputed material facts also objectively demonstrate that Mr. Calzada's manifest intentions were to force the individual officer Defendants into spit-second decisions to take lethal action against him. He had earlier threatened "suicide by cop" and, unfortunately, carried out his threat. But even if it is assumed that Mr. Calzada was not intending to fire the rifle, or that he intended to use the handgun only on himself,

> [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.[486]

Officers are "justified in using more force than in fact was needed" if the officers "reasonably, but mistakenly, believed that a suspect was likely to fight back[.]"[487] The circumstances of this case demonstrate that Officers Perez, Beck, and Mackley were objectively reasonable in their beliefs and objectively justified in their actions.

The close proximity of Mr. Calzada to Officers Perez, Beck, and Mackley further supports that a reasonable officer would have believed they faced with a split-second decision when Mr. Calzada manipulated his rifle with his left hand, and when he drew his handgun from behind his head with his right hand. In that split-second, it was objectively reasonable for Officers Perez, Beck, and Mackley to fear for their lives and the lives of the other individual officer Defendants. And it was objectively reasonable to use deadly force against Mr. Calzada

---

[485] *Garner*, 471 U.S. at 11; *Murr*, 511 F.3d at 1260.

[486] *Graham*, 490 U.S. at 396-397.

[487] *Murr*, 511 F.3d at 1260.

without giving further warning.[488] A reasonable officer in the same circumstance would have probable cause to believe that Mr. Calzada posed an immediate threat of serious physical harm to the individual officer Defendants.

> *Mr. Calzada purposefully concealed himself and remained silent in the trunk of his vehicle to evade law enforcement*

The third factor to consider in determining whether Officers Perez, Beck, and Mackley's use of deadly force was objectively reasonable is Mr. Calzada's attempts to resist or evade arrest.[489] It is undisputed that Mr. Calzada was not suspected of any crime.[490] And the individual officer Defendants were not attempting to arrest him.[491] But, just as with the factor regarding the severity of the crime,[492] these facts are insufficient to demonstrate or permit a reasonable inference that the use of deadly force against Mr. Calzada was not objectively reasonable.

Based on the totality of the circumstances, Mr. Calzada purposefully concealed himself in the trunk of his vehicle to evade law enforcement. It is undisputed that after several hours of communicating with Officer Vanderwarf and Dr. Gushman on the phone, Mr. Calzada broke off communications.[493] As discussed, after communications were lost and could not be reestablished, it was unknown whether Mr. Calzada was awake, asleep, unconscious, or dead.[494] And it was legally justified and objectively reasonable for the individual officer Defendants to

---

[488] *C.f. Cordova*, 816 F.3d at 661 ("The district court did not abuse its discretion or misstate the law in instructing the jury that a command to 'drop the weapon' is a sufficient warning [before employing deadly force] where events are unfolding quickly.").

[489] *Mecham*, 500 F.3d at 1204.

[490] *Supra*, Undisputed Facts ¶¶ 20, 23, 27, 85.

[491] *Id*.

[492] *Supra*, Discussion at 76-79.

[493] *Supra*, Undisputed Facts ¶¶ 29, 32, 34, 47, 55-57.

[494] *Supra*, Discussion at 55-62.

enter and search his home for him.[495] With 20/20 hindsight, we now know that after breaking off communications, Mr. Calzada went to his garage and concealed himself in his vehicle's trunk with his handgun and assault rifle.

It is undisputed that upon breaching the garage, the individual officer Defendants made several verbal calls out to Mr. Calzada.[496] It is also undisputed that individual officer Defendants continued to verbally call out to Mr. Calzada as they searched the garage and the home.[497] Mr. Calzada never responded to these attempts to locate and reestablish communication with him.[498] Yet the undisputed material facts demonstrate that when the individual officer Defendants encountered him in the vehicle's trunk, Mr. Calzada was awake, aware of the officers' presence, and understood their commands.[499]

Based on the totality of the circumstances, Mr. Calzada purposefully concealed himself and remained silent in the trunk of his vehicle to evade law enforcement. A reasonable officer in the same circumstances as the individual officer Defendants would have a reasonable basis to believe that Mr. Calzada was purposely evading law enforcement. The individual officer Defendants already had an objectively reasonable basis for proceeding through the home with heightened caution for a potential violent encounter with Mr. Calzada.[500] The circumstances supporting this heightened caution, combined with the fact that Mr. Calzada had concealed himself in the vehicle's trunk armed with a handgun and an assault rifle, would give a reasonable

---

[495] *Id*. at 47-67.

[496] *Supra*, Undisputed Facts ¶ 81.

[497] *Id*. ¶ 84.

[498] *Id*. ¶¶ 81-82, 88.

[499] *Id*. ¶¶ 94, 101, 120.

[500] *Supra*, Discussion at 76-79.

officer a reasonable basis to believe that Mr. Calzada intended for there to be a violent encounter if and when the officers discovered his location.

Under the circumstances, it is remarkable that the individual officer Defendants did not rush to physically restrain or subdue Mr. Calzada, or to use deadly force upon discovering him. Instead, they announced their presence; commanded him to drop his gun; took reasonable protective measures for their safety; and attempted to reestablish communications with him. None of the individual officer Defendants ever heard Mr. Calzada respond to any of their questions or orders.[501] And Mr. Calzada ultimately made what a reasonable officer would have reasonably believed to be hostile movements towards the individual officer Defendants with his weapons.[502]

Based on the undisputed material facts and the totality of the circumstances, the factor for whether the suspect's attempts to resist or evade arrest does not favor a finding that the individual officer Defendants' reckless and deliberate actions created the need to use deadly force.[503] Nor does it demonstrate or a permit a reasonable inference that Officers Perez, Beck, and Mackley's use of deadly force against Mr. Calzada was unreasonable.

*Mr. Calzada's disturbed condition does not render the individual officer Defendants' responses to the situation unreasonable or unjustified*

The fourth factor to consider in determining whether Officers Perez, Beck, and Mackley's use of deadly force was objectively reasonable is Mr. Calzada's mental illness or disturbed condition.[504] There is no record evidence that Mr. Calzada suffered from a mental

---

[501] *Supra*, Undisputed Facts ¶ 110.

[502] *Supra*, Discussion at 85-90.

[503] *C.f. Clark v. Colbert*, 895 F.3d 1258, 1263 (10th Cir. 2018) ("[E]ven if [an individual] ultimately was not guilty of a crime, [the circumstances] indicated incapacitation was necessary.").

[504] *Husk*, 919 F.3d at 1214.

illness. However, it is undisputed that before and during law enforcement's involvement with him on October 21, 2014, Mr. Calzada was suicidal, under the influence of prescription medications and large quantities of alcohol, and exhibited paranoid or agitated behavior.[505]

Plaintiff argues that the individual officer Defendant's conduct, and specifically Officers Perez, Beck, and Mackley's use of deadly force, cannot be reasonable when considering Mr. Calzada's disturbed condition.[506] Plaintiff argues that the individual officer Defendants' reckless and deliberate conduct escalated the situation and created the need to use deadly force.[507] Plaintiff further argues that Officers Perez, Beck, and Mackley unreasonably failed to warn Mr. Calzada before their use of deadly force.[508] These arguments are contrary to the undisputed material facts and lack merit.

The undisputed material facts must be considered in the totality of the circumstances "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[509] It is neither helpful nor relevant to undergo a "retrospective inquiry" to suggest that "[p]erhaps the situation might have been more peacefully resolved" had officers acted differently.[510]

As discussed, the individual officer Defendants' conduct leading up to their encounter with Mr. Calzada in the vehicle's truck was objectively reasonable.[511] This conduct did not

---

[505] *Supra*, Undisputed Facts ¶¶ 16, 28, 31, 34-36, 39-40, 42, 45-46, 49-51, 54-58, 60, 94.

[506] Response at 64-68.

[507] *Id*.

[508] *Id*.

[509] *Graham*, 490 U.S. at 396; *Murr*, 511 F.3d at 1259.

[510] *Jiron*, 392 F.3d at 418.

[511] *Supra*, Discussion at 47-67, 76-79, 90-92.

unreasonably escalate the situation or recklessly create the need to use deadly force.[512] The individual officer Defendants' conduct upon encountering Mr. Calzada in the vehicle's trunk also did not unreasonably escalate the situation or recklessly create the need to use deadly force.[513] Mr. Calzada's disturbed condition does not change this.

This is not a case where officers recklessly rushed into a confrontation with, or purposely cornered, an armed emotionally disturbed individual and employed deadly force within minutes.[514] This case involved over five hours of communications between a trained police negotiator and Mr. Calzada (including communications with Mr. Calzada's psychologist) in attempt to have him exit the home unarmed. It involved a loss of communication with Mr. Calzada, after which it was unknown whether Mr. Calzada was awake, asleep, unconscious, or dead. And it involved an hourlong slow and deliberate search of the home for Mr. Calzada. This search ended when the individual officer Defendants discovered that Mr. Calzada had purposefully cornered himself with a handgun and an assault rifle in the trunk of his vehicle.

Upon encountering Mr. Calzada concealed and armed in his vehicle's truck, the individual officer Defendants did not rush to physically restrain or subdue him, or to use deadly force against him. Instead, they announced their presence; commanded Mr. Calzada to drop his gun; and informed him that he was not in trouble and that they were only there to help him. They took reasonable protective measures for their safety while maintaining close proximity to Mr. Calzada. And for seven minutes attempted to reestablish communications with him (including with the trained negotiator).

---

[512] *Id*.

[513] *Id*. at 79-92.

[514] *Compare with Husk*, 919 F.3d at 1209-1211; *Allen v. Muskogee, Oklahoma*, 119 F.3d 837, 839 (10th Cir. 1997); *Sevier*, 60 F.3d at 697-699; *In re Estate of Bleck*, 643 Fed. App'x at 755; *Hastings*, 252 Fed. App'x at 198-200.

It was not until Mr. Calzada made hostile movements towards his rifle that Officers Perez used deadly force against him. And it was not until Mr. Calzada made a hostile movement with his handgun that Officers Beck and Mackley used deadly force against him. Mr. Calzada had not complied with the repeated commands to drop his gun, and did not comply with the commands to stop when he began reaching for his rifle.[515] Mr. Calzada's hostile movements necessitated spit-second decisions by the officers. And there is insufficient record evidence to demonstrate or permit a reasonable inference that, at the time Mr. Calzada made these hostile movements, it would have been feasible for Officers Perez, Beck, and Mackley to give additional warnings before using deadly force.

Based on the totality of the circumstances, the individual officer Defendants did not unreasonably escalate the situation with Mr. Calzada or recklessly create the need to use deadly force against him. And Mr. Calzada's disturbed condition does not render the individual officer Defendants' responses to the situation unreasonable or unjustified.

*Officers Perez, Beck, and Mackley's use of deadly force against Mr. Calzada was objectively reasonable*

Based on the undisputed material facts, and viewing the totality of the circumstances, it was reasonable for the individual officer Defendants to be on heightened caution for a potential violent encounter with Mr. Calzada.[516] When Officers Perez, Beck, and Mackley used deadly force against Mr. Calzada, he posed an immediate threat of serious physical harm to the individual officer Defendants.[517] Mr. Calzada had purposefully concealed himself and remained

---

[515] *C.f. Cordova*, 816 F.3d at 645 ("The district court did not abuse its discretion or misstate the law in instructing the jury that a command to 'drop the weapon' is a sufficient warning [before employing deadly force] where events are unfolding quickly.").

[516] *Supra*, Discussion at 76-79.

[517] *Id*. at 79-90.

silent in the trunk of his vehicle to evade law enforcement.[518] And Mr. Calzada's disturbed condition does not render the individual officer Defendants' responses to the situation unreasonable or unjustified.[519]

The undisputed material facts and the totality of the circumstances demonstrate that Officers Perez, Beck, and Mackley's use of deadly for against Mr. Calzada was objectively reasonable. Therefore, Officers Perez, Beck, and Mackley's did not violate Mr. Calzada's Fourth Amendment rights in their use of deadly force against him.

### 5. Mr. Calzada's rights were not clearly established at the time of the challenged use of deadly force

Although Officers Perez, Beck, and Mackley's use of deadly force did not violate Mr. Calzada's Fourth Amendment rights,[520] it is still appropriate to address the second prong of the qualified immunity analysis, *i.e.*, whether Mr. Calzada's rights were clearly established at the time of the challenged conduct.[521]

There is a trove of Supreme Court and Tenth Circuit precedent discussing the legal framework and principles that apply to claims of excessive force under the Fourth Amendment. Plaintiff cites to many of these cases to argue that Mr. Calzada's Fourth Amendment rights were violated by Officers Perez, Beck, and Mackley's use of deadly force against him, and that his rights were clearly established at that time.[522] But as discussed, Officers Perez, Beck, and Mackley's use of deadly force did not violate Mr. Calzada's Fourth Amendment rights.[523]

---

[518] *Id*. at 90-92.

[519] *Id*. at 92-95.

[520] *Id*. at 75-96.

[521] *al-Kidd*, 563 U.S. at 735.

[522] Response at 63-68, 75-80.

[523] *Supra*, Discussion at 75-96.

The legal framework and principles established by prior precedent certainly define the contours of an individual's Fourth Amendment rights against excessive force. However, these contours establish that excessive force is determined based on objective reasonableness.[524] This is a test that is "not capable of precise definition or mechanical application."[525] It "requires careful attention to the facts and circumstances of each particular case"[526] to determine "whether the totality of the circumstances justified the use of force."[527] And it is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[528]

Because of this, the legal framework and principles regarding excessive force are "at too high a level of generality"[529] to demonstrate on their own that Mr. Calzada's rights were clearly established at the time of Officers Perez, Beck, and Mackley's use of deadly force. "[S]pecificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."[530] "[T]he rule's contours must be so well defined that it is clear to a reasonable officer that [the officer's] conduct was unlawful in the situation [the officer] confronted."[531]

---

[524] *Graham*, 490 U.S. at 396.

[525] *Id*.

[526] *Id*.

[527] *Murr*, 511 F.3d at 1259 (quoting *Sevier*, 60 F.3d at 699).

[528] *Graham*, 490 U.S. at 396 (1989).

[529] *Bond*, 595 U.S. at 12.

[530] *Id*. (internal quotations omitted).

[531] *Id*. (internal quotations omitted).

To demonstrate that Mr. Calzada's rights were clearly established at the time of Officers Perez, Beck, and Mackley's use of deadly force, Plaintiff must identify existing precedent with sufficient factual similarity to this case to have "place[d] the lawfulness of the particular action[s] beyond debate."[532] Plaintiff fails to do so.

Plaintiff relies on the Supreme Court's opinion in *Garner*[533] and the Tenth Circuit's opinions in *Husk*,[534] *Hastings*,[535] *Allen*,[536] *Sevier*,[537] and *Quezada*[538] as collectively establishing that the lawfulness of Officers Perez, Beck, and Mackley's use of deadly force was beyond debate.[539] It is unnecessary to discuss the facts and holdings of each of these cases in detail.[540] Whether considered individually or collectively, these cases do not share sufficient factual similarities to this case to place the lawfulness of Officers Perez, Beck, and Mackley's conduct beyond debate.

As discussed,[541] this is not a case where officers recklessly rushed into a confrontation with, or purposely cornered, an armed emotionally disturbed individual and employed deadly

---

[532] *Emmons*, 139 S.Ct. at 504 (internal quotations and punctuation omitted).

[533] 471 U.S. 1.

[534] 919 F.3d 1204.

[535] 252 Fed. App'x 197.

[536] 119 F.3d 837.

[537] 60 F.3d 695.

[538] *Quezada v. Cty. of Bernalillo*, 944 F.2d 710 (10th Cir. 1991).

[539] Response at 75-80.

[540] It is worthy to note, however, that Plaintiff's reading of *Quezada* is incorrect. Among the precedent Plaintiff relies on, *Quezada* shares the closest factual similarities to this case. *Quezada*, 944 F.2d at 712-713. But the Tenth Circuit did not decide whether the officers use of force in that case violated the individual's rights. Instead, the Tenth Circuit held that "the district court's factual findings [we]re clearly erroneous on the § 1983 claim because the district court did not assess the evidence for objective reasonableness as articulated by *Graham*." *Id*. at 717. Therefore, *Quezada* is entirely unhelpful to the determination of whether Officer's Perez, Beck, and Mackley's conduct was prohibited by clearly established law.

[541] *Supra*, Discussion at 56-67, 75-96.

force within minutes.[542] This case involved over five hours of communications between officers (and Mr. Calzada's psychologist) and Mr. Calzada to have him exit the home unarmed. This case involved a loss of communication with Mr. Calzada, after which Mr. Calzada's condition was unknown but there a real possibility that he was seriously injured or threatened with such injury. This case involved an hourlong search of the home for Mr. Calzada, which ended with the individual officer Defendants discovering that Mr. Calzada had purposefully cornered himself with a handgun and an assault rifle in his vehicle's trunk. This case involved the individual officer Defendants attempting to reestablish communication with Mr. Calzada while also commanding him to drop his gun for approximately seven minutes. This case involved the individual officer Defendants taking protective measures for their safety while maintaining close proximity to Mr. Calzada. And this case involved Mr. Calzada making hostile movements towards his rifle and with his handgun which required Officers Perez, Beck, and Mackley to make split-second decisions regarding the use of deadly force.

Under the totality of the circumstances, the precedent Plaintiff relies on does not support that Officers Perez, Beck, and Mackley's use of deadly force against Mr. Calzada was unreasonable or violated his Fourth Amendment rights. And this precedent does not establish that the lawfulness of Officers Perez, Beck, and Mackley's conduct was beyond debate.

Indeed, in *Arnold v. City of Olathe, Kansas*,[543] a more recent opinion having arguably the closest factual similarity to this case, the Tenth Circuit held "[t]he officers' use of force was reasonable given the totality of the circumstances and the severe threat to officer safety.[544] The

---

[542] *Compare with Husk*, 919 F.3d at 1209-1211; *Allen v. Muskogee, Oklahoma*, 119 F.3d 837, 839 (10th Cir. 1997); *Sevier*, 60 F.3d at 697-699; *In re Estate of Bleck*, 643 Fed. App'x at 755; *Hastings*, 252 Fed. App'x at 198-200.

[543] 35 F.4th 778 (10th Cir. 2022).

[544] *Id*. at 792.

Tenth Circuit also held that no clearly established law applied to the facts of the case, distinguishing the case from *Husk*, *Hastings*, *Allen*, and *Sevier*.[545]

Plaintiff fails to demonstrate that clearly established law prohibited Officers Perez, Beck, and Mackley's use of deadly force against Mr. Calzada. And the undisputed material facts demonstrate that this is not the rare obvious case, where the unlawfulness of Officers Perez, Beck, and Mackley's conduct is sufficiently clear even though existing precedent does not address similar circumstances. Therefore, Mr. Calzada's rights were not clearly established at the time of Officers Perez, Beck, and Mackley's challenged use of deadly force.

### 6. Officers Perez, Beck, and Mackley are entitled to qualified immunity for their use of deadly force against Mr. Calzada

Officers Perez, Beck, and Mackley did not violate Mr. Calzada's Fourth Amendment rights when using deadly force against Mr. Calzada.[546] And Mr. Calzada's rights were not clearly established at the time of the individual officer Defendants' challenged conduct.[547] Therefore, Officers Perez, Beck, and Mackley are entitled to qualified immunity for their use of deadly force against Mr. Calzada. This portion of Plaintiff's first cause of action under § 1983 against Officers Perez, Beck, and Mackley is DISMISSED with prejudice.

### D. Plaintiff cannot establish municipal liability under § 1983 against Weber County and Roy City

Plaintiff's second cause of action under 42 U.S.C. § 1983 seeks to impose municipal liability against Weber County and Roy City for the shooting death of Mr. Calzada.[548] Plaintiff alleges that Weber County and Roy City's failure to properly train the individual officer

---

[545] *Id*. at 793-794.

[546] *Supra*, Discussion at 75-96.

[547] *Id*. at 96-100.

[548] Complaint ¶¶ 114-121.

Defendants in the safe, reasonable, and appropriate use of deadly weapons caused Mr. Calzada's death.[549]

"A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff."[550] To establish municipal liability for the failure to train officers in the use of force, "a [p]laintiff must first prove the training was in fact inadequate."[551] The plaintiff must then establish:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.[552]

Thus, a municipality "cannot 'be held liable where there was no underlying constitutional violation by any of its officers.'"[553] And "a finding of qualified immunity . . . based on a conclusion that the officer[s] ha[ve] committed no constitutional violation . . . preclude[s] the imposition of municipal liability."[554]

Because the individual officer Defendants did not violate Mr. Calzada's Fourth Amendment rights,[555] Plaintiff cannot establish municipal liability under § 1983 against Weber County and Roy City. Therefore, Plaintiff's second cause of action under § 1983 against Weber County and Roy City is DISMISSED with prejudice.

---

[549] *Id.*

[550] *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).

[551] *Husk*, 919 F.3d at 1221 (internal quotations omitted).

[552] *Id.* (internal quotations and punctuation omitted).

[553] *Lang*, 738 Fed. App'x at 943 (quoting *Hinton*, 997 F.2d at 782).

[554] *Jiron*, 392 F.3d at 419 n. 8 (citing *Hinton*, 997 F.2d at 782-783).

[555] *Supra*, Discussion at 47-67, 75-96.

### E.  Plaintiff cannot establish supervisor liability
### under § 1983 against Lieutenant Pledger

Plaintiff's third cause of action under 42 U.S.C. § 1983 seeks to impose supervisor liability against Lieutenant Pledger for ordering and authorizing the individual officer Defendants' entry and search of Mr. Calzada's home, and failing to take reasonable steps to protect Mr. Calzada from the violation of his Fourth Amendment rights.[556]

"A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."[557] Thus, "when a plaintiff sues an official under . . . § 1983 for conduct 'arising from his or her superintendent responsibilities,' the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his [or her] own conduct and state of mind did so as well."[558]

Because the individual officer Defendants (including Lieutenant Pledger's own conduct) did not violate Mr. Calzada's Fourth Amendment rights,[559] Plaintiff cannot establish supervisor liability under § 1983 against Lieutenant Pledger. Therefore, Plaintiff's third cause of action under § 1983 against Lieutenant Pledger is DISMISSED with prejudice.

---

[556] Complaint ¶¶ 122-126.

[557] *Dodds v. Richardson,* 614 F.3d 1185, 1199 (10th Cir. 2010).

[558] *Id*. at 1198 (quoting *Iqbal*, 556 U.S. at 677); *Arnold*, 35 F.4th at 793.

[559] *Supra*, Discussion at 47-67, 75-96.

## III.   CONCLUSION

As stated in the opening,[560] the incident giving rise to this case is a tragedy. The legal framework and analysis in this Memorandum Decision do not consider or account for the significant human issues presented by this occurrence. The trauma to those involved and affected cannot be remediated in this proceeding. But seeking that personal and community recovery is essential, even though at times it may seem insurmountable.

## IV.   ORDER

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment[561] is GRANTED. Plaintiff's three remaining causes of action under § 1983[562] against the remaining Defendants are DISMISSED with prejudice.

The Clerk is directed to close the case.

Signed March 27, 2024.

BY THE COURT

David Nuffer
United States District Judge

---

[560] *Supra* at 2.

[561] Docket no. 57, filed May 23, 2019.

[562] Complaint ¶¶ 100-126.